IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )          Case No. CR-21-187-C
                                         )
JOSE LUIS AMADOR-BONILLA,                )
                                         )
                    Defendant.           )

---

DEFENDANT JOSE LUIS AMADOR–BONILLA'S
MOTION TO DISMISS

---

Julia Summers
Assistant Federal Public Defender
Office of the Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
Phone: (405) 609-5930
Fax: (405) 609-5932
julia_summers@fd.org


Counsel for Defendant
Jose Luis Amador-Bonilla

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

OVERVIEW ...................................................................................................... 1

INTRODUCTION .............................................................................................. 2

ARGUMENT ..................................................................................................... 4

    A. Legal Framework ..................................................................................... 4

    B. Under the *Arlington Heights* Factors, racism and eugenics were
       a "motivating factor" in the passage of illegal reentry laws. ................... 6

       1. The historical background of the illegal reentry law ......................... 6

       2. The second factor (events leading up to the law) shows a
          discriminatory purpose because the 1952 Congress passed
          related legislation using racial slurs ................................................. 14

       3. The third factor (legislative history) shows a discriminatory purpose ............. 15

       4. The fourth factor (deviations from procedural norms) shows a
          Discriminatory purpose because the 1952 Congress knew about
          §1326's racist origins – and said nothing ....................................... 23

    C. As Mr. Amador-Bonilla has demonstrated disparate impact and
       Discriminatory purpose, the burden shifts to the government ............... 27

CONCLUSION ................................................................................................ 27

CERTIFICATE OF SERVICE ......................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ................................................................. 22

*Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493 (9th Cir. 2016) ............... 8

*Buck v. Bell*, 274 U.S. 200 (1927)...................................................................................... 8

*Democratic National Committee v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) ...................... 22

*Hunter v. Underwood*, 471 U.S. 222 (1985) ................................................................. 5, 21

*La Union del Pueblo Entero v. Ross*, 353 F. Supp.3d 381 (D. Md. 2018)....................... 13

*Loving v. Virginia*, 388 U.S. 1 (1967) ................................................................................ 4

*Ramos v. Louisiana*, 140 S.Ct. 1390 (2020)...................................................................... 3

*Sessions v. Morales-Santana*, 137 S.Ct. 1678 (2017) ....................................................... 4

*United States v. Carrillo-Lopez*, __F.Supp.3d___, 2021 WL 3667330

   (D. Nev. Aug. 18, 2021) .................................................................. 1, 14-15, 23, 25-27

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,

   429 U.S. 252 (1944)................................................................................ 1, 3-6, 21-22

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........................................................................ 4

**Federal Statutes**

8 U.S.C. §1326 ................................................................................ 1-4, 6, 13-14, 24-28

Act of Mar. 4, 1929, Pub. L. No. 70-1018, ch. 690,

   70 Congress, 45 Stat. 1551 (1929)................................................................................ 2

Pub. L. No. 82-283, 66 Stat. 26 (1952) ...................................................................... 13, 25

**Other Authorities**

*Passengers on doomed 1948 flight, their names now emerge from shadows*,

   Los Angeles Times (July 10, 2013) ........................................................................... 12

*Zoot Suit Riots: After 75 years, L.A. looks back on a violent summer*,

   Los Angeles Times (June 4, 2018) ............................................................................ 12

*See also Exhibits 1-18.*

**OVERVIEW**

On July 22, 2021, Defendant Amador-Bonilla was indicted on one count of "illegal reentry after removal from the United States" in violation of 8 U.S.C. § 1326(a) and (b) ("Section 1326"). Doc. 1. Mr. Amador-Bonilla hereby moves this court for a dismissal of this indictment on the grounds that Section 1326 violates the equal protection guarantee of the Fifth Amendment under the standard articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1944). On August 18, 2021, the Honorable Miranda M. Du of the District Court of Nevada agreed with this proposition in *United States v. Carrillo-Lopez*, __F.Supp.3d___, 2021 WL 3667330 (D. Nev. Aug. 18, 2021), finding the statute had a disparate racial impact despite its facial neutrality and that the government failed to show that the section would have been enacted without a racially discriminatory intent as described in *Village of Arlington Heights*. *See* Exhibit 1. The government filed an appeal the next day in the Ninth Circuit, which remains pending. (9th Circuit Case No. 21-10233). Mr. Amador-Bonilla believes the District Court of Nevada's ruling in *Carrillo-Lopez* was correct and should be followed by this Court.

In finding § 1326 to be unconstitutional, Judge Du reviewed extensive evidence and heard expert testimony from Professor Kelly Lytle Hernández, Tom Lifka Endowed Chair in History at the University of California at Los Angeles and 2019 John D. and Catherine T. MacArthur Fellow (*See* Exhibit 2, Prof. Hernández's CV), and Professor Benjamin Gonzalez O'Brien, Associate Professor of Political Science at San Diego State University (*See* Exhibit 3, Prof. O'Brien's CV). Attached to this motion as exhibits are all evidence that was before Judge Du, including transcripts from the hearings at which Professors

1

Hernández and O'Brien testified. With this evidence before the Court, the defense does not request an evidentiary hearing. However, should the Court elect to hold an evidentiary hearing, defense would anticipate calling Professors Hernández and O'Brien to testify, if available, or similarly-credentialed and qualified experts.

