IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
_____

*United States of America v. Jose Luis Amador-Bonilla*
_____

Case No. CR-21-187-C
_____

**EXHIBIT 4**

*THE EUGENICAL ASPECTS OF DEPORTATION*

House of Representatives, 70th Congress
Before the Committee on Immigration and Naturalization

Hearing No. 70.1.4
February 21, 1928

*See Motion to Dismiss,* filed 09/21/21, Doc. 61, Ex. D
*United States v. Munoz-De La O*, Case No. CR-20-134-RMP
United States District Court for the Eastern District of Washington

# THE EUGENICAL ASPECTS OF DEPORTATION

## HEARINGS

BEFORE

## THE COMMITTEE ON IMMIGRATION AND NATURALIZATION HOUSE OF REPRESENTATIVES

### SEVENTIETH CONGRESS

FIRST SESSION

FEBRUARY 21, 1928

(INCLUDING TESTIMONY TAKEN APRIL 28, 1926, WITH EIGHT APPENDICES)

STATEMENT OF

### DR. HARRY H. LAUGHLIN

HEARING NO. 70.1.4



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON
1928

89604

EXHIBIT 4
Page 1 of 88

# COMMITTEE ON IMMIGRATION AND NATURALIZATION

## House of Representatives

### SEVENTIETH CONGRESS

ALBERT JOHNSON, Washington, *Chairman*

J. WILL TAYLOR, Tennessee.
HAYS B. WHITE, Kansas.
ARTHUR M. FREE, California.
BIRD J. VINCENT, Michigan.
THOMAS A. JENKINS, Ohio.
BENJAMIN M. GOLDER, Pennsylvania.
CLARENCE MacGREGOR, New York.
GEORGE J. SCHNEIDER, Wisconsin.
ELBERT S. BRIGHAM, Vermont.
CARL G. BACHMANN, West Virginia.
KATHERINE LANGLEY, Kentucky.
J. MITCHELL CHASE, Pennsylvania.

ADOLPH J. SABATH, Illinois.
JOHN C. BOX, Texas.
SAMUEL DICKSTEIN, New York.
SAMUEL RUTHERFORD, Georgia.
JOHN W. MOORE, Kentucky.
LINDSAY WARREN, North Carolina.
JOHN M. EVANS, Montana.
R. A. GREEN, Florida.

P. F. SNYDER, *Clerk*

II

EXHIBIT 4
Page 2 of 88

# THE EUGENICAL ASPECTS OF DEPORTATION

House of Representatives,
Committee on Immigration and Naturalization,
*Tuesday, February 21, 1928.*

The committee this day met at 10.30 o'clock a. m., Hon. Albert Johnson, chairman, presiding.

The Chairman. The committee will be in order. Members of the committee will remember that on April 28, 1926, the committee authorized Dr. Harry H. Laughlin, who has been conducting some of the statistical and biological researches for the committee, to make further investigations for the committee. Up to that date three reports had been printed. On that date Doctor Laughlin made a preliminary report on the subject "The Eugenical Aspects of Deportation," and he was authorized by the committee to prepare tables and analyses concerning biological and other matters derived from studies of the deportations from the United States.

That matter is now before the committee and ready for the printer. It has occurred to the chairman that it would be well to authorize these researches to go to the printer as of this date and thereby bring them into the activities of this Congress. If there is no objection, it will be so ordered.

I think this will be found a very interesting hearing.

House of Representatives,
Committee on Immigration,
*Wednesday, April 28, 1926.*

The Chairman. The committee will be in order. In accordance with previous arrangement, this meeting was called in order to hear Dr. Harry H. Laughlin, of the eugenics record office of the Carnegie Institution of Washington, in a series of statements on the biological aspects of immigration. At the last meeting, if you will remember, when the doctor was present, it was agreed to set aside from that hearing his observations with regard to deportation under present laws and to make them the subject of a special hearing. If there is no objection he will proceed along that line to-day.

### PREVIOUS INVESTIGATIONS

The committee will remember also that on two or three previous occasions we authorized Doctor Laughlin to make investigations and studies for our use; Doctor Laughlin has been the expert eugenics agent for our committee since 1920, and his valuable investigations on different phases of immigration from time to time have been printed. These studies previously reported to this committee by Doctor Laughlin are as follows:

1. April 17, 1920, "Biological aspects of immigration."
2. November 21, 1922, "Analysis of America's modern melting pot."

**1**

EXHIBIT 4
Page 3 of 88

3. March 8, 1924, "Europe as an emigrant exporting continent and the United States as an immigrant receiving Nation."

Those are all printed in the records of the committee. Doctor Laughlin is now ready to report, as the result of his researches, on "The eugenical aspects of deportation."

The committee understands that these investigations were made at first hand under our authority, and because they have required so much study in the collection of data, in the preparation of tables and in their analysis, it is desirable that permission be granted to add tables and explanatory appendixes, and to revise the statements.

Mr. HOLADAY. Mr. Chairman, I would like to make a motion. These tables are very interesting and useful, and we shall need them in future reference.

I move that the matter that Doctor Laughlin gives us this morning, together with such tables and other data as he may prepare, be incorporated in the committee report of the hearing.

I understand that there are some matters on which he is not yet ready to report; and I include in my motion that we request him to continue his study of this matter and to include all of his data and analysis in the printed reports.

The CHAIRMAN. Gentlemen, you have heard the motion. Is there any discussion? Without objection, it will be considered ordered.

I understand that the motion which has just been made and carried provides that Doctor Laughlin, expert eugenics agent of this committee, shall go ahead with the several studies which he has on hand.

### FUTURE INVESTIGATIONS FOR THIS COMMITTEE

And just for your information, the subjects on which he is now working, in order to make future reports, are as follows (I quote from a memorandum of Doctor Laughlin's):

1. *The European sources of American immigration.*—The first material for this particular research was gathered in Europe under the joint auspices of the Committee on Immigration and Naturalization and the Department of Labor. Satisfactory data were secured from 67 of the 123 consular districts in Europe and the Near East. The completion of this investigation and the analysis of its findings for the use of the committee will depend upon a common agreement among this committee, the president of the Carnegie Institution, of Washington, and the Department of State of the United States. The facts covered by the particular survey relate to the population density, the standards of living, differential economic stress, and the racial composition of the population of each of the 123 American consular districts in Europe and the Near East, together with a record of the emigration history from each district and an examination of the current forces in the particular district which bear upon the quantity and quality of both actual and potential emigration.

Mr. HOLADAY. Mr. Chairman, I intend my motion to provide also that as to those future investigations, because the work on deportation is not yet completed, he be authorized to continue them.

The CHAIRMAN. Without objection, that authority is given.

The second study Doctor Laughlin is to make is as follows:

2. *Further study of crime among aliens.*—An extension of the researches of this subject already made in the "Analysis of America's modern melting pot." In the new study it is proposed to survey not only the State institutions for the criminalistic classes, but also to survey the field represented by the courts, the jails, and the public and private welfare organizations, and to classify foreign-born criminals by race, type, and history of crime, circumstances of immigration and naturalization, and to investigate alien crime in relation to soundness of social instincts and stress of adjustment to new environment.

EXHIBIT 4
Page 4 of 88

3. *Population increase and economic stress in relation to human migration.*—An analysis of population growth in connection with economic stress in the different countries of the world.

4. *Mate selection and race crossing in the United States.*—An investigation of the history and present trend of mate selection and an analysis of their underlying causes. This should include not only a study of wide race crossing, but also of mate selection between the more closely related racial strains and family stocks.

5. *Differential fecundity within the present American population, with particular reference to the racial composition and individual quality of future population.*—An analysis of reproduction rates of different groups of the American population.

We hope ultimately to hear and have printed reports on all these subjects, which bear intimately upon immigration policy.

Mr. JENKINS. Mr. Chairman, does Doctor Laughlin do this work for the Government?

The CHAIRMAN. He does it for us.

Mr. JENKINS. For this committee?

The CHAIRMAN. Yes. I will say that his report on "Analysis of America's modern melting pot," as printed for these hearings, was priceless and the demand for it was so great that copies of it can hardly be found now. That was printed in 1922.

Now, in giving your present report on deportation, will you please proceed in your own way, Doctor Laughlin?

## STATEMENT OF DR. HARRY H. LAUGHLIN, OF THE EUGENICS RECORD OFFICE OF THE CARNEGIE INSTITUTION OF WASHINGTON, COLD SPRING HARBOR, LONG ISLAND, N. Y.

Doctor LAUGHLIN. Mr. Chairman and gentlemen of the committee, in answer to the question asked a few minutes ago, I will state that I am not a Government official, but a member of the eugenics record office of the Carnegie Institution of Washington, which is devoted to scientific research. The chairman of this committee indicated that these researches on immigration in relation to population would be of value, and so I have made this particular study on deportation in order that I might lay the facts before this committee.

The CHAIRMAN. I suggest that you open your statement by outlining your present researches.

Doctor LAUGHLIN. In the investigation which I am reporting to-day, we made a survey of the several State and Federal custodial institutions for all types of the socially inadequate, including the feeble-minded, the insane, the criminalistic, and other classes. We studied the relation between the total number of foreign-born inmates in State custodial institutions and the number of such inmates who are deportable, by specific types and classes. We followed this with a study of the nondeportable foreign-born inmates in State institutions, by types and classes and causes of nondeportability. Then followed a comparison between the numbers of foreign-born inmates deportable and the numbers actually deported, by specific types and classes. The work included also an examination of the deportation practices of the several States, particularly in their relation to Federal procedure. Finally we made some studies on the economic and eugenic aspects of deportation.

In our immigration law and practice, deportation is the last line of defense against contamination of American family stocks by alien hereditary degeneracy. The first line of defense is the attempt to exclude certain types and classes of antisocial, and otherwise undesirable persons, from admission into the United States. Under

EXHIBIT 4
Page 5 of 88

the perfect operation of the law, there would be no one to deport, but the fact is that many inadequates and potential inadequates have broken through our first lines, so that our last resort is to deport them, if we wish to protect American blood from alien contamination. It is not a matter of race—that is determined by the quota—but of later discovered degeneracy among the particular immigrants, regardless of race.

### SCOPE OF INVESTIGATION

The present investigation has been a first-hand study made under the direct auspices of this committee, into the several aspects of deportation.   In this study, out of 688 State and Federal institutions for the several types of the socially inadequate institutions, we received returns from 684, so that any statistical summaries which we may make from this investigation may be considered as practically complete and as fairly representative of the actual situation.   Only four—three for the delinquent classed and one for the deaf—institutions in the group did not finally make returns to these studies. These are: Rosewood State Training School, Owings Mills, Md.; House of Correction and State Prison for Women, Rutland, Vt.; Louisiana State School for the Deaf, Baton Rouge, La.; Mother Berkerdyke Home, Ellsworth, Kans.

Of the total 688 institutions, 53 are for the feeble-minded; 173 for the insane, 203 for the criminalistic and delinquent classes; 12 for epileptics; 82 for tuberculosis cases; 1 for leprosy; 42 for the blind; 30 for the deaf; 5 for the deformed or crippled; and 87 for the dependents.   These are major institutions maintained by the States and Federal Government, and do not include private institutions nor municipal institutions, such as jails and local almshouses, or county institutions for the tubercular.

The CHAIRMAN. It does not include county almshouses?

Doctor LAUGHLIN. No, sir.   It includes only State and Federal institutions, maintained directly by State and Federal Governments.

Of course the total number of institutions varies from time to time; new ones open and occasionally an old institution is closed. Most of the returns for the present survey were made during the calendar year 1925; many of them were not made until 1926.   They do not represent the exact situation at any one date, but they show the conditions severally at the time of their respective reports.

In these returns, for the 684 institutions, the authorities reported 74,170 foreign-born inmates.

In a preliminary survey which terminated January 1, 1923, we found, in 667 State and Federal institutions, where there were all classes of the socially inadequate in the United States, a total of 451,046 inmates.   Of these the institutional authorities reported knowledge of the nativity of 386,713, or 85.74 per cent; they confessed ignorance about the nativity of 64,333 inmates, or 14.26 per cent of the whole.   Of the total number of inmates of known nativity in 1922, 71,271, or 15.80 per cent, were reported as of foreign birth. It is not this figure, 71,271 for 1922, but the corresponding figure, 74,184 for 1925 and 1926, that we herewith analyze and present to the committee.

The CHAIRMAN. It is interesting to compare the 15.80 per cent of all inmates being of foreign birth with the 12.97 per cent of all our population in 1920 being of foreign birth.   It is significant that

EXHIBIT 4
Page 6 of 88

while these defective aliens, whom the several States now support, were assigned a quota of zero, they have even overstepped the average run of defectiveness in the whole population by about one-fourth.

## FOREIGN-BORN INMATES OF CUSTODIAL INSTITUTIONS

Doctor LAUGHLIN. The present investigation concerns primarily the deportability of these 74,184 foreign-born inmates. (See Table I, p. 6.) If our immigration laws had worked as was intended, none of the present 74,184 inmates would have been admitted. But our first lines of defense were so broken by the alien attack that over 70,000 inadequates were found in 684 out of 688 State and Federal institutions. This disregards the additional numbers which are always found in municipal and private custodial institutions; it disregards also the number of aliens now at large in this country who are destined, shortly, to become institutional inmates.

It is apparent that, from the practical point of view, the deportation service must be greatly reinforced, both by statute defining its duties and by adequate appropriations making it physically possible to carry on the duties which are imposed upon it by law.

The CHAIRMAN. Do they differentiate in these reports as to the foreign born who are naturalized and those who are not naturalized?

## CAUSES OF NONDEPORTABILITY

Doctor LAUGHLIN. Yes, sir. This brings us to the analysis of the causes of nondeportability. In order to answer this and other questions in a definite manner, I have prepared a summary table, called Table No. 1. It shows, in condensed form, the statistical summary and analysis of this problem which deserves particular attention.

(Doctor Laughlin here displayed and explained Table No. I, p. 6.)

A very interesting feature shown by the examination of the chart consists in the fact that out of the 74,170 inmates of foreign birth, only 3,798, or 5.12 per cent, were reported as deportable; this means that 70,372, or 94.88 per cent, are not deportable. There are three reasons for the nondeportability of inadequates of foreign birth. First, the foreign-born person may be a naturalized citizen; second, he may have been in the United States more than five years; and third, he may have become inadequate from causes arising since his admission into the United States. Of these 70,372 foreign-born inmates who are reported as not deportable, the institution authorities gave the following reasons: For 15,363, or 20.71 per cent, the foreign-born inmates were naturalized. For 33,447, or 45.10 per cent, the particular aliens had been residents of the United States for more than five years. With 3,526, or 4.75 per cent, the reason assigned for nondeportability was that these persons had become inadequates from causes arising since their arrival in the United States; and for 18,036, or 24.32 per cent of the total foreign-born inmates, the institutional authorities claim nondeportability, but could give no reason why. Of course this means that for about one-fourth of the aliens, the institutional authorities of the States, which States were maintaining these alien inmates at their own expense, possessed very little information concerning the histories of their custodial charges. If a more vigorous deportation policy were in operation, doubtless much of this particular missing information would be found.

EXHIBIT 4
Page 7 of 88

6                    EUGENICAL ASPECTS OF DEPORTATION

TABLE I.—*Institutional inmates, native born and foreign born, 1925–26*

| | Number of institutions | Native born | | Foreign born | | Nativity not known | | Total |
|---|---|---|---|---|---|---|---|---|
| | | Number | Per cent | Number | Per cent | Number | Per cent | |
| Feeble-minded | 53 | 36,347 | 84.2 | 1,602 | 3.71 | 5,218 | 12.09 | 43,16 |
| Insane | 173 | 148,484 | 60.43 | 53,586 | 21.97 | 43,254 | 17.60 | 245,72 |
| Criminalistic | 200 | 85,057 | 78.76 | 11,224 | 10.39 | 11,715 | 10.85 | 107,99 |
| Epileptic | 12 | 7,391 | 72.52 | 749 | 7.39 | 2,052 | 20.13 | 10,19 |
| Tuberculous | 82 | 13,478 | 74.85 | 2,608 | 14.48 | 1,920 | 10.66 | 18,00 |
| Leprous | 1 | 143 | 73.33 | 52 | 26.67 | | | 19 |
| Blind | 42 | 5,684 | 93.06 | 130 | 2.13 | 294 | 4.81 | 6,10 |
| Deaf | 29 | 6,382 | 91.84 | 57 | .82 | 510 | 7.34 | 6,94 |
| Deformed and crippled | 5 | 662 | 75.48 | 16 | 1.82 | 199 | 22.69 | 87 |
| Dependent | 87 | 21,254 | 54.28 | 3,746 | 9.57 | 14,155 | 36.15 | 39,15 |
| Total | 1 684 | 324,882 | 67.91 | 74,170 | 15.50 | 79,317 | 16.58 | 478,36 |

1 684 out of a total of 688 institutions supplied returns for this investigation.   (See p. 4.)

If only about 1 in 20 of the public charges of the Federal Government and of the several State governments is reported as deportable it means that 19 out of every 20 of the foreign-born inadequates in State and Federal institutions, by some way or another, not only go through our immigration sieve at our shore and border, but also have managed to circumvent deportation.   The principal remedy would seem to provide for more thorough examination into the individual and family histories of the would-be immigrant.   A great advance in this direction has been made by beginning the examination of immigrants in their home towns.   The feasibility of such examinations was first demonstrated by my studies made as a representative of the United States Department of Labor and of this committee. We made successfully such actual experimental examinations in Europe in 1923 and 1924, in perfect consonance with international law.   This procedure seems to point the way for achieving a more thorough sorting of immigrants before they take the ship for the United States.   The would-be immigrant must present his foreign passport to the American consul.   The American consul, before granting his visa, can, as we have demonstrated, require a great deal of information concerning the individual's present condition, his past history, and, if need be, the history of his family, all of which would throw a great deal of light upon the possibilities of the particular immigrant and his offspring developing into valuable citizens of the United States.   But one of the principal direct results of such requirement for more thorough overseas examination would consist in the more certain sorting out of individuals who are "likely to become public charges."

IMMIGRANTS DEBARRED AND ALIENS DEPORTED

The CHAIRMAN. Let us have your memorandum on the relation between would-be immigrants debarred and aliens deported.

Doctor LAUGHLIN. For the fiscal year ending June 30, 1925, 294,314 aliens were admitted into the United States, according to the report of the Commissioner General of Immigration.

During the same year, 25,390 would-be immigrants were rejected at the ports and border.   The following table gives the classification of this latter number by causes:

EXHIBIT 4
Page 8 of 88

*Would-be immigrants debarred*

[From the report of the Commissioner-General of Immigration]

Without proper immigration visas (under act of 1924):

| | |
|---|---:|
| Land | 15,989 |
| Seaport | 2,618 |
| Likely to become public charges | 3,029 |
| Loathsome or dangerous contagious diseases | 562 |
| Per centum limit law, extended (excess quota) | 561 |
| Unable to read | 523 |
| Contract laborers | 452 |
| Mental or physical defectives | 505 |
| Stowaways | 308 |
| Criminals | 251 |
| Under Chinese exclusion act | 188 |
| Immoral classes | 98 |
| All other classes | 306 |
| **Total** | **25,390** |

Only 3,029 were rejected as likely to become public charges, only 251 as criminals, and only 505 as mental or physical defectives. Compare these figures with the actual findings in institutions in the United States. With the growth of inspection overseas, this class of would-be immigrants debarred at our gates should be greatly reduced. The removal of the necessity for such debarring is one of the greatest humanitarian advances which we could make in our immigration policy. The would-be immigrant who is ultimately to be debarred or deported should, very early in his contact with the United States consular and immigration officials, find out the truth concerning his prospect for admission. Of course, one of the greatest practical advances in this direction would consist in making it cost the transportation companies money to bring to our gates a debarable candidate for admission. If the transportation companies made money, both by bringing them to our gates and then by carrying them back again, doubtless many debarables would go through this procedure. But if it cost the companies money to bring debarables to us, they would collaborate with the United States in assorting immigrants as early as possible in the migration process.

During the same fiscal year—that is, the one which ended June 30, 1925—there were deported 9,495 persons. By causes these are listed as follows:

*Aliens deported*

[From the report of the Commissioner-General of Immigration]

| | |
|---|---:|
| Entered without inspection | 1,169 |
| Likely to become public charges and vagrants | 1,759 |
| Mental diseases or defects | 608 |
| Without proper visa (under immigration act of 1924) | 2,723 |
| Criminals | 637 |
| Unable to read | 474 |
| Under per cent limit (act of 1921) | 394 |
| Immoral classes | 327 |
| Physically defective | 174 |
| Loathsome or dangerous contagious diseases | 104 |
| Under Chinese exclusion laws | 93 |
| Entered within one year of deportation | 164 |
| All other causes | 869 |
| **Total** | **9,495** |

EXHIBIT 4
Page 9 of 88

TABLE II.—*Causes of nondeportability of foreign-born institutional inmates for all types of social inadequacy*

[From the present institutional investigation, 1925-26]

| Type of institution | Number of institutions reporting | Number of foreign-born inmates | | | Foreign-born inmates, deportable | | | | | Causes of nondeportability of foreign-born inmates | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Naturalized citizens | | | | Resident of United States more than 5 years | | | | Causes arising since admission | | | | Causes not given | | | |
| | | Male | Female | Total | Per cent | Male | Female | Total | Per cent | Male | Female | Total | Per cent | Male | Female | Total | Per cent | Male | Female | Total | Per cent | | | Total | Per cent |
| Feeble-minded | 53 | 744 | 838 | 1,602 | 100 | 12 | 9 | 21 | 1.31 | 9 | 6 | 15 | 0.94 | 363 | 553 | 925 | 57.80 | 3 | 6 | 9 | 0.56 | | | 631 | 39.38 |
| Insane | 173 | 29,942 | 24,044 | 53,986 | 100 | 812 | 411 | 1,223 | 2.27 | 6,383 | 5,056 | 11,439 | 21.19 | 14,276 | 11,454 | 25,730 | 47.66 | 1,223 | 392 | 1,615 | 2.99 | | | 13,979 | 25.89 |
| Criminalistic | 200 | 10,731 | 483 | 11,224 | 100 | 2,365 | 43 | 2,409 | 21.46 | 1,932 | 98 | 2,030 | 18.09 | 2,930 | 342 | 3,272 | 29.15 | 238 | 8 | 246 | 2.21 | | | 3,265 | 29.09 |
| Epileptic | 12 | 2,392 | 357 | 749 | 100 | 8 | 2 | 10 | 1.34 | 41 | 30 | 71 | 9.48 | 363 | 325 | 688 | 89.19 | 0 | 0 | 0 | 0 | | | 0 | 0 |
| Tuberculous | 2 | 2,066 | 542 | 2,608 | 100 | 88 | 30 | 118 | 4.52 | 654 | 204 | 858 | 32.90 | 759 | 252 | 1,011 | 38.77 | 517 | 24 | 541 | 20.74 | | | 80 | 3.07 |
| Leprous | 1 | 43 | 45 | 88 | 100 | | | | | 0 | 0 | 0 | 0 | 7 | 7 | 22 | 100.00 | 0 | 0 | 0 | 0 | | | 0 | 0 |
| Blind | 42 | 92 | 38 | 130 | 100 | 2 | 1 | 3 | 5.28 | 32 | 12 | 44 | 33.85 | 13 | 13 | 45 | 34.62 | 0 | 15 | 15 | 11.54 | | | 26 | 20.00 |
| Deaf | 20 | 30 | 27 | 57 | 100 | | | | | 3 | 8 | 18 | 19.30 | 18 | 15 | 33 | 57.89 | 0 | 0 | 0 | 0 | | | 10 | 17.54 |
| Deformed and crippled | 5 | | | | | | | | | | | | | | | | | | | | | | | | |
| Dependent | 87 | 3,226 | 520 | 3,746 | 100 | 10 | 4 | 14 | 37 | 776 | 119 | 895 | 23.89 | 1,396 | 312 | 1,698 | 45.33 | 1,060 | 54 | 1,004 | 25.00 | | | 45 | 1.20 |
| Total | 684 | 47,270 | 26,894 | 74,170 | 100 | 3,295 | 503 | 3,798 | 5.12 | 9,830 | 5,533 | 15,363 | 20.71 | 20,133 | 13,309 | 33,447 | 45.10 | 3,033 | 493 | 3,528 | 4.75 | | | 18,036 | 24.32 |

*Aliens deported from United States for the fiscal year ending June 30, 1925*

[From the report of the Commissioner General of Immigration, 1925]

| Causes of deportability: | Number deported |
|---|---|
| Feeble-minded | 527 |
| Insane | 637 |
| Criminals | 6 |
| Epileptics | 93 |
| Under Chinese exclusion act | 66 |
| Contract laborers | |

| Causes of deportability—continued. | Number deported |
|---|---|
| Unable to read (over 16 years) | 474 |
| Likely to become a public charge | 1,738 |
| All others (including persons deported for legal reasons not necessarily coupled with social inadequacy) | 5,920 |
| Total | 9,495 |

EXHIBIT 4
Page 10 of 88

Deportables fall principally into four classes in relation to the statute of limitations, mode of entry and kind of person.  These classes are, first, members of excluded classes at time of entry, whose deportation is compulsory within five years after entry; second, public charges from causes existing prior to entry; and whose deportation is compulsory within five years after entry; third, entered without the consent of, or at time or place not designated by immigration officials, and whose deportation is required within three years after entry; fourth, certain classes of prostitutes, persons engaged in the white slave trade, and anarchists, whose deportation is compulsory within five years after entry.

In this study we are interested only in deportation of the socially inadequate individuals, particularly those who have become the charges of the several States on account of inadequacy of one or more of the several types shown in the tables which accompany this report.  During the year 1925 the Immigration Service deported 4 persons because of their feeble-mindedness.  In the 53 institutions for the feeble-minded, the present survey found 1,612 foreign-born inmates; thus we find that the relation between the number actually deported and the foreign born of this particular class is very remote. In reference to the insane, we learn that the immigration service deported, on account of insanity and all other mental conditions, except feeble-mindedness, in this year, 527 persons.  Our survey found 53,986 insane persons of foreign birth in our State and Federal institutions.  In 1925 the immigration service deported 637 criminals. We found in the State and Federal prisons (thus excluding jails and workhouses) 11,444 persons of foreign birth.  To catch up with the intent of the law to maintain its standard of desirability for immigrants, the country will have to deport defective aliens in greatly increased numbers.

At this point it is proper to compare the findings of the present field survey with the official records of deportation made by the Secretary of Labor and the Commissioner General of Immigration.

## LIMITATIONS OF PRESENT DEPORTATION FACILITIES

The CHAIRMAN.  Let us add these to our record.

In the Ninth Annual Report of the Secretary of Labor, for the fiscal year ending June 30, 1921, the Secretary says (p. 28):

The lack of a sufficient appropriation has prevented systematic overhauling of the various State and Federal charitable institutions with a view to returning deportable alien inmates to their respective countries, although this work will be prosecuted as vigorously as possible with the limited funds at hand.

In the Annual Report of the Commissioner General of Immigration for the fiscal year ending June 30, 1922, the Commissioner General says (p. 17):

Lack of funds has prevented the bureau from conducting an active campaign against aliens unlawfully resident here, and many such who were proper subjects for deportation under our laws have been permitted to remain for this reason.  In fact, it may be stated that the bureau has been careful to see that the activities in this direction of its field officers have been confined to the more extreme cases where, for peculiarly good cause, deportation should be accomplished.

In the Annual Report of the Commissioner General of Immigration for the fiscal year ending June 30, 1925, this officer says (p. 9):

Of the total number of deportations effected during the year, 958 aliens were permitted to reship one way foreign as seamen in lieu of deportation, and in

EXHIBIT 4
Page 11 of 88

fulfillment of the terms of the warrants of deportation in their respective cases. This procedure resulted in a saving to the Government of approximately $148,281.56.

In addition to the foregong, many thousands of dollars have been saved the appropriation by judiciously controlling the transportation of deportees from point to point in this country for ultimate deportation, with a view to the maximum economy. * * * Approximately $20,868 was saved in transportation costs alone in effecting, through the port of Galveston, Tex., instead of conveying them to Ellis Island * * *.

Doctor LAUGHLIN. It is important to consider that while we may expect a great reduction in the number of persons rejected at the ports and border, the number of deportations has, in recent years, risen rapidly. Both of these trends point toward greater efficiency in policy and administration. Thus in 1921 the total number of persons deported was 4,517; in 1922, 4,345; in 1923, 3,661; and in 1924, 6,433. This speaks well for the executive department intrusted with this work. The advance is small, but it is in the right direction. The deportation of all deportable persons in the United States would constitute a tremendous task and would cost much more than the funds made available by Congress for such a purpose. As a matter of fact, most deportables are permitted to remain in the country until the statute of limitations automatically transforms them into the class of nondeportables. In the present study we are concerned primarily with institutional inmates. The individuals who get in the institutions constitute only a minor portion of the undesirable elements. It is known that only those inadequates who fall way below the line of efficiency into the class of helplessness or desperation are institutionalized. These are the extreme inadequates and are always much fewer than the great border-line class, lying between competency and efficiency on the one hand and helplessness and menace on the other. But of the 74,170 foreign-born inmates, 33,447 were given as nondeportables because of more than five years' residence within the United States. This, as I previously stated, is 45.10 per cent of our whole number of foreign-born inadequates in the State and Federal custodial institutions. Of these, only 3,526, or 4.75 per cent, were nondeportable because they were certified as having become inadequate from causes arising since their arrival in the United States. Except for the statute of limitations, practically all of these inadequates would be deportable except the 3,526, for whom we take the responsibility, because we assume that their misfortunes are due to causes which arose in this country; it is assumed that they did not bring the basic causes of inadequacy with them. It might be well to extend the statute of limitations to 10 years, making exceptions for certain classes of criminalistic persons who should never be given the advantage of this limitation.

