IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

———————————————

*United States of America v. Jose Luis Amador-Bonilla*

———————————————

Case No. CR-21-187-C

———————————————

**EXHIBIT 10**

*CONGRESSIONAL RECORD
HOUSE OF REPRESENTATIVES*

February 9, 1928

*See Motion to Dismiss,* filed 09/21/21, Doc. 61, Ex. H
*United States v. Munoz-De La O*, Case No. CR-20-134-RMP
United States District Court for the Eastern District of Washington

Case 5:21-cr-00187-C   Document 15-10   Filed 10/01/21   Page 2 of 3

Mr. SPEAKS. Have I the right, Mr. Speaker, to demand a separate vote upon the amendment which I introduced and which was agreed to in the committee?

The SPEAKER. Any gentleman may demand a separate vote on any amendment.

Is a separate vote demanded on any other amendment? If not, the Chair will put the other amendments in gross.

The other amendments were agreed to.

CONSTRUCTION OF PUBLIC BUILDINGS

Mr. ELLIOTT. Mr. Speaker, I submit a conference report on the bill (H. R. 278) to amend section 5 of the act entitled "An act to provide for the construction of certain public buildings, and for other purposes," approved May 25, 1926.

MISSOURI RIVER BRIDGE, GLASGOW, MONT.

Mr. DENISON. Mr. Speaker, there is a Senate bill (S. 1501) on the Speaker's table. I ask unanimous consent that it may be indefinitely postponed, a similar bill having passed the House and also the Senate.

The SPEAKER. The gentleman from Illinois asks unanimous consent that the bill (S. 1501) on the Speaker's table be indefinitely postponed. Is there objection?

There was no objection.

LEAVE OF ABSENCE

By unanimous consent, leave of absence was granted as follows:

To Mr. SEARS of Florida, indefinitely, on account of sickness in family.

To Mr. CELLER, for one week, on account of sickness.

RESTRICTION OF MEXICAN IMMIGRATION

Mr. BOX. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD by printing an address delivered by me at an immigration conference.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. BOX. Mr. Speaker, under authority granted by the House, I submit for printing in the RECORD an address delivered by me on January 19, 1928, before the immigration conference held in Memorial Continental Hall, Washington, D. C., under the auspices of the Key Men of America, a patriotic organization composed of authorized representatives of a great number of other affiliated patriotic societies engaged in the study of immigration problems.

The address is as follows:

Mr. Chairman, ladies, and gentlemen, during the present session of Congress immigration discussion and legislation will probably center around four important questions:

(1) Shall our deportation laws be strengthened, extended, and better enforced?

(2) Shall the endless chain of relationship existing between immigrants and their kindred abroad be permitted to start dragging out of Europe thousands of those whom the laws now exclude?

(3) Shall we retain in the law the national-origins provisions, written into the act of 1924, making it more accurately and adequately serve the Nation's purpose to keep itself American, or shall they be suspended or repealed at the dictation of certain hyphenated minorities of our population?

(4) Shall the quota provisions of the immigration law be made applicable to Mexico, South America, and adjacent islands?

To this last question I shall devote my brief remarks.

The people of the United States have so definitely determined that immigration shall be rigidly held in check that many who would oppose this settled policy dare not openly attack it. The opposition declares itself in sympathy with the policy and then seeks to break down essential parts of the law and opposes any consistent completion of it making it serve the Nation's purpose to maintain its distinguishing character and institutions. Declaring that they do not believe that paupers and serfs and peons, the ignorant, the diseased, and the criminal of the world should pour by tens and hundreds of thousands into the United States as the decades pass, they nevertheless oppose the stopping of that very class from coming out of Mexico and the West Indies into the country at the rate of 75,000, more or less, per year.

Every reason which calls for the exclusion of the most wretched, ignorant, dirty, diseased, and degraded people of Europe or Asia demands that the illiterate, unclean, peonized masses moving this way from Mexico be stopped at the border. Few will seriously propose the repeal of the immigration laws during the present Congress, but the efforts of those who understand and support the spirit and purpose of these laws to complete them and make them more effective by the application of their quota provisions to Mexico and the West Indies, will be insidiously and strenuously opposed.

