IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
_____

*United States of America v. Jose Luis Amador-Bonilla*
_____

Case No. CR-21-187-C
_____

**EXHIBIT 12**

*DEPORTATION HEARING*

House of Representatives, 69th Congress
Before the Committee on Immigration and Naturalization

Hearing No. 69.1.3
January 12, 1926

*See Motion to Dismiss,* filed 09/21/21, Doc. 61, Ex. I
*United States v. Munoz-De La O*, Case No. CR-20-134-RMP
United States District Court for the Eastern District of Washington

# DEPORTATION

## HEARINGS

BEFORE

## THE COMMITTEE ON IMMIGRATION AND NATURALIZATION HOUSE OF REPRESENTATIVES

### SIXTY-NINTH CONGRESS

FIRST SESSION

JANUARY 12, 1926

STATEMENTS OF

### HON. ROBE CARL WHITE, HON. HARRY E. HULL, MR. W. H. WAGNER

ON

## PROPOSED DEPORTATION ACT OF 1926

HEARING No. 69.1.3



WASHINGTON
GOVERNMENT PRINTING OFFICE
1926

78672

EXHIBIT 12
Page 1 of 35

## COMMITTEE ON IMMIGRATION AND NATURALIZATION

### HOUSE OF REPRESENTATIVES

#### SIXTY-NINTH CONGRESS

**ALBERT JOHNSON, Washington, *Chairman***

J. WILL TAYLOR, Tennessee.
HAYS B. WHITE, Kansas.
ARTHUR M. FREE, California.
WILLIAM P. HOLADAY, Illinois.
BIRD J. VINCENT, Michigan.
WILLIAM I. SWOOPE, Pennsylvania.
ROBERT L. BACON, New York.
THOMAS A. JENKINS, Ohio.
BENJAMIN M. GOLDER, Pennsylvania.

ADOLPH J. SABATH, Illinois.
JOHN E. RAKER, California.
RILEY J. WILSON, Louisiana.
JOHN C. BOX, Texas.
SAMUEL DICKSTEIN, New York.
SAMUEL RUTHERFORD, Georgia.
JOHN W. MOORE, Kentucky.

P. F. SNYDER, *Clerk*

II

EXHIBIT 12
Page 2 of 35

# DEPORTATION

House of Representatives,
Committee on Immigration and Naturalization,
*Washington, D. C., January 12, 1926.*

The committee met at 10.30 o'clock a. m., Hon. Albert Johnson (chairman) presiding.

The Chairman. This committee is considering a bill which it is proposed to call the deportation act of 1926, introduced by Mr. Holaday, and which passed the House in the last Congress. The first few paragraphs deal with the arrival of sailors, and we will defer consideration of that for the present and look at page 5, on line 14, beginning with section 19, referring to aliens who shall be taken into custody and deported, as follows:

Sec. 19. (a) At any time after entering the United States (whether the entry was before or after the enactment of the deportation act of 1926) the following aliens shall be taken into custody and deported:

(1) An alien who at the time of entry was a member of one or more of the classes excluded by law from admission to the United States;

(2) An alien who entered the United States at any time or place other than as designated by immigration officials, or who eluded examination or inspection, or who obtained entry by a false or misleading representation. This paragraph shall not apply to any alien who entered the United States before June 3, 1921;

(3) An alien who remains in the United States for a longer time than authorized by law or regulations made under authority of law;

(4) An alien who is a public charge from causes not affirmatively shown to have arisen subsequent to entry into the United States;

(5) An alien who, from causes not affirmatively shown to have arisen subsequent to entry into the United States, is an idiot, imbecile, feeble-minded person, epileptic, insane person, person of constitutional psychopathic inferiority, or person with chronic alcoholism;

(6) An alien who is convicted of any offense (committed after the enactment of the deportation act of 1926) for which he is sentenced to imprisonment for a term of one year or more;

(7) An alien who is convicted of any offense (committed after the enactment of the deportation act of 1926) for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under one or more previous convictions of the same or any other offense (committed after the enactment of the deportation act of 1926) amounts to eighteen months or more;

(8) An alien who is convicted of a violation of, or conspiracy to violate (committed or entered into after the enactment of the deportation act of 1926) any statute of the United States or a State or Territory prohibiting or regulating the manufacture, possession, sale, exchange, dispensing, giving away, transportation, importation, or exportation of intoxicating liquors for beverage purposes, for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under one or more previous convictions of a violation of or conspiracy to violate any of such statutes (such previous violations or conspiracies having been committed or entered into after the enactment of the deportation act of 1926), amounts to one year or more;

(9) An alien who was convicted, or who admits the commission, prior to entry, of an offense involving moral turpitude;

1

EXHIBIT 12
Page 3 of 35

2                              DEPORTATION

(10) An alien who has, after the enactment of the deportation act of 1926, violated or conspired to violate, whether or not convicted of such violation or conspiracy, (A) the white slave traffic act, or any law amendatory of, supplementary to, or in substitution for, such act; or (B) any statute of the United States prohibiting or regulating the manufacture, possession, sale, exchange, dispensing, giving away, transportation, importation, or exportation of opium, coca leaves, or any salt, derivative, or preparation of opium or coca leaves;

(11) An alien who is found practicing prostitution or is an inmate of, or connected with the management of, a house of prostitution, or who receives, shares in, or derives benefit from, any part of the earnings of any prostitute, or who manages or is employed by, in, or in connection with, any house of prostitution or music or dance hall or other place of amusement or resort habitually frequented by prostitutes or where prostitutes gather, or who in any way assists any prostitute, or protects or promises to protect from arrest any prostitute, or who imports or attempts to import any person for the purpose of prostitution, or for any other immoral purpose, or who enters for any such purpose, or who has been convicted and imprisoned for a violation of any of the provisions of section 4 hereof;

(12) An alien who willfully conceals or harbors, attempts to conceal or harbor, or aids, assists, or abets any other person to conceal or harbor, any alien liable to deportation;

(13) An alien who willfully aids or assists in any way any alien to unlawfully enter the United States;

(14) An alien who is found employed on a vessel engaged in the coastwise trade of the United States without having been admitted to the United States for permanent residence. This paragraph shall not apply to any alien who entered the United States before July 1, 1924.

(b) No conviction shall serve as a basis for deportation proceedings under paragraph (6), (7), or (8) of subdivision (a) unless such conviction is in a court of record and the judgment on such conviction has become final. In the case of a sentence for an indeterminate term in which the minimum term under the sentence is less than one year, the term actually served shall, for the purposes of paragraphs (6), (7), and (8) of subdivision (a), be considered the term for which sentenced. An alien who has been pardoned after conviction of an offense as specified in paragraph (6), (7), or (8) of subdivision (a) shall not be deported.

(c) An alien sentenced to imprisonment shall not be deported under any provision of law until after the termination of the imprisonment.

The CHAIRMAN. Other sections of the bill need not be read for the purposes of this hearing.

You will notice this enlarges the present deportation clauses of the law and goes into detail on each one of these classes, and the committee would like to know from the officers of the Department of Labor something about the number of deportations, the cost of deportations, and the possible number of deportations, based on your best estimate, under these provisions.

Mr. ROBE CARL WHITE. The Commissioner General has the figures with him and I will ask him to furnish them.

The CHAIRMAN. Then we will hear Mr. Hull.

### STATEMENT OF HON. HARRY D. HULL

Mr. HULL. You want to know the number of deportations. They are on the increase, and are now running something like 900 a month. May I be permitted to give you an analysis of this bill before I answer your question?

The principal purpose of the pending deportation bill is to provide legislation for ridding the country of several classes of undesirable aliens who could not be reached because of shortcomings or defects in the act of February 5, 1917.

EXHIBIT 12
Page 4 of 35

The principal characteristic of the new legislation would be the factor which the so-called "statutory period" now bears to the deportation problem. In other words, aliens would be deportable regardless of the length of time which has elapsed since their entry into the United States.

Under the present law we are limited in our activities with respect to deporting alien criminals, first, by the period of their residence here; second, by the vexatious question whether the offense of which they have been convicted involves moral turpitude; and, lastly, the duration of the sentence imposed.

Under the act of February 5, 1917, convictions must result in a sentence of one year or more imposed within five years after entry, or there must be two such sentences for convictions after May 1, 1917, and, of course, the offense must be one which can be said to involve moral turpitude.

With respect to the foregoing feature the new legislation proposes to wipe out the moral turpitude question which is one that has vexed the law officers of the bureau and the department for almost 20 years. There was a time when the question was comparatively simple, because whether or not a particular offense involved moral turpitude depended upon whether the crime was malum prohibitum or malum in se.

If the former, then the tendency was to hold that the offense did not come into the category which made deportation possible even at this late date, although, as when heretofore stated, case after case has arisen in the courts, we have not yet concluded as a matter of department policy that alien violators of the Harrison narcotic law (as distinguished from those who are convicted under the act of May 26, 1922, which relates only to those having knowledge that narcotics were imported contrary to law) should be deported.

The same, of course, applies to violators of the prohibition law, and because of the solicitor's opinions holding that the offenses do not involve moral turpitude the bureau has as a rule denied applications for warrants of arrest in these cases, notwithstanding the fact that the Supreme Court of the District of Columbia decided (in a divided opinion) that this means of determining whether an offense involves moral turpitude is a thing of the past and that violation of the liquor laws constitute an offense involving moral turpitude.

Then, too, as you are aware, many States have legislation covering indeterminate sentences; that is, defendants are sentenced, for example in New York, to serve from six months to three years for a specified offense. The District Court for the Southern District of New York has held such a sentence to be one of three years within the meaning of the immigration law and that the alien could upon the expiration of his imprisonment be deported. There are several States, however, where, were the question tried in the courts, we could not with confidence look forward to similar favorable decisions. The new legislation, if passed, would once and for all dispose of these two important questions which in the past have been generally decided in favor of the alien.

One of the most far-reaching and important features of the new law is that section which proposes to vest in such officials as you

EXHIBIT 12
Page 5 of 35

may designate the right to issue warrants of arrest, without the necessity of submitting applications to the bureau as has been the practice since warrant procedure as such became established. Undoubtedly at those stations where we have officials expert in that line material advantages (solely in the way of saving time, however) will result, but what we may expect from extending the authority to the average immigration officer in charge I hesitate to say. If the number of applications which the warrant division here has denied is any criterion, I know that, in the past, we would have found ourselves in very serious difficulties, not only financially but legally as well.

Another important feature of the new law is that by means of "tacking" sentences, it becomes possible to deport aliens who are chronic petty offenders. For instance, there recently came to our attention the case of an alien who had been sentenced no less than thirty times, but as he did not receive two sentences of at least one year, we are unable to deport him. Such a situation can not arise under the new law.

So far as the 1917 law relating to the deportation of criminal classes, its language is as follows:

Any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States, or who is hereafter sentenced more than once to such a term of imprisonment because of conviction in this country of any crime involving moral turpitude, committeed at any time after entry.

The pertinent portion of the proposed legislation with respect to criminal classes reads:

An alien who is convicted of any offense (committed after the enactment of the deportation act of 1925) for which he is sentenced to imprisonment for a term of one year or more.

An alien who is convicted of any offense (committed after the enactment of the deportation act of 1925) for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under one or more previous convictions of the same or any other offense (committed after the enactment of the deportation act of 1925), amounts to eighteen months or more.