Judge Du's order details the unlawful reentry statute's sordid history and held that § 1326 not only disparately impacts Latinxs, but also that Congress was motivated by racial animus when it enacted the original unlawful reentry statute in 1929, as well as when it recodified it in 1952. Because the government could offer no evidence that Congress would have enacted the unlawful reentry statute but for its discriminatory purpose, Judge Du ruled that "Section 1326 violates the Equal Protection clause of the Fifth Amendment" and dismissed the indictment.

Because § 1326 violates the Fifth Amendment's guarantee of equal protection, Mr. Carrillo-Lopez, a Latinx individual born in Guatemala and naturalized in Nicaragua, respectfully asks this Court to join Judge Du, find section 1326 to be unconstitutional, and dismiss the indictment against him.

## INTRODUCTION[1]

Section 1326 was created from the passage in 1929 of the Undesirable Aliens Act. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, ch. 690, 70 Congress, 45 Stat. 1551 (1929). It has an "uncomfortable past" that reveals racist and initially discriminatory origins. *See*

---

[1] Most of the following argument is lifted wholesale from the motion, and supplemental motion, filed by Carrillo-Lopez.  Full credit is owed to Lauren Gorman, Assistant Federal Public defender for the District Court of Nevada, who wrote the original motion. In the interests of time and because what Ms. Gorman said in her motion cannot be better stated by the undersigned counsel here, the undersigned counsel is mimicking her research and work herein, nearly word for word.

*Ramos v. Louisiana*, 140 S.Ct. 1390, 1401 (2020) (striking down a state's criminal law enacted a century earlier based on the "racially discriminatory *reasons* that [the state] adopted [its] peculiar rules in the first place," emphasis in original, and finding it could not "supply an excuse for leaving an uncomfortable past unexamined".) As the attorneys for Mr. Carrillo-Lopez described, "the 'Undesirable Aliens Act of 1929' was conceived, drafted and enacted by white supremacists out of a belief that the 'Mexican race'[2] would destroy the racial purity of the United States. Legislators referred to Mexicans as 'mongrels' and 'peons.'[3] They claimed Mexicans were 'poisoning the American citizen.'[4] They sought to keep the country's blood 'white and purely Caucasian.'[5] They solicited reports and testimony from a eugenicist who likened immigration policy to the 'breed[ing] of thoroughbred horses.'[6] Not only did this racism underlie the original version of § 1326, the law has disparately impacted Mexicans and other Latinx individuals in the century since." *Motion to Dismiss Because § 1326 Violates Equal Protection Under Arlington Heights*, Case No. 3:20-CR-00026-MMD-WGC, D.N.V., Doc. 26.

The original illegal reentry law was enacted with a discriminatory purpose and still has a disparate impact (see attached exhibits). Thus it is shown that § 1326 is unconstitutional under *Arlington Heights*. The burden now shifts to the government to

---

[2] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality. For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History:1930*, https://www.census.gov/history/www/through_the_decades/index_of_questions/1930_1.html    (last accessed Oct. 1., 2021).
[3] *See infra* at 8, 10, 11, 12, 13, 17.
[4] *See infra* at 15, 17.
[5] *See infra*  at 13.
[6] *See infra*  at 13–14.

show that Congress would have passed the 1929 law in the absence of any discriminatory purpose. If the government cannot make this showing, as it failed to do in *Carillo-Lopez*, the law is invalid, and this Court must dismiss Mr. Amador-Bonilla's criminal charge.

ARGUMENT

**A.    Legal Framework**

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws just as it does to state laws via the Fourteenth Amendment. *See Sessions v. Morales-Santana*, 137 S.Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See e.g., Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See, e.g. Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See, e.g. Arlington Heights*, 429 U.S. at 265–68.

Mr. Amador-Bonilla challenges the constitutionality of § 1326 under this third *Arlington Heights* rationale. *Arlington Heights* clarified that the *effect* of a racially discriminatory law, standing alone, does not make it unconstitutional, challengers must also show "[p]roof of racially discriminatory *intent* or *purpose*" at the time of the law's passage. *Id*. at 265 (emphasis added). Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may

4

be available." *Id*. at 266. *Arlington Heights* provides a non-exhaustive list of factors to consider in determining discriminatory intent of a law, including (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) any legislative departures from normal procedures or substantive procedures; and (5) the legislative or administrative history behind it. *Id*. at 266–68.

A challenger need only show "proof that a discriminatory purpose has been a *motivating factor*" in creation of the law, not that the legislature's passing of the law "rested solely on racially discriminatory purposes." *Id*. at 265–266. Once this is shown, the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Id*. at 270 n.21. *See also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id*. at 225.

Courts have applied *Arlington Heights* to a variety of laws and governmental actions. One of the first involved a provision in the Alabama Constitution that barred voting for any person convicted of a "crime involving moral turpitude." *Hunter*, 471 U.S. 222. Though neutral on its face, the provision disenfranchised ten time as many Blacks as whites. *Id*. at 227. To prove discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama constitutional convention where lawmakers had originally

enacted the provision, as well as several historical studies and the testimony of two expert historians. *See id*. at 229. This evidence showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a "motivating factor" underlying the voting provision. *Id*. at 229–31. And because the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the Supreme Court held that it violated equal protection. *Id*. at 231.