### RELATION BETWEEN NUMBER OF DEPORTABLES AND ACTUAL DEPORTATIONS

(See Table II, p. 8)

This investigation shows that not nearly all of the aliens who were found in the United States, and who are inadequate below the level set by our immigration standards, are legally deportable, and of those who are legally deportable only a small fraction are actually returned to the countries which produce them. The situation calls for not only raising our admission standards on the basis of total numbers,

EXHIBIT 4
Page 12 of 88

race, family stock, and individual quality, but also of keeping track of the aliens within our borders, and upon the first discovery of an alien, especially if such person is likely to become the parent of future Americans, who does not conform to our admission standards and to the standard we have set for our own citizenry, of securing his prompt return to his home country. It seems like a simple statement, but it is elementary. Our present research has covered a portion of this field in a careful manner. It is hoped that future researches will investigate other phases, particularly the trend of our national racial characteristics as the result of race crossing within the United States, and also the trend in hereiditary endowment of our people in reference to those inborn capacities which we prize, regardless of race.

The CHAIRMAN. We hope that such a study will be made. It would be of great use to the committee in its deliberations.

ADMINISTRATION DISTRICTS OF THE BUREAU OF IMMIGRATION OF THE UNITED STATES DEPARTMENT OF LABOR

The CHAIRMAN. Let me suggest that you show the map of the United States which you have prepared showing the boundaries of the several immigration districts. The desire to diffuse information concerning deportation procedure prompts me to suggest that the map which is before us (see p. 52), showing the districts and the headquarters of the immigration officers, be published in these hearings.

Doctor LAUGHLIN. We have a copy of the general order No. 2 which, on December 6, 1922, established these districts. For our own use we prepared a map showing them, but so far as I know no map has yet been published showing their boundaries, convenient for ready reference. The only map of this sort which I have seen is the one in the office of the Bureau of Immigration in Washington.

The CHAIRMAN. Without objection, this map will be printed in the record, and other plats as needed.

Doctor LAUGHLIN. This [indicating] is a map (see p. 52) of the United States which shows the administrative immigration districts of the United States; and every one of these districts has a capital, you might say, which is the headquarters of the immigration business in that district.

The CHAIRMAN. Let me interrupt you a moment to explain this map [indicating]. (See p. 52.) Of course, each person would be interested in his own district. You notice right away that the State of Washington is split in the middle and that one corner of it, apparently about the size of two or three New England States, is the western district of Washington. Now, in the institutions there, there are over 1,300 deportable people, including some, however, who have been in the institutions more than the five-year limit.

Now, that is not only highly informative, but these tables are carried out so as to show why these people are not deported, what the cost of deporting them would be, and so on. And that is shown on those tables for the whole United States. The publication of this map ought to be of use as an aid in making the necessary contacts between persons in charge of or who know of deportable aliens and the deportation officers of the United States.

EXHIBIT 4
Page 13 of 88

12          EUGENICAL ASPECTS OF DEPORTATION

### THE INTERSTATE RETURN OF SOCIAL INADEQUATES

Doctor LAUGHLIN. Closely connected with the matter of the international return or deportation of inadequates is the interstate and intercommunity return of similar classes. We often find in the custodial institutions of one State a large number of inmates who spent most of their effective lives, if they possessed such a period at all, in some other State, but who are now being maintained, many with no hope of social or economic rehabilitation, in custodial institutions of or at the cost of some host State. In social management and in governmental policy and in the interests of eugenical conservation there is a very important general principle of responsibility and deportation which is being developed and which has made great headway in recent years.

The CHAIRMAN. How would this principle be stated?

Doctor LAUGHLIN. It might well read this way: "Each community which produces a socially inadequate individual should be required to care for such person during the period of inadequacy." This would prevent "dumping," if such practice exists. It would prevent the official or unofficial encouragement of emigration of the less effective members of a community, and it would place the responsibility where it belongs socially, economically, and eugenically. Socially, the care of a defective is certainly the duty of the family, the community, the State, and the nation which produces him. Economically the cost should be assessed on the group responsible for him, and eugenically, it is clear that a person with defective hereditary endowment should not be permitted to leave his offspring as seed stock in other territories than his own. Nor, for that matter, should he be permitted to reproduce at home. But that is a domestic matter. The home territory should solve its own eugenical problems at home. While considering the United States as a whole, the matter of international deportation is a Federal matter.

The several States have it as a function of theirs to maintain social inadequates, although the Federal Government decides who may come in. The latter Government ought, therefore, in common justice, to deport all foreign-born inadequates to the countries whence they came, when such inadequates are found being maintained at the expense of the several States. Indeed, there is a growing tendency on the part of the several States to request permission of the Federal Government to sue the United States in equity to recover the cost of maintaining foreign-born inadequates, whom the United States has permitted to come into its Territories and whom only the United States can deport. Doubtless, greater activity of this sort on the part of the several States would exert pressure which would animate the Federal Government to develop its deportation policy to a point of greater efficiency.

In reference to interstate deportation, our particular investigation asked four principal questions of each of the 688 custodial institutions. We received returns from 590 of these, jointly with similar returns in reference to international deportation. The questions and answers, tabulated by substance of answer and type of institution, are as follows.

The CHAIRMAN. We can examine the tables and print them in the hearing.

EXHIBIT 4
Page 14 of 88

EUGENICAL ASPECTS OF DEPORTATION        **13**

## A. Return of Citizens of Other States

**1. When a citizen of another State is returned from your institution, to what officer in his home State is he delivered?**

*Type of institution*

[Note.—Types of institutions: F=for the feeble-minded; I=for the insane; C=for the criminalistic and delinquent; E=for the epileptic; T=for the tuberculous; B=for the blind; D=for the deaf; Dep.=for the dependent]

| Answer | F. | I. | C. | E. | T. | B. | D. | Dep. | All others | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Sheriff | 5 | 20 | 8 | 1 | | 1 | | | | 35 |
| Institution | 4 | 39 | 7 | | 3 | 1 | 1 | 2 | | 57 |
| Relatives or friends | 5 | 5 | 17 | | | 1 | 5 | 4 | | 37 |
| No returns made | 14 | 17 | 43 | 2 | 25 | 7 | 4 | 22 | 2 | 142 |
| No answer | 8 | 31 | 38 | 1 | 14 | 9 | 4 | 17 | 1 | 112 |
| No nonresidents admitted | 5 | 1 | 11 | 1 | 15 | 13 | 9 | 21 | 5 | 72 |
| Refer us to some State department or official | 3 | 17 | 4 | 2 | 5 | | | 1 | | 32 |
| Probate judge | | 1 | | | | | | | | 1 |
| U. S. Veterans' Bureau or hospital | | 3 | | | 2 | | | | | 5 |
| No fixed rule—home, institution, or county official | | 15 | 2 | 1 | | | | | | 18 |
| Designated by authorities of receiving State | 3 | 12 | 18 | | | 1 | | | | 34 |
| Designated by authorities of returning State | 1 | 8 | 1 | | 1 | | | | | 11 |
| Probation officer | | | 8 | | | | | | | 8 |
| Police official | | | 2 | | | | | | | 2 |
| County attorney | | | 1 | | | | | | | 1 |
| No State laws on subject | 1 | | 4 | | 1 | | | | | 6 |
| Returned only when discharged or paroled | | 1 | | | | | | | | 8 |
| Commissioner of charities | | | 1 | | | | | | | 1 |
| Court | | | 3 | | | | | | | 3 |
| None | | | | | 5 | | | | | 5 |
| Total | 49 | 153 | 177 | 9 | 71 | 33 | 23 | 67 | | 590 |

**2. In such cases, what is the nature of the cooperation given by the receiving State?**

*Type of institution*

| Answer | F. | I. | C. | E. | T. | B. | D. | Dep. | All others | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| None given | 3 | 7 | 14 | 1 | 7 | 1 | 3 | 2 | | 38 |
| Good cooperation | 4 | 19 | 14 | 2 | 1 | | 2 | | | 42 |
| No inmates returned | 17 | 17 | 43 | 3 | 23 | 7 | 4 | 22 | 2 | 138 |
| No nonresidents admitted | 5 | 1 | 9 | 1 | 17 | 9 | 5 | 21 | 5 | 73 |
| Acceptance of legal residents | 1 | 31 | 2 | | 2 | | | 1 | | 37 |
| Good cooperation with some States but not with others | 1 | 12 | | | | | | | | 13 |
| No answer | 12 | 23 | 47 | | 16 | 15 | 9 | 19 | 1 | 142 |
| Refer us to some State department or official | 3 | 19 | 5 | 2 | 5 | | | 1 | | 35 |
| Reciprocal agreements | 2 | 8 | 2 | | | | | | | 12 |
| Extradition | 1 | | 13 | | | | | | | 14 |
| No fixed rules or laws | | 5 | 5 | | | | | 1 | | 11 |
| Arrangements made by State department or official | | 10 | | | | 1 | | | | 11 |
| Pays expenses of return | | 1 | 5 | | | | | | | 6 |
| Call for prisoner | | | 14 | | | | | | | 14 |
| Returned only when discharged or paroled | | | 4 | | | | | | | 4 |
| Total | 49 | 153 | 177 | 9 | 71 | 33 | 23 | 67 | | 590 |

EXHIBIT 4
Page 15 of 88

**14**          EUGENICAL ASPECTS OF DEPORTATION

**3. In case of such returns, who pays the transportation and other return charges?**

*Type of institution*

| Answer | F. | I. | C. | E. | T. | B. | D. | Dep. | All others | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Returning State or institution | 8 | 75 | 19 | 3 | 2 | 1 | 1 | 2 | | 111 |
| Receiving State | 1 | 4 | 39 | | | 1 | | | | 45 |
| Patient, relatives, or friends | 4 | 8 | 21 | | 2 | 1 | 4 | 3 | | 43 |
| County | 1 | 2 | | | | | | | | 3 |
| No returns made | 15 | 15 | 47 | | 24 | 7 | 4 | 23 | 3 | 141 |
| No nonresidents admitted | 5 | | 9 | 3 | 17 | 8 | 5 | 20 | 3 | 68 |
| Refer us to some State department or official | 2 | 19 | 5 | 2 | 5 | | | 1 | | 34 |
| No answer | 12 | 11 | 29 | | 14 | 15 | 9 | 17 | 2 | 109 |
| Each case determined on its own merits | 1 | 7 | | | | | | 1 | | 9 |
| U. S. Veterans' Bureau or Federal Government | | 9 | 3 | | 6 | | | | | 18 |
| Decided by some State department | | 2 | | | | | | | | 2 |
| No laws on subject | | 1 | 5 | | 1 | | | | | 7 |
| **Total** | **49** | **153** | **177** | **9** | **71** | **33** | **23** | **67** | **8** | **590** |

**4. What practical rule determines whether an inmate shall be returned to his home State?**

*Type of institution*

| Answer | F. | I. | C. | E. | T. | B. | D. | Dep. | All others | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Legal residence | 11 | 75 | 8 | 4 | 4 | 1 | 1 | 1 | | 105 |
| Residence of family | 5 | | 6 | | | | 4 | 1 | | 16 |
| No returns made | 10 | 14 | 43 | 1 | 23 | 7 | 4 | 22 | 3 | 127 |
| No nonresidents admitted | 7 | 1 | 9 | 1 | 15 | 9 | 5 | 20 | 3 | 70 |
| No answer | 9 | 15 | 31 | | 14 | 15 | 9 | 18 | 2 | 113 |
| Refer us to some State department or official | 3 | 19 | 5 | 1 | 5 | | | 1 | | 34 |
| Arrangements made by county returning patient | | | 1 | | | | | | | 1 |
| If relatives will pay transportation | 1 | 1 | 1 | | | | | | | 3 |
| Determined by State department | 2 | 5 | 3 | | | | | | | 10 |
| If permanently dependent | | 5 | | | 1 | | | | | 5 |
| Exiles of U. S. Veterans' Bureau | | 5 | | | | | | | | 5 |
| If home State will accept patient | | 4 | 1 | | | | | | | 5 |
| State laws | | 1 | | 1 | | | | | | 2 |
| If wanted for crime in home State | | 6 | 6 | | 1 | | | 1 | | 14 |
| No uniform rules | | 1 | 3 | | | | | | | 4 |
| Agreement between States | | 1 | | | | | | | | 3 |
| If friends will accept patient | | 1 | | 1 | 1 | | | | | 3 |
| No law allowing such returns | | 2 | 9 | | 1 | | | | | 12 |
| Returned home if environment is suitable | | | 9 | | | | | 1 | | 10 |
| Returned only when paroled or discharged | | | 8 | | | | | | | 8 |
| Warrant of arrest | | | 24 | | | | | | | 24 |
| Welfare and condition of inmate | | | 5 | | 6 | 1 | | 1 | | 13 |
| **Total** | **49** | **153** | **177** | **9** | **71** | **33** | **23** | **67** | **8** | **590** |

Doctor LAUGHLIN. While there is yet no highly developed system for returning inadequates to their respective sources in the United States, we can see a definite groping toward such an end and can observe considerable progress being made toward its achievement within the last few years.

EXHIBIT 4
Page 16 of 88

One of the most interesting studies made in the field of national and interstate deportation has been carried on by the New York State bureau of special examination, by Dr. Spencer L. Dawes, medical examiner.

The CHAIRMAN. It is important that we have this report on file. If we can secure it, I suggest that we print it as an appendix to this hearing. Without objection this will be ordered.

(See Appendix 5, p. 67.)

Doctor LAUGHLIN. I have here also the returns from our own inquiry on international deportation practices, received from the same 590 institutions.

The CHAIRMAN. These also should be included in the record. The States, as well as the Federal Government, have a responsibility and a duty in deportation.

## THE ADMINISTRATIVE INITIATIVE IN DEPORTATION OF ALIEN PUBLIC CHARGES

Doctor LAUGHLIN. We made inquiry of each State and Federal custodial institution in the United States to find out how many foreigners each had in its custody, and of those how many were deportable, and of those who were not deportable, why each was not deportable, as I have already explained. And then we went further and made inquiry into the procedure of deportation. Of each institution we asked the following three questions:

1. With what Federal deportation office, if any, has your institution made immediate contacts?

2. In the case of deportation of aliens from your institution, who has taken the initiative—your institution or the Federal authority?

3. In the case of deportation of aliens from your institution, who pays the cost of transportation and other deportation expenses to the border or port of departure, your institution (that is, your State) or the Federal Government?

The returns of this study are shown in the accompanying tables (pp. 12, 13, and 15). When it came to asking the institutions, who had custody of more than 70,000 aliens, with what Federal deportation office, if any, the particular institution had made immediate contact, only 196 could answer the question; 288 claim to have made no contacts; 77 gave no answer; the other institutions referred us to some other official for our answer. It is interesting that from 590 institutional returns, in reference to initiative in deportation, 202 have stated that they had never made any deportation, and consequently could not answer the question; 40 had no alien inmates; 94 did not answer. Only three confessed not to know. One claimed that "the patient or relatives" took the initiative; 18 that "some State department or official took it," while one referred it to the "court of commitment." Fifteen said that "either the State or Federal Government" took the initiative. Thirty-one answered "some official of the State." Eighty-five said that the Federal Government took the initiative, and 100 said that the particular institution took the initiative.

89604—28——2

EXHIBIT 4
Page 17 of 88

**16**  EUGENICAL ASPECTS OF DEPORTATION

### B. DEPORTATION OF ALIENS

**1. With what Federal deportation office, if any, has your institution made immediate contacts?**

*Type of institution*

| Answer | F. | I. | C. | E. | T. | B. | D. | Dep. | All others [1] | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Office named | 15 | 85 | 77 | 2 | 12 | | | 4 | 1 | 196 |
| No contacts made | 26 | 46 | 72 | 6 | 44 | 77 | 14 | 48 | 5 | 288 |
| No answer | 5 | 9 | 25 | | 9 | 5 | 8 | 14 | 2 | 77 |
| No foreign-born | 1 | | | | | 1 | 1 | 1 | | 4 |
| Refer us to some State department or official | 2 | 13 | 3 | 1 | 6 | | | | | 25 |
| Total | 49 | 153 | 177 | 9 | 71 | 33 | 23 | 67 | 8 | 590 |

[1] Includes, for all questions under "B," 5 institutions for the deformed, 1 for inebriates, 1 for lepers, and 1 for diseases (venereal).

**2. In the case of deportation of aliens from your institution, who has taken the initiative, your institution or the Federal authority?**

*Type of institution*

| Answer | F | I | C | E | T | B | D | Dep. | All others | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Institution (or State) | 8 | 61 | 24 | 2 | 4 | | | 1 | | 100 |
| Federal Government | 4 | 17 | 50 | 1 | 11 | | | 1 | 1 | 85 |
| Some State department or official | 3 | 13 | 7 | 1 | 4 | | | 3 | | 31 |
| Either State or Federal Government | | 9 | 5 | 1 | | | | | | 15 |
| Court of commitment | 1 | | | | | | | | | 1 |
| No deportations made | 18 | 29 | 55 | | 31 | 18 | 10 | 39 | 2 | 202 |
| No alien inmates | 2 | | 10 | | 8 | 8 | 4 | 7 | 1 | 40 |
| No answer | 10 | 9 | 25 | 3 | 11 | 7 | 9 | 16 | 4 | 94 |
| Do not know | 1 | 2 | | | | | | | | 3 |
| Patient or relatives | | 1 | | | | | | | | 1 |
| Refer us to some State department or official | 2 | 12 | 1 | 1 | 2 | | | | | 18 |
| Total | 49 | 153 | 177 | 9 | 71 | 33 | 23 | 67 | | 590 |

**3. In the case of deportation of aliens from your institution, who pays the cost of transportation, your institution (or State) or the Federal Government?**

*Type of institution*

| Answer | F | I | C | E | T | B | D | Dep. | All others | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Federal Government | 7 | 77 | 76 | 3 | 10 | | | 5 | | 178 |
| State institution or State department | 4 | 8 | 3 | 1 | 3 | 2 | | | | 21 |
| No deportations made | 20 | 30 | 46 | | 34 | 14 | 10 | 42 | 3 | 199 |
| No alien inmates | 2 | | 8 | | 8 | 11 | 4 | 10 | 1 | 44 |
| Relatives or friends | 1 | 2 | 1 | 1 | | | | 1 | | 7 |
| County | 2 | | | | | | | | | 2 |
| Sometimes Federal, sometimes State Government | | 5 | | | | | | | | 5 |
| No answer | 9 | 12 | 38 | 2 | 9 | 6 | 9 | 8 | 3 | 196 |
| Refer us to some State department or official | 4 | 19 | 5 | 2 | 7 | | | 1 | | 38 |
| Total | 49 | 153 | 177 | 9 | 71 | 33 | 23 | 67 | | 590 |

EXHIBIT 4
Page 18 of 88

## FEDERAL AND STATE COLLABORATION IN DEPORTATION

Doctor LAUGHLIN. In this study one thing came out very prominently, and that is the peculiar relation between the Federal and the State Governments in the business of deportation. Now it is clear that many States have no laws at all to coordinate or cooperate with the Federal Government in deporting defectives. They leave the initiative to the Federal Government to find these individuals that need deportation or are deportable under the law; other States, such as New York, which has the greatest deportation problem of any State, recognizing the gravity of the situation, has a Bureau of Deportation well organized.

Rather than take the time of the committee to describe that process further, I will merely say that we secured from each State data as follows:

Whether the State has any central officer concerned with or delegated to the task of controlling deportation; whether the State has any law of any sort to take the initiative in deportation or to coordinate with the Federal Government, and also whether the State has any law or administrative system enabling the State officers to deport or return, not to foreign countries, but to other States in the United States, their socially inadequate individuals. This idea of deportation to the home of the dependent was treated as an international matter, as an interstate matter, and even as an intercounty matter, and beyond that as an interfamily matter.

We find that the Federal Government is much further advanced than the several State governments in trying to locate the responsibility for the production of degenerates. We have laws in the United States calling for the deportation of certain classes. Not all of the States have laws calling for the return to their home States of the citizens of other States, who are dependent and defective, and who are maintained by the host State. It is clear that when once the biological principle of human migration is firmly established in our policy of government, the following rule will be put into effect: "Any county, State, or nation which is responsible for the production of a degenerate or defective must be made to take care of that individual and not impose his custody, expense, and care upon another community."

In summary of another phase of the study, let me say that we find 28 States, (see appendix 4, p. 54) each with the department or officer for the general control of its custodial institutions and with more or less authority over State deportation activities. There are 29 States which claim to have machinery and procedure for taking the initiative for deportation. Thirteen States report having no provision for deportation. Twenty-two States report having laws for the return to the home States of nonresident inmates of their institutions. But generally, so far as State initiative in deportation of aliens is concerned, there is but little activity. Only a small portion of the administrative officers of State custodial institutions with alien inmates are acquainted with deportation laws and procedure or take active interest in deportation of aliens. When such business is handled at all by the State, it is generally handled by a central State agent, but for the most part, initiative and execution of deportation processes is still largely a Federal matter. Many institutions do not even keep permanent records of deportations; thus they are unable to give a

EXHIBIT 4
Page 19 of 88

statistical history of aliens deported from their respective institutions. Homes for orphans and dependent children, whose inmates are largely native born, naturally show little interest in deportation. Schools and institutions for the blind and the deaf very reluctantly furnish information pertaining to their pupils. They seem to resent having their charges classified among the socially handicapped. As this group of handicapped persons, consists largely of native-born persons, there is hardly any deportation practiced by institutions for their care.

Two States are of particular interest. In California deportations are handled by the department of institutions. This bureau has initiated deportations from 13 institutions—6 for the insane, 4 for the criminalistic, 2 for the feeble-minded, and 1 for the blind. But New York is perhaps the best example in which the State is exceptionally active in such matters. Here the problem of alien inadequates is so pressing that a Bureau of Deportation is maintained by the State hospital commission, which works in close harmony with the Federal Government. It is clear that in each of the several States there should be an active State deportation bureau or officer in one of its departments concerned with handling social inadequates. This bureau or officer should be charged with taking the initiative in locating deportable aliens and citizens returnable to other countries, and in consummating such deportation and return.

## TYPICAL DUTIES OF THE STATE DEPORTATION OFFICERS

A paragraph like the following might well define the duties of the State deportation officer:

It shall be the duty of the State deportation officer to survey the institutions and population of the State in order to locate individual aliens and nonresident social inadequates, and when such inadequates are found, it shall be the duty of the said officer to institute and to consummate legal proceedings, in collaboration with the Federal immigration service, for the deportation of such aliens to the countries of their origin or citizenship, and to institute and to consummate legal proceedings for the return, to their respective home States, of such inadequates who are citizens of other States.

The CHAIRMAN. Will you describe again the second study which we have in mind?

Doctor LAUGHLIN. There is another important study which, if made, would constitute a logical step in this series of researches. I refer to the matter of mate selection. This has to do with family stock crossing and with the questions of race mixtures. Suppose we have 10,000 persons of known race and family stock quality in our midst; how will they mate? How many children will each mating produce? The answer to such questions is important. These are some of the things we want to find out, because of their bearing upon the inborn character of future Americans. Mate selection, *together* with differential fecundity, should constitute early studies. Immigration policy has and will continue to constitute a major element in this problem.

The CHAIRMAN. More than in any other field, the Federal Government controls the character of future Americans through immigration. These biological studies are of fundamental importance.

Mr. BOX. We shall have to give heed to them or go out of business.

EXHIBIT 4
Page 20 of 88

### RACE MIXTURE AND DIFFERENTIAL FECUNDITY

Doctor LAUGHLIN. Wherever two races come in contact there is always race mixture in the long run, and the upper levels tend to maintain themselves because of the purity of the women of the upper classes.   The women of the upper classes marry only into their own racial and social levels.   The women of the lower classes and the so-called inferior races tend to take mates, whether legitimately or illegitimately, from the dominant or upper races.   The consequence is that the perpetuity of a race depends upon the virtue of its women, and among the lower races, wherever two races come in contact, there is a tendency towards "breeding up" by the "pure sire method." But that, of course, can not supply the whole nation with its upper levels; the upper levels are always recruited by the mothers of the better class.   The "pure sire" principle in race mixture has had the biological effect of breeding up the lower races, and the only thing that has prevented the complete mixture of races where the two come in contact is the high virtue and the high mate selection standard of the women of the dominant classes.

Mr. Box. May I ask right there, is it not true that the upper classes are subjected constantly to the tendency to have very small families?

Doctor LAUGHLIN. Yes, sir; and that is a matter of differential fecundity that calls for still another study.   The time will come when the several States, rather than the Federal Government, in making marriage laws, and the people in building up their customs, will have to demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity, and to prevent, either by segregation or sterilization or otherwise, the reproduction by the more degenerate classes.   That is the job of the biological control of population, and immigration, of course, is one of the three great factors and the only one the Federal Government can now use effectively.   Immigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation.

### THE FAMILY OR PEDIGREE STANDARD FOR ADMITTING IMMIGRANTS

There is one other feature which might well be brought to the attention of the committee, and that is the family basis for admitting persons into the United States.   The law should define a family standard for admission, because equally or even more important than the individual is the family stock from which he springs.   The immigrant is, above all, a progenitor of future Americans.   The family or hereditary standard should be high enough to insure that future Americans sired by present-day immigrants be well endowed physically, mentally, and normally.   It might be well to define a family and the standard for family connections something like this:

For the purposes of this act, and for administering the immigration law, the family is hereby defined as a small group of persons closely related by blood.

Socially, the family is a small group of persons closely related by blood, marriage, or adoption, and which constitutes a single household or a single economic unit.   But these latter considerations are

EXHIBIT 4
Page 21 of 88

apart from the present problem.   We are now interested in good blood—that is, in the standard of hereditary family excellence.   For the latter, the law might state:

A sound family is one which, except for the normal exigencies of childhood and old age, has not more than 1 inadequate out of 10 total members; provided that such inadequates shall not be so on account of highly hereditary and highly degenerative constitutional traits; provided that a sound family shall, in its own community, bear a favorable reputation for physical stamina, intelligence, obedience to sobriety, and initiative.

Then if a person, besides being required to be not feeble-minded, not insane, not criminalistic, not possessed of loathsome disease, and not apt to become a public charge, could be required positively to be derived from a sound family, we would expect from the persons who are admitted to the United States that fewer persons ultimately would get into the socially inadequate classes, and there would be much less need for deportation, and, above all, we should logically expect that the children of immigrants would tend to raise the level of our future racial soundness, intelligence, and inborn social instincts.

The family unit standard would also be an advantage from the humanitarian point of view, because in this country the immigrant's family would not have to be broken up on account of one or more members being deported.   No member of the family would have been admitted in the first place, so its members could maintain their family unity in their own homes.   If family quality were made a provision and requirement for immigration, the country would profit greatly.

Mr. WHITE. This question might not be pertinent; but have you taken into consideration the great difficulties there would be in arriving at this definition, in the way of parentage, progenitors?

Doctor LAUGHLIN. There is no doubt about the difficulty of the job, but if we ever have a process of registering aliens on this side of the water, and of examining aliens abroad, and have an immigration passport system with immigration passports carefully visaced by our consuls on the other side, it ought to be a possible task.   It would not be a small task by any means, but it would be a possible task.


BASIC PRINCIPLES OF THE UNITED STATES IMMIGRATION POLICY

The immigration laws or the United States and our immigration policy formerly were based upon the asylum idea; let every one come to the United States who cares to come.   The next step in advance was to base the immigration policy on economic grounds.   Then the third basis is the one we are just entering on now, the biological. The first step in that direction was taken when certain undesirable classes were excluded, but as we showed in the last hearing, excluding the individual without reference to the stock or the family he comes from is not very effective, because in the next generation, instead of the alien feeble-minded, for instance, supplying only 30 per cent of their quota, the children of immigrants supplied 190 per cent which showed the letting in of bad blood.

The time will come when this country will have to face, more courageously than it has at the present time, the matter not only of race and of individual quality, but also of pedigree or family stock, and

EXHIBIT 4
Page 22 of 88

we will also have to face boldly and courageously the matter of race. It is a matter of conservation of nationality. After the Chinese exclusion act, the greatest step that the American people took in relation to the nationality or race was, of course, the quota laws of 1921 and 1924. It is now clear that the country has in its recent legislation entered definitely upon the biological basis, a farsighted policy, of immigration control.

The CHAIRMAN. The mere fact that we have a 2 per cent quota law is a long step in the right direction.

Doctor LAUGHLIN. Yes, sir.

The CHAIRMAN. And you think it led us to the conclusion that we ought to weed out within the 2 per cent, or any other per cent we have?

Doctor LAUGHLIN. Yes, sir.

The CHAIRMAN. Of course, as a matter of fact, the quota act is really the first restrictive step we ever had in the law. The others were more or less selective attempts, slight attempts to selection by certain elimination, with the exception of the Chinese exclusion act.

Mr. BOX. In your opinion, what would be the ultimate result upon the people of America and upon the country if we should continue indefinitely the policy that had controlled us prior to the enactment of the 2 per cent law?

Doctor LAUGHLIN. The racial constitution of the ultimate American would, before many generations, be very different from the American of to-day. It would be certain in time to upset our ideals of law and government, and it would cause also a severe social upset. Our social ideals would be changed because the fundamental instincts of the people would be different. They might be better, but they would be different, most probably inferior.

Mr. BOX. I want to have the opinion stay in the record.

The CHAIRMAN. I will be very glad to have it stay.

THE SOVEREIGN RIGHT TO DEPORT ALIENS, AND THE OBLIGATION OF THE HOME COUNTRY TO RECEIVE ITS RETURNING NATIONALS

The CHAIRMAN. Suppose the home country should refuse to receive its nationals whom we attempt to deport to it?

Doctor LAUGHLIN. While international law is not written in black and white, by a superior legal authority capable physically of enforcing its statutes, nevertheless it is clearly established in practice that no country or State or community for that matter, may refuse to receive into its territory its own nationals, regardless of whether such nationals return voluntarily from or are deported by a host country. A second section of the same unwritten law states in substance that every sovereign nation has the right to deport aliens from its territories, which right can be limited only by specific treaties. In Italy I have had an Italian immigration official tap me on the chest and inform me that Italy has the right to deport any alien within her borders without giving any reason for such action. I had to agree to that proposition, and at the same time to claim the same right for the United States and for every other sovereign nation. As a matter of fact, in practice, if we can prove that any given alien came to the United States from a certain country or city in that country, the home country or community does not refuse to receive him.

EXHIBIT 4
Page 23 of 88

It therefore behooves us, in our immigration business, to keep a careful record of origins of immigrants. This is only one more argument in favor of registration.