The admission of a large and increasing number of Mexican peons to engage in all kinds of work is at variance with the American purpose to protect the wages of its working people and maintain their standard of living. Mexican labor is not free; it is not well paid; its standard of living is low. The yearly admission of several scores of thousands from just across the Mexican border tends constantly to lower the wages and conditions of men and women of America who labor with their hands in industry, in transportation, and in agriculture. One who has been in Mexico or in Mexican sections of cities and towns of southwestern United States enough to make general observation needs no evidence or argument to convince him of the truth of the statement that Mexican peon labor is poorly paid and lives miserably in the midst of want, dirt, and disease.

In industry and transportation they displace great numbers of Americans who are left without employment and drift into poverty, even vagrancy, being unable to maintain families or to help sustain American communities. Volumes of data could be presented by way of support and illustration of this proposition. It is said that farmers need them. On the contrary, American farmers, including those of Texas and the Southwest, as a class do not need them or want them. I state the rule as of country-wide application, without denying that a small percentage of farmers want them, and that in some restricted regions this percentage is considerable. I doubt if a majority of the bona fide farmers of any State want or need them. I have given much attention to the question and am convinced that as a state-wide or nation-wide proposition they are not only not needed and not wanted, but the admission of great numbers of them to engage in agricultural work would be seriously hurtful to the interests of farmers, farm workers, and country communities. They take the places of white Americans in communities and often thereby destroy schools, churches, and all good community life.

American farmers are now burdened with a surplus of staple farm products which they can not sell profitably at home or abroad. That surplus weighs down the prices of the entire crop in both the domestic and foreign markets until it threatens agriculture with financial ruin. Individual farmers, farm organizations, their Representatives in Congress, students of farm economics, bankers, and business men of the farming sections, all are striving to find a means of getting rid of this surplus of farm products, with its dead weight upon the price of farmers' crops. Congress is continually being urged to make appropriations to help carry the farmers' surplus, to levy taxes on farm products, to restrain overproduction, and otherwise to provide a method of getting rid of this oversupply of the farmers' leading crops. The President in his messages to Congress has repeatedly discussed this surplus and dealt with proposed remedies for it.

The importers of such Mexican laborers as go to farms at all want them to increase farm production, not by the labor of American farmers, for the sustenance of families and the support of American farm life, but by serf labor working mainly for absentee landlords on millions of acres of semiarid lands. Many of these lands have heretofore been profitably used for grazing cattle, sheep, and goats. Many of them are held by speculative owners.

A great part of these areas can not be cultivated until the Government has spent vast sums in reclaiming them. Their development when needed as homes for our people and in support of American communities is highly desirable. Their occupation and cultivation by serfs should not be encouraged. These lands and this mass of peon labor are to be exploited in the enlargement of America's surplus farm production, possibly to the increased profit of these speculative owners, but certainly to the great injury of America's present agricultural population, consisting of farmers, living and supporting themselves by their own labor and that of their families, on the farms of America.

The dreaded surplus, which already makes an abundant crop worse for farmers as a whole than a scant one, is to be made more dreadful by the importation of foreign labor working for lower wages and under harder conditions. The surplus which I have mentioned often hurts worse than a pest of locusts on the wheat crop or of boll weevil in the cotton fields.

While farmers, business interests in agricultural sections, Congress, and the President are deep in the consideration of the great problem presented by the farm surplus, and when presidential campaigns may turn on the condition and its consequences, labor importers are scheming and propagandizing for the purpose of bringing in armies of alien peons, claiming that they are needed on the farms, where they would only make the farm-surplus problem worse. If the Government tries to relieve this distress of the farmer caused by surplus production, shall it at the same time be de-Americanizing farms and farming communities and making the surplus and price situation worse by importing masses of serf laborers? Some think that agricultural prices can be sustained by a high tariff. Why have a tariff wall to keep out the products of pauper labor abroad and at the same time be bringing in armies of peons to increase the oversupply inside the tariff wall to the ruin of our own farmers?