An alien who is convicted of a violation of, or conspiracy to violate (committed or entered into after the enactment of the deportation act of 1925), any statute of the United States or a State or Territory prohibiting or regulating the manufacture, possession, sale, exchange, dispensing, giving away, transportation, importation, or exportation of intoxicating liquors for beverage purposes, for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under one or more previous convictions of a violation of or conspiracy to violate any of such statutes (such previous violations or conspiracies having been committed or entered into after the enactment of the deportation act of 1925), amounts to one year or more.

An alien who was convicted, or who admits the commission prior to entry, of an offense involving moral turpitude.

An alien who has, after the enactment of the deportation act of 1925, violated or conspired to violate, whether or not convicted of such violation or conspiracy (A) the white slave traffic act or any law amendatory of, supplementary to, or in substitution for, such act; or (B) any statute of the United States prohibiting or regulating the manufacture, possession, sale, exchange, dispensing, giving away, transportation, importation, or exportation of opium, coca leaves, or any salt, derivative, or preparation of opium or coca leaves.

At present we have no law for deporting, for instance, an alien who assists another to unlawfully enter the country unless by a stretch of the imagination we conclude that he was a person likely

EXHIBIT 12
Page 6 of 35

to become a public charge, an opinion in which we would most likely be promptly overruled by, for instance, Judge Anderson of the district court of Boston, and other judges holding views somewhat similar to his. For that reason the new legislation provides machinery for the deportation at any time after entry of "an alien who conceals or harbors, attempts to conceal or harbor, or aids, assists, or abets any other person to conceal or harbor any alien liable to deportation; an alien who aids or assists in any way any alien to unlawfully enter the United States."

Another very important feature is the inclusion in the deportable classes of any alien "who is found employed on a vessel engaged in the coastwise trade of the United States without having been admitted to the United States for permanent residence."

The bill also makes some very important changes in section 18 of the immigration act with respect to deportation expenses as well as the power of the Secretary to direct the alien's removal at the expense of the steamship company to certain specified places or countries, as well as other important features.

Now, I can give you some figures. In 1910, we deported 3,520; in 1911, 3,310; in 1912, 2,853; in 1913, 3,626, etc. The following table gives the number for the fiscal years 1910–1913, and 1919–1925, and five months of the current fiscal year.

DEPORTATION OF ALIENS

| Fiscal year: | Number deported | Fiscal year: | Number deported |
|---|---|---|---|
| 1910 | 3,520 | 1925 | 9,495 |
| 1911 | 3,310 | 1926 (5 months)— | |
| 1912 | 2,853 | July | 919 |
| 1913 | 3,626 | August | 940 |
| 1919 | 3,103 | September | 855 |
| 1920 | 2,762 | October | 909 |
| 1921 | 4,517 | November | 869 |
| 1922 | 4,345 | | —— 4,492 |
| 1923 | 3,661 | | |
| 1924 | 6,409 | | |

Mr. HOLADAY. What was the number in 1912?

Mr. HULL. In 1912 there were 2,853. There was a little drop in there. In 1919 there were 3,103; in 1920, 2,762; in 1921 (which was, of course, just before the enactment of the first quota law), there were 4,517. I presume a part of that was after the enactment of the first quota law. In 1922, there were 4,345; in 1923, 3,661; in 1924, 6,409; and in 1925, 9,495—which is the best gauge that you have of the number that we are deporting at the present time. We are running along, at the present time, at about the same rate as for 1925, the number being about 4,492 for the five months. That is up to the first day of December.

The CHAIRMAN. Let me ask you right there, in order to be very clear: When you say, "deportation," you mean an alien picked up some place in the United States and deported?

Mr. HULL. Yes, sir.

The CHAIRMAN. As differentiated from being debarred?

Mr. HULL. Yes.

The CHAIRMAN. Now, you gave some figures there and indicated the first quota act, which became effective June 3, 1921, might have

EXHIBIT 12
Page 7 of 35

6                              DEPORTATION

affected the figures that fiscal year, which was within less than a month of expiring.

Mr. HULL. Yes.

The CHAIRMAN. Do you think the first quota law had any effect on deportations in that short space of time?

Mr. HULL. Well, I do not know. I was not, of course, in the Bureau at that time. I do not know. I presume it had a slight effect. At any rate, the figures would indicate it did. The first quota act went into effect, as I recollect, on June 3, 1921.

The CHAIRMAN. Yes. How could the restrictive policy of that act cause an enlargement of deportations?

Mr. HULL. Well, of course, it would make the number greater that could be deported in the following years. When you have a restricted policy, you make a larger class deportable.

Mr. WHITE. I would like to ask Mr. Hull this question: Have you reason to think, Mr. Hull, or do the statistics prove that a large part of these deportations are parties who have surreptitiously entered the United States, or are we to conclude these persons largely have passed muster and gotten in here and it has subsequently been determined they were not eligible to admission?

Mr. HULL. Largely there are smuggled in, some come as visitors and others become public charges after legal entry. Most of these we are deporting.

Mr. WHITE. Illegally?

Mr. HULL. Some of them criminals; perhaps a few of them who legally came in are criminals.

Mr. DICKSTEIN. You do not mean to say you have deported anybody who came in in excess of the quota; you are referring to those who came in here illegally or did not go through the proper medical inspection, who you found subsequently in the States and found illegally in the United States?

Mr. HULL. They might be here in excess of the quota.

Mr. DICKSTEIN. Yes, a man might come in in excess of the quota and be found in the United States in certain circumstances, and yet be legally admitted to the United States.

Mr. WILSON. You do not mean in excess of the quota as provided by law?

Mr. HULL. No; he is here; he came in under the quota.

Mr. WILSON. But came in in violation of some other law?

Mr. HULL. Yes.

Mr. HOLADAY. Can you place, in your statement, the reason for the deportations in the year 1925?

Mr. HULL. The reasons?

Mr. HOLADAY. Yes, the grounds.

The CHAIRMAN. He means a table. I think you have the same thing in your report.

Mr. HOLADAY. Yes; I think that is in the report.

Mr. HULL. Yes, that can be done.

The CHAIRMAN. Let that be inserted at this point, from your annual report.

(The table above referred to is as follows:)

EXHIBIT 12
Page 8 of 35

## DEPORTATION

7

TABLE 56.—*Aliens deported to countries whence they came after entering the United States, fiscal year ended June 30, 1925, by race or people and causes*

| Race or people | Number deported | Feeble-minded | Insanity | Epileptics | Constitutional psychopathic inferiority | Other mental conditions | Tuberculosis (contagious) | Other contagious diseases | Pregnancy | Other physical conditions | Prostitutes, or inmates of houses of prostitution, and aliens coming for any immoral purpose | Support by or received the proceeds of prostitution, or connected with house of prostitution, or other place habitually frequented by prostitutes | Aliens who procure or attempted to bring in prostitutes or aliens for any immoral purpose, or assists, or protects prostitutes from arrest | Found in the U. S. after having been deported as a prostitute or a procurer or as having been connected with the business of prostitution or other immoral purposes of importation for purposes of prostitution, and violations under the act of Oct. 16, 1918, as amended June 5, 1920 | Anarchists | Criminals | Under narcotic act | Polygamist | Without proper visa under immigration act of 1924 | Under per centum limit act of 1921 (excess quota) | Without passport under the State Department regulations | Under passport provision of sec. 3, act of 1917 | Under Chinese exclusion act | Geographically extended classes (natives of that portion of Asia and Islands adjacent thereto described in sec. 3, act of 1917) | Under last proviso of sec. 3, 13, 17, and under sec. 17, immigration act of 1924 | Contract laborers | Unable to read (over 16 years of age) | Under 16 years of age, unaccompanied by parent | Assisted aliens | Professional beggars and vagrants | Likely to become a public charge | Entered the United States within one year of previous deportation | Entered without inspection, or at a time or place not designated by immigration officials. Deportation required within three years | Other causes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 9,495 | 462 | 837 | 6 | 28 | 47 | 28 | 70 | 9 | 9,165 | 209 | 51 | 33 | 14 | 22 | 632 | 42 | 1 | 2,723 | 334 | 630 | 29 | 93 | 51 | 115,66 | 86 | 474 | 23 | 37 | 3 | 3,738 | 164 | 1,169 | 88 |
| African (black) | 107 | | 2 | | | | | | | 9 | 3 | | | | | 13 | | | 10 | 10 | 6 | | | | | | 3 | 1 | 1 | | 42 | 2 | 10 | |
| Armenian | 26 | | 10 | | | | | 1 | | 2 | | | | | | 1 | | | 1 | | 1 | | | | | | 2 | 1 | | | 4 | 2 | 3 | |
| Bohemian and Moravian (Czech) | 30 | | 3 | | | | | | | 1 | | | | | | 2 | | | | | | | | | | | | | | | 7 | | | |
| Bulgarian, Serbian, and Montenegrin | 34 | | 1 | | | | | | | | | | | | | 2 | | | | | | | | | | | | | | | | | 1 | |
| Chinese | 105 | | | | | | | | | 3 | | | | | | 20 | 12 | | 57 | 17 | 13 | | 93 | | | | 4 | | | | 24 | 2 | 57 | 1 |
| Croatian and Slovenian | 201 | | | | | | | | | 3 | 1 | 2 | | | | | | | 22 | 22 | 18 | | | | | | 5 | 1 | | | 43 | 2 | | 1 |
| Cuban | 117 | | | | | | | | | | | 4 | | | | | 1 | | 36 | 3 | | | | | | | 1 | | | | 16 | | 11 | |
| Dalmatian, Bosnian, and Herzegovinian | 28 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dutch and Flemish | 249 | | | | | | | 1 | | 4 | 2 | | 1 | | | 6 | | | 115 | | 2 | | | | 1 | | 3 | | | | 10 | 2 | 11 | |
| East Indian | 67 | 2 | 3 | | | 3 | | 3 | | 15 | | | | | 1 | 4 | | | 305 | 9 | 2 | 6 | | 1 | 1 | 1 | 33 | 2 | | | 120 | 4 | 14 | 2 |
| English | 4,072 | 24 | 1 | | 1 | 6 | | 2 | 1 | 45 | 25 | 10 | 14 | 3 | 1 | 43 | 2 | | 83 | 8 | 60 | | | | 2 | 10 | 36 | 6 | 7 | | 120 | 7 | 89 | 14 |
| Finnish | 61 | | | | | | | | | | | | | | | 11 | 1 | | 33 | 3 | 38 | | | | | | 8 | | | | 22 | 1 | 34 | 1 |
| French | 469 | | | | | | | | | 6 | | | | | | | | | 315 | 6 | 36 | | | 1 | 9 | 2 | 3 | | | | 122 | 1 | 31 | 1 |
| German | 750 | 1 | 5 | | | 1 | | 1 | | 7 | 3 | | 1 | | | | | | 65 | | 47 | | | | 1 | 1 | 6 | 4 | | | 111 | 8 | 54 | 2 |
| Greek | 297 | | 1 | | | | | 1 | | 9 | | | | | | 2 | | | 66 | | 10 | | | | | | 7 | 1 | | | 42 | 4 | 38 | 3 |
| Hebrew | 291 | | 3 | | | | 1 | | | 10 | | | | | | 2 | | | 57 | | 10 | | | | 1 | | 3 | 7 | | | 111 | 5 | 48 | 5 |
| Irish | 354 | | 1 | 1 | | 1 | 1 | | | 6 | | | | | | 5 | 1 | | 59 | | 34 | | | | | | 5 | 3 | 4 | | 101 | 2 | 36 | 1 |
| Italian (north) | 152 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Italian (south) | 644 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