Animus infected § 1326 to an equal, or perhaps greater, degree.

**B.    Under the *Arlington Heights* factors, racism and eugenics were a "motivating factor" in the passage of illegal reentry laws.**

A close examination of the political context underlying the criminalization of illegal entry in 1929 reveals a disturbing truth: that racism and eugenics were not only a "motivating factor" in the legislature's passage of this law. *Arlington Heights*, 429 U.S. at 265. They were the *primary* factor.

**1.    The historical background of the illegal reentry law**

Historians often refer to the 1920s as the "Tribal Twenties"—a time when "the Ku Klux Klan was reborn, Jim Crow came of age, and public intellectuals preached the science of eugenics." Exhibit 5, Declaration of Dr. Kelly Lytle Hernández, Professor of History at the University of California, Los Angeles, at 2. World War I had produced "a feverish sentiment against presumably disloyal 'hyphenated Americans,'" and "few could resist the combination of nativism, job scarcity, and anti-Bolshevism that fueled the politics of

restriction."[7] Prominent restrictionists "spoke increasingly of 'racial indigestion,'"[8] and "the 'contamination' of Anglo-American society."[9]

The decade also brought a flood of immigration legislation fueled by fears of "non-white" immigration.[10] Many politicians, especially those popularly known as "nativists," hoped to "restrict and even end immigration to the United States from every region of the world other than western Europe." Exhibit 5, Hernández declaration, at 2. At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.[11] During the remainder of the decade, legislators aimed for "'America [to] cease to be the "melting pot."'"[12] Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American manufacturing," nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[13]

These fears of non-white immigration were bolstered by the growing acceptance of eugenics—a theory that "captured the imagination of many of America's leading intellectuals."[14] The popular magazine *The Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability

---

[7] Mae M. Ngai, *Impossible Subjects*, 19, 20 (2004 William Chafe. et al.).
[8] *Id.* at 23.
[9] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, 28 (2010).
[10] See generally Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019).
[11] Emergency Immigration Act of 1921, Pub.L. 67-5, 42 Stat. 5 (1921).
[12] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration*, 2020, 3 (2020) (quoting Senator David A. Reed).
[13] Hernández, *supra*, at 28.
[14] Yang, *supra*, at 35.

and democracy.[15] The leader of a major scientific institution contended that neither education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior."[16] And states throughout the country were drafting laws "based on this burgeoning race science, including aggressive sterilization programs."[17]

At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[18] Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi Germany, used as a template.[19] During the 1920s, Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population." Exhibit 4, *The Eugenical Aspects of Deportation: Hearings before the Committee on Immigration and Naturalization House of Representative*, 70th Cong. 70.1.4, pp. 2, 3 (1928). Relying heavily on these theories, Congress would anchor its immigration legislation in eugenics and racial inferiority for the remainder of the decade.[20]

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants — which was often code for non-white. *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505–06 (9th Cir. 2016) (holding that "the use of

---

[15] *Id.* at 8.

[16] Okrent, *supra*, at 3.

[17] Id. at 38. Those sterilization laws were affirmed in the now infamous decision *Buck v. Bell*, 274 U.S. 200, 207 (1927).

[18] Ngai, *supra*, at 24.

[19] *Harry Laughlin and Eugenics*, Truman State University. Accessible at https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.

[20] *See* E.P. Hutchinson, *Legislative History of American Immigration Law*, 1798-1965, 212-13 (1981).

'code words' may demonstrate discriminatory intent"). The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census.

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon.[21] The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established. Indeed, its newly-created "Quota Board" interpreted this provision to exclude all Black people; all East and South Asians (including those who had American citizenship by birth); and all citizens in Hawai'i, Puerto Rico, and Alaska.[22] Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[23]

Yet there was a wrinkle in the National Origins Act — it did not set quotas on immigrants from countries in the Western Hemisphere. This was due to the influence of large agricultural businesses that relied heavily on labor from just over the border.[24] These agri-businesses pressured legislators from western states to vote against the law, forcing nativists in Congress to "choose between accepting a Mexican quota exemption or passing no immigration law at all." Ex. 5, Hernández declaration, at 3. As one representative complained, there was no chance of capping the number of Mexican immigrants because too many growers were "interested in the importation of these poor peons." Exhibit 6,

---

[21] Ngai, *supra*, at 24–25.
[22] *Id*. at 26.
[23] *Id*. at 35.
[24] *See* Hans P. Vought, *The Bully Pulpit*, 179 (2004).

Representative Box (TX), "Deportation of Aliens." *Congressional Record*, (Feb. 16, 1929) p. H3619.

So, despite passing the most sweeping immigration law in years, legislators were not happy. Representative Madden grumbled that the bill "leaves open the doors for perhaps the worst element that comes into the United States — the Mexican peon."[25] Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants, stating that "the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel." Exhibit 7, Representative O'Sullivan, "Administration of the Law." *Congressional Record* 65:6 (1924) p. H5900. Legislators "proposed bill after bill" restricting Mexican immigration but none could survive opposition from southwestern growers. Exhibit 5, Hernández declaration, at 5. To solve this problem, a group of key figures began to strategize a new type of immigration bill that would approach immigration from a criminal — rather than a civil — angle.