Deportation of aliens who become public charges is common international practice, and it is suggested also for increased use in interstate practice. Under the international practice, the country that produces the defective must be responsible for him, if no other country can be prevailed upon to naturalize or to care for him. Looking at the question from the practical standpoint of New York State, aliens who become public charges are costing this State a great many millions of dollars every year for their maintenance in its custodial institutions. It is especially costly to the great cities, and the States that have great cities in them. Millions of dollars for institutional maintenance are spent on inadequate aliens, which expenditure should be borne by the State or community which produces the particular defectives. In actual practice we do not pay much attention to the matter of original responsibility. A man may be born in some Eastern State; he may go to some Western State and reside there for a short time, perhaps for less than a year, and get committed to a public institution. The burden of his maintenance will thus be put upon State which did not produce him, to which he, in his prime, rendered no services, and in which he has lived but a short time.

### RESPONSIBILITY FOR THE PRODUCTION OF INADEQUATES

If any outstanding principle of practical eugenics has been developed within the last few years it is that of placing all responsibility for the production of hereditary degenerates or defectives. This principle is worth restating: So far as a family, a community, a state, or a nation is able to maintain its own defectives, it should be compelled by municipal and international law to do so. The policy of a family throwing its defectives on the community for maintenance is not looked upon with so much favor as formerly. In other words, the idea of public charity, while not less kind than formerly, is certainly becoming more effective. A State like New York, which, for the period 1894–1920, sent from its hospitals for the insane to the States of their residence 5,317 insane persons, shows that one State does not intend, if it can help it, to maintain in its public institutions individuals produced by another. Similarly, the United States does not purpose to maintain in its institutions persons who are produced in alien countries.

Mr. WHITE. Thousands of people from all sections come to Colorado, for instance, to be cured of tuberculosis.

Doctor LAUGHLIN. That principle of responsibility for the maintenance of dependent, defective, and delinquent classes should hold true not only as between States but, as I have said, between nations.

Mr. DICKSTEIN. They go out there in order to save their lives. Of course, that is an unfortunate situation. If New York were a place where tuberculosis could be cured, they would come to New York, of course.

Mr. WHITE. There are a lot of New York people who have gone to Colorado and settled there.

EXHIBIT 4
Page 24 of 88

Mr. Dickstein. And we have sent millions of dollars to Colorado to support those poor unfortunates.

Mr. White. Yes; they have sent large sums of money there for the support of one of the most splendid institutions in the State, the National Jewish Home for Consumptives. That condition is not confined to any particular State. That is true also of Kansas, and of every other State to which my attention has been called.

Doctor Laughlin. The general acceptance of the basic principle which would place responsibility for the maintenance of inadequates on the community which produces them would serve not only a valuable international purpose, but also would constitute a valuable rule for interstate and intercommunity adjustment, and, what is most important, it would work an advance in the practical application of national eugenics or race conservation.

With the United States deportation is not a matter of caprice. It is regulated by most liberal law which is administered with great charity and considerable laxity. The standards for deportation call for returning to their home countries only aliens who have demonstrated, beyond doubt, degeneracy far below the level which we wish to maintain for ourselves. As the matter now stands, no nation, State, or lesser community which produces a defective or degenerate person can refuse to receive such person into its territories when such person turns voluntarily from or is deported by a host community, State, or nation. It is a good principle as well as an actual one, and one which, in the interests of justice, peace, and eugenical soundness, should be strengthened. One of the most liberal features is the law that prevents the deportation of aliens who become public charges "from causes arising since arriving in the United States." This provision is a liberal and a just one, and is a keystone against injustice in deportation.

### EXILING AND "DUMPING" OF INADEQUATES

At present, practically all of the territory of the world is claimed and fully occupied, so that no nation has a right to exile or to "dump" its undesirable human stock into the territories of another. Each nation (and indeed each lesser civil and social organization from the province and village to the family itself) must, in accordance with the principle of "live and let live," be responsible for the protection and care of its own undesirable and inadequate human stock. Institutionalization is the immediate palliative, but national eugenics is the long-time cure for human degeneracy. A general acknowledgment of the international evil of exiling or "dumping," a harsh word not used in the careful parlance of international law, would greatly strengthen the principle of responsibility for defectives. The receiving nation should acknowledge with gratitude the origin of immigrants who become desirable citizens and who leave superior offsprings. Such acknowledgments would constitute a considerable factor in making international amity.

### DESIRABLE AND UNDESIRABLE EXILES

Of course, we have received many splendid persons who have made most desirable immigrants from the seed-stock viewpoint, who have been practically exiled or driven out of their home coun-

EXHIBIT 4
Page 25 of 88

tries because they disagreed with the ruling authorities in religious faith or in political adherence.   But at the present time, with tolerance quite a general thing, we can expect little or no further superior human seed stock through exiling or "dumping" by foreign countries.   Countries are continually increasing their appreciation of good human stock.   "Dumping," exiling, and assisting emigration have, for the most part, in recent generations, resulted and will doubtless continue for many generations, to result in exporting from their home countries relatively little splendid human breeding stock, compared with the number of biological and social misfits.   As a rule, the emigrant who was not welcome in his home country is derived from the genetically less effective stocks.   We shall have to guard our own interests in selecting desirable immigrants.   This calls for supporting our rules for debarring undesirables, for vigorous deportation laws, and for their active enforcement.

### THE LEGAL AND THE EUGENICAL ASPECTS OF CHINESE IMMIGRATION

Doctor LAUGHLIN. Chinese immigration and its control constitute a very important and instructive chapter in national eugenics. The Chinese are subject to deportation not because of social inadequacy—many Chinese are of splendid physique and healthy in both mind and body, have splendid minds, fine temperamental balance, and altruistic instincts—but simply because they are not racially assimilable.

The sex ratio of an immigrant stock is always important.   Of the 61,639 Chinese found in the United States in 1920, there were practically 7 males to 1 female.   The fecundity of the Chinese in America is limited primarily by the number of Chinese women in the country. If the Chinese men reproduce in this country, they will have to find wives among other nonwhite races, because there is very little mating of white women and Chinese men.   Unless the number of Chinese women increase, the number of Chinese will never grow to comprise a considerable percentage of our whole population.   The number of Chinese in the country under the present policy need not exceed the number which we need in order to maintain desirable commercial and cultural contacts with the Chinese people.   There must always be a certain interchange of visitors, and even permanent residents and possibly immigrants, among peoples who are in commercial and cultural contact.   But this number can always be kept low and need, in no manner, constitute an immigration of human seed-stock which would contribute a considerable proportion of the population of future generations of the host country.   It need not lay the foundation for extensive race mixture, nor bend the trend in the development of national racial traits toward the immigrant stocks.

While the Chinese are recognized to be one of the oldest and most superior of the world's races, still, because of a great difference between their racial characteristics and those of the foundation stocks of the American people, it was not considered desirable to permit them to migrate in great numbers to the United States—not great enough to constitute an important element in producing offspring for future generations.   During the year ending June 30, 1925, there were a total of 6,804 Chinese admitted, while 6,639 departed, leaving a net gain of only 165.   During this year only 93 Chinese were deported

EXHIBIT 4
Page 26 of 88

under the Chinese exclusion laws, and 54 by United States marshals
—147 in all.  Only 188 Chinese were debarred at our ports during
the year ending June 30, 1925.  The Federal census of 1920 found
61,639 Chinese in the United States.  It is important to consider
that in 1900 there were 89,863 Chinese here, and in 1910 there were
71,513.  If, without the Chinese exclusion law of 1882, economic
forces had been permitted to operate in the absence of statute law,
there would have been hundreds of thousands and probably millions
of Chinese in the United States at the present time.  It is a splendid
demonstration of how, in the case of modern immigration in times of
peace, statute law can control immigration in sovereign states.  Of
the several factors which govern changes in poulaption, immigration
is the easiest to govern by statute law.  The Chinese exclusion act
was no reflection on the splendid racial qualities of the Chinese people.
It was simply a statement that the Chinese were so different from the
foundation stocks of the United States that race mixture, which, in
the long run, always follows immigration, was not desirable on a
large scale for either the Chinese or the American foundation races.
The same eugenic principle applies to subraces within the white race,
to family stocks within each subrace, and to individuals within the
family stocks.  These are the principal foundations for immigrant
selection: first, race; second, family stocks; third, individual quality.
Regardless of race, immigration should be made to recruit to our
high standard of family stock and individual excellence, and it should
not be permitted to become a factor for deterioration, nor for break-
ing down our law and order.  The immigrant should be looked upon
primarily as seed stock for reproducing future Americans.

### SOVEREIGN RIGHTS IN HUMAN MIGRATION

The CHAIRMAN. It is a sound principle of international law that
every nation has the right to determine who may enter its borders
and how long each entrant may stay.  There is also growing into an
established rule the principle of applied eugenics that every com-
munity, whether a state or a sovereign nation, which produces an
antisocial person, whether defective or criminal, should be required
to care for such a person.  We should do everything possible, both in
legislation and administration, to reduce to the lowest possible level,
principally by debarring and deporting, crime among aliens in the
United States.

Mr. Box. Mr. Chairman, the trouble with the whole subject is
that it is too big for most of us.  But it looks as though we will have
to control immigration to suit our own needs or we will lose our
national character.  A thing like that would spell destruction for the
future of America.

The CHAIRMAN. It certainly would. .

Mr. WHITE. Along that very line then, I want to ask, should we not
now begin seriously to consider if we may, consistently with inter-
national relations, shut off entirely immigration from those countries
which we think are less desirable, that would degrade our own racial
and institutional standards?  Of course that would be a hard thing
to do, but we find by an examination of the report of the Commissioner
of Immigration that in some years the quota has been filled from many
certain countries and that it is short from many other countries,

EXHIBIT 4
Page 27 of 88

but to our surprise, countries that we believed generally—that I
believe generally would be better if we could have immigration from,
notably England, France, Holland, and the northern countries of
Europe—these have not nearly approached their quota, to the sur-
prise of myself and many others. Why not go the limit with them?

Mr. VINCENT. Then we will get just what you are after, Mr.
White. We can do it and do it legitimately and regularly.

Doctor LAUGHLIN. In California in 1918 there were admitted to
all the hospitals for the insane 2,151 persons, of whom 1,959, or 91 per
cent were natives of other States or countries.

The CHAIRMAN. I should like to have you present to the committee
the especial data which you have on the three classes of inadequates—
that is, the feeble-minded, the insane, and the criminal classes—
which we discussed earlier.

## DEPORTATION OF THE FEEBLE-MINDED

Doctor LAUGHLIN. The feeble-minded present an interesting group
when studied in relation to deportation. Unlike any other group
except the congenitally crippled, the alien feeble-minded in the United
States are a group of persons who entered the country while suffering
from their particular defects. Persons do not become feeble-minded.
If they suffer from this ailment, they have always had it. Conse-
quently, the feeble-minded aliens, both those in our institutions and the
many more of them who are not in custodial care, have, by some
means or another, managed to get past our immigration bars which
would exclude them. With almost any other class it is possible that
at the time of entry the potentiality for later defect or inadequacy may
be so thoroughly hidden that it can not be determined, even by the
best inspection, although the individual may have a constitutional
make-up which is the principal cause for the particular breakdown
and a social conduct known as crime or some type of insanity, or a
breakdown of physical and moral energy necessary to effective work.
There is one reason for nondeportability of alien dependents which
does not apply to the feeble-minded—that is the class which acquired
the particular ailment "from causes arising since admission into the
United States." Another interesting phase in reference to feeble-
mindedness is that our standards of admission in reference to intelli-
gence require only that the individual be talented enough to learn to
read and to keep out of custodial institutions for the feeble-minded.
This means that he may be a very inferior individual so far as his
intellectual, his spiritual, and his moral constitution is concerned.

The CHAIRMAN. Can you show us the table that has something to
do with the birth rate of different intelligence classes in the United
States?

Doctor LAUGHLIN. Yes; we have some data on this subject.

The CHAIRMAN. You can proceed with that subject then.

## DISTRIBUTION OF INTELLIGENCE AMONG THE FOREIGN BORN

Doctor LAUGHLIN. The best measure of intelligence in nativity
groups in the United States has been based upon the Army intelli-
gence tests. These tests measured 12,407 foreign-born recruits in

EXHIBIT 4
Page 28 of 88

our Army, which were fairly representative not only of all foreign-born recruits but also of the whole foreign-born population. This test found intelligence distribution as follows: Among the foreign born, (1) very superior (Army grade A), 1.1 per cent; (2) superior (Army grade B), 2.9 per cent; (3) high average (Army grade C+), 7.3 per cent; (4) average (Army grade C), 26.6 per cent; (5) low average (Army grade C−), 16.5 per cent; (6) inferior (Army grade D), 30.8 per cent; (7) very inferior (Army grade D−, E), 14.8 per cent. Now, if we project these per cents to the whole 13,920,692 foreign-born persons in the United States in 1920, we find that 62.1 per cent, or 8,644,749, are below the average of American intelligence.

Mr. Box (interposing). Does that mean that eight-thirteenths of them are below the average?

Doctor LAUGHLIN. That is exactly what it means. Now, for the population of the native stock——

Mr. Box (interposing). What is the average?

Doctor LAUGHLIN. The average intelligence do you mean?

Mr. Box. Yes. Is it the average of the people throughout the United States?

Doctor LAUGHLIN. That average is C of the Army intelligence grading, which, interpreted in common language, means that a man of grade C makes a good common worker. A man of grade C− means a man who is a good worker under direction; and a man of grade D is lacking in adaptability and needs much supervision; and in that class the cost of the supervision is greater than the value of the work [indicating grade D on paper]; below that, his labor has no net value.

If a man comes in the level of grade C+, he is an intelligent, skilled worker. A man of grade B is a first-class executive. And the men of grade A are the leaders in their respective occupations.

### IMMIGRATION STANDARDS IN RELATION TO INTELLIGENCE

Now, our immigration standards in reference to intelligence are much too low if we are to consider immigration from the seed-stock standpoint and desire to make it add to the average of our native intelligence. Instead of drawing the line between very inferior and absolute feeble-minded persons, we should require of the immigrant an intelligence at least equal to that of our stocks already established. If we set it below this, immigration will tend to pull down the level of native intelligence in our future generations of Americans. This is, course, regardless of race. It is a matter of family stocks within each race. I have here a table (see Table III, p. 27) showing the results of a special survey of 50 institutions for the feeble-minded, made in 1925. In these we found 36,347 native-born inmates and 1,514 foreign-born inmates. Out of these, only 18 were returned as deportable; 15 were naturalized citizens. It is pathetically strange that any American court would naturalize any feeble-minded person. Only nine were reported as having become feeble-minded from causes arising since admission. These nine may have been admitted as children and suffered from some disease or injury which stopped their mental development. But as a rule, feeble-mindedness is potential at birth, and these nine exceptions only serve to emphasize the generality of the rule.

EXHIBIT 4
Page 29 of 88

28          EUGENICAL ASPECTS OF DEPORTATION

TABLE III.—*Causes of nondeportability of foreign-born inmates of State institutions for the feeble-minded*

| State and institution | Number of foreign-born inmates | | | Foreign-born inmates deportable | | | Naturalized citizens | | | Resident of United States more than five years | | | Causes arising since admission to United States | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total |
| 1. Alabama: Home and School for Feeble-minded, Tuscaloosa... | 1 | 0 | 1 | | | | | | | | | | | | |
| 2. California: Sonoma State Home, Eldridge... | 70 | 71 | 141 | 1 | 0 | 1 | | | | 69 | 71 | 140 | | | |
| Colorado: | | | | | | | | | | | | | | | |
| 3. State and Training School, Ridge... | 1 | 1 | 2 | 0 | 0 | 0 | | | | 1 | 1 | 2 | | | |
| 4. State Home and Training School for Mental Defectives, Grand Junction... | 4 | 2 | 6 | 0 | 0 | 0 | | | | 4 | 2 | 6 | | | |
| 5. Delaware: Colony for the Feeble-minded, Stockley... | 2 | 3 | 5 | 0 | 0 | 0 | 2 | 3 | 5 | | | | | | |
| 6. Florida: Florida Farm Colony, Gainsville... | 1 | 2 | 3 | 0 | 0 | 0 | | | | 1 | 2 | 3 | | | |
| 7. Idaho: Idaho State Sanitarium, Nampa... | 11 | 12 | 23 | 0 | 0 | 0 | | | | 11 | 12 | 23 | | | |
| 8. Illinois: State School and Colony, Lincoln... | 25 | 57 | 82 | 1 | 1 | 2 | | | | 24 | 56 | 80 | | | |
| Indiana: | | | | | | | | | | | | | | | |
| 9. School for Feeble-minded Youth, Fort Wayne... | 4 | 3 | 7 | 0 | 0 | 0 | 1 | 2 | 3 | 3 | 1 | 4 | | | |
| 10. Farm Colony for Feeble-minded, Butlerville... | 5 | 0 | 5 | 0 | 0 | 0 | 1 | 0 | 1 | 4 | 0 | 4 | 0 | 0 | 0 |
| 11. Iowa: Institution for Feeble-minded Children, Glenwood... | 11 | 15 | 26 | 0 | 0 | 0 | | | | 11 | 15 | 26 | | | |
| 12. Kansas: State Training School, Winfield... | | | | | | | | | | | | | | | |
| 13. Kentucky: State Institution for Feeble-minded, Frankfort... | 1 | 2 | 3 | 0 | 0 | 0 | | | | | | | 1 | 2 | 3 |
| 14. Louisiana: State Colony and Training School, Alexandria... | 1 | 0 | 1 | 0 | 0 | 0 | | | | 1 | 0 | 1 | | | |
| 15. Maine: School for Feeble-minded, West Pownal... | 3 | 9 | 12 | 0 | 0 | 0 | | | | 3 | 9 | 12 | | | |
| Massachusetts: | | | | | | | | | | | | | | | |
| 16. Wrentham State School, Wrentham... | 12 | 37 | 49 | 0 | 0 | 0 | | | | 12 | 37 | 49 | | | |
| 17. State Hospital, Belchertown... | 13 | 27 | 40 | 0 | 0 | 0 | | | | 13 | 27 | 40 | | | |
| 18. Michigan: Home and Training School, Lapeer... | 73 | 61 | 134 | 4 | 1 | 5 | | | | 69 | 60 | 129 | | | |
| 19. Minnesota: School for Feeble-minded and colony for epileptics, Faribault... | | | | | | | | | | | | | | | |
| 20. Mississippi: Colony for Feeble-minded, Ellisville... | 0 | 0 | 0 | | | | | | | | | | | | |
| 21. Missouri: Colony for Feeble-minded and Epileptics, Marshall... | 0 | 0 | 0 | | | | | | | | | | | | |
| 22. Montana: School for Deaf, Blind, and Feeble-minded Children, Boulder... | | | 14 | | | | | | | | | | | | |
| 23. Nebraska: Institution for Feeble-minded, Beatrice... | 7 | 14 | 21 | 0 | 0 | 0 | | | | 7 | 14 | 21 | | | |
| 24. New Hampshire: School for Feeble-minded, Laconia... | 3 | 7 | 10 | 0 | 0 | 0 | | | | 3 | 7 | 10 | | | |
| New Jersey: | | | | | | | | | | | | | | | |
| 25. State Institution for Feeble-minded Women, Vineland... | 0 | 56 | 56 | 0 | 0 | 0 | | | | 0 | 52 | 52 | | | |
| 26. State Colony for Feeble-minded Males, New Lisbon... | 7 | 0 | 7 | 0 | 0 | 0 | | | | | | | | | |
| 27. State Colony for Feeble-minded Males, Woodbine... | 4 | 0 | 4 | 0 | 0 | 0 | 4 | 0 | 4 | | | | | | |
| New York: | | | | | | | | | | | | | | | |
| 28. Letchworth Village, Thiells... | 58 | 47 | 105 | 4 | 2 | 6 | | | | | | | | | |
| 29. Rome State School, Rome... | 182 | 54 | 236 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | |
| 30. Newark State School, Newark... | 0 | 109 | 109 | 0 | 2 | 2 | | | | 0 | 107 | 107 | | | |
| 31. Syracuse State School, Syracuse... | 25 | 35 | 60 | | | | | | | | | | | | |

EXHIBIT 4
Page 30 of 88

TABLE III.—*Causes of nondeportability of foreign-born inmates*—Continued.

| State and institution | Number of foreign-born inmates | | | Foreign-born inmates deportable | | | Naturalized citizens | | | Resident of United States more than five years | | | Causes arising since admission to United States | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total |
| 32. North Carolina: Caswell Training School, Kinston | 0 | 0 | 0 | .... | | | .... | | | .... | | | .... | | |
| 33. North Dakota: Institution for Feeble-minded, Grafton | 20 | 21 | 41 | 0 | 0 | 0 | .... | | | 20 | 21 | 41 | .... | | |
| 34. Ohio: Institution for Feeble-minded, Columbus | 60 | 55 | 115 | .... | | | .... | | | .... | | | .... | | |
| 35. Oklahoma: Institution for Feeble-minded, Enid | 0 | 0 | 0 | .... | | | .... | | | .... | | | .... | | |
| 36. Oregon: State Institution for Feeble-minded, Salem | 11 | 10 | 21 | 1 | 0 | 1 | .... | | | 10 | 10 | 20 | .... | | |
| Pennsylvania: | | | | | | | | | | | | | | | |
| 37.   Polk State School, Polk | 15 | 18 | 33 | 0 | 0 | 0 | .... | | | 15 | 18 | 33 | .... | | |
| 38.   Laurelton State Village, Laurelton | 0 | 6 | 6 | 0 | 0 | 0 | .... | | | 0 | 6 | 6 | .... | | |
| 39.   Pennhurst State School, Pennhurst | 29 | 27 | 56 | .... | | | .... | | | .... | | | .... | | |
| 40. Rhode Island: Exeter School, Slocum | 3 | 7 | 10 | 0 | 0 | 0 | .... | | | 2 | 6 | 8 | 1 | 1 | 2 |
| 41. South Carolina: State Training School for Feeble-minded, Clinton | 0 | 0 | 0 | .... | | | .... | | | .... | | | .... | | |
| 42. South Dakota: State Home and School for Feeble-minded, Redfield | 12 | 15 | 27 | 0 | 1 | 1 | .... | | | .... | | | .... | | |
| 43. Tennessee: Home and Training School for Feeble-minded Persons, Nashville | 0 | 0 | 0 | .... | | | .... | | | .... | | | .... | | |
| 44. Texas: State Colony for Feeble-minded, Austin | 1 | 3 | 4 | 0 | 0 | 0 | .... | | | .... | | | 1 | 3 | 4 |
| 45. Vermont: State School for Feeble-minded, Brandon | 2 | 6 | 8 | 0 | 0 | 0 | .... | | | 2 | 6 | 8 | .... | | |
| 46. Virginia: State Colony for Epileptics and Feeble-minded, Colony | 1 | 1 | 2 | 0 | 0 | 0 | 1 | 1 | 2 | .... | | | .... | | |
| 47. Washington: State Custodial School, Medical Lake | 0 | 0 | 0 | .... | | | .... | | | .... | | | .... | | |
| Wisconsin: | | | | | | | | | | | | | | | |
| 48. Northern Wisconsin Colony and Training School, Chippewa Falls | 7 | 16 | 23 | 0 | 0 | 0 | .... | | | .... | | | .... | | |
| 49.   Southern Wisconsin Home for Feeble-minded and Epileptics, Union Grove | 0 | 0 | 0 | .... | | | .... | | | .... | | | .... | | |
| 50. Wyoming: State School for Defectives, Lander | 6 | 0 | 6 | 0 | 0 | 0 | .... | | | 6 | 0 | 6 | .... | | |
| Total | 691 | 809 | ¹1,514 | 11 | 7 | 18 | 9 | 6 | 15 | 291 | 540 | 831 | 3 | 6 | 9 |

¹ Includes 14 inmates not classified by sex.

## DEPORTATION OF THE INSANE

The CHAIRMAN. The second class in which we are particularly interested is the insane. Doctor Laughlin has made studies on this subject for this committee and has reported them in past hearings. Just now we are interested in the deportation of the class of persons suffering from mental disease.

Doctor LAUGHLIN. For practical purposes insanity is made to include all groups of mental disease except feeble-mindedness. Feeble-mindedness is simply the failure to develop intelligence. Insanity is a disorder which develops in both otherwise normal and in defective individuals. It constitutes the cause of the great bulk of costs for custodial care of the inadequates. In a study made by the

EXHIBIT 4
Page 31 of 88

United States Bureau of the Census under date of January 1, 1923, the following facts were determined:

*Nativity and parentage of patients in hospitals for mental disease, January 1, 1923, for the entire United States*

| | |
|---|---|
| Total number | 265, 829 |
| Per 100,000 | 252. 8 |
| White patients | 244, 968 |
| Per 100,000 | 259. 8 |
| Negro | 20, 084 |
| Per 100,000 | 192. 0 |
| Indian | 244 |
| Per 100,000 | 104. 5 |
| Chinese | 207 |
| Per 100,000 | 340. 6 |
| Japanese | 163 |
| Per 100,000 | 148. 3 |

*White patients*

| | |
|---|---|
| Native white: | |
| Native parentage | 92, 913 |
| Per 100,000 | 159. 8 |
| Foreign parentage | 32, 271 |
| Per 100,000 | 207. 0 |
| Mixed parentage | 9, 409 |
| Per 100,000 | 135. 8 |
| Parentage unknown | 34, 673 |
| Foreign-born white | 69, 984 |
| Per 100,000 | 513. 9 |
| Nativity unknown | 5, 688 |

If the native-born and foreign-born whites are compared with reference to their respective rates in producing insane persons—insane enough to cause commitment to custodial institutions—we find the alien insane 3.22 times as frequent per 100,000 persons of their respective nativity group as the insane native whites of native parentage, 2.48 times as frequent as native whites of foreign parentage, and 3.78 times as frequent as native whites of mixed parentage. There may be something in the fact that the foreign-born immigrant suffers great stress in his attempts to make adjustments in the new country, and consequently he breaks down more frequently than the native, but after making due allowance for all this, it would seem that the immigrants of the present generation are more unstable mentally in their hereditary or constitutional make-up than were the immigrants of one and more generations ago. This difference of frequency is too great to be accounted for by the factor of mere additional stress on the immigrant compared with the present stress on families already established. One wonders whether or not the European countries are not supervising their emigration much more intelligently than the United States supervises her immigration policy. European nations seem to be appreciating the seed-stock idea, both in exporting their surplus stocks and in receiving new blood—all of which goes to emphasize the necessity for each nation looking after its own fundamental interests.

In time of onset, the insane differ from the feeble-minded primarily in the fact that most persons who become insane do not break down until adult life. Thus, the opportunity for coming through the immigration barrier by a potentially insane person is relatively easy, unless we study the particular individual in his home surroundings,

EXHIBIT 4
Page 32 of 88

secure some of his individual history, and, above all, learn from what sort of family stock he springs. All of this is made more possible and practicable by our new system of examining immigrants overseas.

## DEPORTATION OF CRIMINALS

The CHAIRMAN. The third special class has to do with criminals.

Doctor LAUGHLIN. Among the 74,170 aliens found in the State and Federal institutions, 11,224 were in such institutions on account of having committed crime of a serious nature in the United States. This does not include jails or workhouses, but only the penitentiaries and prisons. It is interesting that of these criminalistic aliens, only 2,909 were reported as deportable. The reasons why the rest were not deportable were given as follows: naturalized citizens, 2,030; residents of the United States more than five years, 4,272; criminalistic from causes arising since admission, 248; claimed by the authorities not to be deportable but no causes given, 2,265.

The CHAIRMAN. The committee will remember that some years ago Doctor Laughlin presented a study on "The Analysis of America's Modern Melting Pot," in which he showed that, so far as felons were concerned, the foreign-born person was no more apt than a native born to get in prison in the United States, but it should be pointed out that our laws seek to keep out all criminalistic persons, whereas our efforts have resulted only in keeping them out to about the frequency of our native stock. Later studies seem to indicate that among the petty crimes, particularly the violation of the liquor laws, the foreign born are guilty, according to their numbers, to a much greater degree than the native stocks.

Doctor LAUGHLIN. Of course we should try to keep down the "quota fulfillment" of the criminalistic classes among the foreign-born to zero, but when, in spite of our efforts to do so, we find criminalistic aliens within our borders, it would seem that the next best step would be to deport them. We can not here go into the causes of crime, but it seems strange that prison authorities would say that about one felon out of forty-six became so from "causes arising since coming to the United States." It would be rather hard before a court to prove that the causes of crime were not much more fundamental and long-standing than that. A person may be subjected to such strain that he may break down mentally, in which case he is not punished as a criminal but is generously cared for as an insane person; but to list an individual criminal in this exempt class seems almost impossible. The criminalistic is one class for which it would seem most proper to remove the statute of limitations so far as deportability is concerned.

The CHAIRMAN. Any far-reaching plan to combat crime in the United States would fail to achieve its fullest possibility if it neglected the matter of crime among aliens. According to the census of 1920, the foreign-born white population of the United States comprised 12.97 per cent of our whole population. These aliens were admitted not as a right but as a privilege granted them by the United States. It is the obvious intent of our law to debar all aliens who are criminalistic in tendency. We have thus set up a bar against the admission of criminals. But, in spite of our efforts along these lines, many aliens who are admitted are later found to violate

EXHIBIT 4
Page 33 of 88

our laws.  Thus in 1922, in a first-hand study by this Committee on Immigration and Naturalization, we found in 155 State and Federal prisons that, in proportion to their numbers, the foreign-born (quota fulfillment, 98.50) were approximately as numerous as our native-born (quota fulfillment, 100.26) prisoners.  This is for felons in the prisons.  If we turn from these more serious offenses to misdemeanors, we find the percentage of alien offenders somewhat increased. This ratio  is substantially verified by the Bureau of the Census, which, on January 1, 1923, found the foreign-born white prisoners (in all prisons for felons, and jails and workhouses for misdemeanants) to constitute 13.8 per cent of the total, a quota fulfillment of 106.39. These 13.8 per cent of prisoners were drawn from 12.97 per cent of the whole population.   It should be the business of our immigration laws and their administration to prevent altogether the admission of persons likely to violate our laws.  But if, in spite of our vigilance in debarring such aliens, we find an alien violating our laws in a serious offense, he should, after proof of his offense, be deported.