Another purpose of the immigration laws is the protection of American racial stock from further degradation or change through mongrelization. The Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction

EXHIBIT 10
Page 1 of 2

**2818**  CONGRESSIONAL RECORD—HOUSE  FEBRUARY 9

but submitted and multiplied as serfs. Into that was fused much negro slave blood. This blend of low-grade Spaniard, peonized Indian, and negro slave mixes with negroes, mulatoes, and other mongrels, and some sorry whites, already here. The prevention of such mongrelization and the degradation it causes is one of the purposes of our laws which the admission of these people will tend to defeat.

Every incoming race causes blood mixture, but if this were not true, a mixture of bloc of peoples of different races has a bad effect upon citizenship, creating more race conflicts and weakening national character. This is worse when the newcomers have different and lower social and political ideals. Mexico's Government has always been an expression of Mexican impulses and traditions. Rather, it is an exhibition of the lack of better traditions and the want of intelligence and stamina among the mass of its people. One purpose of our immigration laws is to prevent the lowering of the ideals and the average of our citizenship, the creation of race friction and the weakening of the Nation's powers of cohesion, resulting from the intermixing of differing races. The admission of 75,000 Mexican peons annually tends to the aggravation of this, another evil which the laws are designed to prevent or cure.

To keep out the illiterate and the diseased is another essential part of the Nation's immigration policy. The Mexican peons are illiterate and ignorant. Because of their unsanitary habits and living conditions and their vices they are especially subject to smallpox, venereal diseases, tuberculosis, and other dangerous contagions. Their admission is inconsistent with this phase of our policy.

The protection of American society against the importation of crime and pauperism is yet another object of these laws. Few, if any, other immigrants have brought us so large a proportion of criminals and paupers as have the Mexican peons. If time permitted, I could present masses of authentic reports sustaining the truth of this statement. As one of a great many instances, I read a news item from the Dallas News of January 5, 1928:

MEXICANS SUFFERING FROM UNEMPLOYMENT, AGENCY MAN REPORTS

"Unemployment conditions among Mexicans in Dallas is the most acute in the history of 'Little Mexico,' A. Luna, operator of an employment agency, said Wednesday. He declared that hundreds of families are suffering severely, especially on account of the recent cold weather.

"'These people are badly in need of immediate relief,' Mr. Luna said, 'perhaps much more relief than is now available.'"

Note the term "Little Mexico" used in this news item. These "Little Mexicos" are springing up in many sections in and about the cities and industrial centers and all over the Nation. Some of them are assuming large proportions, and all of them together are becoming disturbingly large.

The number of such reports coming from California, Colorado, Arizona, New Mexico, and the whole Southwest, through the press and from public and private charity organizations, is very great and covers the whole period of mass peon immigration from its beginning until now.

The statements made in connection with each of these propositions are presented to this company, containing many students of the problem and a large percentage of those with whom the present and future public welfare is a paramount consideration, with the assurance that such citizens will give further attention to the question and disprove or verify the statements made.

The volume of Mexican immigration, the attending circumstances, and the prospects for its continuance and enlargement are such as to make this an important part of one of the Nation's greatest problems. Mexico has nearly 15,000,000 people who are prolific breeders, capable of producing millions of new inhabitants every year.

Their economic condition will continue worse than ours for an indefinite time and cause their laborers to want to tramp to the United States. Under a well-known law of population, the gaps left at home by those who come from year to year will be rapidly refilled by a natural increase. Thus Mexico will become an inexhaustible source of this low-grade immigration.

Immigrants who have poured upon our shores from Europe and Old World countries have had to pay the expense of land travel in reaching foreign seaports, after which the heavy expense of ocean transportation had to be paid. Mexico's masses have only to tramp to the border. The expense of their transportation, whether paid by them or others, is trifling compared to the cost of crossing the ocean from Europe or Asia to America. The methods by which labor importers reach them and induce them to come are inexpensive and easy. The building of barriers against the flood flowing in from elsewhere must increase the inpouring from Mexico. Unless it is checked it will continue with increasing volume.