78072—26——2

EXHIBIT 12
Page 9 of 35

8                           DEPORTATION

TABLE 56.—Aliens deported to countries whence they came after entering the United States, fiscal year ended June 30, 1925, by race or people and causes—Continued

| Race or people | Number deported | Feeble-minded | Insanity | Epileptics | Constitutional psychopathic inferiority | Other mental conditions | Tuberculosis (contagious) | Other contagious diseases | Pregnancy | Other physical conditions | Prostitutes, or aliens coming for any immoral purpose | Supporting or receiving the proceeds of prostitution, or connected with house of prostitution or other place frequented by prostitutes | Aliens who procure or attempted to bring in prostitutes or aliens for any immoral purpose, or assists, or protects prostitutes | Found in the U. S. after having been deported as a procurer or as a prostitute or connected with the business of prostitution or other importation for immoral purposes | Anarchists, and violations under the act of Oct. 16, 1918, as amended June 8, 1920 | Criminals | Under narcotic act | Polygamists | Without proper visa under immigration act of 1924 | Under per centum limit act of 1921 (excess quota) | Without passport under the State Department regulations | Under passport provision of sec. 3, act of 1917 | Under Chinese exclusion act | Geographically excluded classes (natives of that portion of Asia and islands adjacent thereto described in sec. 3, act of 1917) | Under last proviso of sec. 3, act of 1917 (sec. 23, act of 1917); and under sec. 17, immigration act 1924 | Contract laborers | Unable to read (over 16 years of age) | Under 16 years of age, unaccompanied by parent | Assisted aliens | Professional beggars and vagrants | Likely to become a public charge | Entered the United States within one year of previous deportation | Entered without inspection, or at place not designated by immigration officials. Deportation required within three years | Other causes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Japanese | 38 | | 1 | | | | | | | | | 3 | | | | 5 | 1 | | 19 | | | 28 | | 2 | | | 2 | 1 | | | 11 | | 6 | 1 |
| Korean | 6 | | | | | | | | | | | | | | 1 | | | | | | | | | | | | | | | | 1 | | | |
| Lithuanian | 23 | | 3 | | | | | 2 | | | | 1 | | | | 9 | | | | 2 | 9 | | | | 3 | | 3 | | | | 5 | | 6 | 3 |
| Magyar | 22 | | 51 | | | | 20 | | | | | 6 | | | | 109 | 1 | | 224 | | 18 | | | | | | 264 | | | | 347 | 28 | 346 | 3 |
| Mexican | 1,751 | 3 | 51 | 3 | 1 | 2 | 20 | 3 | 2 | 28 | 114 | | 11 | 18 | 6 | 109 | 1 | 1 | 224 | 34 | 18 | 6 | | | 3 | 13 | 264 | 6 | 2 | | 347 | 28 | 346 | 3 |
| Pacific Islander | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Polish | 65 | | 4 | | 2 | 3 | 3 | | | 3 | 6 | 2 | | | 4 | 10 | | | 30 | 3 | 10 | | | | 7 | 1 | 6 | 5 | | 2 | 21 | 6 | 13 | 2 |
| Portuguese | 101 | | 3 | 1 | | | | | | 3 | | | | | 1 | 5 | | | 17 | 3 | 8 | | | | 1 | | 9 | 2 | | | 15 | 3 | 62 | 3 |
| Roumanian | 85 | | 8 | | 1 | 4 | | | | 3 | | | | | | 10 | 1 | | 45 | 3 | 2 | | | | 13 | | 5 | | | | 11 | | 38 | |
| Russian | 83 | 1 | 5 | 2 | 1 | | | | | | | | | | 4 | 12 | 3 | | 141 | 3 | 36 | | | | | | 25 | | | | 41 | 1 | | 3 |
| Ruthenian (Russniak) | 44 | | | | | | | | | | | | | | 1 | | | | 18 | 1 | 1 | | | | | | 13 | | | | 9 | | | |
| Scandinavian (Norwegians, Danes, and Swedes) | 512 | 4 | 44 | | 2 | 5 | | 10 | 3 | 12 | 6 | 1 | | 2 | | 18 | 1 | | 65 | | 24 | | | | 7 | | 16 | | | | 62 | | | |
| Slovak | 97 | | 11 | | | | | 3 | | 2 | | | | | | 8 | | | 43 | | 23 | | | | | | 5 | | 1 | | | | 2 | |
| Slovenian | 37 | | 14 | | | | 1 | | | 1 | | | | | | 3 | | | 28 | | 14 | | | | | | 13 | | | | | | | |
| Spanish | 324 | | 8 | | 1 | 3 | | 1 | | 1 | | 1 | | | | 14 | | | 141 | | 29 | 1 | | | | 1 | 1 | | | | | | 24 | |
| Spanish American | 67 | | 6 | | | | | 1 | | 2 | | | | | | 3 | | | 20 | | 1 | | | | | | | | | | | | | |
| Syrian | 116 | | | | | | 1 | 1 | | | 3 | 1 | | | | 1 | | | 20 | | | 2 | | 6 | | | 9 | 1 | | | 31 | | 10 | |
| Turkish | 42 | | | | | | 1 | | | | | | | | | | | | 20 | | | | | | | | | | | | | | | |
| Welsh | 3 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| West Indian (except Cuban) | 42 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Other peoples | 150 | | | | | | | | | | 3 | | | | 6 | | | | 46 | | 2 | | | | | 9 | | 31 | | | 21 | | 10 | |

EXHIBIT 12
Page 10 of 35

Mr. HULL. I might say, by months, so far this year, that we have deported in July, 919; August, 940; September, 855; October, 909; and November, 869.

Now, of course, I presume what you want to get is something in regard to the expense of deportation. Of course, on the details, Mr. White or Mr. Wagner, probably Mr. Wagner, will be better than I am. I have only been in the bureau something like 10 months and, of course, I have not accumulated all the knowledge, but I find the deportation costs are something like $87, on an average, per man. That is the way they are running, at least, this year.

The CHAIRMAN. That is the average between sending him back across the land borders and sending him overseas?

Mr. HULL. That is the actual expense of the average amount for all. The overhead is not included in that. The actual dollars and cents that we are out, on the average, for every alien that we deport, rail and water transportation, detention charges, etc., or the actual money that it costs our bureau to deport an alien, on the average, is $87, and that may be at the land border or it may be at the port. Of course, that does not include, you know, the aliens that we allow to depart voluntarily; it is the actual deportation under warrant of the Secretary of Labor.

Mr. DICKSTEIN. How long have most of the people been in this country that you have deported since 1925?

Mr. HULL. It would be hard to say, but then the great bulk of them are here less than five years.

The CHAIRMAN. In most of the cases, the law forbids you to go back of five years?

Mr. HULL. I think it is five years.

The CHAIRMAN. Three years.

Mr. HULL. Some of them you can go back to five, and some of them you can go further; but in many cases it is less than three years.

Mr. DICKSTEIN. A man who has committed two felonies—the statute as against him would not apply, would it, Mr. Hull? A man who had served two prison sentences for a felony, you could deport him at any time, if he were an alien?

Mr. HULL. As I understand it, you mean a man who has had two convictions of felony?

Mr. DICKSTEIN. Yes.

Mr. HULL. Of course, there is the question of moral turpitude there. Of course, just how far you can go is sometimes debatable.

The CHAIRMAN. Now the figures show that deportations are increasing, and you have given us the average cost per deportation?

Mr. HULL. Yes.

The CHAIRMAN. And that includes those who go out under the plan by which they are permitted to ship foreign? Do you get the average by including all methods you adopt to save money?

Mr. HULL. Well, if here is a warrant out, I understand that is included.

The CHAIRMAN. I know, but you arrange that quite a large number may depart?

Mr. HULL. Yes.

EXHIBIT 12
Page 11 of 35

DEPORTATION

The CHAIRMAN. Are they then called deportees?

Mr. HULL. Well, it depends on how far you have gone, as I understand that. If you have arrested a man and taken him down and gotten him to the seaport and he says, "If you let me go, I will ship foreign," and that can be arranged, he would count as a deportation.

The CHAIRMAN. Then when you actually deport a man and it is arranged he can ship foreign, does that man count in your average cost of deportations?

Mr. HULL. Why, as I understand it, he does. He certainly would, because there is some expense connected with his detention and arrest and carrying him down to the port, but we save a great deal of money along that line.

The CHAIRMAN. In making your estimates of the amount of money to be secured for any one year, how can you arrive at any such figure?

Mr. HULL. Well, so far as it relates to the time since I have been in the bureau, we have not arrived at any positive figures. It is estimated at $1,000,000.

The CHAIRMAN. Do you feel obliged at any time to delay the matter of deportations for lack of funds?

Mr. HULL. Why, we certainly do. When I went into the bureau I found the bureau facing a potential deficit. I went in in May and there was a deficit of about $100,000, and if we had gone ahead, why we would then have had a deficit of close to $100,000.

Mr. BOX. Gone ahead with what, Mr. Commissioner?

Mr. HULL. Deportations.

Mr. BOX. Under the law?

Mr. HULL. Under the law.

The CHAIRMAN. That is the point we are trying to arrive at, in the preparation of a bill which would greatly enlarge the number of deportations.

Mr. WILSON. Do you understand, Mr. Hull, they had to check up on deportations because they did not have the money?

Mr. DICKSTEIN. No; they had to stop deportations because they did not have the money.

Mr. HULL. We had to stop.

Mr. WILSON. I say, you would have deported more if you had had sufficient funds?

Mr. HULL. Certainly.

Mr. BACON. Have you brought that to the attention of the Appropriations Committee?

Mr. HULL. We have brought the facts to the attention of the Bureau of the Budget and I think it has been brought to the attention of the Appropriations Committee.

Mr. BACON. I understand.

Mr. HULL. But I was asked to sign an order stopping deportations so that, when the 1st of July came, we would not show a deficit for the year.

The CHAIRMAN. When did you sign such an order?

Mr. HULL. I think it was the 25th of May, if I remember rightly.

The CHAIRMAN. Of last year?

Mr. HULL. Ten days after I went in the bureau.

EXHIBIT 12
Page 12 of 35

Mr. WILSON. When you made an estimate for the Budget, did you make that known, that you needed more money for deportations?

Mr. HULL. Absolutely.

Mr. WILSON. You sent that in?

Mr. HULL. Oh, certainly. We have asked for more money and told them why.

Mr. WILSON. Did they recommend it, or do you know?

Mr. HULL. Well, they have not recommended it so far; that is, for the fiscal year 1927.

The CHAIRMAN. Now, let us get that. That was May, 1924, then, you signed the order?

Mr. HULL. No; May, 1925.

The CHAIRMAN. 1925?

Mr. HULL. I went into the bureau on May 15, 1925.

The CHAIRMAN. And the new fiscal year came on the following July 1?

Mr. HULL. The following July 1.

The CHAIRMAN. So that you would go into the new fiscal year, then, short of money?

Mr. HULL. No; we did not. We had the money, but we stopped deportations the 25th of May; absolutely stopped them.

The CHAIRMAN. What happened with individuals who were waiting deportation?

Mr. HULL. They were detained.

The CHAIRMAN. For how long?

Mr. HULL. Well, until the first of the next fiscal year.

The CHAIRMAN. And then did you have sufficient funds to start in and catch up with the work?