Between 1929 and 1952, there were two major historical events bearing on the Latinx population: the "repatriation drives" of the Great Depression and the subsequent "Bracero Program." Both events demonstrate the United States' intent to prevent Latinxs' permanent settlement and to maintain control over a temporary and exploitable Latinx workforce.

The so-called "repatriation drives" carried out during the Great Depression amounted to a government-led campaign of intimidation and coercion against the Latinx

---

[25] Benjamin Gonzalez O'Brien, Chap. 1, *Handcuffs and Chain Link* (2018).

population in the United States. As Professor Gonzalez O'Brien testified, "this was a campaign that was meant to fuel voluntary re-patronization … driven by a sense of the threat of deportation or the threat of additional penalties if those individuals did not return to Mexico."[26] The campaign achieved its purpose, driving millions of Latinxs — many, if not most, of whom were U.S. citizens — out of the United States. California has since apologized to the "estimated two million people of Mexican ancestry [who] were forcibly relocated to Mexico, approximately 1.2 million of whom had been born in the United States."[27]

Not long after this mass expulsion of Latinxs, the United States entered World War II, finding itself in need of cheap labor. In 1942, the United States started the Mexican Farm Labor Program, also known as "Operation Bracero" or the "Bracero Program." The idea was to funnel Latinx labor into the United States on a legal and temporary basis, while ensuring decent wages and humane treatment for the laborers. But the reality was that Braceros were lured to the United States only to be brutalized. They were subjected to medical inspections that required them to strip naked and involved invasive inspections and "being gassed systematically with DDT."[28] The protections they were promised were routinely ignored.[29] They were exploited and subjected to literally back-breaking labor precisely because of their race. As Professor Lytle Hernández testified, the Braceros were

---

[26] Exhibit 8 (Testimony of Professor Gonzalez O'Brien) at 87.
[27] California Apology Act for the 1930s Mexican Repatriation Program (effective January 1, 2006), available at https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=GOV&division=1.& title=2.&part=&chapter=8.5.&article=
[28] Exhibit 8 (Testimony of Professor Lytle Hernández) at 76–77.
[29] Exhibit 8 (Testimony of Professor Lytle Hernández) at 78.

mistreated because of the stereotype "that they, as a racial group, um, were more stout and close to the ground and sort of fit for this kind of labor, and so they didn't need the accoutrement that others did."[30] When they were no longer needed, they were sent back to Mexico.[31]

Both the "repatriation drives" of the Great Depression and the subsequent "Bracero Program" demonstrate that anti-Latinx racism remained prevalent in the years leading up to the passage of the INA in 1952. This history of racism manifested itself in countless other ways over the years, including the 1943 Sleepy Lagoon Trial in Los Angeles (a mass murder trial of 22 Latinx defendants, during which a sheriff's captain testified that "the Mexican element" had an innate "desire to use a knife or some other lethal weapon … his desire is to kill, or, at least, let blood") and the subsequent Zoot Suit Riots (10 days during which mobs of U.S. servicemen in Los Angeles took to the streets and beat Latinx youths with impunity).[32]

This anti-Latinx racism remained prevalent in 1952, as evidenced by Congress's passage of Senate Bill 1851 (the so-called "Wetback Bill") that year. This bill's passage is

---

[30] Exhibit 8 (Testimony of Professor Lytle Hernández) at 78.

[31] In 1948, a plane returning Braceros to Mexico crashed in central California, killing all of the 100 people onboard. News accounts gave the names of the crew and an immigration officer—and listed the others simply as "deportees." *Passengers on doomed 1948 flight, their names now emerge from shadows*, Los Angeles Times (July 10, 2013), available at https://www.latimes.com/local/lame-deportees-guthrie-20130710-dto-htmlstory.html. This inspired Woody Guthrie to write his classic song "Deportee": Oh, the sky-plane caught fire over Los Gatos Canyon, A fireball of lightning that shook all our hills. Who are all these friends who are falling like dry leaves? The radio said, "They're just deportees." Goodbye to my Juan, goodbye Roselita, Adios mis amigos, Jesús y María. You won't have a name when you ride the big airplane, All they will call you will be "deportees."

[32] *See Zoot Suit Riots: After 75 years, L.A. looks back on a violent summer*, Los Angeles Times (June 4, 2018), available at https://www.latimes.com/local/lanow/la-me-ln-zoot-suit-riotsanniversary-20180604-story.html.

particularly probative for two reasons: first, it was passed by the same Congress that, just two months later, would recodify the unlawful reentry provision of the Undesirable Aliens Act; and second, it shared the aim of preventing unlawful immigration (its stated purpose was to "assist in preventing aliens from entering or remaining in the United States illegally.").[33]

The 1952 Congress's debate and passage of the Wetback Bill is relevant historical background demonstrating the open racism of the legislature that would enact §1326 only two months later. As Professor Gonzalez O'Brien testified, "throughout the debate [on the bill], Mexican undocumented entrants [were] regularly referenced as wetbacks," the debate focused on the "wetback problem," and legislators suggested that individuals "may be criminals because they are wetbacks."[34] The fact that the 1952 Congress openly used the racial slur "wetback" to refer to Mexicans — while debating the "Wetback Bill" — is illustrative of the open racial animus of the 1952 Congress.