### INSTITUTIONAL INITIATIVE IN DEPORTATION

Doctor LAUGHLIN.  I will give a description of the way in which we went at this particular investigation.  First, the matter was considered from the standpoint of several State governments.  From the governor, the secretary of state, or some other responsible official, we secured a statement from the particular State government concerning its practice of deportation.  I have these summaries, and with the consent of the committee I will print them in full in the report. (See appendix 4, p. 54.)

Besides the State survey which I have described very briefly, we made an institutional survey.  We appealed to each one of these 688 State and Federal institutions, asking each a number of questions, and asking each to go into its files and give us certain data, such as the name of the institution, where it is located, the type, sex, and race of inmates it holds; then the classification of inmates by sex and by nativity, whether native or foreign born.  The next item calls for a report on the number of foreign-born inmates, and how many are now deportable—males, females, and total.  All this material I have already analyzed for you.  Then at that point in the questionnaire we gave reference to the Federal immigration act of February 5, 1917, with special reference to sections 18, 19, and 20. Further, we asked the superintendents of institutions about the inmates in their institutions who were deportable to other States and to other communities, and we asked for reference in the laws of the States as to how these processes of international and interstate deportation were carried on by the particular State.  Then we asked for an historical note; we asked each institution to state the number of persons who had been deported from the particular institution since its first deportation.

We still have some institutions to hear from, but the returns will be practically complete in the near future.  The present results show the type of information which we have secured from the several institutions.  For example, take an institution for the feeble-minded. Here is one at random, the Nebraska Institution for the Feeble-

EXHIBIT 4
Page 34 of 88

minded, at Beatrice, Nebraska. It is for both sexes, and on the date of this return it had an inmate population of 756. Of these, 747 were native born and only 9 were foreign born. That is a western agricultural State. But when it comes to the matter of deportation, they reported none deportable, and since that institution was established it had deported no aliens.

If we go to Massachusetts, in the Wrentham State School there are 1,311 inmates, of whom only 55 are foreign born, but they call none of them deportable; 55 feeble-minded persons were foreign born and were feeble-minded when they came to the United States, because persons do not get feeble-minded afterwards—they do not "go feeble-minded," we must remember—once feeble-minded, always feeble-minded, but none was deportable, and in the whole history of that institution they have listed only six persons deported. The annual turnover is, moreover, large.

And so the story goes on the feeble-minded. Now for the insane—these are only random samples.

### POPULATION TURNOVER IN INSTITUTIONS

The CHAIRMAN. What do you mean by the "turnover"? Do you mean the feeble-minded in and out of these institutions?

Doctor LAUGHLIN. Turnover refers to the period of renewal of institution population. It measures the duration of an "inmate generation." It measures also the average length of institutional residence. The feeble-minded in the State institutions average about nine years' residence. Then they die off. That is the average record. Sometimes the higher grade feeble-minded, the morons, are trained to do menial service, and are sometimes let out on parole, but the average residence in institutions for the feeble-minded in the United States is about nine years. For the insane the average period is only about two and one-half years. Their turnover is much more rapid than that of the feeble-minded on account of the shorter period of commitment, and due principally to the fact that many of the insane may be cured. Of course, some classes of the insane, such as the large group with dementia praecox, it would seem, never get well.

Now, if you will take an institution for the insane—let us take one right from the middle of the lot, because the stack of reports is so large. Here is one from Minnesota. Here is Hastings, Minn., with an inmate population of 984. They report 417 foreign born, but they report only one deportable.

The CHAIRMAN. Do they differentiate in these reports as to the foreign-born and naturalized foreign-born?

Doctor LAUGHLIN. Yes; our analysis of causes for nondeportability shows that.

### CERTAIN DEGENERATE FAMILIES

Mr. HOLADAY. From your analysis of this subject—for instance, take a State highly specialized in manufacturing like New Jersey and compare it with a State like California or Oregon, where the industry is more agriculture than anything else—is there a larger percentage of

EXHIBIT 4
Page 35 of 88

feeble-minded persons in the agricultural districts than in the thickly settled commercial and manufacturing districts?

Doctor LAUGHLIN. No, the feeble-minded families tend to gravitate toward the outskirts of the great cities, and in agricultural regions toward the poorest lands in the hills. Families of this sort do not have money enough to come down into the valleys and occupy valuable agricultural lands, nor do the lowest of them have intelligence enough to live in the towns and work in manufacturing or commercial enterprises, so they have gravitated toward the hills where they squat on the land, and to the outskirts of towns where they build shacks from which no one cares to drive them.

Mr. VINCENT. And they propagate rapidly?

Doctor LAUGHLIN. Very rapidly. They beg and steal, and were often convicted of petty crimes. They were often relatively easy to study from the pedigree point of view because of their tribal life, and because both the parents' and the children's names are often found on the books of the charity organizations.

The Ishmaels, who are living in Indiana, were studied by Dr. A. H. Estabrook, of the Carnegie Institution of Washington. They are called American gypsies; they go north in the summer time and south in the winter. Their pedigree records show that about four or five generations ago they came up from Kentucky, and the further history shows that into Kentucky they had come from Virginia, and it is thought—it has not yet been demonstrated beyond a doubt—that those early Virginians, persons who were exiled from Great Britain, were "dumped" into Virginia in very much the same manner as England "dumped" many of her degenerates into Botany Bay in Australia. Indeed "Botany Bay" has come to mean a place of exile for degenerate human stocks.

At any rate the occurrence of the Ishmaels is typical of what happens when we keep degenerate immigrants for seed stock. A few degenerate individuals arrive in Virginia, either voluntarily or by "dumping," they are pushed westward into Kentucky, and like camp followers on the trail of the substantial and capable pioneers, they move from Kentucky up into Indiana. That is where they are now.

The CHAIRMAN. In the meantime they intermarried with other peoples?

Doctor LAUGHLIN. Others of their own social level. They are mostly white, degenerate whites. The men hardly ever rise above the mentality of 8 or 9 years, consequently they are barely intelligent enough to go about and live and beg, but not intelligent nor energetic enough to live as intelligent farmers or factory hands.

Mr. Box. But the women at an early age become subject to motherhood and increase rapidly. I want that to go into the record, because it is bearing on the matter that is before this committee. Is that a fact?

Doctor LAUGHLIN. They propagate rapidly. We can show you the pedigrees collected by Doctor Estabrook; they show the size of the families. In these degenerate families the increase is very rapid.

Mr. HOLADAY. I remember reading—I do not remember where I read it, whether in a book or in a newspaper—of a woman, an alien coming to this country, a criminal or partly insane, and she produced children—this was some 60 or 70 years ago, or maybe longer—and

EXHIBIT 4
Page 36 of 88

the history was that the number of the same class that had been produced in this country by reason of that woman's coming here was very large. Have you got anything like that that we can get hold of?

Mr. Box. Do you mean the Jukes family?

Doctor Laughlin. Our office has studied a large number of degenerate families. Some of those which have been investigated are the Hill Folk, the Jukes, the Ishmaels, and the Nams. One interesting thing which we find out about degenerate families, whenever we send a field worker into a State to begin the study of pedigrees, making as his central place of study an institution for the feeble-minded, is that we can get, in any State, into a great network of degenerate families. The Jukes and the Ishmaels and others are noted simply because they have been studied. They are members of degenerate classes, but they are not novel. There are hundreds of such families. The task is to trace such families to their origin. The present-day lesson for the Nation and for each State, community, and family is to prevent the entrance of members of such families as human seed stock.

The Chairman. And they are not subject to the ordinary moral or intellectual or social restraints that other people are?

Mr. Box. That is true, is it not?

Doctor Laughlin. It is. In these degenerate families fecundity of the tribe is limited by the physical fecundity of the women, married and unmarried. That is the real limit.

Mr. White. Are those people susceptible of improvement under better environments?

Doctor Laughlin. No. The Ishmael study was begun 40 years ago. The original students had great hopes of rehabilitating these people by charity and opportunity. But such of these people who were given opportunities demonstrated that, despite opportunities for education and for training and for positions, most of them could not and did not make good. It was not in them. They could not go on beyond their natural capacities.

Mr. White. None of them has made good?

Doctor Laughlin. None of the tribe—well, I will not say that. Among these degenerates occasionally one will rise above the level, and bud off from the tribe and become lost in the general population. I had reference, however, to the general run, the "nine out of ten" of them.

In New Jersey, take the State hospital at Morris Plains; there are 2,702 inmates, of whom 1,202 were foreign born. Of these foreign born the superintendent reported only seven deportable.

Now, instead of taking up these different types of degeneracy, I think I might as well go over this chart and give the summaries. (See Table II, p. 8.)

Mr. Box. May I interrupt just a moment, Mr. Chairman? Isn't there a restriction in our law about their deportation in addition to the question of citizenship? They might be foreign born, unnaturalized, and still be in that class of nondeportable?

The Chairman. Yes.

Mr. Box. That is what I wanted to get.

The Chairman. And foreign born and not naturalized and convicted of certain crimes, and after a certain time not deportable?

Mr. Holaday. And they don't have to show in some cases that the condition existed prior to their coming here?

EXHIBIT 4
Page 37 of 88

The CHAIRMAN. This whole study is designed to point out the flaws in the deportation clauses of the act and the regulations.

Mr. VINCENT. In other words, up to date, the history of it makes it almost conclusive that there ought to be just one provision: If they violate any of these laws, deport them at any time.

Mr. HOLADAY. The Public Health Service makes a particular examination to find out the physical condition of the immigrant, so that if it comes up in the future, the question of deporting him, they can go back to the record and see what existed at the time he came in.

Mr. BOX. Is it not true that in determining who should be sent to these institutions the local authorities often fail to make record of that? That very weakness could develop there, could it not?

Doctor LAUGHLIN. That is one place, of course.

The CHAIRMAN. Does it not further happen that the local authorities are unable to determine nativity?

Doctor LAUGHLIN. Often that is the case and even when they are able to, it is not required by the laws of some States, and many authorities were therefore not concerned with determining "place where born."

### DEFECTIVE ALIEN BLOOD IN THE SECOND GENERATION

Mr. BOX. Is there anything to show the number of those in the institutions born of alien parents, either both or one?

Doctor LAUGHLIN. Not in this general survey. We found that very difficult, and only occasionally could we get a good return from an institution. For instance, the Connecticut School for Boys at Meriden, Conn., reported a total of 382 inmates, of whom 63 were foreign born and 319 were native born, but of those native born 90 had native-born parents, 14 had one parent foreign born, and 278 had both parents foreign born. Now, that is the sort of information we would like to get in every institution.

Mr. BOX. But you did not get that in other institutions?

Doctor LAUGHLIN. No, sir. One other study that I mentioned in the last report as being appropriate for future investigation was mate selection, and I have already begun the collection of data on sex ratios. Now, the sex of the immigrant is very important, of course. We can see how the ultimate population of any country will be very different if the immigrants are 100 per cent males or if they are only 50 per cent males. So that is a question which would come under the head of mate selection, which I have indicated here (see p. 3). We hope to be able to make a study on this subject in the near future.

Mr. BOX. Can you develop that idea?

Doctor LAUGHLIN. We desire to do that in an early study.

Mr. BOX. Many young men of the best brain and brawn in this country have been absolutely sterile because of want of marriage. They work out their existence and fade away.

Doctor LAUGHLIN. An examination of such phenomena is one of the logical points to develop under the study of mate selection in relation to immigration, which we contemplate making.

This Connecticut institution just referred to, has made up an exceptionally thorough report. It is interesting to find that of the 382 who constitute the entire population of the institution, 278 have foreign-born parents, indicating that this institution for delinquent

EXHIBIT 4
Page 38 of 88

boys is maintained not for American stock but for either aliens or children of persons who have been in this country only one generation. That is the report from Connecticut.

Mr. Box. What class of inadequates is that?

Doctor LAUGHLIN. Juvenile delinquents.

Mr. RAKER. Did you get any reports of the Government institutions here in Washington for boys and girls?

Doctor LAUGHLIN. Yes; these returns are from State and Federal institutions. The Federal Government has only about 15 custodial institutions. It has an institution for the insane here in Washington; it has also several Federal penitentiaries. About 15 out of 688 State and Feedral institutions are maintained by the Federal Government.

### THE PRINCIPAL LEGAL CAUSE OF NONDEPORTABILITY

The CHAIRMAN. Let me interrupt you there. I want to make a point in the matter of reasons for nondeportability.

Doctor LAUGHLIN. The reason most nondeportable foreign-born social inadequates are not deportable is because they have been in the United States more than five years. The insane come to the United States at the average age of 28 years. Those who break down and go to the hospitals for the insane do so at the average age of 41 years. Thus the average alien who goes to the hospital for the insane has been in the United States 13 years, and consequently is not deportable. This is the principal reason for the great difference between the number of foreign-born insane and the number of foreign-born insane persons who are deportable. The second factor of naturalization is relatively less important as a deterrent cause. (Table II, p. 8.)

### THE DIRECT COST OF ALIENS IN INSTITUTIONS

The CHAIRMAN. Now this is a good place to bring up the matter of statute of limitations—the five-year period. With the feeble-minded, five years is long enough, because if a person is feeble-midned now and found in an institution, that person is always feeble-minded. With the insane or the potentially insane, the five-year period of limitation is not enough, because, on the average, those persons are here 13 years before they are sent to institutions.

Then there is the matter of cost of aliens in institutions. What is the total amount?

Doctor LAUGHLIN. At $1 per inmate per day, it costs the State governments about $75,000 per day to maintain its foreign-born institutional inmates.

Mr. Box. Multiply it by 365 and see what that would be for the year.

Doctor LAUGHLIN. Of course the greatest expense to the Nation is not the dollars and cents for this maintenance, but the moral and social cost, and above all it is the biological cost. If these persons are potential parents, they are going to cost not only in dollars and cents now and in future time, but they are going to deteriorate and degenerate the whole population into which they and their children migrate.

EXHIBIT 4
Page 39 of 88

38          EUGENICAL ASPECTS OF DEPORTATION

## NORMAL INADEQUACY OF YOUTH AND OLD AGE

I mentioned the point of family and community and State and National responsibility, and how laws are gradually being enacted and administrative systems worked out to thrust upon or return to the community or the family or the State that permits production of the individual, the custody of that person. In most of these studies the term "socially inadequate" is not applied to a person who is incapacitated on account of the normal inadequacy of young childhood and old age. The child could not make a living, of course, until he was 15 or 16 years old, and a man 80 years of age is not apt to be able to care for himself.

Mr. VINCENT. Now wait a moment on that. You say 15 or 16. You can put it down to 10 if you give them a chance and don't bind them down by laws.

Mr. BOX. Of course Doctor Laughlin is assuming that the boy ought to be in school.

Mr. VINCENT. Yes, I know.

Doctor LAUGHLIN. The point is that the definition "social inadequacy" does not apply to the normal exigencies of childhood and old age. They are both normal, and mean nothing from the eugenic standpoint.

Now the study of deportation naturally leads up to the question of registration, and if there were a registration system for aliens in operation in the United States at the present time, then information of the sort, but much more complete and refined than that which we have here, could be compiled, and such facts should be compiled and analyzed every year for the use of this committee and of the whole country.

## INITIATIVE BY THE FEDERAL IMMIGRATION SERVICE

I want to call attention to one phrase or one paragraph in the present immigration law and to point out its defects in not supporting properly or not supporting effectively a system for studying alien inadequates in the United States and locating them on the initiative of the United States.

In the act of February 5, 1917, section 23, it provides:

It shall be the duty of the Commissioner General of Immigration to detail officers of the Immigration Service from time to time * * * to secure information as to the number of aliens detained in the penal, reformatory, and charitable institutions (public and private) of the several States and Territories, the District of Columbia, and other territory of the United States, and to inform the officers of such institutions of the provisions of law in relation to the deportation of aliens who have become public charges.

That is in the law of 1917, but there is no provision for the maintenance of a thorough roster of State, Federal, and local institutions, nor of courts, nor of charity organizations, which latter are often the first to come in contact with a potential inadequate.

If an amendment to this section of the law just read should require such a roster to be kept up to date, then I think it would be much easier for the Immigration Service to maintain the deportation service and to maintain contact with all these sources of social inadequacy among the foreign born. Not only should institutions

EXHIBIT 4
Page 40 of 88

be listed in roster form, but all charitable societies which are not custodial should be listed and close contact kept with them. If the charitable organizations are not listed and used as collaborators, then the statute of limitations is pretty apt to exclude from deportation the average socially inadequate person, because individuals of this sort, very frequently, drift among charity organizations for several years before they are sent to the permanent custodial institutions. It is essential in effective deportation practice to find an individual early in his social breakdown; that is, before he is rendered nondeportable by the statute of limitations.

The CHAIRMAN. Even if they found them early, we would find that other countries were not willing to take them without a great exchange of letters which endeavor to show their place of nativity and proof of birth in a foreign country, and the extent of the breakdown here which makes it desirable for this country to turn them back to the country that gave them to us. That is one of the hard things of deportation. Now my experience is that the service down here, the Immigration Service, carries on correspondence with State institutions and asks them to report the number of deportable aliens frequently, and then sends crews around the United States gathering up these deportables, particularly criminals whose sentences are about to expire, and finally brings a carload to New York and sends them out.

Doctor LAUGHLIN. There is no criticism of the administration of the law, with the present machinery, and the present appropriation. It is simply the tremendous job that the law has imposed upon the Immigration Service. New standards, new procedures, better machinery, and larger appropriations are needed.

From the standpoint of a good many of these institutions, we find that they never heard of the deportation act, nor do they know how to initiate deportation procedure.

The CHAIRMAN. There is a big flaw somewhere, because the figures right here for the year just closed show only a few thousand deported. They show many thousand alien seamen deserted and a large number of stowaways in the country, to say nothing of the classes that begin after that, criminal and dependent.

Mr. HOLADAY. And thousands of excess quota over the borders, smuggled in.

Doctor LAUGHLIN. These studies are only of State and Federal institutions. Only a small portion of the Nation's deportables are found in such institutions. The service should deport from local institutions, as well as State institutions. This is a relatively small study of the whole population. There are only about 75,000 foreigners included in this whole study.

The new deportation act should provide for combing the Federal, State, local, and private institutions, and for keeping in touch with the courts and charity organizations, and otherwise actively searching out deportables in the whole population, both in institutions and at large.

The CHAIRMAN. Let us come to the conclusion of the whole matter.

EXHIBIT 4
Page 41 of 88

### THREE PRIMARY FACTORS IN NATIONAL EUGENIC TREND

Doctor LAUGHLIN. Every nation in its racial trend depends primarily on three factors. It depends first on mate selection, which is very important. The States govern that without any reference to the Federal Government, but to know who marry and whom they marry is very important. Its control is a matter of custom much more than of statute law.

The second factor in racial destiny is differential fecundity—that is, not only the absolute number of children that a given mating will have, but the relative number of children which matings of the better classes produce, compared to the numbers which inferior classes produce. That, too, is a matter controlled largely by custom and by social and economic factors. The Federal Government has almost nothing and the State governments very little to do with differential fecundity.

Mr. Box. It is a matter of State control, as far as it is controlled at all, is it not?

Doctor LAUGHLIN. Yes, sir. Now the States, for instance, have tried in a small manner to lower the production degenerates. In all, 23 States have passed eugenical sterilization laws providing for the sexual sterilization of certain classes. Of course that is not a Federal matter.

The third factor in racial destiny is human migration, and under the form of government which we have in the United States it is, of course, entrusted to the hands of the Federal Government.

Mr. VINCENT. Now, will you restate the three basal factors, please?

Doctor LAUGHLIN. The first is mate selection; second, differential fecundity, and third, human migration.

Deportation is a phase of migration control. It is a matter of mixed Federal authority and State responsibility. The peculiar thing is this: that the States have the responsibility to go into the population at large to take custody of and care for social inadequates, such as the feeble-minded, the insane, and the criminalistic classes. It institutionalizes them and pays for their maintenance, whether they are foreign born or native born. The Federal Government has the sole authority to admit and to deport aliens, so that unless there is a close cooperation between the Federal Government with the authority, and the States with the responsibility, the last line of defense, or deportation, is going to break down, and the principal reason why the deportation system is not working in the United States is on account of this lack of coordination.

### DEFINITION OF "PUBLIC CHARGE"

There is another matter. Our laws should define "public charge" clearly. If a person is in an institution maintained by the State, the Federal Government, a city or a town, he is a public charge. The institution may be maintained in whole or in part by State funds, so that in order to cover the case clearly, a definition of "public charge" should be put into this clause to clarify it.

Mr. BACON. Would you advocate that?

EXHIBIT 4
Page 42 of 88

Doctor LAUGHLIN. Yes, sir, I would add:

For the purpose of this act, a public charge is a person maintained in whole or in part by public funds in a Federal, State, city, county or township custodial or charitable institution, or who receives outdoor relief at public expense.

For maintenance, institutional inmates cost at least $1 per day. Moreover, there is a great overhead expense in buildings and administration in the operation of these institutions. In an earlier institutional survey, I found that in 1916, for 576 institutions in all of the States, the average investment in institutional plants per inmate was $1,034.71.

The computed cost of a "public charge" should include the entire cost and maintenance, including overhead and administration—that is, what it actually costs the State.

In 1915 our previous survey showed that Massachusetts spent 30.4 per cent of all of her State expenditures for State custodial institutions. In the same year Alabama spent 5.4 per cent of her appropriations for the same purpose, while the several States as a unit spent 15.8 per cent of their total State appropriations for this purpose. A large percentage of the inmates of these institutions are deportable aliens who are not deported. Thus, from the standpoint of dollars and cents, which is the least debit, failure of Federal deportation is costing the States a great deal of money.

### ROSTER OF SOURCES FOR LOCATING INADEQUATE ALIENS

There is another item of importance. The Commissioner General of Immigration should be instructed to maintain, besides a roster of public custodial institutions, a list of and to make contacts with all agencies rendering outdoors relief at public expense. There is no roster of these public institutions and agencies kept now. When we want to make a special survey, we have to gather the names of these institutions from random and scattered sources.

The CHAIRMAN. Would you like a roster to go beyond the State institutions and to the counties and cities?

Doctor LAUGHLIN. Yes, sir; a roster of institutions for all classes of social inadequates where such institutions are maintained in whole or in part by the Federal Government, the State government, cities, or counties. I would include also the private institutions, the courts, and the charity organizations.

Besides producing and maintaining such a roster up to date, the law should require the deportation service to maintain friendly relations with all such institutions and agencies, and to take the initiative in explaining to the responsible authorities of each of these public institutions and organizations the law on deportation, and the procedure to be followed in deporting deportable aliens and in instituting deportation proceedings.

The CHAIRMAN. In the case of a person about to be deported, does the State pay the cost of transportation, say from Oregon to Ellis Island?

Doctor LAUGHLIN. The Federal deportation service generally pays that. The deportee or his friends pay the expenses of a friend or relative who accompanies voluntarily the deportee. Generally the deportee is a public charge and has no money. The State looks on deportation as a Federal matter.   (See p. 15.)

EXHIBIT 4
Page 43 of 88

The CHAIRMAN. The immigration bureau in Portland, Oreg., in the month of October, 1924, spent $1,744 for railroad tickets alone for deporting aliens.   Then do you think a bill somewhat enlarging the scope and making clearer certain processes is necessary?

Doctor LAUGHLIN. Yes, sir.

Mr. HOLADAY. Have you any idea of the cost to the States and counties of maintaining deportable persons?

Doctor LAUGHLIN. I have the figures.   That may be computed by finding the number of deportable persons and assuming that it costs just as much to maintain an alien as it does a native-born citizen in the institution.

In a survey just completed we received returns from 684 out of 688 State institutions for all types of inadequates, including the criminalistic, the insane, the feeble-minded, and other classes.   These are only the institutions maintained directly by the State, and do not cover those maintained by the municipalities, nor do they include private institutions.   We found 74,170 foreign-born inmates. Of course the immigration law contemplated keeping these out, but nevertheless they got in.   The next best thing is to provide for the deportation of most of them.   Indeed, only 3,526 of this total number were certified as becoming inadequate through causes arising since their arrival in the United States.

### MAINTENANCE COST OF INADEQUATE ALIENS

We have made no exact computation of the direct cost of maintaining institutional inmates since 1915.   In that year, however, we found that for all State custodial institutions the average maintenance cost was $17.35 per month.   This varied from $15.21 for the feeble-minded to $40.64 for the leprous, the criminals averaging $18.93 maintenance cost per month.   If, since 1915, the general cost of living has increased approximately 70 per cent, then it is a fair estimate that now these 74,170 alien inmates in State institutions are costing approximately $1 each per day for maintenance.   This does not include any charges against institutional establishment.

So far as the Federal Government is concerned, the situation is this: The United States arrogates to itself the authority to control immigration, but the several States have the function of maintaining most of the social inadequates.   There would be poetic justice in the States asking the Federal Government to permit itself to be sued in Federal courts to recover maintenance cost of aliens whom the Federal Government has admitted and who are thrust upon the States without any choice on their part, and whom the Federal Government is, it would seem, duty bound, at least, to deport.   For the year ending June 30, 1927, the net cost to the Federal Government of the Immigration Service was $1,922,478.   Against this the several States are spending approximately $27,000,000 per year for maintenance of alien adequates whom our Immigration Service has let into the country and whom our deportation service does not remove.   The authority and the responsibility for controlling the admission and deportation of immigrants is a Federal matter, but the cost and responsibility for caring for inadequate aliens falls largely to the several States.

EXHIBIT 4
Page 44 of 88

Of course, listing this direct cost of $27,000,000 per year is interesting and is a valuable piece of information because it is definitely measurable, but this direct cost is only a small fraction of the actual cost of inferior aliens. Their economic inefficiency and their destruction of property when at large amounts, in costs, to many millions of dollars more than the direct cost of those who fall so low as to become public charges, while the greatest costs of all are, of course, the lowering of national efficiency, the destruction of national ideals, and the position of inferior aliens as seed stock for the future generations of Americans. Superior aliens are needed in the United States for the same reasons that the inferior should be rejected. This is not a matter of race, but of family stock within each race.

Mr. Box. In the question of expense, has any one estimated the total cost or indirect expense to the country of the poor, indigent, and incompetent that come to this country that are not put into institutions?

The Chairman. You mean municipal and private aid to families and that sort of thing?

Mr. Box. Yes, and the economic drain on the whole country. You see that has been overlooked entirely in our discussion so far, and I thought possibly, before we got through, we might get that. Presumably that is much greater than the amount listed in these other figures. Is that capable of segregation?

Doctor Laughlin. Not definitely now, but we could, by research, get at it reasonably near. Such a study of costs should include, first, direct institutional cost of defective and dependent aliens, such as we have already given; second, cost of outdoor relief; third, cost of loss of efficiency and in destruction of property by individual immigrants who are inadequate from constitutional causes; and fourth the social and biological costs chargeable to lower efficiency of the offspring of degenerate immigrants, compared with normal American efficiency, and the social and biological assets accredited to increased efficiency of superior immigrant strains. We should then strike a balance. It would be a big but a possible job.

The Chairman. Now I want to ask, do your figures take into consideration those admitted into hospitals to be cured of various deportable diseases? In other words, I visited Ellis Island one day and there saw several wards full of boys with scalp diseases.

Doctor Laughlin. It is not the infectious disease which is eugenically the most dangerous. It is the constitutional diseases which are hereditary that concerns us. Of course we all understand that a person with almost any infectious disease, unless it is syphilis or leprosy or tuberculosis, can come to the United States and be cured and not affect the good citizenship or the individual effectiveness or the blood of the individual.

The Chairman. Just an inconvenience, not a danger.

Doctor Laughlin. It is a job for quarantine, rather than for deportation.

Mr. White. How do so many of these nonadmissible aliens—the class described by you—get into the United States?

Doctor Laughlin. They get through the immigration sieve simply because the Immigration Service can not diagnose a man's prospect by the short examination given. Making a diagnosis is a big job, if properly done.

EXHIBIT 4
Page 45 of 88

The CHAIRMAN. How do the States fail to connect up with the Federal deportation service—that is to say, if they are sleeping on their rights, why?

Doctor LAUGHLIN. The superintendents and boards of trustees of the custodial institutions in the States, having complete charge of persons committed to their keeping, rarely get in touch with the deportation service of the Federal Bureau of Immigration. The average alien lives in the institution the same as a native born, and when he crosses the five-year limit he is not deportable. That's the average history. The more thorough the examination—personal and family—the more surely would we exclude those who later become deportable. This examination should not only include the physical examination at Ellis Island but should be supported by the history or background of the immigrant. His individual or family history is really more important than his physical examination. The Johnson Act of 1924 is a step in this direction.

Mr. WHITE. So that, as a matter of fact, the trouble that the States and counties and the Federal Government are up against is that we are not furnishing a sufficient number of employees, medical assistants, both men and women, who are competent to pass upon the aliens and make the necessary examination? Is that not one of the biggest troubles?

Doctor LAUGHLIN. Yes, sir; that is one of the major troubles. Prevention of necessity for deportation is the best remedy. However, do the best the Nation can, there will always be need for deportation, or the "final selection," so long as we are an immigrant-receiving nation.

An inventory of aliens in the United States on the basis of racial and social values would constitute a measure of the degree to which our immigration laws, including provisions for deportation, are effective. One item in this inventory consists of the aliens in institutions. If we could have foreseen that the particular alien would have become a public charge we would not have admitted him. Also, if races which are not assimilable with the foundation American stocks are found in large numbers within the United States, this too is a measure of the failure of the immigration laws to work to the best interests of the country. Then, within each race, the lower qualities of individuals—those not inadequate enough to become custodial charges but much below the average of our own national efficiency—are not adding to our national welfare. Only those individuals of compatible race who are capable of reproducing offspring of superior quality, and who, themselves, are superior, constitute immigration assets.

### PARALLEL BETWEEN RECRUITING THOROUGHBRED STOCK BLOOD BY PURCHASE AND NATIONAL FAMILY STOCK BLOOD BY IMMIGRATION

I have made some studies with regard to a closely parallel thing for Mr. Walter J. Salmon of New York, one of the most distinguished and successful breeders of thoroughbred horses in the United States. When this gentleman recruits his stud farm, he never even considers acquiring a mare or a stallion not of the top level, judged by excellence of near-kin, and he has been very successful in racing for that reason. He weeds out from the lower levels and recruits by purchase, analo-

EXHIBIT 4
Page 46 of 88

gous to immigration in man, to the top levels.   Man is an animal,
and so far as heredity and future generations are concerned, there is
considerable real basis for the comparison just made.