The most dangerous mass immigration now menacing us is that from Mexico.

Our efforts to deal wisely and adequately with Mexican peon immigration from the standpoint of public and patriotic interest are opposed by the same selfish interests which have hindered all the Nation's efforts in dealing with our immigration, namely, the short-sighted, present profit-seeking interests of those who want cheap labor. If it were not for this opposition, the grave question which I am suggesting would be settled soon and the settlement made would be with a patriotic view to the public welfare now and hereafter.

If we ask Mexico, Haiti, Cuba, and South America to consent to the application of this necessary restriction, they will, of course, refuse and the evil stream will continue to pour its pollution into the mass of our population.

Efforts to obtain the consent of foreign countries to our immigration policy have been an unbroken failure throughout the history of our dealing with the problem. More than one presidential administration tried to settle the Chinese immigration question by the Burlingame treaty, in which it was recited that the right of races to migrate was inherent and inalienable. This was to apply as between the hundreds of Chinese millions and America. The United States Congress had to cut the Nation's way out of that ruinous entanglement.

Italy did not consent to our present law, but wanted to handle the subject by treaty to which her consent would be necessary, but the Constitution had vested this power in Congress, and Congress exercised it, accomplishing the Nation's purpose and helping to save its future. Other instances could be cited; one more will be enough. Japan had interests and a will concerning Japanese immigration in conflict with the interests and will of the United States. Every effort was made to avoid having America declare its will by congressional action as our Constitution contemplates. So long as we dickered with that question, consulting any but our constitutional rule, it remained unsettled and troublesome. It would have been with us yet had Congress waited for the consent of a foreign power or left that question to be settled in any but the constitutional way; but the will of America was accomplished in the manner provided by the fathers. The world did not crumble, its peace was not disturbed, but our friends of former times remain our friends, respecting us and being by us respected. Any other course would have continued the question and the irritation it caused.

These and other national experiences in dealing with the immigration problem should be recalled by the public when men say that in this instance we must consult the wishes of the people south of the Rio Grande or farther south.

Ladies and gentlemen, practically all of the reasons which have moved the United States to adopt and adhere to the policy of restricting immigration from Europe and Asia argue for the restriction of peon immigration from Mexico and the countries to the south and east. The difficulties which folly and greed have heretofore thrown in the Nation's path are being thrown in its way now. Let us hope that the people of these times and the membership of this Congress will be as wise and courageous as those who have preceded us.

### LEAVE TO FILE MINORITY VIEWS

Mr. GIBSON. Mr. Speaker, I ask unanimous consent that the gentleman from Wisconsin [Mr. LAMPERT] may file minority views on the so-called market site bill, and that I may have the privilege also of filing separate minority views on the same bill.

The SPEAKER. The gentleman from Vermont asks unanimous consent that the gentleman from Wisconsin [Mr. LAMPERT] and himself may file separate minority views on the market site bill. Is there objection?

There was no objection.

### AGRICULTURAL RELIEF

Mr. CONNALLY of Texas. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. CONNALLY of Texas. Mr. Speaker, under leave granted me to extend my remarks in the RECORD, I desire to include my speech before the Committee on Agriculture on February 9, 1928, which is as follows:

Mr. CONNALLY. Mr. Chairman and gentlemen of the committee, I thank you for giving me this opportunity to make a few observations in reference to agricultural legislation, and I thank also the gentleman from Michigan, Mr. KETCHAM.

Probably most of you know I voted against the McNary-Haugen bill. I have been abused by many cooperative representatives here who are drawing pretty handsome salaries. But I have been trying to vote for the farmer, whether he belonged to a cooperative organization or not; and what I wanted to suggest to the committee this morning is that it seems to me as a Member of Congress that it is about time for this committee and for the Congress to quit fooling the farmer and really pass some practical measure that stands some chance of becoming a law.

EXHIBIT 10
Page 2 of 2