Mr. HULL. We have not yet; we hope to get them.

The CHAIRMAN. Have you many now awaiting deportation?

Mr. HULL. No; we are going right ahead, so far.

The CHAIRMAN. Well, when they are detained, where are they detained?

Mr. HULL. Well, at the points of deportation, or they may be detained back in the country, or they may be left in jail. We do not start after a party, that is all; we just let them stay.

Mr. BOX. They are all in custody, are they not, Mr. Commissioner?

Mr. HULL. Most of them. I won't say " all," because it might be some of them are paroled.

Mr. BOX. That is the exception?

Mr. HULL. Yes; that is an exception.

The CHAIRMAN. Could you put a table in this record showing the number on hand awaiting deportation at any given date that is convenient to you?

Mr. HULL. Yes; what date do you want?

The CHAIRMAN. You select the date that would fit the records of the various stations, just so we can see how we are running in deportations.

Mr. HULL. Well, it would be higher the 25th of June or the 1st of July, than it would be at other times.

The CHAIRMAN. Why?

Mr. HULL. Well, because we stopped.

Mr. BOX. And they continued to accumulate?

Mr. HULL. They accumulated to some extent.

EXHIBIT 12
Page 13 of 35

Mr. Box. I think that statement ought to show the greatest number that accumulated, the persons then in custody that had accumulated on your hands, because of lack of funds to deport them.

The Chairman. That is one point. Another table that is desirable would be the number on hand now.

Mr. Holaday. Why would it not be a good idea for that first statement to be as of date June 30, 1925.· That would show the number on hand at the close of the fiscal year. Then a statement of the number on hand at a recent date, say, January 1, or whatever date would be possible.

The Chairman. Yes.

(The table above referred to is as follows:)

Number of aliens under orders of deportation—

| June 30, 1925 | 1,150 |
| Jan. 1, 1926 | 2,788 |
| Jan. 15, 1926 | 2,835 |

The Chairman. Now, then, where are you now on deportations this month? Are you proceeding with cases as they come along, or are you deferring?

Mr. Hull. Well, we are proceeding, but not proceeding quite as fast as we would like to.

The Chairman. How is your deportation money prorated per month, or is it dosed out by the month?

Mr. Hull. Well, we have only sufficient funds for about seven months deportation work.

The Chairman. Is it allotted to you by the month?

Mr. Hull. No, it is allotted in a lump sum. But, then, we have been exceeding out apportionment; that is, we have been exceeding the amount that was appropriated up to the present time, and we have asked for a deficiency from the Budget and it has been granted by them; that is, the Budget have recommended a deficiency for this year, as I understand.

The Chairman. A supplemental appropriation?

Mr. Hull. A supplemental appropriation.

The Chairman. How large will that be?

Mr. Hull. I do not know, of course. That depends on Congress. The Budget has recommended, I understand, $600,000.

The Chairman. To take care of pending deportation matters?

Mr. Hull. Oh, yes, and other expenses. The border patrol comes in here.

The Chairman. The border patrol—operating expense?

Mr. Hull. Yes. I think about $450,000 for border patrol. You see, there are, you might say, two things in regard to the enforcement of this act; first, your border patrol, which stops the alien at the border and it is much cheaper, in my opinion, to stop the alien at the border than it is to let him get in; but you must have a very effective force, and you have to have a larger force than we have at the present time. Of course, the border patrol, you see, is a creation of the last year and, while it is doing wonderful work, marvelous work you might say, it is not large enough by quite a bit.

Mr. Bacon. It ought to be twice as large, ought it not, Mr. Hull?

Mr. Hull. I do not think there is anybody wise enough to say what that border patrol will have to be. It will have to be twice;

EXHIBIT 12
Page 14 of 35

and, more than that, I will say that if you desire 95 per cent efficiency.

It will never be 100 per cent efficient, but it can be made very close to what you might say is 100 per cent efficient, but it will take work and it will take time.   You can not create it in a minute.

Mr. WILSON. Can you give an estimate of the number of aliens now held who are subject to deportation and who you are unable to deport because of the lack of funds?

Mr. HULL. No.   We have not stopped deporting this year.

Mr. WILSON. What I mean is you had to cut down?

Mr. HULL. We have not stopped.   No, I do not think, officially, that we cut down.

The CHAIRMAN. Let me get at it on another tack——

Mr. HULL. We have told them to go ahead.

Mr. WHITE. I got that mixed a little, Mr. Chairman.   He was speaking a little while ago of the last fiscal year.   This fiscal year you have not discontinued deportations, as yet?

Mr. ROBE CARL WHITE. They have been curtailed.

Mr. HULL. We have curtailed to some extent; that is the point.

Mr. WHITE. Are you going to be short of funds?

Mr. HULL. We will have to do more than that, if we do not get some funds.

The CHAIRMAN. When you warn your officials out through the country with regard to expenditures for deportations, what do you do?   Do you send them a telegram saying, "Slow down," or how do you word it?

Mr. HULL. I think they are simply warned that they can not have any more money for their allotments.

The CHAIRMAN. For deportation purposes?

Mr. HULL. No——

Mr. ROBE CARL WHITE. When we went before the Budget, we made our representations and then we were advised that our appropriation would be the same for this coming year as for last year and at that time we had not curtailed any of our activities, and our financial man reported to me and Mr. Hull that if we continued on the same basis we were then going, we would wind up the year with a deficit of $350,000 to $400,000.   When that fact became known, I immediately approved an order of Mr. Hull notifying the field officers that they must cut down in their deportation work, as that is about the only phase of the work where we can save money.   This is the only flexible part of our appropriation, unless we reduce the personnel.   If you do not mind, I will quote a letter received yesterday from one of the district directors, which will give you an idea of the whole situation, or the situation in most of the districts.   He wrote:

> The financial problem, as regards meeting expenses chargeable against the immigration appropriation, with which we are confronted here, simply can not be solved without funds.   The immigration allotment given this district on July 1, to cover expenses for the fiscal year, is now completely exhausted and the deficit which has already been created is rapidly increasing.   On the 1st of January, the balance in our immigration allotment was only $697.87.

That is for an entire district.

> * * * Our fixed obligations alone, for the remainder of the year, such as telephone, rentals, etc., will total about $1,200, and, in addition, our detention bills at the present time are running over $14 per day.

EXHIBIT 12
Page 15 of 35

That is for the detention of aliens.

* * * There is only one way to meet this situation, if additional funds can not be supplied, and that is to immediately release all the aliens we are now holding in jails, make no more arrests, and refuse to take into custody those aliens for whom we hold warrants and are due for early release from penal institutions within the district.

This program does not appeal to me and, if put into actual operation, nothing short of absolute chaos would be the result. However, with our allotment completely exhausted and a debt of $700 already contracted, and with positive instructions outstanding that we must keep within the amount given the district at the beginning of the year, there seems to be no other course to follow.

I would greatly appreciate some advice or instructions as to how this situation is to be handled.

Mr. DICKSTEIN. Where did that come from?

Mr. ROBE CARL WHITE. This came from Buffalo, from the man in the Buffalo district. In the Buffalo district, the last knowledge I had of it, they had about 700 unserved warrants. They had several hundred (I have forgotten the exact number) warrants that were served, but the hearings have not yet been held. Now, at the time that order was issued, we had been informed that our appropriation for 1927 was the same as for 1926. Since then we have asked for a deficiency, covering this year, and we understand, or have been informed by the Budget, that the President has approved the submission of our estimate of $600,000 to Congress. Therefore, we can ease up on these districts by giving them a new allotment, providing the Appropriations Committee of Congress approves the recommendation of the President and the Budget, which we have reason to believe, or I presume we are safe in believing, they will do. The order curtailing the activities of all districts has not yet been withdrawn, so that is the occasion for this letter from the district director. The men were driven desperate to try to handle the situation. If we had been compelled to operate under our appropriation, without a deficiency appropriation this year, it would simply mean marking time.

Mr. BACON. What is the situation for the coming fiscal year in the Budget?

Mr. ROBE CARL WHITE. Well, the coming fiscal year, for 1927, the appropriation is the same as for 1926.

Mr. BACON. In spite of the fact it has been proved that you needed a $600,000 additional appropriation to carry on?

Mr. ROBE CARL WHITE. Well, I do not know as I can say "proved." Our representations to the Budget were made along the lines of needing additional moneys. We failed to convince them of that fact.

Mr. BOX. You did convince them, however, you needed some $600,000 additional for the present year?

Mr. ROBE CARL WHITE. Yes; we convinced them of that fact.

Mr. BACON. Is the Budget for 1927 $600,000 short of what you asked for?

Mr. ROBE CARL WHITE. $1,350,000 short.

Mr. BACON. In other words, you asked $1,350,000 that you did not get from the Budget?

Mr. BOX. Yes; and even this deficiency appropriation, I understand, is not what they said they needed for this immediate work. Is that correct, Mr. Secretary?

Mr. BACON. I understood that too, Mr. Box.

EXHIBIT 12
Page 16 of 35

Mr. JENKINS. Suppose a man is arrested and held for deportation, because of lack of funds; has he any right to get a release from jail?

The CHAIRMAN. Oh, yes.

Mr. ROBE CARL WHITE. Yes; he has rights.   The courts repeatedly have held we have no right to hold an alien an unreasonable length of time.  Three months has been held by the courts to be an unreasonable length of time.  It is true that we have held aliens as high as two years, but it was generally because the aliens themselves refused to disclose their country of nativity, or to give any information whatever on which we could get a passport, or we carried them on because they were generally bad ones and we figured they should be confined.  However, that eats up our appropriation very rapidly.

Mr. JENKINS. That is what I thought; that it would be useless to hold these fellows there if the law gave them a right to release themselves.  But I see your point.  Now let me ask you another question: Has your enforcing or parole department any system whereby they can take into custody the worst ones and pass up the less offensive?

Mr. ROBE CARL WHITE. Oh, yes.  That is exactly what the last order said.  You understand, gentlemen, we have never gone out and made surveys of districts to ascertain whether or not aliens are in that district unlawfully—illegally in this country.  We have had numerous demands for this character of work to be done, but we have instructed our men to confine themselves to what we call the emergency work—the work that is right in front of them, the deporting of aliens who are reported to the Immigration Service through various sources, civil authorities, and individuals; and the ones they run across in their everyday work.  At the present time, I have requests from four places for surveys claiming many are in these localities illegally and that serious trouble might arise unless we clean out the aliens who are illegally there, and we are arranging to-day for one party of three inspectors to go and make a survey of one district.  That is only one of many districts and places where we really ought to go and make a survey and get the aliens who are illegally here and deport them.  That kind of work we have been unable to do.

The CHAIRMAN. Now, is it not just that situation that is probably responsible for the very insistent demand that Congress enact an enlarged deportation act?

Mr. ROBE CARL WHITE. I presume it is; yes, sir.

Mr. VINCENT. Mr. White, you said that the Budget had recommended the same appropriation, as originally made in 1924, for 1925?

Mr. ROBE CARL WHITE. Yes.

Mr. VINCENT. Now, let me see if I understand it exactly.  As I remember it, after we passed the immigration law in 1924, this committee was instrumental in getting an amendment put on the appropriation bill, for an item concerning immigration, of $1,200,000, in addition to that recommended by the Bureau of the Budget.