Professor Gonzalez O'Brien testified before Judge Du that the "term 'wetback' is one that is racially derogatory, was recognized as being racially derogatory at the time," and "across the period of the 1940s and 1950s [was] associated … almost synonymous with Mexicans."[35] "[W]hile the use of racial slurs, epithets, or other derogatory language does not alone prove discriminatory intent, it is evidence that official action may be motivated by such an unlawful purpose." *La Union del Pueblo Entero v. Ross*, 353 F.

---

[33] Pub. L. No. 82-283, 66 Stat. 26 (1952).
[34] Exhibit 8 (Testimony of Professor Gonzalez O'Brien) at 97–98, 107.
[35] Exhibit 8 (Testimony of Professor Gonzalez O'Brien) at 89.

Supp.3d 381, 395 (D. Md. 2018). As Judge Du found in *Carrillo-Lopez*, the use of the term "wetback" "evidences the racial environment and rhetoric in 1952, even among high-ranking government officials and committees, specifically with regard to Mexican and Latinx people." *Id*. at \*13.

**2.    The second factor (events leading up to the law) shows a discriminatory purpose because the 1952 Congress passed related legislation using racial slurs.**

The specific sequence of events leading to the 1952 Congress's recodification of the Undesirable Aliens Act's unlawful reentry provision is troubling for two reasons. First, the same Congress passed the "Wetback Bill" two months prior. Second, Deputy Attorney General Peyton Ford wrote to the Chairman of the Committee on the Judiciary on behalf of the Department of Justice, included the racial slur "wetback," and requested the one and only substantive change to the statute — the expansion of the law to cover those "found in" the United States.[36] As the letter makes clear, this change was expressly designed to make it easier for the government to establish venue in criminal prosecutions.[37]

Deputy Attorney General Ford was not some fringe figure shooting off a letter to his representative. He was the second-highest-ranking Department of Justice official and was providing "the views of the Department of Justice."[38] Based on his request alone (the congressional record does not appear to contain any other comment on what is now §1326), the 1952 Congress expanded the unlawful reentry statute so that venue would lie wherever

---

[36] Exhibit 9 (Statement of Peyton Ford, Deputy Attorney General, May 14, 1951).

[37] Exhibit 9 at 6 ("This change would overcome the inadequacies in existing law which have been observed in those cases in which it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecutions against a deported alien under the 1929 act.").

[38] Exhibit 9 at 1.

a reentering immigrant was found. (But for this expansion, the government would have no grounds to prosecute Mr. Munoz in this district.)

As Judge Du found in *Carrillo-Lopez*, this sequence of events demonstrates that "[t]he 1952 Congress's silence does not evince a neutral viewpoint, but worked to expand the enforceability of an admittedly racist law." *Id*. at \*14.

### 3. The third factor (legislative history) shows a discriminatory purpose.

After passage of the National Origins Act of 1924, the Department of Labor (which governed the Bureau of Immigration) began implementing Congress's new quota system.[39] Then-Secretary of Labor James Davis was a strong advocate of Dr. Laughlin and his eugenics theories — even using them as the basis for policies he had developed and published under the title "Selective Immigration or None."[40] Davis warned that the "rat type" was coming to the United States, and that these "rat men" would jeopardize the American gene pool.[41]

Secretary Davis was nevertheless torn between his belief in eugenics and his responsibility to maintain a large labor supply for the railroad and agriculture industries.[42] So together with devout racist (and suspected Ku Klux Klan member) Senator Coleman Blease,[43] Davis developed a compromise — Congress would criminalize border crossing

---

[39] *See* Vought, *supra*, at 174–79.
[40] *Id*.
[41] *Id*. at 174–75.
[42] *Id*. at 216.
[43] For biographical and historical context about Senator Blease, *See* B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, The Journal of Southern History, 62:1, pp. 57–86 (Feb. 1996), available at http://www.jstor.com/stable/2211206.

after the fact, rather than prevent it in the first place.[44] That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that depended on Mexican labor.[45] The southwest growers were in agreement — as one put it, "We, in California, would greatly prefer some set up in which our peak labor demands might be met and upon the completion of our harvest these laborers returned to their country." Exhibit 5, Hernández declaration, at 7.

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee. Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization." Exhibit 10, Representative Box (TX). "Restriction of Mexican Immigration," *Congressional Record*, (Feb. 9, 1928) pp. H2817–18. In one speech at an immigration conference, Rep. Box had explained that

> [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs. Into that was fused much negro slave blood….The prevention of such mongrelization and the degradation it causes is one of the purposes of our [immigration] laws.

*Id*. Box believed this importation was "raising a serious race question" because Mexicans were "essentially different from us in character, in social position." Exhibit 6 at H3619.

---

[44] Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2020), https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy.
[45] *Id*.