Now, I will show you how this applies to our foreign-born popula-
tion.   The foreign-born population in the United States, if the
standard had been, not the very highest, but barely above our native
average, would, instead of having 13,000,000 foreign born in the United
States in 1920, have refused admission to more than 8,600,000 of
them.   We have already discussed this particular matter.   (See p. 26).

### PRESENT LOW LEGAL STANDARD FOR INTELLIGENCE IN THE IMMIGRANT

The present immigration laws of the United States, so far as intel-
ligence is concerned, draw the line barely above feeble-mindedness.
A person who has intelligence enough to keep out of custodial insti-
tutions has enough to conform to the immigration laws of the United
States; whereas it seems to be logical, in studying population, if
immigration is to recruit to the improvement of quality of our popu-
lation, with reference to intelligence, this quality in the new human
seed stock ought at least to be above the average, instead of below it.

Any sound immigration policy calls for setting our national stand-
ards in reference to the total number of immigrants we can assimi-
late; then in distributing them by the quota system according to
race; then, inside of each race, selecting superior individuals, and,
above all, in insisting that these individuals be of such sound heredi-
tary endowment that their offspring will tend to raise the level of
American intelligence, and to improve the standard of all other
hereditary qualities which we prize in the American people, such as
honesty, industry, intitiative, courage, natural reverence for law and
order, altruistic instincts, artistic talents, ability to collaborate,
ability to solve new problems, generally called inventiveness, and
the like.   These qualities, besides sound bodies, are the fundamental
inborn possessions of a superior race.   In administering such a
standard, we have first to select, in his home territory, the would-be
immigrant from among many applicants; then we can study him on
board ship; then we can give him the thorough examination at the
port of entry; then we can, if we choose, and doubtless shall have to,
register him; then if he does not make good, we can deport him.
Deportation is the last line of defense.   If we do not deport the
undesirable individual, we can not got rid of his blood, no matter
how inferior it may be, because we can not deport his offspring born
here.   A child born here, regardless of race or degeneracy, is a citizen
of the United States and is eligible to the Presidency, so far as birth
and citizenship are concerned.

### GAP BETWEEN FEDERAL AND STATE DEPORTATION ACTIVITIES

In examining deportation, as it works at present, it is clear that
the machinery is not perfectly adapted to its purpose.   There is a
great gap between the Federal authority and the State responsibility
for the care of inadequate aliens.   There is not much general knowl-
edge, among people who deal with inadequate aliens, about the pro-
cedure to be followed in deportation.   The Federal Government
lacks sufficient funds for carrying on the work adequately, even if all
other factors were favorable.

EXHIBIT 4
Page 47 of 88

**46**          EUGENICAL ASPECTS OF DEPORTATION

### THE USE OF IMMIGRATION

Immigration can be made to improve the quality of the American people, but if the present standard is not raised and rigidly enforced, and if the aliens of degenerate or inferior stock who are found within our borders, especially those who will become the parents of future Americans, are not deported, then, depending on the number of such cases, immigration will tend to work not toward the improvement but toward the degeneration of the American people.

The CHAIRMAN. This hearing, together with the charts and tables which have been worked out for it, will be published in due form for our use, and we thank Doctor Laughlin for his valuable services in making these researches and in presenting their findings to us.   Immigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts.

EXHIBIT 4
Page 48 of 88

# APPENDICES

**Appendix 1.** Historical development of the United States deportation statutes and rules. Prepared by Mrs. Marguerite Drake Conklin.

**Appendix 2.** Statutes and rules as chronologically developed for each deportable class of aliens. Prepared by Mrs. Marguerite Drake Conklin.

**Appendix 3.** Boundaries of immigration administrative districts of the United States, established by rule 28 of the Immigration Regulations, March 1, 1927. (See map opposite p. 52.)

**Appendix 4.** Practice of the several States in reference to the deportation of socially inadequate aliens, and to the return of socially inadequate citizens of other States. Prepared by Harry H. Laughlin.

**Appendix 5.** Report of the medical examiner of the New York State Bureau of Special Examinations, for the year ending June 30, 1925. Prepared by Spencer L. Dawes, M. D., medical examiner.

**Appendix 6.** Deportation of aliens and return of citizens to other States, by classes of social inadequacy. Survey completed January 1, 1923. Hitherto unpublished findings of a preliminary investigation on deportation made for the Committee on Immigration and Naturalization of the House of Representatives, by Harry H. Laughlin.

**Appendix 7.** The causes of nondeportability of foreign-born inmates of American State and Federal custodial institutions. This is a special memorandum prepared by Harry H. Laughlin, for Hon. Albert Johnson, chairman of the Committee on Immigration and Naturalization of the House of Representatives. This study consists of an analysis of the principal findings of the present investigations on deportation made for this committee.

**Appendix 8.** Set of the principal schedules used in securing data for the researches on deportation reported in this hearing. Prepared by Harry H. Laughlin.

## APPENDIX 1

*Historical development of the United States deportation statutes and rules*

[Prepared by Mrs. Marguerite Drake Conklin]

| Statute of rule | Provisions |
|---|---|
| Mar. 3, 1875, statute, sec. 3... | All convicts and prostitutes must be returned to the country whence they came, at the expense of the transportation agency by which they were brought to port of entry. |
| May 6, 1882, statute, secs. 1, 6, and 12. | All Chinese laborers are deportable. Every Chinese person other than a laborer who is entitled to enter the United States is deportable at any time by any justice, judge, or commissioner of the court of the United States at the cost of the United States, unless he possesses a certificate of admission by the Chinese Government. |
| Aug. 3, 1882, statute, sec. 2... | Lunatics, idiots, and persons likely to become public charges, added to excluded classes, are deportable at the expense of the transportation agency by which they were brought to port of entry. |
| Feb. 23, 1887, statute, sec. 7... | All contract laborers (except domestics, and skilled workmen for new trades not established in the United States, and all persons belonging to recognized professions) are deportable within one year after entry. |
| Sept. 13, 1888, statute, secs. 6 and 13. | All Chinese laborers who have returned to the United States are deportable at any time by any justice, judge, or commissioner of a United States court, unless the particular individual has a lawful wife, child, or parent in the United States, or property therein to the value of $1,000, or debts of like amount due him and pending payment. All Chinese persons, or persons of Chinese descent, found unlawfully in the United States or territories are deportable at any time. |
| Mar. 3, 1891, statute, secs. 11 and 5. | Insane persons, paupers, persons with loathsome or dangerous contagious diseases, polygamists, contract laborers coming in answer to advertisements abroad, and assisted persons who belong to any excluded class are deportable within one year after entry. |
| May 5, 1892, statute, secs. 2 and 6. | All Chinese laborers within the United States at the time of the passage of this act, and who are otherwise entitled to remain in the United States, are deportable after one year unless they possess certificates of residence issued by the collector of revenue of their respective districts. |
| Apr. 29, 1902, statute, sec. 1... | All Chinese laborers and Chinese persons or persons of Chinese descent are deportable from the island territories unless they comply with the rules and laws, which are the same for the island territories as for the mainland; and all Chinese laborers, who enter the mainland from island territories or who go from one portion of island territory to another, are deportable. |

89604—28——4

47

EXHIBIT 4
Page 49 of 88

48 · EUGENICAL ASPECTS OF DEPORTATION

*Historical development of the United States deportation statutes and rules—Continued*

| Statute of rule | Provisions |
|---|---|
| Mar. 3, 1903, statute, sec. 21.. | All epileptics, insane persons who have had one or more attacks of insanity within 5 years previous to entry or who have had two or more attacks of insanity at any time previously, professional beggars, anarchists, and persons who attempt to bring in prostitutes are deportable within 1 year after entry.<br>All persons who are likely to become public charges are deportable within 2 years after entry.<br>All other aliens except contract laborers are deportable within 3 years after entry at expense of persons unlawfully bringing them in, or of the immigrant fund.<br>When aliens are to be immediately returned to the country whence they came, and when their physical or mental conditions are such as to require personal care, the particular vessel which brought the particular immigrant to port of entry pays the expense of the attendant. |
| Feb. 20, 1907, statute, secs. 2 and 20. | Imbeciles, feeble-minded persons, persons with tuberculosis, persons otherwise mentally or physically defective, public charges and children under 16 years of age unaccompanied by parent are deportable within 3 years after entry. |
| Feb. 5, 1917, statute, secs. 3 and 19. | Any alien who at the time of entry was a member of one or more of the classes excluded by law is deportable within 5 years after entry.<br>Alien violators of United States laws, aliens advocating or teaching the unlawful destruction of property, or teaching anarchy, or the overthrow of the Government of the United States are deportable within 5 years, at the expense of the transportation agency which brought the particular immigrant to port of entry.<br>All aliens who within 5 years have become public charges from causes not affirmatively shown to have arisen subsequent to landing are deportable.<br>All aliens who within 5 years have been sentenced to imprisonment for a term of 1 year or more, because of a crime involving moral turpitude, are deportable.<br>All aliens who are connected in any manner with a house of prostitution, or who receive benefits from any part of the earnings of any prostitute, are deportable within 5 years, at the expense of the transportation agency which brought the particular immigrant to port of entry.<br>All aliens who have entered the United States by water or land at any time or place other than designated by immigration officials, or who have entered without inspection, are deportable within 3 years after entry, at the expense of the transportation agency which brought the particular immigrant to port of entry. |
| Feb. 5, 1917, rule No. 3...... | All Chinese persons, who were members of one or more of the classes excluded by law under the immigration act of 1917, are deportable within 5 years after entry. |
| Feb. 5, 1917, rule No. 6...... | Every Chinese person refused admission to the United States, being actually or constructively on the vessel or other conveyance by which he was brought to port of entry, must be returned to the country whence he came, at the expense of the transportation agency owning such a vessel or conveyance. |
| May 19, 1921, statute, sec. 2.. | All aliens are deportable who have entered the United States after their respective 3 per cent quota allotments have been filled for that particular fiscal year. |
| May 26, 1924, statute, secs. 7 and 14. | Any alien who at any time after entering the United States is found to have entered without proper immigration visa, or to have remained therein for a longer time than permitted by regulations, shall be deported in the same manner as provided for in secs. 19 and 20 of the immigration act of 1917. |
| July 1, 1925 statute, sec. 19... | All aliens are deportable who have entered the United States after their respective 2 per cent quota allotments have been filled for the particular year. |

### SPECIAL CASES OF NONDEPORTABILITY

| | |
|---|---|
| 1917, rule 6.............. | Every child under 16 accompanied by either parent is deportable, unless a parent is already in the United States, or unless the board finds that the child is strong and healthy, and not likely to become a public charge. |
| 1917, rule 4.............. | The following classes of aliens over 16 years may enter and remain in the United States, whether such person can read or not, if otherwise admissible:<br>(1) Persons who are physically incapable of reading.<br>(2) Any alien or citizen of the United States may bring or send for his father or grandfather over 55 years of age, his wife, his mother, or grandmother, or his unmarried or widowed daughter, if such relative is otherwise admissible.<br>(3) Persons entering the United States to avoid religious persecution in the country of their last permanent address.<br>(4) Persons previously residing in the United States for 5 years who return to the United States within 6 months from the date of their departure therefrom.<br>(5) Persons in transit through the United States.<br>(6) Persons lawfully admitted and who later go in transit through foreign contiguous territory.<br>(7) Exhibitors and employees of fairs and expositions authorized by Congress. |

EXHIBIT 4
Page 50 of 88

*Historical development of the United States deportation statutes and rules*—Continued

### SPECIAL CASES OF NONDEPORTABILITY—Continued

| Statute of rule | Provisions |
|---|---|
| 1917 statute, sec. 3 | Skilled labor, if otherwise admissible, may remain in the United States if labor of like kind unemployed can not be found in this country. The provisions of this law shall not be held to exclude professional actors, artists, professors for colleges or seminaries, persons belonging to recognized learned professions, or persons employed as domestic servants. |
| 1917 statute, sec. 3 | Nothing in this act shall be construed to apply to accredited officials of foreign governments, nor to their suites, families, or guests. |
| 1917, rule 23 | Any alien brought to the United States in violation of law may be detained, if the testimony of such alien is necessary on behalf of the U. S. Government in the prosecution of offenders against any provision of this act or laws of the United States. |
| 1917 statute, sec. 18 | If the health and safety of an insane alien would be unduly imperiled by immediate deportation, such alien may, at the expense of the appropriation for the enforcement of this act, be held for treatment until such time as such alien may, in the opinion of such medical officer, be safely deported. |
| | If the wife or minor child of an alien resident in the United States arrives afflicted with tuberculosis or a loathsome or dangerous contagious disease which is easily curable, he or she may be detained for hospital treatment and not deported. |
| 1917 statute, sec. 21 | Any alien likely to become a public charge may remain in this country upon giving a suitable and proper bond. |
| 1917, rule 17, subdivision 1 | Aliens whose prompt deportation can not be accomplished because of war or other conditions may, upon permission secured from the department, be released and permitted to accept self-supporting employment. |

### APPENDIX 2

*Statutes and rules on deportation as chronologically developed for each deportable class of aliens*

[Prepared by Mrs. Marguerite Drake Conklin]

| Deportable classes | Statute or rule | Conditions |
|---|---|---|
| 1. Convicts (except for political offense only). | Mar. 3, 1875, statute, sec. 5. | Every convict must be returned to the country whence he came by the transportation agency bringing him to port of entry. |
| Do | Aug. 3, 1882, statute, sec. 4. | Expense of return voyage of all convicts is paid by owner of the vessel bringing them to port of entry. |
| Do | Mar. 3, 1891, statute, sec. 11. | All convicts are deportable within 1 year after entry. |
| Do | Mar. 3, 1903, statute, sec. 21. | All convicts are deportable within 3 years after entry, at the expense of the transportation agency bringing them to port of entry. Such agency also must pay one-half of the expenses to port of entry. |
| Do | Feb. 5, 1917, statute, sec. 19. | All criminals are deportable within 5 years after entry. |
| Do | May 1, 1917, rule, No. 22. | All aliens who, within 5 years, have been sentenced to imprisonment for a term of 1 year or more because of a crime involving moral turpitude are deportable. |
| 2. Prostitutes, or white slave traders. | Mar. 3, 1875, statute, sec. 5. | Women imported for purposes of prostitution are returned immediately. |
| Do | Mar. 3, 1903, statute, secs. 2 and 3. | All prostitutes and all aliens importing or attempting to import prostitutes, are deportable within 3 years after entry, at expense of the deportation agency bringing them to port of entry. |
| Do | Feb. 20, 1907, statute, secs. 2 and 3. | All aliens who are connected with a house of prostitution or who are receiving benefit from any part of the earnings of any prostitute or who are connected with any immoral practice are deportable by the amended law of 1903. |
| Do | Feb. 5, 1917, statute, sec. 19. | Aliens practicing prostitution, connected with houses of prostitution or places frequented by prostitutes, either as manager, employee, or sharer in proceeds, or persons importing or aiding in any way women entering for purpose of prostitution, or for any other immoral purpose, or aliens previously deported under a similar act are deportable within 3 years. |
| 3. Contract laborers | Feb. 23, 1887, statute, sec. 7. | All contract laborers, except domestics, and skilled workmen for new trades not established in the United States, and all persons belonging to recognized professions are deportable within 1 year after entry at the expense of the transportation agency bringing them to port of entry. |

EXHIBIT 4
Page 51 of 88

EUGENICAL ASPECTS OF DEPORTATION

*Statutes and rules on deportation as chronologically developed for each deportable class of aliens—Continued*

| Deportable classes | Statute or rule | Conditions |
|---|---|---|
| 3. Contract laborers | Mar. 3, 1891, statute, sec. 5. | The provisions of the law of 1891 shall not be held to exclude private secretaries, and servants of foreigners temporarily residing in the United States, nor ministers, professors, or persons belonging to recognized learned professions. |
| Do | Apr. 29, 1902, statute, sec. 3. | Exhibitors and employees of fairs and expositions authorized by Congress are not deportable. |
| Do | Mar. 3, 1903, statute, secs. 20 and 21. | Skilled labor, if otherwise admissible, may remain in the United States if unemployed labor of like kind can not be found in this country. |
| Do | May 1, 1917, rule 27, subdivision 6. | Otherwise admissible aliens may enter under contract for purpose of learning skilled trade if $500 bond is given to guarantee their immediate return when the course of training is finished. |
| 4. Public charge | Aug. 3, 1882, statute, sec. 2. | All aliens who are likely to become public charges are immediately deportable. |
| Do | Mar. 3, 1891, statute, sec. 11. | All aliens who are likely to become public charges are deportable within 1 year after entry, at expense of vessel bringing them to port of entry. |
| Do | Mar. 3, 1903, statute, sec. 20. | All aliens who have become public charges due to causes prior to entry are deportable within 2 years, at the expense of transportation agency bringing them to port of entry, or from immigrant fund. |
| Do | Feb. 20, 1907, statute, secs. 19, 21, 23. | All aliens who have become public charges due to causes prior to entry are deportable within 3 years at the expense of the transportation agency bringing them to port of entry, or from immigrant fund. |
| Do | May 1, 1917, rule No. 27, subdivision 11. | All aliens who have become public charges due to causes prior to entry are deportable within 5 years. at the expense of the transportation agency bringing them to port of entry, or from immigrant fund. Aliens likely to become public charges may be admitted under bond. |
| 5. Insane | Aug. 3, 1882, statute, sec. 2. | All lunatics are immediately deportable at the expense of transportation agency bringing them to port of entry. |
| Do | Mar. 3, 1891, statute, sec. 1. | All insane persons are deportable within 1 year at expense of transportation agency bringing them to port of entry. |
| Do | Mar. 3, 1903, statute, secs. 2 and 21. | Insane persons who have had one or more attacks of insanity within 5 years previous to entry or who have had two or more attacks at any time previously are deportable within 1 year after entry. |
| Do | Feb. 5, 1917, statute, secs. 18 and 19. | If the health and safety of an insane alien would be unduly imperiled by immediate deportation, such alien may, at the expense of the appropriation for the enforcement of this act, be held for treatment until such time as such alien may, in the opinion of such medical officer, be safely deported. |
| Do | May 1, 1917, statute, secs. 5 and 23. | When insane aliens are to be returned to the country whence they came, and when their physical or mental conditions are such as to require personal care, the vessel which brought them to port of entry must pay the expense of the attendant. |
| 6. Feebleminded | Aug. 3, 1882, statute, sec. 2. | All idiots are immediately deportable. |
| Do | Mar. 3, 1891, statute, sec. 1. | All feeble-minded aliens are deportable within 1 year after entry. |
| Do | Mar. 3, 1903, statute, sec. 21. | All feeble-minded aliens are deportable within 3 years. |
| Do | Feb. 20, 1907, statute, secs. 2 and 20. | All idiots, imbeciles, feeble-minded persons are deportable within 3 years. |
| Do | Feb. 5, 1917, statute, secs. 3 and 19. | All idiots, imbeciles, feeble-minded persons are deportable within 5 years. |
| 7. Loathsome or dangerous contagious disease. | Mar. 3, 1891, statute, secs. 1 and 11. | Aliens afflicted with loathsome or dangerous contagious disease are deportable within 1 year. |
| Do | Mar. 3, 1903, statute, sec. 21. | All aliens afflicted with loathsome or dangerous contagious diseases are deportable within 3 years. |
| Do | Feb. 20, 1907, statute, sec. 2. | All aliens afflicted with tuberculosis are deportable within 3 years. |
| Do | Feb. 5, 1917, statute, secs. 11 and 22. | If the wife or minor child of an alien resident in the United States arrives afflicted with tuberculosis or a loathsome contagious disease which is easily curable, he or she may be detained for hospital treatment and not deported. |
| Do | | Aliens coming from country where an epidemic or disease is prevalent may be detained on board for examination pending deportation or admission. |
| 8. Anarchists | Mar. 3, 1903, statute, secs. 2 and 21. | Persons who advocate the overthrow of United States Government by violence or of all government and forms of law, or the assassination of public officials are deportable. |

EXHIBIT 4
Page 52 of 88

*Statutes and rules on deportation as chronologically developed for each deportable class of aliens—Continued*

| Deportable classes | Statute or rule | Conditions |
|---|---|---|
| 8. Anarchists | Feb. 5, 1917, statute, sec. 3. | Alien violators of United States laws, aliens advocating or teaching the unlawful destruction of property, or teaching anarchy, or the overthrow of the Government of the United States are deportable within 5 years. |
| 9. Epileptics | Mar. 3, 1903, statute, sec. 21. | All epileptics are deportable within 3 years. |
| | Feb. 5, 1917, statute, sec. 19. | All epileptics are deportable within 5 years. |
| 10. Chinese | May 6, 1882, statute, secs. 1, 6, and 12. | All Chinese laborers are deportable. Every Chinese person other than a laborer who is entitled to enter the United States is deportable at any time by any justice, judge, or commissioner of the court of the United States at the cost of the United States, unless he possesses a certificate of admission by the Chinese Government. |
| | Sept. 13, 1888, statute, secs. 6 and 13. | All Chinese laborers who have returned to the United States are deportable at any time by any justice, judge, or commissioner of a United States court unless the particular individual has a lawful wife, child, or parent in the United States or property therein to the value of $1,000, or debts of like amount due him and pending payment. All Chinese persons or persons of Chinese descent found unlawfully in the United States or Territories are deportable at any time. |
| Do | May 5, 1892, statute, secs. 2 and 6. | All Chinese laborers within the United States at the time of the passage of this act, and who otherwise are entitled to remain in the United States, are deportable after one year unless they possess certificates of residence issued by the collector of revenue of their respective districts. |
| Do | Apr. 29, 1902, statute, sec. 1. | All Chinese laborers and Chinese persons or persons of Chinese descent are deportable from the island territories unless they comply with the rules and laws, which are the same for the island territories as for the mainland, and all Chinese laborers who enter the mainland from island territories, or who go from one portion of island territory to another are deportable. |
| Do | Feb. 3, 1917, rule No. 3. | All Chinese persons are deportable within five years after entry who were members of one or more of the classes excluded by law under the immigration act of 1917. |
| Do | Feb. 5, 1917, rule No. 6. | Every Chinese person refused admission to the United States, being actually or constructively on the vessel or other conveyance by which he was brought to port of entry, must be returned to the country whence he came, at the expense of the transportation agency owning such vessel or conveyance. |
| 11. Entered without inspection. | Feb. 5, 1917, statute, sec. 19. | Any alien who has entered the United States by water or land at any time or place other than designated by immigration officials, or who has entered without inspection is deportable within 3 years. |
| 12. Without proper immigration visa. | May 26, 1924, statute, secs. 7 and 14. | Any alien who at any time after entering the United States is found to have entered without proper immigration visa, or to have remained therein for a longer time than permitted by regulations, is deportable in the same manner as provided for in the immigration act of 1917. |
| 13. Unable to read | Feb. 5, 1917, statute, secs. 3 and 19. | All aliens over 16 years of age physically capable of reading are deportable who can not read the English language or some other language or dialect. |
| 14. In excess of quota limit. | May 19, 1921, statute, sec. 2. | All aliens are deportable who have entered the United States after their respective country's 3 per cent quota allotment has been filled for that particular fiscal year. |
| | July 1, 1925, statute, sec. 10. | All aliens are deportable who have entered the United States after their respective country's 2 per cent quota allotment has been filled for that particular fiscal year. |
| 15. Physical defectives | Feb. 5, 1917, statute, secs. 3 and 19. | All aliens are deportable who were found at the time of entry to have been certified by the examining surgeon as being mentally or physically defective, of such physical defect is of a nature which may affect the ability of such alien to earn a living. |
| 16. Reentered within year of deportation. | do | All aliens who have been deported under any of the provisions of this act, and who have reentered within one year after deportation are deportable. |

EXHIBIT 4
Page 53 of 88

52                    EUGENICAL ASPECTS OF DEPORTATION

## APPENDIX 3

BOUNDARIES OF IMMIGRATION ADMINISTRATIVE DISTRICTS OF THE UNITED STATES, ESTABLISHED MARCH 1, 1927, BY RULE 23, BY THE COMMISSIONER GENERAL OF IMMIGRATION, WITH THE APPROVAL OF THE SECRETARY OF LABOR

(See map opposite p. 52)

### RULE 23.   ADMINISTRATIVE DISTRICTS

For convenience in enforcing both the immigration laws and the Chinese exclusion laws, the territory within which immigration officials are located is divided into districts, under the jurisdiction of commissioners of immigration or district directors numbered, defined, and with headquarters fixed, as follows:

| Dist. No. | Title of officer | Location of headquarters | Extent of district |
|---|---|---|---|
| 1 | Commissioner of immigration. | Montreal, Canada.. | Includes that part of the State of Maine lying east of meridian 68 and north of parallel 45; the counties of Carroll, Grafton, and Coos in the State of New Hampshire; that part of the State of Vermont lying north of the counties of Windham and Bennington; that part of the State of New York, lying north of the counties of Warren, Fulton, Oneida, and Oswego, and that part of Herkimer County north of Black Creek and Mill Creek; also that part of the southern peninsula of the State of Michigan lying north of the counties of Alcona, Oscoda, Crawford, Kalkaska, Grand Travers, and Benzie; and that part of the northern peninsula of said State lying east of the counties of Baraga and Iron; in addition to territory within the United States, has jurisdiction and control over ports of Halifax, Yarmouth, St. John, Quebec, and all Canadian interior stations within the contiguous Canadian territory. |
| 2 | District of director. | Portland, Me....... | Includes that part of the State of Maine lying west of meridian 68 and south of parallel 45; the counties of Belknap and Stratford in the State of New Hampshire and the township of Portsmouth, in the county of Rockingham, in said State. |
| 3 | Commissioner of immigration. | Boston, Mass....... | Includes the States of Massachusetts and Rhode Island; the State of Connecticut except the county of Fairfield; the county of Rockingham, in the State of New Hampshire, except Portsmouth Township and the counties of Hillsboro, Cheshire, Sullivan, and Merrimack; and that part of the State of Vermont lying south of the counties of Windsor and Rutland. |
| 4 | .....do.... | Ellis Island, New York Harbor, N. Y. | Includes that part of the State of New York lying south of the counties of Essex and Hamilton and that part of the county of Herkimer lying south of Black Creek and Mill Creek and east of Oneida County, and east of the counties of Madison, Chenango, and Broome; and that part of the State of New Jersey lying north of the counties of Ocean, Burlington, and Mercer, except the township of Upper Freehold in the county of Monmouth. |
|  | Chinese inspector in charge. | United States barge office, New York, N. Y. | Includes States of New York and New Jersey; Chinese matters only. |
| 5 | District director. | Buffalo, N. Y....... | Includes that part of the State of New York lying west of the counties of Delaware, Otsego, Herkimer, and south of the counties of Lewis and Jefferson; the counties of McKean, Warren, Erie, and Crawford in the State of Pennsylvania; and that part of the State of Ohio lying north of the counties of Mahoning, Carroll, Tuscarawas, Holmes, Knox, and Morrow and east of the counties of Crawford, Seneca, Sandusky, and Ottawa. |
| 6 | Commissioner of immigration. | Philadelphia Immigration Station, Gloucester City, N. J. | Includes that part of the State of New Jersey lying south of the counties of Monmouth, Middlesex, Somerset, and Hunterdon, and the township of Upper Freehold in Monmouth County; the State of Delaware; and all that part of the State of Pennsylvania lying east of the counties of McKean, Elk, Clearfield, Blair, and Bedford. |
| 7 | District director. | Pittsburgh, Pa...... | Includes that part of the State of West Virginia lying north of parallel 38 and west of meridian 80; that part of the State of Pennsylvania lying west of Fulton, Huntingdon, Center, Cameron, and Potter, and south of McKean, Warren, and Crawford; and that part of the State of Ohio lying south of the counties of Mahoning, Stark, and Wayne and east of meridian 82. |

EXHIBIT 4
Page 54 of 88



Administrative Districts of the Bureau of I

(Established March 1, 1927 b

NOTE.—The 29 districts referred to in the hearing (p. 10) were delimited by General Order No. 2, December 6, 1922, of the
Immigration rule No. 28.   This later map is herewith printed because it shows the actual districts