EXHIBIT 12
Page 17 of 35

16                              DEPORTATION

Now, do I understand that their recommendation now includes that
amount, or that it goes back to the amount with that off?
  Mr. ROBE CARL WHITE. It includes that amount.
  Mr. VINCENT. It includes that amount?
  Mr. ROBE CARL WHITE. In other words, our appropriation for
1925 is $5,084,000.
  Mr. WAGNER. $5,084,865.
  Mr. ROBE CARL WHITE. And the appropriation recommended to
Congress for 1927 is the same amount. Now, you understand the
Budget Committee appreciates the fact that when they give us
$600,000 additional this year, something will be required for next
year. Of course, they hope that we will be able to curtail our
activities in such way as to absorb this extra amount, and we will
make every honest effort to do so.
  Mr. BACON. Mr. White, is it not true that the item Mr. Vincent
speaks of, namely, the $1,200,000, was entirely designed for the use
of the border patrol?
  The CHAIRMAN. Except $200,000; $1,000,000 for the border patrol.
  Mr. BACON. $1,000,000 for the border patrol, and the other $200,-
000 for what?
  Mr. WAGNER. Just the general immigration expenses.
  Mr. BACON. In other words, it did not largely affect your question
of deportations?
  Mr. ROBE CARL WHITE. No.
  Mr. HOLADAY. Mr. White, your sole reason for the department
pursuing the restricted deportation policy and confining its activities
to what you term "emergency cases" is because of the lack of funds
to finance the border and more active policy, is it not?
  Mr. ROBE CARL WHITE. Oh, yes. Yes; we must live within our
appropriations. You understand, gentlemen, that we have certain
fixed charges. The salary roll is fixed, and it is about $4,097,571 at
the present time. Now, that is a fixed charge, unless you reduce your
personnel. That leaves us $987,294 with which to pay all other
expenses, including deportation. Now, out of that, the cost of
deporting aliens for the first five months of this year was $395,129,
and the overhead estimated expense outside of salaries is about
$500,000 for the year. Now, then, we have already spent in five
months almost all that was available for deportation work for the
whole year. Now, the added $600,000 will enable us to get by for
the rest of this year, continuing the same policy we have been follow-
ing: that is, deporting about 900 aliens a month.
  Mr. VINCENT. If you had more money, without passing any new
deportation law at all, taking the one you have now and making
the surveys such as you have very properly suggested, I think,
there would be a tremendous increase in deportations, would there
not?
  Mr. ROBE CARL WHITE. Oh, yes. We could make the deporta-
tions almost anything you wanted, until we rid the country of the
aliens who are illegally here. And our best estimate, secured from
the director recently (and it can only be an estimate, you under-
stand), and which I believe is conservative, is there are now between
250,000 and 275,000 aliens in this country who are illegally here,
and who are supposed to have entered since 1921. Some of those,
probably, are entitled to relief. But the greater proportion of

EXHIBIT 12
Page 18 of 35

them should not be here; they should be out of the country and, if they want to remain in the United States, they should come back properly and with proper documents and a clean bill of health as to their character and morals.

Mr. FREE. Will you describe the process of deportation; that is, is a man picked up and then there is a ticket bought for him, or does some inspector go with him?

Mr. ROBE CARL WHITE. Do you want me to describe the method?

Mr. FREE. Will you please do that and give us an estimate of the expense per person?

Mr. ROBE CARL WHITE. Our inspectors first locate the man, make some inquiries and, if they think the alien is here illegally, they then ask the Secretary of Labor for a warrant of arrest. They serve the warrant of arrest, take the alien in charge, and then the alien, under the law, is entitled to a hearing, with his own attorney present, if he wishes. This hearing is recorded and transcribed and the inspector recommends to the Secretary, after the hearing is completed, whether or not in his judgment the alien is here illegally; and, if so, the grounds upon which he should be deported. That is forwarded to the department, passed upon there, and if they approve the recommendation of the inspector a warrant of deportation is issued, under which the alien is taken in charge and deported.

Then it becomes necessary for us to secure a passport and to take the alien, at Government expense, from wherever he is found in the country (if he is to go across the water) to the port of embarkation. If he is found in Nevada, and he should go to France or England, he is taken to New York. The expense of that part of the deportation is defrayed by the Government. Then, in many cases, the steamship companies pay the expense from the port of embarkation to his destination. Of course, we have quite a number that we deport entirely at Government expense.

That, in short, is about the process.

Mr. VINCENT. That would be true in all cases where the deportation arises solely upon some act of the individual after he has been legally brought into the country?

Mr. ROBE CARL WHITE. Yes. There are a great many grounds upon which deportation occurs.

Mr. VINCENT. The steamship companies would not be responsible for some crime he committed here?

Mr. ROBE CARL WHITE. That is correct.

The CHAIRMAN. Let me ask you, right on that point; I was informed, last summer, in the effort to break up tong wars, or Chinese factional wars, in New York City, the Department of Labor, through its immigration service, stepped in and arrested and arranged for the deportation of about 250 Chinese?

Mr. ROBE CARL WHITE. No, Mr. Chairman, this is what happened——

The CHAIRMAN. I would like to know.

Mr. ROBE CARL WHITE. The tong war broke out in New York City and the Department of Justice, through Mr. Buckner, made raids. After they had taken into custody a great many Chinese, they asked the Immigration Service to come there and see whether they were deportable, or not. In the first place, we did not initi-

EXHIBIT 12
Page 19 of 35

18                          DEPORTATION

ate a single arrest; it was initiated by the Department of Justice
or the city authorities, and we only took the ones that we knew
were deportable, and that amounted to——

Mr. WAGNER. Two hundred and fifty-three was my recollection.

Mr. ROBE CARL WHITE. Mr. Wagner says it amounted to 253
from New York. Now that, without any initiative of our own,
without any way of preventing it, loaded our appropriation with
almost $40,000. Then the same process was undertaken at Cleve-
land. I have forgotten the details, but it never reached any great
proportion.

The CHAIRMAN. Right along that line—that is exactly why I
brought it up—your service could have inaugurated an inquiry
among the Chinese of New York as to their right to be in the United
States?

Mr. ROBE CARL WHITE. Yes, sir. We have often made surveys—
we used to in years gone by.

The CHAIRMAN. But you did not do it in this case?

Mr. ROBE CARL WHITE. We did not do it in this instance, we have
for years had reason to believe that there are probably from two
to three thousand Chinese in the city of New York alone, who
would be subject to deportation if their cases were gone into care-
fully.

Mr. BACON. You did not have the money to make a survey?

Mr. ROBE CARL WHITE. We did not have the money. It would
probably mean half a million dollars to clean up the New York
Chinese situation alone, to say nothing of every other community in
the United States.

The CHAIRMAN. That is what I am trying to get at; that is
where this discussion comes in, to aid the Committee in its considera-
tion of an enlarged deportation bill.

Mr. DICKSTEIN. Mr. White, did you glance through page 5, section
19, and all the way down, to page 15, the section, we will say, refer-
ring to aliens who entered the United States at any time, at a place
other than designated by the Immigration officials, etc.?

Mr. ROBE CARL WHITE. Where is that?

Mr. DICKSTEIN. That is on page 5, section 19, subdivision 2.

Mr. ROBE CARL WHITE. Yes.

Mr. DICKSTEIN. Now, let us assume that in the past 10 or 15
years men have come to this country and did not go through the
proper legal steps; they have married American wives and have
American children. Now, if they were found, the way the section
reads, you would have a right to deport them?

Mr. HOLADAY. Mr. Dickstein, I think you failed to read the last
line there.

Mr. DICKSTEIN. Who entered the United States before June 3,
1921. But I am going back 10 years before that.

Mr. HOLADAY. It would not apply to them.

Mr. DICKSTEIN. It would apply only to those who came after?

Mr. ROBE CARL WHITE. After June 3, 1921.

Mr. HOLADAY. Yes.

Mr. DICKSTEIN. What would you do in that case where the man
had married and had American children, and was otherwise admis-
sible, of good moral character, and everything else?

EXHIBIT 12
Page 20 of 35

Mr. Bacon. Do you call it good moral character if they break the laws of the country by coming in, by smuggling?

Mr. Dickstein. I can see the argument that they came here illegally, say, on June 4, 1921.

Mr. Bacon. Since the first quota law.

Mr. Dickstein. Yes; but they are otherwise fit; they are not bolsheviks; are not anarchists, and do not believe in the destruction of this Government, and they have married and have American children. What are you going to do with them?

The Chairman. Why, give them a clean bill of health and let them tell all the rest of their relatives back home how to get in the same way.

Mr. Dickstein. I am only trying to get the information.

The Chairman. Well, you have got it.

Mr. Dickstein. You have given it to me.

Mr. Robe Carl White. I think the circumstances of each case should govern. There are some cases in which I think an injustice would be done to aliens who are illegally in this country if we deported them. I know all along the border, in the sparsely settled districts, we have run across cases where men residing near the border have sold their belongings and come across, there was no immigration officer within many miles of them, and they drove across, and later they were picked up in the United States. There was no intention on the part of the alien to evade our laws. There are some few instances of that kind where it seems to me an injustice would be done if they were deported. I am, however, personally opposed to Congress passing a blanket law legalizing the entry of all aliens who came into this country prior to any given date.

Mr. Dickstein. Prior to June 3, 1921?

Mr. Robe Carl White. I would be opposed to that, for this reason, that I think every case should be investigated, and I would much prefer that you give authority to some one to legalize their entry, after investigation.

Mr. Dickstein. How about the Commissioner of Immigration, or the Department of Labor?

Mr. Robe Carl White. I think the Commissioner General of Immigration would be the proper man, of course, in whom to lodge that discretionary authority.

Mr. Golder. When you deport an alien, is it necessary to make some arrangement with the country from which he came?

Mr. Robe Carl White. Only to secure passports.

Mr. Golder. Do you ever have any difficulty in securing the approval of the country to which you intend to send him?

Mr. Robe Carl White. Oh, yes; we have questions arising all the time. We have two or three aliens in custody now who have been in custody for some time, waiting passports, because the country to which they are going refuses to issue the passport on the ground they have no record of his having been born there. We have a little child now—I have forgotten its affliction—but it is a mandatory deportation case, so far as the deportation law is concerned. The father is a naturalized citizen of the United States. The child was admitted temporarily several years ago; has been here ever since,

EXHIBIT 12
Page 21 of 35

and now the laws of the country of its nativity—I think it is Poland—is such that when the father became a naturalized American citizen the child expatriated itself, and so it refuses to take her back. Under Polish laws the child is now an American citizen, and, under our laws, it is still a Polish citizen.

Mr. GOLDER. What do you do in those cases?

Mr. ROBE CARL WHITE. Well, we do not know what to do.

Mr. VINCENT. Well, is it not a fact, to be perfectly truthful about it, that the United States can not do anything about a case of that kind?

Mr. ROBE CARL WHITE. I do not know, but I am inclined to believe there is nothing we can do. I do not know.

Mr. BOX. With reference to those cases of aliens that are held in custody, the Government pays the expenses of those aliens, does it not?

Mr. ROBE CARL WHITE. Yes, where we pick them up under a deportation order.

Mr. BOX. And the ones who are to be deported, if you had to hold them six months or a year, the cost of deporting is then very much greater than if they were deported promptly?

Mr. ROBE CARL WHITE. Oh, yes indeed.

Mr. BOX. And if you had had the funds to deport those aliens immediately upon arrest, the expense would have been very much less than now?