Box was joined by the influential Chairman of the House Immigration and Naturalization Committee, Representative Albert Johnson of Washington. Chairman Johnson — for whom the 1924 "Johnson-Reed" National Origins Act was named—was an "energetic and vehement racist and nativist." [46] He headed the Eugenics Research Association, a group that opposed interracial marriage and supported forced sterilizations.[47] He also proudly described his 1924 law as a "bulwark against 'a stream of alien blood, with all its inherited misconceptions respecting the relationships of the governing power to the governed.'"[48] Within two years of the 1924 Act, Chairman Johnson turned to legislation that would exclude the "Mexican race," explaining that while the argument for immigration restriction had previously been economic, now "'the fundamental reason for it is biological.'"[49]

Following the lead of these legislators, other lawmakers soon "turned to narratives of racial threat to justify restriction."[50] In 1928, for instance, Representative Robert A. Green of Florida delivered a radio speech (later read into the congressional record by Representative Lankford) that advocated for Western Hemisphere quotas. He asserted that countries south of the United States are "composed of mixture blood of White, Indian, and negro." Exhibit 11, Representative Lankford. "Across the Borders." *Congressional Record* (Feb. 3, 1928) p. H2462. Immigration from these countries, he believed, created a "very

---

[46] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, p. 242–43 (2002).
[47] *Id.*
[48] Roger Daniels, *Guarding the Golden Door*, p. 55 (Hill and Wang, 2004).
[49] Okrent, *supra*, at 3.
[50] Gonzalez O'Brien, *supra*, at Chap. 1 (Kindle edition).

great penalty upon the society which assimilates," and put it at a disadvantage to countries that have "kept their blood white and purely Caucasian." Exhibit 11, at H2462.

Chairman Johnson soon convened hearings on new immigration legislation. *See* Exhibit 12, *Hearings Before the Committee on Immigration and Naturalization*, 69th Cong. 69.1.3 (1926). At the first hearing, Chairman Johnson admitted into the record a letter from a constituent in El Paso who urged the legislators to keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico." Exhibit 12, at 30. In response to this letter, Commissioner General of Immigration Harry Hull, stated, "I think he is right." Exhibit 12, at 30. Rep. Box added, "I have some letters, Mr. Chairman, just like that." Exhibit 12, at 30.

The following month, the same House committee held a hearing on "The Eugenical Aspects of Deportation," where the principal witness was the well-known eugenicist Dr. Laughlin. Exhibit 4, at 1. Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy." Exhibit 4, at 3.

Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination." Exhibit 4, at 3. When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." Exhibit 4, at 11.

Dr. Laughlin discussed the need for further research into "mate selection," because "whenever two races come in contact there is always race mixture" even though the "upper

levels tend to maintain themselves because of the purity of the women of the upper classes." Exhibit 4, at 19. The job of any government, Dr. Laughlin explained, was to "demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity." Exhibit 4, at 19. By deporting or excluding the "lower races" from the country, Dr. Laughlin contended, "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation." Exhibit 4, at 19.

In response, Chairman Johnson advocated for Congress's use of the "principle of applied eugenics" to "do everything possible" to reduce crime by "debarring and deporting" more people. Exhibit 4, at 25. Rep. Box agreed, stating, "we will have to control immigration to suit our own needs or we will lose our national character," which would "spell destruction for the future of America." Exhibit 4, at 25.

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." Exhibit 4, at 44. One such successful breeder he knew "weeds out from the lower levels and recruits by purchase"—a process that is "analogous to immigration in man." Exhibit 4, at 44–45. "Man is an animal," Dr. Laughlin explained, "and so far as heredity and future generations are concerned, there is considerable real basis for [this] comparison." Exhibit 4, at 45.

When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born

here." Exhibit 4, at 45. Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation, or the 'final selection.'" Exhibit 4, at 44. In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts." Exhibit 4, at 46.

Though Chairman Johnson's initial legislation failed, the compromise with the agricultural industry brokered by Secretary Davis and Senator Blease soon made a breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate Committee on Immigration, submitted a report to the full Senate recommending passage of a law that would penalize "aliens who have been expelled from the United States and who reenter the country unlawfully." Exhibit 13, S. Rep. No. 1456, at 1 (1929). This report was accompanied by a letter from Secretary Davis on behalf of the Department of Labor advocating for passage of the law. Exhibit 13, at 2.

The following week, Senator Blease presented this bill on the Senate floor, where he reported that Chairman Johnson had "asked me to get the measures over to the House [within two days] if I possibly could." Exhibit 14, Senator Blease (SC). *Congressional Record* (Jan. 23, 1929) p. S2092. The full Senate passed the bill with almost no discussion or debate. Exhibit 14, at S2092. Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the illegal reentry law. Exhibit 15, S. Rep. No. 2397 (1929).

During debate on the bill, Rep. Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been making a just fight against this situation for years." Exhibit 6, Cong. Rec. 1929. Rep. Blanton urged the House to "apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there." Exhibit 6, Representative Blanton, "Deportation of Aliens." *Congressional Record* (1929) at H3619. Rep. Schafer added that "[t]hese Mexicans also come into Wisconsin in droves," and Rep. Blanton challenged others to visit the international ports of entry in Texas to see the "hordes that come across the bridges with no intention of ever going back." Exhibit 6, at H3619. Rep. Fitzgerald then added that from a "moral standpoint," Mexicans were "poisoning the American citizen" because they are "of a class" that is "very undesirable." Exhibit 6, Representative FitzGerald, "Deportation of Aliens." *Congressional Record* (1929) at H3620.

Minutes later, the bill passed the House of Representatives. Exhibit 6, H3621. The president signed it into law three days later. Exhibit 16, 70th Cong., Sess. II, Chap. 690, Mar. 4, 1929.