EXHIBIT 4
Page 55 of 88



EXHIBIT 4
Page 56 of 88

## EUGENICAL ASPECTS OF DEPORTATION

## 53

| Dist. No. | Title of officer | Location of headquarters | Extent of district |
|---|---|---|---|
| 8 | Commissioner of immigration. | Baltimore, Md....... | Includes the entire State of Maryland; the District of Columbia; all that part of the State of Virginia lying north of parallel 38; and that part of the State of West Virginia lying east of meridian 80. |
| 9 | District director. | Norfolk, Va.......... | Includes that part of the State of Virginia lying south of parallel 38; that part of the State of West Virginia lying south of parallel 38 and east of meridian 82; and those parts of the States of Tennessee and North Carolina lying east of meridian 82. |
| 10 | .....do.......... | Jacksonville, Fla..... | Includes that part of the State of South Carolina lying east of meridian 82; that part of the State of Georgia lying east of meridian 82 and south of parallel 32, and that part of the State of Florida lying east of meridian 85. |
| 11 | .....do.......... | Detroit, Mich....... | Includes that part of the State of Ohio lying west of the counties of Erie, Huron, Richland, and north of the counties of Morrow, Marion, Hardin, Auglaize, and Mercer; that part of the southern peninsula of the State of Michigan lying south of the counties of Alpena, Montmorency, Otsego, Antrim, and Leelanau, except the counties of Berrien and Cass; and that part of the State of Indiana lying east of the counties of St. Joseph, Marshall, and Fulton and north of the counties of Fulton, Wabash, Huntington, Wells, and Adams. |
| 12 | .....do.......... | Cincinnati, Ohio... | Includes those parts of the States of Virginia and West Virginia lying west of meridian 82; that part of the State of Ohio lying west of meridian 82 and south of the counties of Wayne, Ashland, Richland, Crawford, Wyandot, Hancock, Allen, and Van Wert; that part of the State of Indiana lying south of the counties of Allen, Whitley, Kosciusko, Fulton, Cass, Carroll, Tippecanoe, and Warren; and that part of the State of Kentucky lying east of meridian 85. |
| 13 | .....do.......... | Atlanta, Ga........ | Includes that part of the State of Georgia lying north of parallel 32 and west of meridian 82; those parts of the States of South Carolina and North Carolina lying west of meridian 82; that part of the State of Tennessee lying west of meridian 82 and east of meridian 85; and that part of the State of Alabama lying east of meridian 88 and north of parallel 32. |
| 14 | .....do.......... | Chicago, Ill....... | Includes that part of the State of Indiana lying north of the counties of Vermilion, Fountain, Montgomery, Clinton, Howard, and Miami, and west of the counties of Wabash, Kosciusko, and Elkhart; the counties of Cass and Berrien in the State of Michigan; all that part of the State of Wisconsin lying south of the counties of Florence, Forest, Oneida, Lincoln, Taylor, and Vernon and east of the counties of Clark, Jackson, and Monroe; that part of the State of Iowa lying east of the counties of Winneshiek, Fayette, Delaware, Linn, Johnson, Washington, Henry, and Lee; and that part of the State of Illinois lying north of the counties of Hancock, McDonough, Mason, Logan, Dewitt, Piatt, Douglas, and Edgar. |
| 15 | .....do.......... | St. Louis, Mo....... | Includes that part of the State of Kentucky lying east of meridian 85; that part of the State of Illinois lying south of the counties of Vermilion, Champaign, McLean, Tazewell, Fulton, Warren, and Henderson; the counties of Lee, Henry, Van Buren, Jefferson, Davis, Wapello, Appanoose, and Monroe in the State of Iowa; and all that part of the State of Missouri lying east of meridian 93. |
| 16 | District director. | Memphis, Tenn..... | Includes that part of the State of Alabama lying north of parallel 32 and west of meridian 88; that part of the State of Tennessee lying west of meridian 88; that part of the State of Arkansas lying east of meridian 93; that part of the State of Louisiana lying east of meridian 93 and north of parallel 32; and that part of the State of Mississippi lying north of parallel 32. |
| 17 | Commissioner of immigration. | New Orleans, La..... | Includes that part of the State of Florida lying west of meridian 85; those parts of the States of Alabama and Mississippi lying south of parallel 32; and that part of the State of Louisiana lying south of parallel 32 and east of meridian 93. |
| 18 | District director. | Grand Forks, N. Dak. | Includes that part of the northern peninsula of the State of Michigan lying west of the counties of Dickinson and Marquette; that part of the State of Wisconsin lying north of the counties of Price, Sawyer, Washburn, and Burnett; that part of the State of Minnesota lying north of the counties of Pine, Aitkin, Cass, Hubbard, Becker, Mahomet, and Norman; and that part of the State of North Dakota lying north of the counties of Cass, Barnes, Stutsman, Kidder, Burleigh, Oliver, Mercer, Dunn, and McKenzie. |

EXHIBIT 4
Page 57 of 88

**54**            EUGENICAL ASPECTS OF DEPORTATION

| Dist. No. | Title of officer | Location of headquarters | Extent of district |
|---|---|---|---|
| 19 | District director. | Minneapolis, Minn.. | Includes that part of the State of Wisconsin lying north and west of the counties of Crawford, Richland, Sauk, Juneau, Wood, Marathon, Langlade, Oconto, and Marinette except the counties of Douglas, Bayfield, Ashland, and Iron; that part of the State of Minnesota lying south of the counties of Carlton, Itasca, Beltrami, Clearwater, and Polk; that part of the State of North Dakota lying south and east of the counties of Traill, Steele, Griggs, Foster, Wells, Sheridan, McLean, Mountrail, and Williams; that part of the State of South Dakota lying north and east of the counties of Minnehaha, Turner, Hutchinson, Douglas, Charles Mix, Gregory, Tripp, Mellette, Washabaugh, Pennington, Meade, and Butte; and that part of the State of Iowa lying west, north, and east of the counties of Allamakee, Fayette, Bremer, Butler, Franklin, Wright, Humboldt, Pocahontas, Buena Vista, O'Brien, and Osceola. |
| 20 | ....do........... | Omaha, Nebr...... | Includes that part of the State of Iowa lying west, north, and south of the counties of Appanoose, Monroe, Wapello, Jefferson, Henry, Louisa, Muscatine, Cedar, Jones, Dubuque, Clayton, Winnesheik, Chickasaw, Floyd, Cerro Gordo, Hancock, Kossuth, Palo Alto, Clay, and Dickinson; that part of the State of South Dakota lying south and west of the counties of Moody, Lake, McCook, Hanson, Davison, Aurora, Brule, Lyman, Jones, Jackson, Haakon, Ziebach, Perkins, and Harding; and that part of the State of Nebraska lying north and east of the counties of Scotts Bluff, Morrill, Garden, Keith, Lincoln, Frontier, and Red Willow. |
| 21 | ....do........... | Kansas City, Mo... | Includes that part of the State of Arkansas lying north of parallel 36 and west of meridian 93; that part of the State of Missouri lying west of meridian 93; that part of the State of Kansas lying east of meridian 100; and that part of the State of Oklahoma lying east of meridian 100 and north of parallel 36. |
| 22 | ....do........... | San Antonio, Tex.. | Includes that part of the State of Louisiana lying north of parallel 32 and west of meridian 93; that part of the State of Arkansas lying west of meridian 93 and south parallel 36; that part of the State of Oklahoma lying south of parallel 36; and all that part of the State of Texas lying east and south of meridian 100, parallel 32 and meridian 102 except the counties alloted to New Orleans, La., District No. 17. |
| 23 | ....do........... | Helena, Mont..... | Includes that part of the State of Wyoming lying north of parallel 44; that part of the State of Montana lying south of parallel 48 and east of meridian 115, and that part of the State of Idaho lying east of meridian 115 and north of parallel 44. |
| 24 | District director. | Denver, Colo...... | Includes that part of the State of Kansas lying west of meridian 100; that part of the State of Nebraska lying west and south of the counties of Furnas, Gosper, Dawson, Custer, Logan, McPherson, Arthur, Grant, Sheridan, Box Butte, and Sioux; that part of the State of Wyoming lying south of parallel 44 and east of meridian 109; and the State of Colorado. |
| 25 | ....do........... | El Paso, Tex...... | Includes that part of the State of Texas lying west and north of meridian 102, parallel 31, and meridian 100; that part of the State of Oklahoma lying west of meridian 100; the State of New Mexico; and that part of the State of Arizona lying east of meridian 114. |
| 26 | ....do........... | Spokane, Wash.... | Includes all that part of the State of Montana lying north of parallel 48 and also that part lying west of meridian 115; that part of the State of Washington lying east of meridian 120; that part of the State of Oregon lying east of meridian 120 and north of parallel 44; and that part of the State of Idaho lying north of parallel 44 and west of meridian 115. |
| 27 | ....do........... | Salt Lake City, Utah. | Includes the State of Utah; that part of the State of Wyoming lying west of meridian 109 and south of parallel 44; that part of the State of Idaho lying south of parallel 44; and that part of the State of Nevada lying north of parallel 37 and east of meridian 117. |
| 28 | Commissioner of immigration. | Seattle, Wash..... | Includes all that part of the State of Washington lying west of meridian 120 except the counties of Klickitat, Skamania, Clarke, Cowlitz, and Wahkiakum and the townships in the county of Pacific bordering on the Columbia River in the State of Washington. |
| 29 | District director. | Portland, Oreg...... | Includes all that part of the State of Oregon lying south of parallel 44 and also that part lying west of meridian 120; the counties of Klickitat, Skamania, Clarke, Cowlitz, and Wahkiakum and the townships in the county of Pacific bordering on the Columbia River in the State of Washington. |

EXHIBIT 4
Page 58 of 88

| Dist. No. | Title of officer | Location of headquarters | Extent of district |
|---|---|---|---|
| 30 | Commissioner of immigration. | San Francisco, Calif. | Includes that part of the State of Nevada lying west of meridian 117; that part of the State of California lying north of the counties of San Luis Obispo, Kern, and San Bernardino, and west of meridian 117. |
| 31 | District director. | Los Angeles, Calif... | Includes that part of the State of Arizona lying west of meridian 114; that part of the State of Nevada lying south of parallel 37; and that part of the State of California lying east of meridian 117 and south of the counties of Inyot, Tulare, Kings, and Monterey. |
| 32 | ....do........... | Ketchikan, Alaska.. | Includes the Territory of Alaska. |
| 33 | Commissioner of immigration. | San Juan, Porto Rico. | Includes Porto Rico and the Virgin Islands. |
| 34 | District director. | Honolulu, Hawaii... | Includes the Territory of Hawaii. |
| 35 | ......do........ | Galveston, Tex...... | Includes that part of the State of Louisiana lying west of meridian 93 and south of parallel 32; and that part of the State of Texas lying south and east of the counties of Panola, Rusk, Cherokee, Houston, Madison, Grimes, Waller, Austin, Colorado, Lavaca, De Witt, Goliad, Bee, Live Oak, Jim Wells, and north of the county of Kleberg. |

## APPENDIX 4

### PRACTICE OF THE SEVERAL STATES IN THE MATTER OF DEPORTATION OF ALIENS AND OF THE RETURN OF CITIZENS OF OTHER STATES

#### (Prepared by Harrey H. Laughlin)

##### 1. ALABAMA

A. Authority: State board of administration; chief officer, L. A. Board, president.
B. Deportation of aliens:
    1. Initiative—Federal.
    2. Procedure.
    3. Aliens in population at large
    4. State laws: None.
    5. Statistical records.
C. Return of nonresidents:
    1. State laws: None.
    2. Procedure: Merely give transportation.
    3. Statistical records: None.
D. Criticisms:
    1. Should keep all aliens out.
    2. Aliens should be supported by State of legal residence.
    3. Registration of aliens would settle the problem.

##### 2. ARIZONA

A. Authority: None.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: Hearing before Federal officer; case reviewed at Washington; warrant for arrest and deportation executed.
    3. Aliens in population at large: No procedure.
    4. State laws: None.
    5. Statistical records: None compiled.
C. Return of nonresidents:
    1. State laws: None.
    2. Procedure: None.
    3. Statistical records: None.
D. Criticisms:
    1. Proof of legal entry; application for citizenship; five years residence prior to becoming a public charge.
    2. One year's residence in another State prior to becoming a public charge should establish legal residence in that State.
    3. Laws for enforcement of the foregoing.

EXHIBIT 4
Page 59 of 88

**56**          EUGENICAL ASPECTS OF DEPORTATION

### 3. ARKANSAS

A. Authority: None.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: None by the State.
    3. State laws: None.

### 4. CALIFORNIA

A. Authority: Department of institutions; chief officer, W. D. Wagner, director;
    State deportation agent, Charles F. Waymire.
B. Deportation of aliens:
    1. Initiative: State, through the above department.
    2. Procedure: Verification of entry; medical certificate presented; rest
       done by Federal authorities.
    3. Aliens in population at large: Department has jurisdiction only over
       State hospitals and industrial schools.   Has no information in regard
       to others.
    4. State laws: Section 2191, Political Code, 1923, as amended by chapter
       85.
    5. Statistical records: See second biennial report.
C. Return of nonresidents:
    1. State laws: Section 2191, Political Code, 1923, as amended by chapter
       85.
    2. Procedure: Legal settlement determined; patient returned to sheriff of
       home county.
    3. Statistical records: See second biennial report.
D. Criticisms:
    1. Institutions should be maintained only for bona fide residents of United
       States.
    2. Each State should care for its own inadequates.
    3. Interstate conference should be held to form uniform policy of reciprocal
       exchange.

### 5. COLORADO

A. Authority: Department of charities and correction; chief officer, Gertrude
    Vaile, secretary.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Superintendent of institution reports to above department,
       which reports to United States Immigration Bureau.  If alien has
       become a public charge since entry into United States, State pays
       expenses to seaport.  Agreement between department and United
       States official as to payment of expenses of deportation and mainte-
       nance.
    3. Aliens in population at large: No provision in statutes.
    4. State laws: Chapter XVII Compiled Laws, 1921.
    5. Statistical records: See sheet attached to schedule.
C. Return of nonresidents:
    1. No provision.
    2. No provision.
    3. No provision.

### 6. CONNECTICUT

A. Authority: Department of State agencies and institutions; chief officer,
    Raymond F. Gates, State agent.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Examination to procure prior cause certificate; verifica-
       tion of entry; report of case to United States officials.
    3. Aliens in population at large: Federal cases, procedure as above.
       State cases, procure case history, passport, United States income
       tax release, and accompany alien to port.
    4. State laws: Chapter 150, Public Acts, 1921.  Also Federal laws.
    5. Statistical records: See annual reports of department.

EXHIBIT 4
Page 60 of 88

C. Return of nonresidents:
    1. State laws: Chapter 150, Public Acts, 1921.
    2. Procedure: Obtain case history; report to State to which return is to
        be made; agreement for voluntary return, or by warrant under
        above law.
    3. Statistical records: See reports of department.
D. Criticisms:
    1. Consider physical and mental condition of patient; consider dependents;
        whether case is desirable resident; whether expense will be temporary
        or for indefinite period.
    2. See 1.
    3. Authorize district commissioners of immigration to issue warrants for
        arrest of aliens; establish subdistrict offices when necessary.  Inter-
        state: Uniform legal settlement laws.
E. Documents and records: Copy of laws, blank forms, and annual reports sent.
F. Remarks: Federal Government should reimburse State for maintaining de-
    pendents after they have been reported to United States officials.  Need
    larger force in immigration department.

### 7. DELAWARE

A. Authority: None.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: None by the State.
    4. State laws: None.

### 8. DISTRICT OF COLUMBIA

A. Authority: Board of charities; chief officer, George S. Wilson, secretary.
B. Deportation of aliens:
    1. Initiative: Local official, usually.
    2. Procedure: When local official finds deportable alien in an institution,
        he reports to United States officers.
    3. Aliens in population at large: Local officials do not deport aliens in the
        population at large.
    4. State laws: No local statutes.
    5. Statistical records: Local authorities keep no records.
C. Return of nonresidents:
    1. State laws: Section 7, Act of 1899, provides for removal of nonresident
        insane.
    2. Procedure: Cooperation with local authorities in other States to
        establish legal residence.
    3. Statistical records: Figures for 1924 given.
D. Criticisms:
    2. One year's residence as self-supporting individual or family.
    3. Federal Government should be allowed to define by statute conditions
        under which public charges can be transferred from one State to
        another.
E. Documents and records: Copy of law sent.
F. Remarks: The District of Columbia is different from the States in many
    respects, and has very limited experience with aliens.

### 9. FLORIDA

A. Authority: Board of commissioners of State institutions; chief officer, John
    W. Martin, Governor of Florida.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: None by the State.
    4. State laws: None.
    5. Statistical records: None.

### 10. GEORGIA

A. Authority: No bureau.
B. Deportation of aliens: No laws authorizing deportation.  "Banishment from
    the State is prohibited by the State Constitution."

EXHIBIT 4
Page 61 of 88

### 11. IDAHO

A. Authority:
    1. State prison board, Boise.
    2. Idaho Insane Asylum, Blackfoot.
    3. Department of public welfare, Boise.
B. Initiative: Federal.
C. Return of nonresidents: State laws; Chapter 186, Laws of 1923.

### 12. ILLINOIS

A. Authority: Department of public welfare; chief officer, Judge C. H. Jenkins, director.
B. Deportation of aliens:
    1. Initative: State.
    2. Procedure: Deportation agent secures history of all patients committed to institutions. One year establishes residence in the State. Domestic cases are handled by the State; foreign cases are turned over to Federal deportation agent of the district.
    3. Aliens in population at large: These are handled exclusively by the social service department and the Federal agent.
    4. State laws: Duties of State deportation agent transferred to department of public welfare by section 53 of Civil Administrative Code. These duties are to arrange for the deportation of alien inmates of the State hospitals for the insane and other charitable institutions of the State. (See p. 43, General Information and Laws.)
    5. Statistical records: See the Institution Quarterly, Volume XV, No. 3, September, 1924, page 197.
C. Return of nonresidents:
    1. State laws: Gentlemen's agreement with many other States. System of reciprocity which saves expense.
    2. If other States have no department of welfare or similar board, the matter is taken up with the county judge, which method is usually unsatisfactory.
    3. Statistical records: See page 197 of the Institution Quarterly for September, 1924.
D. Criticisms: Habeas corpus proceedings interfere. Too much authority in hands of Secretary of Labor. Too many small politicians interfering with regular method of deporting aliens.

### 13. INDIANA

A. Authority: Board of State Charities; chief officer, J. A. Brown, secretary.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Institution reports case to board of State charities. Board secures facts about alien's entry into United States and reports to United States official of the district.
    3. Aliens in population at large: Aliens reported to Federal authorities; nonresidents returned by board.
    4. State laws: Acts of 1917, chapter 56, page 142.
    5. Statistical records: Number of persons deported or returned under the law of 1917, 83.
C. Return of nonresidents:
    1. State laws: Acts of 1917, chapter 56. Copy inclosed.
    2. Procedure: Investigation to determine legal settlement; correspondence with public agency in other State; deportation by board of State charities.
    3. Statistical records: 76 nonresidents returned. Names of receiving States given.
D. Criticisms: One year constitutes legal residence in the State.

### 14. IOWA

A. Authority: No central bureau.
B. Deportation of aliens: No State law on deportation. When an alien prisoner's term has expired, he is delivered to the United States agent. Notice of warrant of deportation is filed with the warden 30 days before the date of release. Sentence is sometimes suspended to effect deportation.

EXHIBIT 4
Page 62 of 88

### 15. KANSAS

A. Authority: State board of administration; chief officer, Mr. A. B. Carney, chairman.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: Cases that might be deportable are reported to United States officials, who make the investigation. Soon after an alien's arrival in the penitentiary, a questionnaire is filled out and sent to the Federal authorities at Kansas City. Deportation is promptly instituted in all cases found deportable.
    3. Aliens in population at large: Above procedure in all State institutions. Frequently State officials or peace officers report undesirable aliens to United States authorities.
    4. State laws: None.
    5. Statistical records: None available.
C. Return of nonresidents.
    1. State laws: The State tries to admit only citizens or at least legal residents to its institutions. Nonresident insane and public charges are returned to an institution in their home State whenever possible.
    2. Procedure: Correspondence with institutions in the home State and relatives of the dependent person.
    3. Statistical records: None avilable.
D. Criticisms:
    1. Aliens should be cared for if only temporarily incapacitated, but should be deported if they are to be public charges permanently.
    2. Same as above.
    3. Larger appropriations for enforcing United States immigration laws. Removal of statute of time limitations.

### 16. KENTUCKY

A. Authority: No central bureau for the deportation of aliens. State institutions are under the jurisdiction of the State board of charities and corrections, whose chief officer is Joseph P. Byers, commissioner of public institutions.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Superintendents of State institutions report to Department of Labor all aliens committed to their institutions.
C. Return of nonresidents:
    1. State laws: None.
    2. Procedure: Superintendents of institutions report to State board of charities and corrections all patients who are not legal residents of the State. The board communicates with authorities in the State of which the patient is a resident to arrange for his return. All expenses of such returns are paid by the State of Kentucky.

### 17. LOUISIANA

A. Authority: None.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: None by the State.
    4. State laws: None.

### 18. MAINE

A. Authority: No central bureau.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: State or local officials report alien paupers to United States officers, who do all in their power to deport them. The great majority of alien paupers belong in Canada, many of them having entered illegally.
    3. Aliens in population at large: No detailed procedure.
    4. State laws: None.
    5. Statistical records: None.

EXHIBIT 4
Page 63 of 88

C. Return of nonresidents.
    1. State laws: Revised Statutes, chapter 29, section 40.
    2. Procedure: On complaint of overseer of poor, any judge of municipal
       or police court or trial justice may by his warrant cause a nonresident
       pauper to be removed from the State to the place where he belongs,
       at the expense of the town removing him.
    3. Statistical records: None.
D. Criticisms: Laws relating to admittance of aliens should be more rigid.
    Many are admitted who have no intention of becoming good citizens,
    and many enter illegally.

### 19. MARYLAND

A. Authority: Supervisors of city charities, Baltimore; chief officer, Nathaniel
    G. Grasty, secretary.
B. Deportation of aliens:
    1. Initiative: State, through the above board.
    2. Procedure: Cases are referred to above board.  If board determines
       that case is deportable, it is reported to commissioner of immigration.
    3. Aliens in population at large: Procedure same as above.
    4. State laws: None.
    5. Statistical records: None available.
C. Return of nonresidents:
    1. State Laws: Baltimore has reciprocal agreements with a large number
       of States governing the nonresident problem.  Copy of these non-
       resident articles attached.
    2. Procedure: If investigation of supervisors shows a person to belong in
       another State, and if permission can be secured, he is returned at the
       expense of the supervisors.
    3. Statistical records: None available.
D. Criticisms:
    1. Aliens not physically or mentally able to be self-supporting, and likely
       to become a public charge, should be deported.
    2. A nonresident who becomes a public charge within one year after
       arrival in the State should be returned to the State from which he
       came.
    3. A Federal law governing all States "would be a boone to the whole
       country."

### 20. MASSACHUSETTS

A. Authority:
    1. Department of public welfare; chief officer, Richard K. Conant, com-
       missioner.
    2. Department of mental diseases; chief officer, Dr. George M. Kline,
       commissioner.
    3. Department of correction; chief officer, Sanford Bates, commissioner.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: History of each case is taken and Form 534 (proof that
       alien has become public charge from causes existing prior to landing)
       is sent to the institution; also Form 1, stating that alien is held for
       deportation.  Form 534 filled out by hospital physician is returned
       to one of above departments, which sends it to the immigration
       commissioner at Boston.  When Federal officers have arranged for
       deportation, written order for discharge of alien from institution is
       given to immigration commissioner by department concerned.
          In practice the department of correction has an agreement with
       the commissioner at Boston whereby it reports all aliens committed
       to penal institutions, with all available data in regard to arrival,
       place and date of birth, parents, relatives in United States, etc.
       The department has no authority to pay the expense of deportation,
       so all arrangements for deportation must be left to immigration
       commissioner.
    3. Aliens in population at large: In case of families liable to be per-
       manently dependent, the department of public welfare, in a letter
       to the commissioner describes family conditions, instead of filling
       out medical certificates.  Otherwise procedure is the same.
    4. State laws: (a) Criminals (ch. 127, sec. 114, general laws 1921); (b)
       paupers (ch. 121, sec. 9, general laws, ch. 122, sec. 21, 22); (c) insane
       (ch. 123, sec. 20, general laws 1921, as amended by ch. 245, acts of 1923).
    5. Statistical records: Figures from department of public welfare giv en

EXHIBIT 4
Page 64 of 88

C. Return of nonresidents:
    1. State laws: (a) Criminals (ch. 127, sec. 114, general laws, 1921); (b) paupers (ch. 121, secs. 9–11; ch. 122, sec. 21; ch. 122, sec. 32); (c) insane (ch. 123, sec. 20, as amended by ch. 245, acts of 1923).
    2. Procedure: (a) The department of public welfare investigates each case brought to its attention, to establish legal residence in another State, and furnishes transportation, sending an attendant when necessary. Department is guided by transportation agreement of allied national agencies. (b) In cases where the department of mental diseases deports, the matter is taken up with central board of receiving State. Form 3 is sent to States having reciprocal agreement; otherwise letter describing case is sent.
    3. Statistical records: Figures supplied by department of public welfare.
D. Criticisms:
    1. (a) Department of public welfare believes State has no moral or legal responsibility to care for unnaturalized aliens for any considerable period, especially if they are likely to become permanent public charges.
    2. In absence of uniform State laws, State departments should be authorized by law to form agreements as to interchange of public charges.
    3. Commissioner of immigration of each district should have power to issue warrants of arrest and deportation, except in appealed cases.
E. Documents and records: Manual of laws, sample forms, etc., inclosed.
F. Remarks: Cost of maintenance pending deportation proceedings should be borne by Federal Government. Rule 22, subdivision 11 of the Federal law is inoperative, because alien who is dependent from causes arising subsequent to entry will seldom give his consent to deportation.

### 21. MICHIGAN

A. Authority:
    1. Auditor general.
    2. State hospital commission, chief officer, Mare Murray, director.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Superintendent of institution reports to auditor general, who in turn reports to United States officials.
    3. Aliens in population at large: Reported to United States officials.
    4. State laws: Act No. 59 (public acts 1921); act No. 151 (public acts 1923); act No. 72 (public acts 1907).
C. Return of nonresidents:
    1. State laws: Same as above. Matter handled by reciprocal agreements.
    2. Procedure: If receiving state grants request to accept person, he is returned at expense of State making return.
    3. Statistical records: None.

### 22. MINNESOTA

A. Authority: State board of control; chief officer, R. W. Wheelock, chairman.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Deportation agent of above board reports deportable aliens in insane hospitals to Federal deportation agent. Agents at penal institutions report directly to Federal agent.
    3. Aliens in population at large: Reported to Federal agent by local authorities, chairty organizations, etc.
    5. Statistical records: Figures for 1923–24 inclosed.
C. Return of nonresidents: 1. State laws: Sec. 4046 General Statutes, 1913.

### 23. MISSISSIPPI

A. Authority: No central bureau. Separate board for each institution.
B. Deportation of aliens:
    1. Initiative: Federal.
    3. No information. White population is almost 100 per cent Anglo-Saxon.
    5. Statistical records: None.
C. Return of nonresidents: 3. Statistical records: None.

EXHIBIT 4
Page 65 of 88

## 62      EUGENICAL ASPECTS OF DEPORTATION

### 25. MONTANA

A. Authority: No central board.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: United States agent notifies warden of prison whenever an
        alien inmate is wanted for deportation. Alien is discharged on con-
        dition that he be deported.
    3. Aliens in population at large: No central board to deport aliens at
        large.
    5. Statistical records: None.
C. Return of nonresidents:
    2. Procedure: Superintendent of State hospital for the insane makes a
        recommendation to the board of commissioners for the insane for the
        discharge of any inmate who has not resided in the State for one year.

### 26. NEBRASKA

A. Authority: State board of control. Chief officer: A. E. Allyn.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Guardian appointed by proper court procedure, and case
        reported to district director of immigration.
    3. Aliens in population at large: Reported to district director.
    4. State laws: Copy of law inclosed.
C. Return of nonresidents: Matters handled by various county boards or com-
    missions.

### 24. MISSOURI

A. Authority: None.
B. Deportation of aliens: No State laws or procedure pertaining to this subject.

### 27. NEVADA

A. Authority: No central bureau.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Upon report of warden of State prison, board of parole
        commissioners orders alien surrendered to United States officials
        when called for.
    3. Aliens in population at large: No such activity.
    4. State laws: None.
    5. Statistical records: None.
C. Return of nonresidents:
    1. State laws: Revised laws of Nevada, 1912 (Vols. I and II); revised
        laws of Nevada, 1919 (Vol. III).
    2. Procedure: When a mutual agreement can be made with the State in
        which the alien has legal residence, he is returned under contract
        drawn up by superintendent of institution and confirmed by its
        governing board.
    3. Statistical records: See biennial report of superintendent of Nevada
        Hospital for Mental Diseases.
D. Criticisms:
    1. Prior criminal record; conviction for crime here; prior record of pauper-
        ism or abandonment of family elsewhere, on the one hand. On the
        other hand, evident misfortune sustained here.
    2. Cases of dependency, especially with criminal tendencies, should be
        returned to original community legally charged with their care and
        supervision.
    3. There should be appropriations for this work available all the year
        around.

### 29. NEW JERSEY

A. Authority: Department of institutions and agencies. Chief officer: Burdette
    G. Lewis, commissioner.
B. Deportation of aliens.:
    1. Initiative: State.
    2. Procedure: Department obtains information as to date and port of
        landing, and name of steamship, and forwards it to institutions where
        alien is confined. The superintendent then fills out medical certifi-
        cates and sends them to the Federal authorities.

EXHIBIT 4
Page 66 of 88

C. Return of nonresidents:
 1. State laws: Section 424–425, chapter 147, laws of 1918.
 2. Procedure: Facts in regard to nonresidents are collected and submitted to hospital commission or some other board in State where patient is supposed to have legal residence. If return is authorized patient is sent back at expense of the State of New Jersey.
D. Criticisms: 3. Psychological examinations should be given in all cases.

### 28. NEW HAMPSHIRE

A. Authority: State board of charities and correction; chief officer, Wm. J. Ahern, secretary.
B. Deportation of aliens:
 1. Initiative: State.
 2. Procedure: Cases are referred to Federal authorities by anyone interested, usually trustees of an institution or State board of charities and correction.
C. Return of nonresidents:
 1. State laws: No definite regulations. Each case settled by agreement.
 2. Procedure: Trustees of State Hospital for Insane have reciprocal agreement with Massachusetts and several other States whereby persons becoming insane within two years after entering the State may be transferred from an institution in that State to an institution in the State from which they came. Feeble-minded persons may also be removed from the State within two years after arrival. Trustees of New Hampshire State Hospital act as a board of lunacy in making agreements.

### 30. NEW MEXICO

A. Authority: No central board.
B. Deportation of aliens:
 1. Initiative: Usually Federal.
 2. Procedure: Immigration officer makes periodical visits to State penitentiary, interviews prospects and files notice of intention to deport with officers of penitentiary.
 3. Aliens in population at large: Handled by Federal authorities.
 5. Statistical records: None.
C. Return of nonresidents:
 1. State laws: None.
 3. Statistical records: None.
D. Criticisms: Present Federal and State laws seem adequate.

### 31. NEW YORK

A. Authority: No central board. (See 1919 report of bureau of deportation, p. 9.)
B. Deportation of aliens:
 1. Initiative: State.
 2. Procedure: Landing is verified; Form 534 is issued; clinical and medical history secured and issued with Form 534; request for warrant of arrest is made.
 3. Aliens in population at large: No knowledge of any such procedure.
 4. State laws: Insanity law (Art. II, sec. 19).
 5. Statistical records: None.
C. Return of nonresidents:
 1. State laws: Insanity law (Art. II, sec. 19).
 2. Procedure: Case is submitted to State or local officials or relatives or friends, and upon acceptance the nonresident is returned to the institution or individual designated.
 3. Statistical records: None available.
D. Criticisms:
 1. An alien who is a public charge or who belongs to an excluded class, whether or not he is a public charge, and irrespective of the time he has been in the United States, should be liable to deportation.
 2. "The right to legal settlement should be acquired and lost in the same manner as is the right of franchise and should be modified only on humanitarian grounds and then only on acceptance of responsibility by the State of which the patient is a legal resident."