Mr. ROBE CARL WHITE. Yes. The natural flow of deportation should continue, and it is continuing on those we are actually taking in custody. You understand, we use every method we can to avoid detention expenses.

Mr. BOX. Have you any idea now how many remained in custody on the 1st of July, this fiscal year?

Mr. ROBE CARL WHITE. I have not any figures. Mr. Wagner reminds me it was something like one thousand. You understand, Congressman, that our officers, immediately on receiving the order to cease all deportations, permitted every alien possible, to leave the jails under bond or recognizance, in order to avoid detention expense.

Mr. BOX. By that method you reduced it to what is now estimated as 1,000?

Mr. ROBE CARL WHITE. That is my recollection. I can give you the figures later if you want.

Mr. BOX. Can you give us any information about what the average cost is—I know you can not do it accurately, but the average cost—of maintaining those deportees, per man?

Mr. ROBE CARL WHITE. About 90 cents per day.

Mr. BOX. And if you had 1,000 on hand, then you would have about $900 a day expense on that account?

Mr. ROBE CARL WHITE. Yes. There is another point. In our published records, as to the number deported, no account is taken of the number picked up along our borders, who are given the opportunity of returning voluntarily. In one district last year three thousand one hundred and some odd were permitted to return in this way.

The CHAIRMAN. In what district?

Mr. ROBE CARL WHITE. In the San Antonio district.

EXHIBIT 12
Page 22 of 35

The Chairman. Did they go back to Mexico?

Mr. Robe Carl White. They went back to Mexico.

Mr. Box. To what country did they go?

Mr. Robe Carl White. Mexico. They were all Mexicans. We do not permit European aliens from Mexico to return to Mexico voluntarily.

Mr. Box. I want to get that because the committee has some matters pertaining to that very phase of the question.

Mr. Robe Carl White. Yes.

Mr. Box. How many did you say went back voluntarily from San Antonio to Mexico last year?

Mr. Robe Carl White. It was over 3,000.

Mr. Box. Over 3,000 that you had ordered deported, and voluntarily returned?

Mr. Robe Carl White. No.

Mr. Box. Subject to deportation?

Mr. Robe Carl White. They were Mexicans, apprehended and subject to deportation and, rather than be detained, expressed a preference to return of their own will. They signed releases and waivers and we carted them back.

Mr. Box. Do you actually see that they go back over the border?

Mr. Robe Carl White. Oh, yes; every one is put across and delivered to the Mexican authorities.

The Chairman. That is at Federal expense?

Mr. Robe Carl White. Yes.

Mr. Box. Can you give any idea of the expense, roughly, of sending back that 3,000?

Mr. Robe Carl White. No. The service maintains large trucks, and when these men are apprehended, they are taken back by the truckload.

Mr. Box. You carry them back across the Rio Grande in truckloads, then?

Mr. Robe Carl White. Yes; and they are delivered to Mexican authorities.

The Chairman. A sort of holiday trip. [Laughter.]

Mr. Bacon. In addition to the 32,000 Mexicans that came in legally for permanent residence last year, how many came in illegally; have you any idea—a rough estimate?

Mr. Robe Carl White. No. That would be the wildest kind of a guess, but I think I am safe in saying since the establishment of the border patrol 75 per cent of alien smuggling across the Mexican and Canadian borders has been stopped.

Mr. Bacon. Can you tell me how many Mexicans you deported last year?

Mr. Robe Carl White. I have not the figures, but they are given in the Commissioner General's annual report.

Mr. Bacon. That figure would not show, however, the number of Mexicans who were politely turned back?

Mr. Robe Carl White. No; it would not.

Mr. Bacon. The figures of those turned back are not in your annual report, are they?

Mr. Robe Carl White. No.

Mr. Bacon. You say there were 3,000 from the San Antonio district. How many are there for the El Paso border?

EXHIBIT 12
Page 23 of 35

Mr. ROBE CARL WHITE. I haven't the figures in my mind now, as to the entire Texas border, but the number is quite large in both the El Paso district and the California district. We have had some trouble in the California district. They are tightening upon the Mexican side as well as on the American side and there has been some objection to our returning Mexicans under a voluntary procedure.

Mr. WILSON. Now, what does he do? When you drive a truck load up to the consulate, does he refuse to receive them?

Mr. ROBE CARL WHITE. No.

Mr. WILSON. But he simply objects to it in words?

Mr. ROBE CARL WHITE. No. I remember only one objection being made, and that was in the California district. We are having quite a little difficulty in the Southern California district from our own people, who claim the law is being enforced too stringently. It seems to come principally from chambers of commerce along the border.

Mr. BACON. In other words, the people down there are looking for cheap labor?

Mr. ROBE CARL WHITE. Well, they are like the most of us, I guess; they want the law enforced when it does not affect them personally.

Mr. VINCENT. That is a uniform proposition.

Mr. BACON. Can you give the committee any information to show the number of Mexicans handled by the border patrol—not only those deported, but those turned back?

Mr. ROBE CARL WHITE. Yes, I think we have those figures. I am not sure we have them with us.

Mr. BACON. I understand.

Mr. ROBE CARL WHITE. For the last year, Mr. Wagner tells me, the persons questioned, or investigated, for the entire border, that is, for both borders, was 1,252,379; the persons detained temporarily, 9,321; persons referred to local immigrant inspector for further investigation, 14,078; persons apprehended, or assistance rendered in their apprehension, for violation of customs regulations, 1,185; aliens arrested involving seizures of vehicles or contraband goods, 536; aliens arrested on warrants, 2,847; aliens attempting to enter the United States turned back without resorting to warrant procedure, 14,711; alien smugglers captured, 331; smuggled aliens captured, 4,641; miles patroled (on foot, by vehicle, and by boat), 2,288,000.

Then in the inspection of trains, motor vehicles, etc., freight and passenger trains examined were 104,094; passengers on same, estimated, 1,553,500; automobiles and motor busses stopped and examined 418,128; boats and other means of transportation stopped and examined, 33,485. The estimated number of passengers on these automobiles, motor busses, boats, and other means of transportation were 1,543,400.

The seizures, including assistance given other officials, for violation of customs, prohibition, and immigration laws, were, automobile, 253; boats and other conveyances, 195. The value of these vehicles, including the seized contraband goods, estimated, was $475,672.

The special investigation made, such as requests by immigration officers to establish responsibility and willingness to support rela-

EXHIBIT 12
Page 24 of 35

tives applying at various ports of entry for admission into the United Statets, were 2,177.

Mr. BACON. Now, what is the total force of your border patrol?

Mr. ROBE CARL WHITE. Four hundred and ninety-seven.

Mr. BACON. Four hundred and ninety-seven on the Mexican and on the Canadian borders?

Mr. ROBE CARL WHITE. Yes, sir.

Mr. BACON. On both borders?

Mr. ROBE CARL WHITE. Yes. That is the entire force. That does not mean that many men are actually patrolling it. The actual number of officers on the border patrol roll at present is 497, with a total annual salary obligation of $865,000. This leaves only $135,000 to pay for all other expenses incident to the operation and maintenance of the border patrol, which is insufficient. In order to maintain the present forces during the remainder of the year and to take care of the incidental expenses, an additional appropriation of at least $250,000 is necessary. That is a memorandum I wrote to the Secretary.

Mr. BACON. Could we have that memorandum made a part of our record, as far as it affects the border patrol?

The CHAIRMAN. We would be very glad to have that.

(The following memorandum was submitted for the record by the Assistant Secretary:)

### IMMIGRATION BORDER PATROL

The actual number of officers on the border patrol at present is 497, with a total annual salary obligation of $865,000. This leaves only $135,000 to pay for all other expenses incident to the operation and maintenance of the border patrol, which is insufficient. In order to maintain the present force during the remainder of the year and take care of the incidental expenses, an additional appropriation of at least $250,000 is necessary.

In addition, the bureau believes that at least 200 patrol officers should be added to the force. In order to do this, it would require a further appropriation of $200,000 over and above the stated amount of $250,000, making a total of $450,000, and if the border patrol is to function at all in a reasonable manner, a supplemental appropriation in the latter amount should be granted to this branch of the service.

### CHARACTER OF WORK

| | Number |
|---|---|
| Persons questioned or investigated | 1,252,379 |
| Persons detained temporarily | 9,321 |
| Persons referred to local immigrant inspector for further investigation | 14,078 |
| Persons apprehended (or assistance rendered in their apprehension) for violation of customs regulations | 1,185 |
| Aliens arrested involving seizure of vehicles or contraband goods | 536 |
| Aliens arrested on warrants | 2,847 |
| Aliens attempting to enter the United States turned back without resorting to warrant procedure | 14,711 |
| Alien smugglers captured | 331 |
| Smuggled aliens captured | 4,641 |
| Miles patrolled (on foot, by vehicle, and by boat) | 2,288,000 |

### INSPECTION OF TRAINS, MOTOR VEHICLES, ETC.

| | |
|---|---|
| Freight and passenger trains examined | 104,094 |
| Passengers on same, estimated | 1,553,500 |
| Automobiles and motor busses stopped and examined | 418,128 |
| Boats and other means of transportation stopped and examined | 33,485 |
| Passengers on above | 1,543,400 |

EXHIBIT 12
Page 25 of 35

**24**              DEPORTATION

SEIZURES (INCLUDING ASSISTANCE GIVEN OTHER OFFICIALS) FOR VIOLATION OF
CUSTOMS, PROHIBITION, AND IMMIGRATION LAWS

|  | Number |
|---|---|
| Automobiles | 253 |
| Boats and other conveyances | 195 |
| Value of above, including seized contraband goods, estimated | $475,672 |
| Special investigations made, such as requests by immigration officers to establish responsibility and willingness to support relatives applying at various ports of entry for admission to the United States | 2,177 |

Mr. GOLDER. Did I understand you to say, in your judgment, there are about 250,000 aliens now in the United States deportable under the existing laws?

Mr. ROBE CARL WHITE. That is the judgment of the district directors, in all of the districts, which meets with my approval. I believe they are conservative in that.

Mr. GOLDER. I understand Mr. Hull to say that the average cost of deportations is about $89; is that correct?

Mr. ROBE CARL WHITE. Yes; $87.

Mr. GOLDER. That was the average, I understood. Now, does that include the cost of office work connected therewith?

Mr. ROBE CARL WHITE. Oh, no.

Mr. GOLDER. Or is it merely the cost of transportation?

Mr. ROBE CARL WHITE. No.

Mr. BACON. It does not include the cost of investigating and making the surveys?

Mr. ROBE CARL WHITE. It does not include what I call the overhead—the salaries, office expenses, etc.

Mr. GOLDER. Adding, then, the cost of investigation and other incidental expenses, it would cost close to $25,000,000 to deport those now subject to deportation under existing law?

Mr. ROBE CARL WHITE. Something like that. It would extend, of course, over a period of years; you will not get them all at one time.

Mr. BOX. Now, then, this 14,000 that you say returned voluntarily and you carried back, you carried them to the border and there unloaded the truck?

Mr. ROBE CARL WHITE. We turned them over to the Mexican officials.

Mr. BOX. But you have no method, then, of telling what became of them, after they got across the border?

Mr. ROBE CARL WHITE. No.

Mr. BOX. And if they were smuggled back into the country, they would have to be detected?

Mr. ROBE CARL WHITE. Oh, we have picked up some who have been in before, but the number is not large.

Mr. VINCENT. Are you correct in saying you turned them over to the Mexican consul?