This legislative history easily clears the low threshold of showing that racism and eugenics were a "motivating factor" under the first three factors. Like other *Arlington Heights* cases, passage of the racially-motivated law followed a predictable pattern. A broad social movement founded on principles of white supremacy and eugenics gained popular support in the 1920s. *Compare Hunter*, 471 U.S. at 229 (discussing "a movement that swept the post-Reconstruction South to disenfranchise blacks"). Dr. Laughlin, a notorious eugenics "expert," promoted theories of racial inferiority through multiple

21

reports and testimony to Congress. *Compare Democratic National Committee*, 948 F.3d at 1009 (local Republican chair widely shared a "racially tinged" video suggesting Hispanics were involved in ballot fraud). Key lawmakers like Chairman Johnson, Senator Blease, and Representative Box (along with Secretary of Labor Davis) promoted these theories and repeatedly endorsed them during legislative sessions. *Compare id.* (state senator repeated "unfounded and often farfetched allegations" of ballot fraud); Arce, 793 F.3d at 978–79 (legislators accused ethnic studies program of inciting "racial warfare"). Other legislators expressed similar sentiments. *See id.* And even Congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the "inferiority" of the "Mexican race" during legislative sessions in the five years leading up to the law's passage. *Compare Democratic National Committee*, 948 F.3d at 1041 (invoking the "cat's paw doctrine). In other words, the evidence of racial discrimination in the legislative history and events leading up to the passage of the 1929 law easily meets — if not exceeds — the evidence in other *Arlington Heights* cases where race was found to be a "motivating factor."

Congress recodified the Undesirable Aliens Act in 1952. The 1952 Congress's racial animus behind that is demonstrated by its overriding of President Truman's veto of the INA, which explicitly called out the racism of the Act.

On June 25, 1952, President Truman vetoed the INA and issued a veto statement.[51] He condemned the INA as "legislation which would perpetuate injustices of long standing"

---

[51] Exhibit 17 (President Truman's statement on "Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality," June 25, 1952).

and "intensify the repressive and inhumane aspects of our immigration procedures."[52] He expressed dismay that so much of the INA "would continue, practically without change" discriminatory immigration laws.[53] He admonished that it was "the time to shake off this dead weight of past mistakes … time to develop a decent policy of immigration … and a true reflection of the ideals we stand for, at home and abroad."[54]

Two days after President Truman's statement, Congress overrode the veto and passed the INA.

Congress's passage of the INA over a presidential veto explicitly calling out the law for its racism is evidence of racial animus. As Judge Du found in *Carrillo-Lopez*, "Congress' failure to heed President Truman's call to 'reimagine' immigration while simultaneously making the INA, and particularly Section 1326, more punitive in nature, is evidence of at least indifference to the nativist motivations of the statute's predecessor." *Id*. at *12.

**4.     The fourth factor (deviations from procedural norms) shows a discriminatory purpose because the 1952 Congress knew about §1326's racist origins — and said nothing.**

Examining whether the legislature departed from "normal procedures or substantive conclusions" requires courts to consider any procedural irregularities leading up to the enactment of a law, as well as any illogical or counter-intuitive conclusions in the decision-making process. Here, there were several such departures:

---

[52] Exhibit 17 at 3.
[53] Exhibit 17 at 4.
[54] Exhibit 17 at 6.

First, the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation. Both the 1924 and 1929 immigration laws drew heavily on Dr. Laughlin's debunked beliefs that immigration control was a matter of racial engineering, akin to horse breeding. And while Congress ultimately acknowledged the discriminatory origins of the National Origins Act of 1924 and repealed it in 1965, illegal reentry remains one of the few laws still in effect from that era.

Second, the racial vitriol expressed during the debates was directed almost exclusively at Mexicans—even though Canadians were also entering the United States in record numbers. *See* Exhibit 6, at H3621 (stating that 81,506 Canadians entered the United States in 1928). If the 1929 Act were motivated by generalized xenophobia or economic anxiety, rather than racism, one would expect legislators to criticize foreigners across the board. But no legislator referred to Canadians as "mongrels"; none complained of "hordes" of Canadians crossing the border; none objected that Canadians were "poisoning the American citizen." And a representative from Wisconsin complained only about *Mexicans* taking jobs, not Canadians. *See* Exhibit 6, at H3619. These irregularities show that not only was Congress's passage of the Undesirable Aliens Act based on eugenics and racism, it also departed from typical substantive conclusions underlying immigration law.

Third, Congress's passage of the "Wetback Bill" (two months prior to recodifying the unlawful reentry statute) represents an illogical and counter-intuitive irregularity leading up to the enactment of §1326. This is because of the incongruity between the stated intent of the "Wetback Bill" and Congress's actual intent, as demonstrated by the language

of the statute. While the bill's stated aim was to prevent "aliens from entering or remaining in the United States illegally," the law worked to shield employers from prosecution ("for the purposes of this section, employment … shall not constitute harboring").[55] It was obvious then as now that the lure of employment was the primary reason Latinxs were coming to the United States unlawfully. For many reasons, employers are vastly more responsive to deterrence than impoverished immigrants, and the most effective means of deterring "aliens from entering or remaining in the United States illegally" is therefore to punish employers who hire such immigrants. The import here is that the 1952 Congress, despite its avowed interest in limiting unlawful immigration, was in fact furthering the racist compromise introduced by the 1929 Congress: preserving American industry's access to cheap and exploitable Latinx labor while punishing the Latinxs who provided that labor. As Judge Du found in *Carrillo-Lopez*, the 1952 Congress's "criminalization of Mexican immigrant laborers while shielding employers evidences the racially discriminatory motives and intent of the same Congress who enacted Section 1326 only two months later." *Id*. at *15.