89604—28——5

EXHIBIT 4
Page 67 of 88

64          EUGENICAL ASPECTS OF DEPORTATION

D. Criticisms—Continued.
    3. Modification of Federal law indicated under "1" above. No Federal
       law should be made to interfere with State rights as to citizenship.

### 32. NORTH CAROLINA

A. Authority: No central bureau.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: If an alien is found to be insane, the clerk of the court
       notifies the governor of name of such alien and as many facts about
       the case as possible, sending also a copy of the examination taken.
       The governor sends this information to the Secretary of State in
       Washington, requesting him to inform the minister resident or
       plenipotentiary of the country of which the insane person is citizen.
    3. State laws: C. S., section 6211.
C. Return of nonresidents:
    1. State laws: C. S., section 6210.
    2. Procedure: If a nonresident is found to be insane, the clerk of court
       notifies the governor of the State of which he is a citizen of the facts
       in the case. Meanwhile the insane person is confined within the
       county, but not committed to a State hospital. If the home State
       does not provide for his return, the county commissioners turn him
       over to the sheriff of his home county or the superintendent of a
       State hospital, the county removing him bearing the expense.

### [33. NORTH DAKOTA

A. Authority: State board of administration; chief officer, R. B. Murphy,
    chairman.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: If a deportable alien inmate of an institution was a resident
       of another State before entering the institution, that State is notified
       and alien transferred there. Completion of deportation takes
       place from that State.
    3. Aliens in population at large: Same procedure as "2," above, except
       that case is presented to the Federal court.
    4. State laws: No definite law.
    5. Statistical records: None.
C. Return of nonresidents:
    2. Procedure: Each case is brought to attention of authorities of State of
       which patient is a resident. If the facts given are accepted as con-
       clusive evidence, deportation takes place. Immigration commis-
       sioner (filling out schedule) believes exceptions can be made in
       many cases without injury to the State.
    3. Statistical records: None.
D. Criticisms:
    1. Rigid inspection at port of arrival. "Better eliminate where they
       live than attempt to ferret them out after arrival here."
    2. State should approach each case without prejudice, and after consid-
       ering rights of alien and people as a whole, do what seems best for
       all concerned.
    3. Better and more easily interpreted laws, and an efficient organization
       to enforce them.

### 34. OHIO

A. Authority: Department of public welfare; chief officer, J. E. Harper, director.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Aliens thought to be deportable are reported to district
       Immigration officer.
    3. Aliens in population at large: No State provision. Reported by local
       officials to Federal authorities.

EXHIBIT 4
Page 68 of 88

C. Return of nonresidents:
    1. State laws: Revised Statutes, sections 1817–1820, inclusive.
    2. Procedure: Nonresidents are not admitted to State institutions except in special cases.  Application for admission is made to the judge of probate court or superintendent of the institution, who makes an investigation to establish the legal residence of the patient.  These findings are reported to the Ohio board of administration.  Judge or superintendent may recommend to board that patient be admitted, even though a nonresident, and board further investigates and decides on the case.
    3. Statistical records: See figures inclosed.
D. Criticisms:
    1. The only type of alien public charge for whom we have legal or moral responsibility is one who has declared his intention of becoming a citizen, and who is dependent from causes arising since admission to the United States.
    2. Only those who came to the State intending to make it their permanent home, and whose insanity began during residence there, should be cared for.
    3. Undesirable aliens should be deported irrespective of the time they have been in the United States.

### 36. OREGON

A. Authority: Oregon State board of control; chief officer, Carle Abrams, secretary.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: State board of control reports all cases found to the Federal immigration agent at Portland, who arranges for their deportation.
    3. Aliens in population at large: State board of control reports all cases to the Federal immigration agent at Portland, who arranges for their deportation.
    4. State laws: Chapter 210, general laws of Oregon, 1921; chapter 218, general laws of Oregon, 1925.
C. Return of nonresidents:
    1. State laws: Chapter 210, general laws of Oregon, 1921.
    2. Procedure: Reciprocal agreements exist with other States for the mutual exchange of public charges from one State to the State where they have legal residence.  Two years' residence in the State constitute legal settlement.
    3. State records: None supplied.

### 35. OKLAHOMA

A. Authority: State board of public affairs; chief officer, Carl L. Rice, chairman.
B. Deportation of aliens:
    1. Initiative: Federal.
    2. Procedure: None except through Federal Government.
    4. 5. No laws or statistics.
C. Return of nonresidents: No laws or procedure on this subject.

### 37. PENNSYLVANIA

A. Authority: No central office.
B. Deportation of aliens:
    1. Initiative: State, occasionally through pardon board.
    2. Procedure: Pardon board and penitentiary authorities cooperate with Federal department to bring about deportation of criminal alien. An application for pardon is made to the pardon board and is granted on condition that Federal authorities insure his deportation immediately upon release.
    3. Aliens in population at large: No procedure.
    4. State laws: None.
    5. Statistical records: No records of deportation.

EXHIBIT 4
Page 69 of 88

C. Return of nonresidents:
    1. State laws: There is an arrangement by comity between Pennsylvania and adjoining States whereby citizens of other States found in Pennsylvania insane asylums are transferred to the States of which they are citizens.
    2. Procedure: Department of welfare cooperates with similar departments in adjoining States to effect return of insane persons to the institutions of the State of which they are citizens.
    3. Statistical records: No records. Very few instances of interstate deportation.
D. Criticisms:
    1. Pennsylvania desires to have alien public charges deported whenever Federal laws permit but has not attempted to work out the problem.
    2. Pennsylvania is willing to receive Pennsylvania citizens who have become dependent and to send back nonresident public charges to other States but has not been able to work out an economical system.

### 39. SOUTH CAROLINA

A. Authority: None.
B. Deportation of aliens: No law, procedure or statistics on this subject.
C. Return of nonresidents: State laws: Removal of insane persons, section 5086, vol. 3, Code of 1925.

### 40. SOUTH DAKOTA

A. Authority: State board of charities and correction; chief officer, Charles M. Dry, president (?).
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Federal authorities attend to such cases when requested to do so by State officials.
    3. Aliens in population at large: If not a Federal case, "we run them out."
    4. State laws: None.
    5. Statistical records: Figures sent with second report.
C. Return of nonresidents:
    1. State laws: None.
    2. Procedure: Chief deportees are itinerants who seek aid from the town or county. If possible their return is arranged by negotiation; otherwise their fare is paid and they are sent on their way. However, instances are rare.
    3. Statistical records: None.

### 42. TEXAS

A. Authority: None.
B. Deportation of aliens: No State laws in regard to deportation of aliens or return of nonresidents to other States, and no organized efforts to bring about such returns. This work is carried on to a very limited extent by charitable organizations.

### 43. UTAH

A. Authority: None.
B. Deportation of aliens:
    1. Initiative: State in insane cases; Federal in prison cases.
    2. Procedure: Superintendent of State Mental Hospital reports insane cases to Federal inspector, and he comes and checks over records with superintendent. Inspector visits Utah State prison periodically and prison officials cooperate with him in bringing about deportation.
    3. Aliens in population at large: Immigration inspector arranges for deportation of all aliens reported to him by institutions. Some counties are very indifferent to the subject, probably through ignorance.
    4. State laws: None.
    5. Statistical records: Perhaps they would be available for the Utah subdivision at the main office at Denver.
C. Return of nonresidents: Salt Lake County, one-third of the State's population, investigates all cases of persons applying for charitable, medical or hospital aid, and reports deportable cases to inspector. County official welfare worker often secures aid of relatives in deportation. Statistical records of deportation might be obtained from the Denver office.

EXHIBIT 4
Page 70 of 88

### 44. VERMONT

A. Authority: No central bureau.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: About the only cases that come up are those of aliens committed to State prison. The superintendent of the prison makes arrangements with the Federal authorities to have the prisoner deported upon his release.
    4. State laws: None.
C. Return of nonresidents: State laws: Reciprocal agreements with several States whereby insane persons committed to State hospitals are exchanged.

### 45. VIRGINIA

No provision by law for deportation of aliens, and while there is a provision for returning nonresident insane and other dependents, this provision is rarely acted upon.

### 46. WASHINGTON

A. Authority: Department of business control; chief officer: W. J. Hays, director.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: Inclosed form 1045 is filled out when patient enters hospital for insane, and is sent to State deportation agent. Request for verification of landing then sent to district immigration commissioner, followed by medical certificate of physician in charge of patient, on which warrant is based.
    3. Aliens in population at large: No provision in State laws.
    4. State laws: Chapter 82 (laws of 1915); chapter 158 (laws of 1921); chapter 106 (laws of 1923).
    5. Statistical records: Figures inclosed covering period from September, 1919, to September, 1924. Biennial report of above department also.
C. Return of nonresidents:
    1. State laws: Chapter 158, sessions laws of 1921, provides for return of nonresident insane inmates of State hospitals, but does not provide for social inadequates at large.
    2. Procedure: Correspondence with friends and relatives to establish legal residence; then person is returned to relatives or county sheriff. Copy of reciprocal agreements with New York, California, and Oregon inclosed.
    3. Statistical records: Figures given from September, 1919, to September, 1924. Very little was accomplished prior to 1919 when the first State deportation agent was appointed.
D. Criticisms:
    1. All aliens of excluded classes should be deported without time limitation by the agency which admitted them, the Federal Government.
    2. Legal residents of other States should be returned when they become public charges.
    3. Time limitation should be removed from Federal law. The law would be strengthened if recommendations of interstate conference on immigration (New York, October, 1923) were adopted. There should be a uniform law in all States to permit reciprocal agreements.
E. Documents and records: Forms, biennial reports, tables, etc., sent.
F. Remarks: The State Department must take action if Federal laws are to be inforced. Lack of passport from foreign consul is greatest obstacle to deportation.

### 47. WEST VIRGINIA

A. Authority: State board of control; chief officer, James S. Lakin, president.
B. Deportation of aliens:
    1. Initiative: State.
    2. Procedure: State board of control reports cases to Federal service at Pittsburgh, Pa., and deportation is executed by Federal Government. No fixed procedure.
    3. Aliens in population at large: No knowledge of any such procedure.
    4. State laws: Section 27, chapter 58, Barnes's Code of 1923.
    5. Statistical records: None available.

EXHIBIT 4
Page 71 of 88

C. Return of nonresidents.
   1. State laws: Section 27, chapter 58, acts of 1921.   Copy inclosed.
   2. Procedure: Board secures permission to return patient to State of legal residence by corresponding with authorities in that State.
   3. Statistical records: None available.

### 48. WISCONSIN

A. Authority: State board of control; chief officer, Dr. Wm. F. Lorenz, president.
B. Deportation of aliens:
   1. Initiative: Both State and Federal.
   2. Procedure: Federal Government files request with institutions and takes charge at expiration of time.
   3. Aliens in population at large: Procedure suggested by United States Department of Labor.
   4. State laws: None.
   5. Statistical records: See Chicago office of United States Department of Labor.
C. Return of nonresidents:
   1. State laws: No rules.   Each case handled under general administration.
   2. Procedure: No such practice.   Occasionally an insane patient is transferred by request to another State.

### 49. WYOMING

A. Authority: State board of charities and reform, chief officer: Governor Nellie T. Ross, president.
B. Deportation of aliens:
   1. Initiative: State.
   2. Procedure: If aliens are found in the State penitentiary, the Federal officer at Denver is notified and he attends to their deportation.
   3. Aliens in population at large: These are rarely, if ever, deported.
   4. State laws: None.
C. Return of nonresidents:
   1. Procedure: When the superintendent of the hospital for insane finds a nonresident in the institution, he communicates with authorities in the patient's home State and he is returned at the expense of the State of Wyoming.
   2. Statistical records: Figures given for 1923–24.

———

## APPENDIX 5

REPORT OF THE MEDICAL EXAMINER OF THE NEW YORK STATE BUREAU OF SPECIAL EXAMINATIONS, FOR THE YEAR ENDING JUNE 30, 1925, PREPARED BY SPENCER L. DAWES, M. D., MEDICAL EXAMINER

### ANNUAL REPORT OF THE MEDICAL EXAMINER

*To the State hospital commission:*

The medical examiner respectfully submits herewith the annual report of the bureau of special examination, State hospital commission, for the fiscal year ending June 30, 1925.

During the fiscal year this office has investigated 2,123 cases, and from this number we have certified to the Federal authorities 400 aliens, as public charges, insane from causes not affirmatively shown to have arisen subsequent to landing, an increase from the previous year of 88.   This is the largest number certified by this office in many years.   As a matter of fact, there has been a steady rise in the number of certificates issued ever since the adoption of what is known as the "quota" law.   Logically either the character of aliens coming into this country since 1919 is distinctly inferior, or else the inspection and examination at ports of entry is less adequate than ever before.   The actual number deported in the past fiscal year was 241, 30 less than were deported the previous year and 159 less than the number certified by us.   Surely if this department with its woefully inadequate force can certify 400 aliens, the Federal Government should be able to remove more than 241 in the same period.

EXHIBIT 4
Page 72 of 88

Case 5:21-cr-00187-C   Document 15-4   Filed 10/01/21   Page 74 of 89

A comparative table of certifications and deportations for seven fiscal years in succession follows:

| Year | Certifi-cates | Deported |
|---|---|---|
| 1919 | 170 | 87 |
| 1920 | 186 | 147 |
| 1921 | 199 | 329 |
| 1922 | 293 | 172 |
| 1923 | 323 | 250 |
| 1924 | 312 | 271 |
| 1925 | 400 | 211 |

This serves to emphasize the statements just made.

The difficulties in securing passports have not lessened, but have rather been increased. As a matter of fact, the attitude of the Polish and German Governments is so unfriendly as to make it practically useless to apply for passports. On the other hand, the attitude of most other governments is distinctly friendly, and the aid and courtesy granted the State by the majority of them, notably Great Britain, Italy, and France, is worthy of comment.

There have been repatriated 212 aliens without expense to the Federal Government, almost as many as that Government deported. Most of these should never have been admitted to this country and practically all should have been sent back under Federal warrant had the intent of the immigration act been observed. Of these so repatriated, 135 were sent at the expense of friends and relatives. In this latter class we show an increase of 58 over the preceding year.

Our difficulties in the removal of nonresidents are still increasing owing to the rulings of the courts as to legal residence, compelling the State in many instances to care for and support individuals who have been in the State but a few days or a few weeks, a manifestly unfair and illogical situation. Of nonresidents removed we have a total of 676. Of these, 462, or more than two-thirds, were removed without cost of any kind to the State.

If we sum up the total removed from the State, of repatriates and nonresidents at the expense of friends and relatives, we see that it amounts to 597, and inasmuch as the average cost of removal from the State is about $103, this office was responsible for a saving in this respect to the State of $61,491.

If we refer to Table 2 it will be seen that 250 patients were removed directly from Bellevue and King's County Hospital, observation wards, without previous commitment to one of our State institutions, a great saving in cost and labor to the State and the municipality, to say nothing of the delay incident to the removal of a patient once committed. The Veterans' Bureau still cooperates most heartily with this office, as may be seen by referring to the same table and noting the fact that 77 patients were removed from Veterans' Bureau Hospital No. 81. The Veterans' Bureau still reports all nonresident cases to this bureau for our approval before removal to or acceptance from other States; and we still report all ex-soldier cases to them before removal.

The total removals during the year were 1,129, or 37 less than the year preceding. This slight decrease may be wholly attributed to the fact that early in the month of July the funds appropriated by the legislature for repatriation and transfer were entirely exhausted, and for a large part of the month of June no removals were made at the expense of the State. As a matter of fact, within certain bounds the number of removals is practically limited to the amount of money and the office force available, and it would seem that a wise, economic viewpoint on the part of the legislature would persuade them to give us a greater appropriation and a larger working force.

It is a fact that the per capita cost of care, maintenance, and up-keep of a patient in one of our State hospitals is about $425 per year. It is therefore purely a matter of arithmetic to know that our 1,129 removals during the year represent a gross saving to the State of New York for one year alone of $479,825. The entire cost of administration of this office, which includes not only salaries, but rent, transportation, and incidentals is under $37,000, a net saving to the State through the operations of the bureau of special examination for the fiscal year ending June 30, 1925, of $442,825.

EXHIBIT 4
Page 73 of 88

### RELATIONS TO THE FEDERAL GOVERNMENT, TO OTHER STATES

Our relations with the local government officials continues to be most pleasant, especially with the Commissioner of Immigration for Ellis Island, and there can be no adverse criticism as to their attitude. On the contrary, the attitude of the Federal Government, as represented by the Department of Labor in Washington is so arbitrary, unjust, and unfair as to make unbiased almost impossible. The Department of Labor continues to cancel warrants of arrest without vouchsafing reasons, or giving anything but ex parte hearings to the interested aliens. More warrants of arrest and warrants of deportation have been canceled by the Department of Labor during the past fiscal year than ever since records have been kept by the State of New York.

The great majority of these cases appear upon the records as clearly within the intent of the law, and only the decision of the Secretary of Labor is responsible—so far as the State of New York is aware—for retaining them in the country and to contravening the intent of the statute in the matter of these undesirable aliens.

The medical examiner visited Great Britain during the month of July and was there accorded every facility for making inspections and examinations by the American consuls general at Liverpool and London and by the consul at Southampton. He was also assisted in his investigations by the White Star Line and the Cunard Line. He found that the so-called examination abroad (the passport regulations instituted under the new immigration act by the Secretary of Labor and relating to visas for immigrants) were even less effectual and practical, and more annoying and troublesome than it had been believed they could be.

The prospective immigrant must appear before the consul general and answer a series of questions stating that he is neither an imbecile, idiot, epileptic, mental defective, or an insane person; that he is not afflicted with constitutional psychopathic inferiority, and very many and various other questions which it actually takes him over a half hour to answer, with the representative of the consul working at top speed. He of course does not know the meaning of most of these terms, if any of them, nor is it believed he would answer them correctly if he did. He swears to the fact that they are correct, and yet there is no penalty fixed which can be enforced.

This procedure must be carried out, even for babes in arms, so that the only practical advantage accruing from this procedure would seem to be giving extra work to the already overworked consular staff. The law, of course, provides for the issuance of a medical certificate by some physician to be attached to the application for a visa, but does not provide that it shall be true, nor does it specify the kind, character, or official position (if any) of the physician. It is plain to see that the alien may employ any physician, and if his first certificate does not please him, he may discard it and employ others until he finds one whose certificate does suit.

The medical examiner has had two hearings, most helpful and courteous, from the House Committee on Immigration and Naturalization, and has aided in formulating new legislation which passed the last House of Representatives and will undoubtedly pass both Houses of the coming Congress. Several important changes are likely to occur in the new immigration act bearing upon time of deportation and the elimination of the question of public charges, as well as serving warrants of arrest by the local immigration officers.

The medical examiner has delivered many addresses regarding immigration in various parts of the country and believes that sentiment in general is in line with the modifications in the immigration laws which were adopted by the interstate conference on immigration held under the auspices of the State hospital commission in 1923.

In the last report of the medical examiner, the following recommendation was made:

"As the courts have recently held that legal residence (and thus legal settlement) in New York is one of intent, so that a resident of another State may acquire a legal residence in New York over night, the medical examiner suggests that the commission secure a change in the law which will provide that legal residence may be had in New York in the same manner as is the right to vote in this State."

As far as I am aware, no steps were taken in this respect; the medical examiner therefore once more urges this recommendation to the attention of the State hospital commission, all of which is respectfully submitted.

SPENCER L. DAWES,
*Medical Examiner.*

EXHIBIT 4
Page 74 of 88

EUGENICAL ASPECTS OF DEPORTATION        **71**

TABLE 1.—*Monthly record of removals, year ended June 30, 1925*

|  | Total | July | August | September | October | November | December | January | February | March | April | May | June |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aliens deported and repatriated: |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Deported under Federal warrant | 241 | 21 | 14 | 11 | 31 | 17 | 23 | 24 | 23 | 30 | 14 | 16 | 14 |
| Repatriated— |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Expense of State | 77 | 5 | 11 | 2 | 8 | 3 | 2 | 3 | 3 | 27 | 2 | 2 | 9 |
| Expense of friends | 135 | 12 | 9 | 8 | 18 | 18 | 5 | 10 | 4 | 12 | 8 | 17 | 14 |
| Nonresidents removed: |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Expense of State | 214 | 16 | 16 | 15 | 18 | 21 | 19 | 50 | 9 | 32 | 20 | 12 | 13 |
| Expense of friends | 462 | 16 | 44 | 30 | 31 | 46 | 29 | 25 | 24 | 38 | 60 | 48 | 71 |
| Total | 1,129 | 70 | 94 | 69 | 109 | 105 | 75 | 82 | 64 | 139 | 104 | 95 | 121 |
| Certificates issued | 400 | 24 | 42 | 41 | 45 | 20 | 50 | 40 | 30 | 20 | 50 | 10 | 28 |
| Cases investigated | 2,123 | 196 | 199 | 150 | 181 | 189 | 162 | 179 | 142 | 171 | 200 | 141 | 213 |

TABLE 2.—*Patients removed from State hospitals and other institutions*

| State hospitals | Grand total | Aliens deported and repatriated | | | | Nonresidents returned | | |
|---|---|---|---|---|---|---|---|---|
|  |  | Total | United States Immigration Service | Expense of State | Expense of friends | Total | Expense of State | Expense of friends |
| Binghamton | 10 | 7 | 3 | 2 | 2 | 3 | 8 | 1 |
| Brooklyn | 27 | 16 | 11 | 2 | 3 | 11 | 4 | 7 |
| Buffalo | 19 | 10 | 3 | 3 | 4 | 9 | 4 | 5 |
| Central Islip | 128 | 102 | 54 | 22 | 26 | 76 | 36 | 40 |
| Dannemora | 5 | 3 |  | 3 |  | 2 | 2 |  |
| Gowanda | 30 | 11 | 3 | 2 | 6 | 19 | 13 | 6 |
| Harlem Valley | 1 |  |  |  |  | 1 |  | 1 |
| Hudson River | 61 | 13 | 10 | 2 | 1 | 48 | 21 | 27 |
| Kings Park | 70 | 37 | 25 | 5 | 7 | 33 | 23 | 10 |
| Manhattan State Hospital | 303 | 186 | 109 | 29 | 48 | 117 | 47 | 70 |
| Matteawan | 29 | 7 | 4 | 3 |  | 22 | 7 | 15 |
| Middleton | 10 | 4 | 1 | 1 |  | 6 | 4 | 2 |
| Rochester | 9 | 5 | 1 | 1 | 3 | 4 | 1 | 3 |
| St. Lawrence | 10 | 5 | 4 |  | 1 | 5 | 2 | 3 |
| Utica | 11 | 8 | 5 | 1 | 2 | 6 | 3 | 3 |
| Willard | 15 | 1 | 1 |  |  | 14 | 3 | 11 |
| Bellevue | 244 | 30 | 5 | 2 | 23 | 214 | 34 | 178 |
| Kings County | 7 | 1 |  |  | 1 | 6 | 2 | 4 |
| Veterans No. St. | 77 | 1 |  |  | 1 | 76 |  | 76 |
| Grasslands | 1 |  |  |  |  | 1 | 1 |  |
| Albany Hospital | 1 | 1 |  |  |  |  |  |  |
| Bloomingdale | 1 | 1 |  | 2 |  |  |  |  |
| Home | 4 | 1 |  | 2 |  | 2 |  |  |
| Total | 1,129 | 433 | 241 | 77 | 195 | 676 | 214 | 462 |

*Certificates issued by the State hospital commission and alien patients deported from this State by the United States Government in the fiscal years 1919–1926*

| Year ending | Certificates issued | Patients deported | Year ending | Certificates issued | Patients deported |
|---|---|---|---|---|---|
| June 30, 1919 | 170 | 87 | June 30, 1923 | 324 | 250 |
| June 30, 1920 | 186 | 117 | June 30, 1924 | 312 | 271 |
| June 30, 1921 | 199 | 329 | June 30, 1925 | 170 | 241 |
| June 30, 1922 | 284 | 172 | Dec. 31, 1925 [1] | 215 | 124 |

[1] 6 months.

EXHIBIT 4
Page 75 of 88

EUGENICAL ASPECTS OF DEPORTATION

### APPENDIX 6

### DEPORTATION OF ALIENS AND RETURN OF CITIZENS TO OTHER STATES, BY CLASSES OF SOCIAL INADEQUACY.  SURVEY ENDING JANUARY 1, 1923

(Hitherto unpublished findings of a preliminary investigation on deportation made for the Committee on Immigration and Naturalization of the House of Representatives, by H. H. Laughlin)

TABLE A.—*Institutional findings on international deportation and interstate return of socially inadequate inmates.  Reported by 667 institutions with a total of 451,048 inmates, in a survey ending January 1, 1923*

| Class of institution | Number of institutions reporting | Total number of inmates | Aliens deportable | | Citizens returnable to other States | | Aliens deported [1] | | Citizens returned to respective home States [2] | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Number | Per cent | Number | Per cent | Number | Per cent | Number | Per cent |
| Feeble-minded | 49 | 38,036 | 4 | 0.20 | 13 | 0.04 | 57 | 2.52 | 174 | 0.55 |
| Insane | 160 | 225,553 | 920 | 1.95 | 816 | .61 | 7,647 | 16.20 | 8,676 | 6.45 |
| Criminalistic adults | 117 | 80,233 | 1,109 | 9.70 | 218 | .33 | 1,786 | 15.62 | 1,666 | 1.55 |
| Criminalistic juveniles | 81 | 24,263 | 8 | .36 | 205 | .99 | 25 | 1.12 | 1,452 | 7.03 |
| Epileptics | 12 | 9,430 | 8 | 1.16 | 2 | .04 | 4 | .58 | 20 | .27 |
| Tuberculous | 71 | 11,691 | 48 | 2.20 | 3 | .03 | 199 | 5.00 | 7 | .07 |
| Leprous | 6 | 5,955 | | | | | 14 | 5.43 | | |
| Blind | 41 | 5,421 | | | 11 | .22 | | | | |
| Deaf | 32 | 6,639 | | | 4 | .67 | 15 | 15.31 | 8 | .14 |
| Deformed | 7 | 883 | | | | | | | | |
| Dependent adults | 66 | 35,155 | 49 | .79 | 68 | .27 | 210 | 1.11 | 1,047 | 4.19 |
| Dependent children | 29 | 4,463 | | | | | | | | |
| Total | 667 | 451,018 | 2,187 | 5.07 | 1,190 | .47 | 16,482 | 11.71 | 13,320 | 4.22 |

[1] These are the total numbers, as given by the institutional authorities as having been deported from the beginning of deportations, from the several institutions, to Jan. 1, 1924.
[2] Total number returned from beginning of such returns to Jan. 1, 1924.
[3] During the period of the survey (1922) the number of institutions varied slightly from time to time.

### FEEBLE-MINDED

Total number of institutions: 52.
Number of institutions reporting: 49.
Total number of inmates reported: 38,036.
Nativity: Native born, 82.72 per cent; foreign born, 5.31 per cent; unknown, 11.97 per cent.
Number of aliens deportable: 4.
Number returnable to other States: 13.
Historical notes: (1) Number of feeble-minded aliens reported by 49 institutions as having been deported since the establishment of the institutions, by States: Iowa, 1; Massachusetts, 31; New York, 18; North Dakota, 1; Virginia, 3; Wyoming, 3; total, 57.  (2) Feeble-minded residents of other States returned by these 49 institutions to their respective home States: 174.

### INSANE

Total number of institutions: 165.
Number of institutions reporting: 160.
Total number of inmates reported: 225,553.
Nativity: Native born, 59.68 per cent; foreign born, 20.90 per cent; unknown, 19.42 per cent.
Number of aliens deportable: 920.
Number returnable to other States: 816.
Historical notes: (1) Number of insane aliens reported by 160 State institutions as having been deported since the establishment of the institutions, by States: Alabama, 2; Colorado, 4; Connecticut, 291; Delaware, 2; Idaho, 3; Illinois, 171; Indiana, 20; Iowa, 10; Maine, 10; Maryland, 9; Massachusetts, 479; Michigan, 175; Minnesota, 445; Montana, 18; Nebraska, 27; New Jersey, 66; New York,

EXHIBIT 4
Page 76 of 88

5,139; Ohio, 79; Oregon, 76; Pennsylvania, 36; Rhode Island, 203; Tennessee, 1; Texas, 3; Virginia, 18; Vermont, 6; Washington, 303; Wisconsin, 1; Wyoming, 7; total, 7,637.    (2) Insane residents of other States returned by these 160 institutions to their respective home States: 8,676.

## CRIMINALISTIC

Total number of institutions: 207.
Number of institutions reporting: 201 (117 prisons and penitentiaries, 84 juvenile reform schools).
Total number of inmates reported: Juvenile, 23,263; adult, 80,253; total, 103,516.
Nativity: Native born—juvenile, 88.82 per cent; adult, 80.50 per cent. Foreign born—Juvenile, 9.62 per cent; adult, 14.24 per cent. Unknown—juvenile, 1.56 per cent; adult, 5.26 per cent.
Number of deportable aliens: Juvenile, 8; adult, 1,109; total, 1,117.
Number returnable to other States: Juvenile, 205; adult, 218; total, 423.
Historical notes: (1) Number of criminal aliens reported by 201 State institutions as having been deported since the establishment of the institutions, by States and Territories: Arizona, 53; California, 67; Colorado, 58; Connecticut, 1; District of Columbia, 3 (juvenile); Idaho, 29 (4 juvenile); Illinois, 12; Iowa, 27 (1 juvenile); Indiana, 40; Kansas, 30; Louisiana, 2; Maryland, 2; Massachusetts, 13 (1 juvenile); Michigan, 96 (2 juvenile); Missouri, 1; Nevada, 7; New Jersey, 2; New York 51 (53 juvenile); Ohio, 8 (juvenile); Oklahoma, 72; Oregon, 1 (juvenile); Pennsylvania, 5; Texas, 91; Utah, 7 (2 juvenile); Vermont, 8; Washington, 93; Wisconsin, 15; West Virginia, 2; Canal Zone, 1,002; Hawaii, 10; total, 1,811. (2) Criminal residents of other States returned by these 201 institutions to their respective home States: Juvenile, 1,452; adult, 1,006; total, 2,458.