Mr. ROBE CARL WHITE. The Mexican immigration officials at the port. They all go to some port of entry. Most of those were turned over at Laredo, Eagle Pass, and Brownsville, in the Texas territory.

The CHAIRMAN. Now, I want to ask you in regard to the overseas deportations under a limited policy. I assume you first look after those who have served sentences for crime?

Mr. ROBE CARL WHITE. Yes; we try to empty the institutions.

EXHIBIT 12
Page 26 of 35

The CHAIRMAN. And you have a pretty good system of keeping in touch with the State officials?

Mr. ROBE CARL WHITE. We have direct contact with some of them and rely upon the State officials to advise us. Some of the States have laws requiring State officials to notify the Immigration Service of all aliens confined in their institutions; others do not.

The CHAIRMAN. Now, then, your next line: Is that likely to be the alien insane?

Mr. ROBE CARL WHITE. Well, they are generally in the institutions, you know.

The CHAIRMAN. And you clean out the institutions first?

Mr. ROBE CARL WHITE. Yes.

The CHAIRMAN. Then you take care of the most pressing cases that come under the observation of your inspectors?

Mr. ROBE CARL WHITE. Yes.

Mr. FREE. Is the literacy test being applied strictly along the Mexican border now?

Mr. ROBE CARL WHITE. Much more so than ever before in the history of immigration. That is one of the reasons for the great decrease in the number of Mexicans coming in legally through our ports. That is one of the things they object to all along the border having the literacy test enforced.

Mr. BOX. They object to the head tax too, do they not?

Mr. ROBE CARL WHITE. Well, I have never heard of an objection coming from our people with reference to the head tax, but it may come from some of the Mexicans themselves.

Mr. BACON. Who is it that objects—the large employers of labor?

Mr. ROBE CARL WHITE. No, I have never had any objection from the large employers of labor. It is mostly from the chambers of commerce, whoever they represent.

Mr. FREE. I can answer that question, Mr. Bacon. Take the beet-sugar people, for instance: They are very anxious to get Mexicans to work in the beet fields.

Mr. BACON. I suppose that is true of the silver and lead mines?

Mr. FREE. Not so much so. I am speaking now of California. But there is a concerted effort on behalf of most of the beet-sugar factories to get in Mexicans to do that work. I understand in the old days they used to bring them in and then pass them back, and there was sort of a string coming and a string going.

Mr. ROBE CARL WHITE. Mr. Chairman, I would like to ask if it is possible or is it advisable for a section to be added to your deportation law giving the Immigration Service authority to forfeit and use vehicles captured from smugglers of aliens.

The CHAIRMAN. Yes, and I think, if we are not able to prepare a deportation law quickly, that should be sent in as a separate resolution.

Mr. ROBE CARL WHITE. I would be glad to have this done. The Customs Service, the Prohibition Service, can use automobiles seized by their service. We are unable to use a one; we can not even pay for gasoline to run one of them, and the result is that we are confined to the sum of $80,000 for care and maintenance and purchase of vehicles, which is entirely inadequate to properly equip the border patrol.

EXHIBIT 12
Page 27 of 35

DEPORTATION

Mr. BACON. I should think even General Lord could understand that 475 men could not patrol 6,000 miles of border on foot.

Mr. ROBE CARL WHITE. Here is the problem—I want to be fair: The Customs Service are probably asking General Lord, or the Budget Committee, for money to equip and keep a patrol in the same district in which you are keeping an immigration patrol. I happen to know that is true, and I think the time is coming when it will be necessary for Congress to place control of the border patrol in some one place and not have a dual patrol. In my opinion the entire border outside of ports of entry at least should be placed under the Commisioner General of Immigration. Almost any man can detect a case of liquor or narcotics, or goods of any kind, and turn them over to the proper authorities, but it is only the trained immigration officer who can decide whether a person has the right to enter the United States. And without a trained man to deal with the human traffic across our borders you will soon run into many difficulties.

Mr. BACON. It is much cheaper to stop the smuggling of aliens at the border than it is to send them back after they once get in?

Mr. ROBE CARL WHITE. Oh, yes.

Mr. BACON. In other words, to increase your border patrol is in the interest of real economy?

Mr. ROBE CARL WHITE. Yes.

Mr. DICKSTEIN. How many Mexicans came in legally to the United States in 1925?

Mr. BACON. Thirty-two thousand plus immigrants for permanent residence.

Mr. DICKSTEIN. Legally came in?

Mr. BACON. Legally; absolutely.

Mr. WHITE. As I understood you, you say there have been 14,000 apprehended on the Mexican border, who had elected to go back without proceedings?

Mr. ROBE CARL WHITE. On both borders. Very few on the Northern border.

Mr. WHITE. Have you any information which you could submit to the committee, even approximately, of how many of these Mexicans entered surreptitiously to perform seasonal work, or for other purposes, and voluntarily returned, or stayed until they were apprehended or investigated?

Mr. ROBE CARL WHITE. I do not believe, Mr. White, I have any information on that. We, of course, have not endeavored or attempted to interfere with legitimate business along the border any more than we have to.

Mr. WHITE. Are they mainly laborers who elect to go back without proceedings, as a rule?

Mr. ROBE CARL WHITE. I judge so. But, of course, I can not say without referring to our records.

The CHAIRMAN. Now, I want to ask Mr. Hull a question, and that is this: Have you had occasion to deal to any extent with persons admitted under a bond—visitors whose time has expired and who who have to go out?

Mr. HULL. Oh, we have that, of course, very often.

EXHIBIT 12
Page 28 of 35

The CHAIRMAN. Is that going to require inquiry and investigation by the Immigration Service?

Mr. HULL. I think the time will come, probably, that we will have to have a little more efficiency, but we have a fairly efficient system. That, of course, is taken care of by the different districts. You know the country is divided into 35 districts.

The CHAIRMAN. It means ultimately an enlargement of the activities of the Immigration Service with a view to enforcing embarkation, in some cases?

Mr. HULL. I presume there will have to be some more efficient systems adopted, perhaps. but I think it is fairly efficient now, as far as the giving of bonds at the port for coming in as tourists or visitors is concerned.

The CHAIRMAN. Have we proceeded far enough so that you have had to proceed to enforce the collection of bonds?

Mr. HULL. Oh, yes. We have to proceed to enforce the collection of bonds very often.

The CHAIRMAN. In the case of visitors?

Mr. HULL. In the case of visitors or tourists, or something. I do not know exactly which they were. I say, "very often;" I do not mean a whole lot of cases, but they do come up, where we have to breach the bond.

The CHAIRMAN. Now, let us see what the procedure is: After you forfeit the bond. do you then proceed to look for the person who was admitted as a visitor and who has forfeited his bond?

Mr. HULL. We certainly do. We try to apprehend them. They are sometimes out of the country. We have all angles to that. We have cases very often where they claim the man went out, and he has gone, and the bond has been fulfilled; but we usually breach the bond, just the same, because we have no evidence.

The CHAIRMAN. What I am trying to get is whether or not the forfeiture of bonds for visitors will enlarge the necessity for deportation, as time grows on.

Mr. HULL. Of course, that depends; I think, perhaps, when they find out that the bond will be enforced thoroughly, they will probably protect themselves by complying with the bond.

The CHAIRMAN. It has not become an acute matter as yet in deportation?

Mr. HULL. Oh, no. We can handle the bond question. I, myself, think it is a very good way to protect the Government against aliens staying here. I wish we had authority in some cases where we do not have authority, especially in the case of students.

The CHAIRMAN. To exact bonds?

Mr. HULL. To exact bonds. I think you will have to come to that.

Mr. BOX. In what cases and under what circumstances can you do it now, in the cases of visitors and students?

Mr. HULL. As I understand it, you can not exact a bond for a student. You can exact a bond for people who are liable to become a public charge at the ports.

Mr. BOX. You do not do that, though, as to ordinary visitors and commercial people, and people of that class?

Mr. HULL. Oh, certainly not; not ordinarily. It is only when suspicious parties are coming here and liable to become a public

EXHIBIT 12
Page 29 of 35

charge, or liable to try to stay in the country, or something like that. Then the ports usually protect themselves by exacting a bond.

The CHAIRMAN. Now, I want to ask you a question on an entirely different matter. Do you know how it comes that the immigration inspectors are started on a base pay of $140 per month? While the customs inspectors are started on a base pay of $150 a month?

Mr. HULL. No, sir; I do not know. I would like to know.

The CHAIRMAN. Has the department made any recommendations that would result in correcting that inequality?

Mr. HULL. As I understand it, they have, but they have not been able to do it.

The CHAIRMAN. Do you know with what result?

Mr. HULL. They have not been able to do it.

Mr. BACON. Who has the power to correct that?

Mr. ROBE CARL WHITE. The Secretary. Our entrance pay for immigrant inspectors is $1,860, now.

The CHAIRMAN. Has it been raised?

Mr. ROBE CARL WHITE. Yes.

Mr. WAGNER. I do not know about the customs, but I think some misunderstanding exists from the fact our officers received the $240 bonus in addition to their base pay prior to July 1, 1924, and a great many inspectors said they got $1,500 when they were getting $1,740, or something like that. But since July 1, 1924, $1,860 has been the entrance salary for immigration inspectors, and $1,680 for patrol inspectors.

Mr. BACON. The Secretary of Labor could increase the base pay?

Mr. WAGNER. He can.

Mr. BACON. But he would have to get the approval of the Budget?

Mr. WAGNER. No, sir.

Mr. ROBE CARL WHITE. No, sir; but he would have to get the money to pay them.

Mr. VINCENT. And it is the failure to get the money to pay them that has prevented you from increasing the base pay?

Mr. ROBE CARL WHITE. We have not been able to make promotions, except in individual cases, for two years, and we have many men in the service who ought to be promoted, in justice to them and to work they are doing.

The CHAIRMAN. Will you place in the record, at this place, if you can ascertain, the base pay of the various inspectors in the various services of the United States; that is, in the customs, immigration, meat inspection, and any others?

Mr. ROBE CARL WHITE. I think I can do that.

(The information above called for is as follows:)

|  | Per annum |
|---|---|
| Immigration patrol inspector | $1,680 |
| Immigrant inspectors | 1,860 |
| Customs patrol inspectors | 1,700 |
| Deputy collector inspectors | 1,700 |
| Quarantine inspectors, Department of Agriculture | 1,860 |

Mr. WHITE. If I understood you right, Mr. Hull, you said part of the $600,000 supplemental appropriation would be applied to patrol expenses, and I would like to ask you if sufficient of that $600,000 supplemental appropriation could be applied to deportations; that is, to the strictly deportation work, to keep your work current for the balance of the year?

EXHIBIT 12
Page 30 of 35

Mr. HULL. Why, no, not current; you can not do it.

Mr. WHITE. Well, how much would it lack?

Mr. HULL. Well, we have asked for $250,000 more than they gave us, and that would not keep us up to what we might be doing; but it would probably be as near as we can figure what we can use efficiently. You can try to spend too much money.

Mr. WHITE. Yes.

Mr. HULL. If you want to.

Mr. WHITE. Without anticipating any raise in the pay of your inspectors and agents, would you then be able to apply enough of the $600,000 supplemental appropriation to the distinct work of deportation, as you have outlined it here, to keep the work reasonably current?

Mr. HULL. No, sir.

Mr. WHITE. You could not?

Mr. HULL. No, sir.