The 1952 Congress's decision to expand the reach of the unlawful reentry statute based on a letter from the Deputy Attorney General that referred to Mexicans as "wetbacks" is procedurally irregular and evidences racial animus. Furthermore,  the 1952 Congress's lack of debate regarding §1326, when Congress knew of the law's disparate impact on Latinxs and when other provisions of the INA were discussed and debated at length, is an

---

[55] Pub. L. No. 82-283, 66 Stat. 26 (1952).

irregularity demonstrating Congress's discriminatory intent. This is particularly the case given that the 1952 Congress expanded the grounds for deportation, restricted discretionary relief from deportation, and expanded the scope of the unlawful reentry provision. As Professor Gonzalez O'Brien testified, the lack of discussion of the unlawful reentry provision of the INA suggests an acceptance of its racist history.[56] The 1952 Congress had full knowledge of the unlawful reentry statute's disparate impact, as Mexicans comprised up to 99% of the tens of thousands of individuals prosecuted and convicted in the years following the law's passage.[57] Despite having every opportunity to examine the unlawful reentry provision's history and clarify it was recodifying that provision for a legitimate, non-discriminatory purpose, the 1952 Congress ignored the express racism behind the original statute and its disparate impact on Latinxs. As Judge Du found in *Carrillo-Lopez,* "[w]hen considered in comparison with the express debate over other racially problematic predecessor statutes, Congress' silence here weighs in favor or establishing" the 1952 Congress was motivated by racial animus — particularly given "its decision to expand the grounds for deportation and carceral punishment, despite its knowledge of the disparate impact of this provision on Mexican and Latinx people." *Id*. at *11, 15.

When the 1952 Congress recodified the Undesirable Aliens Act's unlawful reentry statute at 8 U.S.C. § 1326, it chose to ignore the original statute's racist history and to expand a law it knew disparately impacted Latinxs. In so doing, the 1952 Congress was

---

[56] Exhibit 8 (Testimony of Professor Gonzalez O'Brien) at 181.
[57] Hernández, *supra*, at 138–39 n.6 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years 1931–36); Exhibit 5 (Declaration of Professor Lytle Hernández) at 8. *See also* Exhibit 18 (S. Rep. No. 1515, Apr. 20, 1950) at 654–56 (regarding testimony from the Immigration and Naturalization Service that refers exclusively to Mexicans and recommends carrying forward the1929 legislation).

motivated at least in part by racial animus. As Professor Gonzalez O'Brien testified, Congress's passage of §1326 "was largely driven by the same things that drove the original codification of [the unlawful reentry statute]; and that was, in part, a desire to control access to Mexican labor, and also a tendency to view Mexicans, individuals from south of the Rio Grande, and at least in the terms of the 1950s, the wetback, as a problematic population"— leading Professor Gonzalez O'Brien to give his professional opinion that the 1952 Congress's recodification of the unlawful reentry statute was "motivated by racial animus."[58]

For these reasons, Judge Du rightly concluded "the totality of the evidence shows that the same factors motivating the passage of [the unlawful reentry statute] in 1929 were present in 1952"— meaning, "racial animus was at least one motivating factor behind the enactment of Section 1326." *Carrillo-Lopez* at *10, 16.

## C.   As Mr. Amador-Bonilla has demonstrated disparate impact and discriminatory purpose, the burden shifts to the government.

The burden is now on the government to establish that "the same decision would have resulted even had the impermissible purpose not been considered." 429 U.S. at 270 n.21.

## CONCLUSION

Judge Du found, "at no point has Congress confronted the racist, nativist roots of Section 1326." *Carrillo-Lopez* at *24. There is no evidence that Congress acted with nondiscriminatory motivation — i.e., that "the same decision would have resulted even had

---

[58] Exhibit 8 (Testimony of Professor Gonzalez O'Brien) at 129–30.

the impermissible purpose not been considered"—when it first criminalized reentry in the Undesirable Aliens Act or when it recodified that statute at §1326. Accordingly, the statute is unconstitutional.

Mr. Amador-Bonilla respectfully asks that the Court find that §1326 violates the Fifth Amendment's equal protection guarantee and dismiss the indictment against him.

Respectfully submitted,

*s/  Julia C. Summers*
JULIA C. SUMMERS
OBA #15851
ASSISTANT FEDERAL PUBLIC DEFENDER
215 DEAN A. MCGEE, SUITE 109
OKLAHOMA CITY, OKLAHOMA 73102
MAIN: (405) 609-5930
FAX: (405) 609-5932
DIRECT: (405) 609-5963
EMAIL: julia_summers@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2021, I electronically transmitted the attached document to the Clerk of Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the ECF Registrants who have entered an appearance in this case.

*s/  Julia C. Summers*
JULIA C. SUMMERS