### EPILEPTIC

Total number of institutions: 13.
Number of institutions reporting: 12.
Total number of inmates reported: 9,430.
Nativity: Native born, 79.36 per cent; foreign born, 7.34 per cent; unknown, 13.30 per cent.
Number of aliens deportable: 8.
Number returnable to other States: 2.
Historical notes: (1) Number of epileptic aliens reported by 12 States institutions as having been deported since the establishment of the institutions, by States: Massachusetts, 1; Texas, 1; Illinois, 2; total, 4.   (2) Epileptic residents of other States returned by these 12 institutions to their respective home States: 20.

### TUBERCULOUS

Total number of institutions: 75.
Number of institutions reporting: 71.
Total number of inmates reported: 14,691.
Nativity: Native born, 64.30 per cent; foreign born, 14.83 per cent; unknown, 20.87 per cent.
Number of aliens deportable: 48.
Number returnable to other States: 3.
Historical notes: (1) Number of tuberculous aliens reported by 71 State institutions as having been deported since the establishment of the institutions, by States and Territories: Connecticut, 26; Maryland, 6; Massachusetts, 10; Missouri, 2; Oregon, 3; Pennsylvania, 5; Hawaii, 57; total, 109.

### LEPROUS

Total number of institutions: 7.
Number of institutions reporting: 6.
Total number of inmates reported: 5,955.
Nativity: Native born, 95.67 per cent; foreign born, 4.33 per cent.
Number of aliens deportable: 1.
Historical note: Number of leprous aliens reported by six State institutions as having been deported since the establishment of the institutions: Canal Zone, 13; Louisiana, 1; total, 14.

EXHIBIT 4
Page 77 of 88

74                EUGENICAL ASPECTS OF DEPORTATION

### BLIND

Total number of institutions: 45.
Number of institutions reporting: 41.
Total number of inmates reported: 5,421.
Nativity: Native born, 93.41 per cent; foreign born, 1.79 per cent; unknown, 4.80 per cent.
Number of inmates returnable to other States: 11.
No inmates reported as having been deported or returned to other States.

### DEAF

Total number of institutions: 33.
Number of institutions reporting: 32.
Total number of inmates reported: 6,669.
Nativity: Native born, 87.75 per cent; foreign born, 1.47 per cent; unknown, 10.78 per cent.
Number of inmates returnable to other States: 4.
Historical notes: (1) Wisconsin School for the Deaf has deported 15 aliens since the establishment of the institution.  (2) Deaf residents of other States returned to their respective home States: 8.

### DEFORMED

Total number of institutions: 7.
Number of institutions reporting: 7.
Total number of inmates reported: 883.
Nativity: Native born, 97.96 per cent; foreign born, 0.04 per cent.
No inmates deported or returned to other States.

### DEPENDENT

Total number of institutions: 93.
Number of institutions reporting: 86 (66 homes for the aged and infirm, 20 homes for children).
Total number of inmates reported: Adult, 35,155; children, 4,463; total, 39,618.
Nativity: Native born—Adult, 71.13 per cent; children, 99.80 per cent. Foreign born—Adult, 14.43 per cent; children, 0.20 per cent.  Unknown—Adult, 14.44 per cent.
Number of aliens deportable: 40.
Number returnable to other States: 68.
Historical notes: (1) The State infirmary at Tewksbury, Mass., has deported 210 dependent aliens since the establishment of the institution.  (2) Dependent residents of other States returned to their respective home States: State infirmary at Tewksbury, Mass., 1,013; Confederate Home, Higginsville, Mo., 4.

---

### APPENDIX 7

### THE CAUSES OF NONDEPORTABILITY OF FOREIGN-BORN INMATES OF AMERICAN STATE CUSTODIAL INSTITUTIONS

(This is a special memorandum prepared by Harry H. Laughlin, for Hon. Albert Johnson, chairman of the Committee on Immigration and Naturalization of the House of Representatives.  This memorandum gives an analysis of the principal findings of the present investigations on deportation made for this committee.)

EUGENICS RECORD OFFICE,
CARNEGIE INSTITUTION OF WASHINGTON,
Cold Spring Harbor, N. Y., January 1, 1928.

Mr. CHAIRMAN. In response to your request I submit this letter as a short summary of the recent investigations on deportation of social inadequates which I have been conducting for the Committee on Immigration and Naturalization of the House of Representatives.  This survey supplied first-hand data in reference to inmate population nativity and deportability of 681 out of 688 State and Federal institutions covering all types of social inadequacy in the several States.  These institutions had on the dates of their respective returns which were

EXHIBIT 4
Page 78 of 88

made during the calendar years 1925 and 1926, a total of 478,433 inmates, of whom 74,170, or 15.50 per cent, were definitely known to be of foreign-born birth. There were doubtless many more aliens among this total institutional population because the institutions reported being unable to determine the nativity of 10.58 per cent of their total charges.

Our present task is to study these 74,170 foreign-born inmates in reference to their deportability. We find that only 3,798, or 5.12 per cent, of the total number of foreign-born inmates were reported by their custodians as definitely deportable. However a survey made several years in the future would undoubtedly show only a fraction of this number as actually having been deported, because many of them will die before possible deportation; a very small number will be discharged or reported as "recovered," but the great majority of them will find themselves retained in their respective institutions until they severally attain five years of residence in the United States, at which time they will automatically cease to be deportable.

NOTE.—See Table II, p. 8, for the essential data analyzed in this memorandum.

There are three principal reasons why the foreign-born inmates of our custodial institutions are not deportable. These are, first, the foreign-born person may be a naturalized citizen; second, he may have been a resident of the United States until the statute of limitations has made him nondeportable; third, he may have become inadequate and dependent, actually or technically, from causes arising since his admission into the United States.

The accompanying table (Table II, p. 8) gives an analysis in reference to these three causes of nondeportability. Of these 74,170 foreign-born inmates, 15,363, or 20.71 per cent, were not deportable because they were naturalized citizens; 33,447, or 45.10 per cent, were not deportable because they had resided in the United States more than five years; while only 3,526, or 4.75 per cent, were not deportable because they were inadequate and dependent from causes technically reported as arising since their admission into the United States. While the authorities claimed nondeportability for 18,036, or 24.32 per cent, but gave no reasons for such claim. Contrasted with these 70,372, or 94.88 per cent of nondeportables only 3,798, or 5.12 per cent were listed as deportable.

Permit me to summarize our findings by causes and classes. Among the foreign-born feeble-minded persons in institutions of the United States we find that only 15 or 0.94 per cent are naturalized citizens. It is a strange commentary on our naturalization procedure that any court should naturalize a feeble-minded individual. For the insane, the excuse is more reasonable. The alien might be behaving normally in every respect when naturalized, but might later break down with insanity, but persons do not break down with feeble-mindedness. The latter are cases of retarded mental development. They never reach normality. Nine or 0.56 per cent of the feeble-minded alien inmates were declared to be nondeportable because they became feeble-minded from causes arising since their admission into the United States.

Of course, in childhood, disease or accident may cause an otherwise perfectly normal child to suffer an arrested mental development. So these cases seem reasonable and are not deportable under our policy. If it can be shown definitely that in certain cases the causes really arose after admission to the United States, then it would seem that our just duty would be to maintain these unfortunates in our institutions. But, on the other hand, of the total of 1,602 foreign-born feeble-minded inmates we find only 21, or 1.31 per cent, listed by their institutional authorities as deportable; 926, or 57.80 per cent, are not now deportable because they have been residents of the United States for more than five years; 631 individuals, or 39.58 per cent, were claimed by their custodians as being nondeportable, but for this number the authorities gave no reason for claiming such immunity. This means, of course, that the feeble-minded persons were always so; that feeble-mindedness is a constitutional defect; that this whole particular group was admitted into the United States contrary to the law which forbids the admission of feeble-minded persons; and that because they were not located and deported within five years after their arrival these mentally defective persons must remain a permanent expense to the several States, and a social and biological drag on the population of the country.

The insane show a very different situation. Here, of the 53,986 foreign-born inmates, we find that only 1,223, or 2.27 per cent, are deportable; 11,439, or 21.19 per cent, are not deportable because they are naturalized citizens. This means that, at the time of immigration, and for a number of years afterwards, the members of this particular group were ostensibly sound citizenship material

EXHIBIT 4
Page 79 of 88

and were therefore naturalized.    Later on they developed psychoses, the incipient signs of which were not recognized at admission into the United States, nor at naturalization.    Next we find that 25,730, or 47.66 per cent, are nondeportable because they have been residents of the United States more than five years; while 1,615, or 2.99 per cent, are reported as nondeportable because they became insane from causes arising since their admission into the United States.    While 13,979, or 25.89 per cent, of the foreign-born insane were listed as nondeportable, but for such nondeportability the institutional authorities could supply no reason. The relatively small percentage of alien insane becoming so from causes arising since their admission reflects, statistically, the constitutional nature of insanity. Only in case of a very severe injury or poisoning, or infection with certain types of diseases, can insanity be said to be caused, primarily, by factors other than those which are constitutional and therefore inborn and hereditary in the individual.

With the criminalistic classes the situation statistically parallels that for the insane.   By figures and percentages, we find 11,224 foreign-born persons in prisons for the more serious crimes, who are reported, in this survey, as being criminalistic.   Of these, 2,409, or 25.02 per cent, are reported as deportables; 2,032, or 18.09 per cent, are not deportables because they are naturalized citizens. Next, 3,272, or 29.15 per cent, are nondeportable because they have been residents of the United States for more than five years; only 248, or 2.21 per cent, were reported by their respective institutions as being criminalistic from causes arising since their admission into the United States; while 3,265, or 29.09 per cent, of the foreign-born inmates in our prisons and reformatories were reported nondeportable, but no reason for such nondeportability was given.   Thus, statistically, we find that the foreign-born potential criminal is, in general, a constitutionally inadequate person, but that, in many cases, he was able to present so normal an appearance to the immigration officials and to the naturalization officers that, before he was taken in charge by the State as a criminalistic person, he was admitted and naturalized as a normal and desirable citizen.

Among the epileptic, 744 foreign-born inmates were reported.   Of these, only 10, or 1.34 per cent, are deportable.   Of those who were not deportable, 71, or 9.48 per cent, were naturalized citizens; 668, or 89.78 per cent, were in the United States more than five years, while not a single one of this class of aliens was reported as having become inadequate from causes arising since admission into the United States.   Thus, as with other types, statistically, the epileptic show constitutional rather than environmental causes of this particular inadequating defect.

Among the tuberculous class 2,608 foreign-born patients were found.   Of these, 118, or 4.52 per cent, were designated as deportable.   Among the nondeportable, 858, or 32.90 per cent, were naturalized citizens.   One thousand and eleven, or 38.77 per cent, were residents of the United States for more than five years; 541, or 20.74 per cent, were reported as having become tuberculous from causes arising since their admission into the United States; while 80, or 3.07 per cent, of the tuberculous aliens in State institutions were listed as nondeportable with no reason for such given.   Tuberculosis is an infectious disease which is most likely to hit the young and undernourished, but there is also an element of heredity in its cause.   Some families and individuals are especially susceptible to it by heredity, others seem to inherit comparative immunity.   While we seek earnestly to prevent and to cure tuberculosis in this country, we should logically enough aid such prevention by guarding against the immigration of infected persons and of persons who are, by inheritance, most susceptible to this disease.

Among the 52 foreign-born lepers, there were no naturalized citizens; none had contracted leprosy after coming to the United States; but all, or 100 per cent, were nondeportable because they had been here for more than five years.

The blind showed 130 foreign-born inmates, none of whom were deportable; of these 44, or 33.85 per cent, were nondeportable because of naturalization; while 45, or 34.62 per cent, showed a residence of more than five years' duration; and 15, or 11.54 per cent, were blinded from causes arising since their arrival in the United States; and 26, or 20 per cent, were listed as nondeportable but with no reason given.

The deaf showed only 57 foreign-born inmates, of whom only 3, or 5 76 per cent, were listed as deportable; 11, or 1,930 per cent, were not deportable because of naturalization; 33, or 57.89 per cent, because of more than five years' residence. No alien deaf in institutions claimed immunity from deportation on account of causes arising since admission; while the authorities listed 10 alien deaf, or 17.54 per cent, of this group as nondeportable but gave no reason why.

EXHIBIT 4
Page 80 of 88

The deformed and crippled showed only 16 alien inmates being maintained by the States primarily on account of deformity apart from dependency or other inadequating causes. Of these 16, none was listed as deportable. The reason for nondeportability in the case of 12 individuals, or 75 per cent, was more than five years residence; and of 4 individuals, or 25 per cent, was dependent from causes arising since admission.

In the dependent classes there were 3,746 foreign-born inmates; only 14, or 0.37 per cent, of whom were deportable. The causes of nondeportability parallel closely with those for the insane and the criminalistic classes. We find that 895, or 23.89 per cent, were naturalized citizens; 1,698, or 45.33 per cent, had been residents of the United States more than five years; 1,094, or 29.20 per cent, were nondeportable from causes reported as arising since admission into the United States; while 45, or 1.20 per cent, were nondeportable but the authorities gave no reason why.

Normally, if necessary, the American people seem glad to support, in their institutions, their foreign-born residents who are homeless, aged, or crippled, or who are disabled by accident, provided such persons came to the United States in sound health and mind, and who, at the time of admission, so far as the most critical examination could determine, were promising citizenship material. But one can not doubt that most all of our foreign-born dependents would show, in a more careful working out of their personal and family histories, a bad reputation and a high percentage of different kinds of constitutional or hereditary inadequacy among their near kin. There are, of course, exceptions, but in general these inadequates have not tended to raise our standards of citizenship and efficiency. They have, contrary to the intent of our laws, somehow gotten into the country.

Permit me to enumerate what seem to be the logical conclusions of this particular research:

1. The five-year limitation provides the principal cause of nondeportability, and consequently the principal cause of current expense in maintaining foreign-born inadequates and dependents of all types.

2. Practically one in five of our foreign-born institutional inmates claim immunity from deportation on account of naturalization. This is not a large percentage, but it speaks rather poorly for this phase of our naturalization practice.

3. The small percentage, about 1 in 20, of foreign-born inmates reported as nondeportable from causes arising since admission into the United States, shows that, generally speaking, the causes of inadequacy are constitutional rather than environmental or accidental, and that, except in occasional instances, the foreign-born in American custodial institutions represent defective human breeding stocks.

4. From the standpoint of race conservation, justice, charity, and economy, these studies demonstrate the necessity—

(a) For establishing higher standards, and for exercising greater vigilance and strictness in sorting out defectives, and particularly potential inadequates, who attempt to enter the United States as immigrants.

(b) For exercising greater scrutiny to avoid naturalizing potential criminals and other inadequates, particularly the potentially insane and ne'er-do-wells.

(c) Biologically, the whole situation points toward the practical necessity for providing, in the immigration statutes and regulations, agencies for securing more information concerning the background of the would-be immigrant, with special reference to his personal and family history and his reputation, and for making the attainment of high personal reputation and a sound family history prerequisites for the admission of immigrants.

Of course, only in so far as our foreign-born inadequates of bad blood have become parents of children, or may in the future become such, are they a permanent menace. The principle of requiring each country and community which produces an inadequate to care for him requires, as a matter of square dealing—that is, as a matter of economic, social, and biological justice—the general rather than the exceptional return of foreign-born inadequates to their home countries and communities. It is much more important in all phases of immigration to look more after the next generation than after the present.

Respectfully submitted.

HARRY H. LAUGHLIN.

EXHIBIT 4
Page 81 of 88

EUGENICAL ASPECTS OF DEPORTATION

### Appendix 8

Set of the principal schedules used in securing data for the researches on deportation reported in this hearing.   Prepared by Harry H. Laughlin.

### Form A

This form was used to secure the correct list of State institutions for the social inadequate.   A list had been previously prepared as of January 1, 1921, and the present form brought this list down to the time of the present investigation, January 1, 1926.

EUGENICAL INVESTIGATIONS OF THE COMMITTEE ON IMMIGRATION AND NATURAL-IZATION OF THE HOUSE OF REPRESENTATIVES, WASHINGTON, D. C.

Subject: New custodial institutions opened and old custodial institutions closed in the State of — — — since January 1, 1921.

(For the list already in hand, and which we desire to correct and bring down to date, see "Statistical Directory of State Institutions for the Defective, Dependent, and Delinquent Classes," United States Bureau of the Census)

For the present purpose, a custodial institution is one devoted to custodial or other continuous care, treatment, or education of persons belonging to one or more of the following classes: (1) Feeble-minded; (2) insane (including the nervous and psychopathic); (3) Criminalistic (including the delinquent and wayward); (4) epileptic; (5) inebriate (including drug habitués); (6) Diseased (including the tuberculous, the syphilitic, the leprous, and others with chronic infectious segregated diseases); (7) blind (including those with greatly impaired vision); (8) deaf (including those with greatly impaired hearing); (9) deformed (including the crippled); and (10) dependent (including children and old folks in "homes," ne'er-do-wells, tramps, and paupers).

(A) NEW STATE INSTITUTIONS OPENED SINCE JANUARY 1, 1921

| Name of institution | Where located | Date opened | Type of persons provided for |
|---|---|---|---|
| (1) | | | |
| (2) | | | |
| (3) | | | |
| (4) | | | |
| (5) | | | |
| (6) | | | |

(B) OLD STATE INSTITUTIONS CLOSED SINCE JANUARY 1, 1921

| Name of institution | Where located | Date closed | Why closed and other remarks |
|---|---|---|---|
| (1) | | | |
| (2) | | | |
| (3) | | | |

Kindly fill out this schedule and return it to H. H. Laughlin, expert eugenics agent, Committee on Immigration and Naturalization, House of Representatives, Cold Spring Harbor, Long Island, N. Y.

Filled out by_____
Position_____
Date_____

EXHIBIT 4
Page 82 of 88

EUGENICAL ASPECTS OF DEPORTATION                    79

## FORM B

This form gave the first returns for all State and Federal institutions:

EUGENICAL INVESTIGATIONS OF THE COMMITTEE ON IMMIGRATION AND NATURAL-
IZATION OF THE HOUSE OF REPRESENTATIVES, WASHINGTON, D. C.

Special subject: Deportation of public charges.
1. Name of institution _____
2. Where located _____
3. Social or pathological classes provided for _____
4. Are there any limits to the races or nationalities provided for? _____
      If so, describe _____
   _____
5. Sexes provided for: Males only, females only, or both sexes? _____
6. Inmate population _____ Date _____
      (a) Of this number, how many are native born?
            Males _____, females _____, total _____
      (b) How many are foreign born?
            Males _____, females _____, total _____

                                          Grand total _____

7. Aliens deportable.—Of the present foreign-born inmates, how many are now
deportable?
            Males _____, females _____, total _____
      (Under sections 18, 19, and 20, immigration act of Feb. 5, 1917, providing for deportation of aliens
      who become public charges within five years after admission.)

8. Residents of other States returnable.—Of the present inmates, how many
are returnable or deportable to other States of the Union, under the State laws?
            Males _____, females _____, total _____
9. Please give reference to State laws and regulations governing such returns
_____
_____
10. Historical note.—How many inmates of the institution have been deported
or returned since its establishment (state whether estimated or compiled data)—
      (a) To foreign countries? Male _____, female _____, total _____
      (b) To other States of the Union? Male _____, female _____, total _____
      (c) Date of first return of inmate to other State or nation _____
                  (Signed) _____
                  (Position) _____
Date _____

## FORM C

This form supplied supplementary returns in reference to the initiative taken
in securing the deportation of institutional inmates, to supply data on collabora-
tion between State and Federal authorities, and to inquire into the policy of the
several States in reference to the return of nonresident institutional inmates.

EUGENICAL INVESTIGATIONS OF THE COMMITTEE ON IMMIGRATION AND NATURALI-
ZATION OF THE HOUSE OF REPRESENTATIVES, WASHINGTON, D. C.

Special subject: Supplementary notes on the deportation of public charges.
1. Name of institution _____       _____
2. Where located _____
A. Deportation of aliens:
      1. With what Federal deportation office, if any, has your institution
            made immediate contacts? _____
      2. In the case of deportation of aliens from your institution, who has
            taken the initiative, your institution or the Federal authority? ___
      _____
      3. In the case of deportation of aliens from your institution, who pays
            the cost of transportation and other transportation expenses to the
            border or port of departure, your institution (that is, your State)
            or the Federal Government?  (Explain system of charges.) _____
      _____

89601—28——6

EXHIBIT 4
Page 83 of 88

B. The return of citizens of other States who are inmates of your institution:

  1. When a citizen of another State is returned from your institution, to what officer in his home State is he delivered? -----------------

  2. In such cases, what is the nature of the cooperation given by the receiving State? ------------------------------------------------------

  3. In the case of such returns, who pays the transportation and other return charges? --------------------------------------------------------

  4. What practical rule determines whether an inmate shall be returned to his home State? ------------------------------------------------------

C. Remarks: ------------------------------------------------------------

  (Signed) ---------------------
  (Position) --------------------------------------------------

Date----------------------------------

## FORM D

This form supplied data on the reasons for nondeportability of nondeportable alien inmates:

*Causes of nondeportability of foreign-born inmates*

Name of institution------------------------------------------------------

Where located------------------------------------------------------------

|  | Number | | |
|---|---|---|---|
|  | Male | Female | Total |
| Number of foreign-born inmates........... |  |  |  |
| A. Foreign-born inmates deportable........... |  |  |  |
| B. Foreign-born inmates not deportable........... |  |  |  |
| (a) Not deportable because naturalized........... |  |  |  |
| (b) Not deportable because in United States five years or longer........... |  |  |  |
| (c) Not deportable because dependent from causes arising since admission to United States........... |  |  |  |

Date-------------------------------      (Signed)-------------------------

## FORM E

This form secured still further detailed information concerning policies of the several States in reference to deportation of aliens and the interstate return of inadequates:

COMMITTEE ON IMMIGRATION AND NATURALIZATION,
HOUSE OF REPRESENTATIVES,
*Washington, D. C.*

SPECIAL RESEARCH OF THE DEPORTATION OF ALIENS, WITH PARTICULAR REFERENCE TO THE PRACTICES OF THE SEVERAL STATES

State of ---------------------

------------------------------------------------

------------------------------------------------

YOUR EXCELLENCY: The Committee on Immigration and Naturalization of the House of Representatives is making a study of the deportation of aliens.

EXHIBIT 4
Page 84 of 88

In order to perfect this research, we need certain data about State practice in the matter.   We should be very grateful if you would request the proper State official to fill out the inclosed questionnaire and to return it, with other appurtenant data, to Harry H. Laughlin, expert eugenics agent, Committee on Immigration and Naturalization, House of Representatives, Cold Spring Harbor, Long Island, N. Y.

Very sincerely,

ALBERT JOHNSON, *Chairman.*

----------------------------------

### FILING RECORD

1.  Received by the governor of the State on _____and referred
                                                        (Date)

to _____ for reply.
              (Name of officer)

2.  This questionnaire was filled out, and the accompanying schedules supplied,
by _____
              (Name)                                                    (Official position)

----------------------------------------------------------------
              (Address)                                                    (Date)

3.  Date received by the Committee's agent_____

NOTE.—When this questionnaire is filled out, kindly return it, accompanied by the records asked for in Item E, page 4, to Harry H. Laughlin, Expert Eugenics Agent, Committee on Immigration and Naturalization, House of Representatives, Cold Spring Harbor, Long Island, N. Y.

State of _____

### DEPORTATION LAWS, REGULATIONS, AND PRACTICES

A. State authority:

Official designation of any central State board or office having charge of the State's custodial institutions, relief cases, the deportation of aliens, and interstate return of inadequate citizens.
Official name of board or office _____
Present chief officer_____
                                          (Name)                                    (Position)

----------------------------------------------------------------
                                          (Address)

B. Deportation of aliens:

1.  In case of deportation of deportable aliens found in the custodial institutions of this State, or in the State's population at large, who takes the initiative—the Federal Government or the State?

----------------------------------------------------------------

2.  Please describe in some detail the procedure followed in effecting the deportation of deportable aliens found in the *custodial institutions* of the State _____

----------------------------------------------------------------

3.  Also, please describe in some detail the procedure followed by the State officials in deporting deportable aliens found in the State's population at large:_____

----------------------------------------------------------------

4.  References to and copies of the laws of the State under which the above practices are carried out: _____

----------------------------------------------------------------

5.  Statistical deportation records, by date, sex, age, type of defect, nation or race, from the central State authority: _____

----------------------------------------------------------------

EXHIBIT 4
Page 85 of 88

C. The interstate return of socially inadequate American citizens from your State to the State of which the deportee is a citizen and legal resident:

    1. Kindly give reference and quote any State law, regulation, order, or practice under which a custodial inmate or public charge, or a socially inadequate individual in the population at large, may be returned by and from your State to the State of which the deportee is a citizen and legal resident:------------------------------

    2. What is the procedure followed in such interstate deportations?----

    3. Statistical interstate deportation records, by date, sex, age, type of defect, and receiving State: --------------------------------

D. Criticisms and recommendations:

    1. What history and condition of an alien would, in your opinion, form an equitable basis for the line of demarcation between (a) the moral and legal responsibility of the State or community to care for an alien public charge, and (b) public policy to deport a socially inadequate alien found within or becoming inadequate within the territories of a given State or community?------------------

    2. Where would you draw this line in the case of American citizens legally residents of other States or cities?------------------

    3. What Federal or State laws, regulations, or practice would, in your opinion, insure the more certain and prompt deportation of deportable aliens, and the interstate return of citizen public charges to their home States or communities?------------------

E. Documents and records:

    Kindly accompany the return of this questionnaire with copies of laws, regulations, forms, orders, records, statistics, and other appurtenant data.

    List of such material which will accompany or follow the return of this questionnaire:

        1--------------------------------------------------
        2--------------------------------------------------
        3--------------------------------------------------
        4--------------------------------------------------
        5--------------------------------------------------

F. Remarks:

--------------------------------------------------

EXHIBIT 4
Page 86 of 88

# INDEX

|  | Page |
|---|---|
| Administrative districts of Bureau of Immigration | 10, 51 |
| Administrative initiative in deportation | 14, 15 |
| Alien inadequates in institutions in 1923 | 71 |
| Aliens deported | 6 |
| Basic principles of immigration policy | 19 |
| "Botany Bay" | 33 |
| Chinese immigration, legal and eugenical aspects of | 23 |
| Contact with Federal deportation office | 15 |
| Costs of alien deportation | 15, 41 |
| Costs of interstate return | 13 |
| Crime among aliens | 3 |
| Criminals, deportation of | 30 |
| Criteria for interstate return | 13 |
| Dawes, Dr. Spencer L. | 67 |
| Degenerate families | 32 |
| Deportability and actual deportations | 9 |
| Deportation facilities | 8 |
| Deportation statutes and rules, historical development of | 46, 48 |
| Desirable and undesirable exiles | 22 |
| Differential fecundity | 3, 18 |
| Direct cost of aliens in institutions | 36, 41 |
| Economic costs | 42 |
| Estabrook, Dr. A. H. | 33 |
| Exiling and "dumping" of inadequates | 22, 29 |
| Family stock standard for immigration | 18, 76 |
| Federal and State collaboration in deportation | 16, 39 |
| Federal Immigration Service, initiative by the | 37 |
| Feeble-minded, deportation of | 25 |
| Field survey, outline of schedules used in | 77 |
| Foreign-born inmates of custodial institutions | 5 |
| Future investigations | 2 |
| Gap between Federal and State deportation activities | 44 |
| Humanitarian advance | 7 |
| Immigration districts, map of | opp. p. 52 |
| Immigration standards | 24, 44, 76 |
| Inadequate aliens, roster of sources for locating | 40 |
| Insane, deportation of | 28 |
| Institutional initiative in deportation | 31 |
| Institutional inmates by classes | opp. p. 6 |
| Intelligence distribution among foreign born | 25 |
| Intelligence, immigration standards in relation to | 26, 44 |
| Interstate cooperation | 12 |
| Interstate return of social inadequates | 11 |
| Mate selection | 3, 17 |
| Naturalization of the feeble-minded | 26, 74 |
| Nativity and parentage of the insane | 29 |
| New York State Bureau of Special Examinations, report of | 67 |
| Nondeportability, causes of | 5, opp. pp. 8, 27 |
| Nondeportability, special cases of | 47 |
| Obligation of home country to receive its nationals | 20 |
| Overseas examinations | 7, 30 |
| Parallel between immigration and recruiting thoroughbred stock | 43 |
| Population increase | 3 |
| Population turnover in institutions | 32 |
| Previous investigations | 1 |
| Primary factors in national eugenic trend | 39 |

EXHIBIT 4
Page 87 of 88

**84**          EUGENICAL ASPECTS OF DEPORTATION

Principal legal cause of nondeportability _____ 36
Public charge, definition of _____ 39
Quarantine versus deportation _____ 42
Race crossing _____ 3, 18
Registration—"keeping track of aliens" _____ 9, 21, 37
Responsibility for the production of inadequates _____ 11, 16, 21, 24, 76
Salmon, Walter J. _____ 43
Scope of present investigation _____ 4
Second generation, defective alien blood in _____ 35
Seed stock, human _____ 6, 10, 17, 18, 20, 23, 33, 35, 36, 39, 42, 43, 44, 45, 76
Sound family, definition of _____ 19
Sources of American immigration _____ 2
Sovereign right to deport aliens _____ 20
Sovereign rights in human migration _____ 24
State claims against Federal Government _____ 41
State deportation officers _____ 17
State officers concerned in immigration _____ 12
State practice in deportation of inadequate aliens _____ 54
State practice in interstate return of inadequate nonresidents _____ 54
Statute of limitations _____ 8, 9, 30
Sterilization, eugenical _____ 39
The Hill Folk, the Jukes, the Ishmaels and the Nams _____ 34
Use of immigration _____ 45
Would-be immigrants debarred _____ 6
Youth and old age, normal inadequacy of _____ 37

✕

EXHIBIT 4
Page 88 of 88