The CHAIRMAN. I want to ask you this: In your opinion, would a sufficient sum, to take care of double the number of deportations we now have, effect a saving in the long run to the Government, through reducing activities in the Federal courts for the prosecution of aliens for liquor violations and narcotic violations and criminal proceedings of every kind?

Mr. HULL. I think that the deportation of these people in an economic proposition and that it should be done as fast as it can be done efficiently.

The CHAIRMAN. It is the place to start, for real economy, is it not?

Mr. HULL. Yes; it is the place to start for real economy. As to whether if you would spend a million dollars in deporting, you would save that in court cases, I would not want to go on record.

The CHAIRMAN. Now we have one letter right to the point. Here is a man who writes from El Paso, on the 6th of January, and says:

With great bunches of men standing in front of the entrance to the Southern Pacific yards here this a. m. wanting work, and this is one day out of the year, with 86 per cent of the defendants in Federal court here aliens, of the bootleg variety, and the thief kind, with 76 per cent of the defendants in the several District courts here aliens, of the bootleg class and criminal kind—

And then he goes on to make an appeal for effective deportations that will reduce the activities in the courts, and I believe he is giving the key as to where we should begin to spend money to save the expansion and congestion in other activities in the Government.

Mr. HULL. I think he is right.

Mr. BOX. I have some letters, Mr. Chairman, just like that.

The CHAIRMAN. I am going to put this letter in the record.

(The letter above referred to is as follows:)

El Paso, Tex., *January 6, 1926.*

Hon. ALBERT JOHNSON,
   *Washington, D. C.*

DEAR SIR: I am writing this in defense of restricted immigration. Why leave the back door of Mexico open? To leave the back door of Mexico open, of itself will paralyze the European quota law, by virtue of the fact that they come to Mexico when they feel like it and bootleg themselves in the United States when they get hungry.

With great bunches of men standing in front of the entrance to the Southern Pacific yards here this a. m. wanting work, and this is one day out

EXHIBIT 12
Page 31 of 35

of the year; with 80 per cent of the defendants in Federal court here aliens, of the bootlegged variety and the thief kind; with 76 per cent of the defendants in the several district courts here aliens of the bootlegged class and criminal kind, 86 bales of cotton was ginned off of my farm last year. I have a valley farm 20 miles from El Paso.

With 67 American families coming into the Mesilla Valley during 1925, all farmers, all bought land and were living on it January 1, 1926, the foreigners are being shipped out bodily; I beg to suggest that more Americans be allowed to come here, instead of the scoff and scum, the mongrel, the bootlegger element, from Mexico, which is composed of the riff raff of southern Europe.

As for a labor shortage, I did not have any trouble last year; I have never had any trouble with the labor question. I could get 10 times the labor that I want, and get it in 10 minutes at that, with great bunches of men standing around all over this town, any day and every day the year around.

With hundreds of Americans here staggering under the enormous burden of taxation—the limit, it can not be raised any more—trying to Americanize these aliens against their will. I have just made a call. It was a two months old baby. It had inherited syphilis and will die. It belongs to an alien woman. Another evidence of the cross section of the aliens that come here.

Put Mexico under the rule, certainly so, and deport all undesirable citizens; forfeit all naturalization papers obtained through fraud, and then two of the three district judges here can go on leave of absence for an indefinite time; the Federal judge can go fishing for six months, if he likes. The courts here are waterlogged with alien business. Take them out of here; send them home; we can cut taxes in 30 days and a 90 per cent perfect enforcement of the eighteenth amendment will be possible in 24 hours.

The citizens in the lower valley are fighting the Hindoo now.

Very truly yours,

———————

The Chairman. Now, when you talk of deporting 250,000 persons (and I assume that number does not contemplate those who have come here in the long years past without certificates of arrival), I assume a deportation, we will say, of 25,000 a year, of the flagrant cases, would act as a deterrent and reduce Federal activities along all other lines?

Mr. Hull. Will you allow me to suggest I think Mr. White, in his answer, might have been misunderstood. I think he was correct; I think the surveys made by the district directors brought forth this fact. When I asked for it, I divided it into two classes; those that came in before June 3, 1921, and those that came in since June 3, 1921.

The Chairman. Yes.

Mr. Hull. And the 250,000 Mr. White mentioned applied to those that apparently had come in since June 3, 1921.

Mr. Robe Carl White. I did not know that.

Mr. Box. That did not apply to the great number back of that date?

Mr. Robe Carl White. No.

Mr. Hull. Now, I have been quoted, and I think every member of the Department of Labor has been quoted, as to the number of aliens here who came in before June 3, 1921. That is a very important question, and I have noticed by some of the questions you are interested in that, and what we are doing with it. Now, nobody knows how many there are.

Mr. Box. You mean those that came illegally?

Mr. Hull. Yes.

EXHIBIT 12
Page 32 of 35

Mr. Box. All of them?

Mr. Hull. No; they did not come legally, they are illegally in this country.

Mr. Box. That is what I mean—illegally.

Mr. Hull. Illegally in this country, but it is a technical question.

Mr. Box. About what is that number, as a rough outline?

Mr. Hull. Nobody knows. The only basis that we have, so far as we know, for the computation is, in the applications for reentry permits, about 20 per cent, so far, have been rejected, if I remember rightly, for lack of verification at the ports or wherever they filed. Now you apply that on through the number of aliens that we know are in the country, and you can make a rough guess and it will run you over 1,300,000. That, probably, is too many, but it may be right. It may be less; we do not know.

The Chairman. That would apply to all the people who are here and unable to prove legal entry into the United States?

Mr. Hull. And the payment of the head tax and inspection.

Mr. Box. That is all prior to June 3, 1921.

Mr. Hull. They came in before June 3, 1921. Now those people are all kinds. Some of them are the nicest people in the world. We have those cases every day, and I have on my desk now a letter from a man who has been voting right along, illegally in the country.

Mr. Bacon. How did he become a citizen?

Mr. Hull. I do not know.

Mr. Bacon. Or didn't he become a citizen? Perhaps he was voting without becoming a citizen.

Mr. White. I would like to answer that question. We had a case in my neighborhood of a German who had come to this country possibly 45 or 50 years ago, possibly longer; his children were born here, but it transpired, during the war, that he had neglected to take all the steps necessary to become a citizen. He had been voting for years and years, was counted as a citizen in the general estimate of the people; his children were born here, but during the war he was apprehended and he was compelled to go to Kansas City, 250 miles, to establish the fact and circumstances. That answers the question.

The Chairman. And, further, until very recently, quite a number of States permitted them to vote, on taking out their first papers. Now there is only one State that does that.

Mr. Robe Carl White. Of the total number of permits, since we had a law permitting us to grant them, 178,195 have been refused because of failure to verify their landings.

Mr. Bacon. That is a permit for what?

The Chairman. A permit to go out of the country and return.

Mr. Robe Carl White. Now, then, I want to put one more item in the record. The revenue derived by our Department for the issuance of permits, to date, is $360,920.11.

The Chairman. To the end of the fiscal year, or to date?

Mr. Wagner. That is up to date, December 31, 1925.

The Chairman. With about 20 per cent of the applicants unable to secure those permits to travel abroad and return, because they could not prove legal entry into the country?

78672—26——3

EXHIBIT 12
Page 33 of 35

DEPORTATION

Mr. Rose Carl White. Yes; unable to get permits, and yet we have received three hundred and sixty odd thousand dollars from that source.

The Chairman. Has you department got together and discussed the advisability of increasing the head tax? Has that ever been discussed down there?

Mr. Rose Carl White. Only incidentally.

The Chairman. I believe that is all. I am sorry we were unable to give Mr. Hull more time.

Mr. White. There is one question I would like to ask. Some allusion has been made to the making of a survey or appraisal of the number of deportable aliens in certain districts—the total number. That would include those who had not been taken into custody, and you used the word "survey" in speaking of the reports, as I understood you, I think, of your superintendents or directors, in certain districts, and I want to ask you, Mr. Hull, if you think it would be possible to make the duty of making that survey supplemental to the duties of your present agents in those districts, so as not to require a large number, or any number, for that matter, of additional employees?

Mr. Hull. If you did so with any efficiency, you would have to provide the money. You can not do it without providing the money. Now, we say "survey"; it is more an estimate by the districts.

Mr. White. Yes.

Mr. Hull. And it varies. You can say it was not accurate, it was nothing more than a mere approximate guess. Now, if you make a survey, you have to provide the money for making that survey. We have no men at the present time to do the work. Our personnel is cut to the very bone and I want to reiterate what Mr. White said, that they are very much underpaid and very much overworked.

Mr. White. It would occur to most any mind that those agents are engaged in that very work now, the apprehension of those men on complaint or evidence furnished, and would not these deportable alens come under their notice constantly from day to day?

Mr. Hull. No; not in a great district like we have; they do not come under their notice.

Mr. Box. You did not employ any extra men to make this survey; it was all done about the time you had in mind. I understand?

Mr. White. Yes; I understand.

Mr. Hull. Simply a request from the office, to send us the information they have. I sent out the request myself, for my own information. I do not place a great deal of reliance on it, I want to say, for fear anybody starts up any scare stories about our going out and trying to deport a lot of people who have been here. We have not been trying to deport anybody who came in before June 3, 1921, unless there is good cause, but there are a lot of people in this country who ought to have their records straightened out.

Mr. Dickstein. How about those who came here prior to June 3, 1921? They can not become citizens?

Mr. Hull. They can not until their records are straightened out. That is one reason we are asking for a registration law, so that those aliens can be taken care of and be registered.

EXHIBIT 12
Page 34 of 35

Mr. DICKSTEIN. Why not legalize those who came here prior to June 3, 1921, if they are otherwise admissible, if they are of good moral character, and fit in with the standards of the United States and would make good American citizens?

Mr. HULL. As we come to them, we are trying to take care of them ourselves; but, as Mr. White has said, it would be the mistake of mistakes for Congress to try to pass a blanket act, because you do not want to legalize a lot of people who ought not to be here.

Mr. DICKSTEIN. That blanket act, or any act, no matter what the act should be, should have some qualification giving power to the Secretary of Labor, that if that person who came here illegally was otherwise fit and admissible, he could be permitted to stay.

The CHAIRMAN. That is section 1 of the proposed registration bill that will be before the committee in the course of time, to find and provide a place where those domiciled in the country would have a place to permit them to naturalize and allay the fear there would be a gigantic deportation.

Mr. HULL. I think you can do no better work, in my opinion, than to straighten that matter out.

Mr. DICKSTEIN. I think so.

The CHAIRMAN. We are very much in sympathy with the suggestion you made, and I think the committee will approve an effort to bring up, immediately before the appropriation act, a resolution that would authorize the use of seized vehicles.

Mr. BOX. I understand that is done in other services now. I think Congress took some action in reference to that at the last session.

Mr. HULL. It has been done.

The CHAIRMAN. It went out of one of the bills passed this year on a point of order, for the reason it had been put in irregularly, and I think this committee should endeavor to pass a resolution immediately to take care of that.

Mr. ROBE CARL WHITE. We asked the Budget committee to put it in the appropriation act, but they said it should be separate legislation.

The CHAIRMAN. We will now adjourn until 10.30 o'clock to-morrow morning.

(Thereupon, at 12 o'clock noon, the committee adjourned until to-morrow, Wednesday, January 13, 1926, at 10.30 o'clock a. m.)

EXHIBIT 12
Page 35 of 35