# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **-vs-** | ) | **Case No. CR-21-187-C** |
| | ) | |
| **JOSE LUIS AMADOR-BONILLA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Respectfully submitted,

ROBERT J. TROESTER
Acting United States Attorney

STEVEN W. CREAGER
BRANDON T. HALE
Assistant U.S. Attorneys
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102

## Table of Contents

Page

Introduction ................................................................................................ 1

Facts ........................................................................................................... 2

Discussion................................................................................................... 2

   I.  Deferential, rational basis scrutiny is the appropriate level of scrutiny for due-process-based equal protection challenges to federal immigration laws. ......... 2

  II.  Even applying *Arlington Heights*, the motion to dismiss should be denied. ........... 8

     A.  The action being reviewed is the 82nd Congress' enactment of the Immigration and Nationality Act of 1952............................................. 8

     B.  Mr. Amador-Bonilla has failed to show that racial discrimination against Latinos was a motivating purpose for enacting § 1326.......................... 9

        1.  The INA's Impact................................................................. 9

        2.  The INA's Historical Background .............................................. 12

        3.  The Events Leading to the INA's Enactment and Its Legislative History ...................................................... 22

        4.  Departures From the Normal Decision-Making Process ............................ 25

     C.  Even if the 1952 Congress was motivated by discrimination against Latinos when it enacted § 1326, Mr. Amador-Bonilla is not entitled to relief because subsequent legislation shows that Congress would have enacted § 1326 without any discriminatory motivation. .................................. 25

Conclusion ................................................................................................ 29

Certificate of Service ................................................................................. 30

## <u>Table of Authorities</u>

Page

### Cases

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018) ................................................................ 12

*Amaya v. United States*,
   247 F.2d 947 (9th Cir. 1957) ...................................................... 18

*Brnovich v. Democratic Nat'l. Comm.*,
   141 S. Ct. 2321 (2021) ................................................................ 16

*City of Mobile, Ala. v. Bolden*,
   446 U.S. 55 (1980) ...................................................................... 12

*Democratic Nat'l. Comm. v. Hobbs*,
   948 F.3d 989 (9th Cir. 2020) ...................................................... 16

*Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ............................................................. 6, 11

*Dowell by Dowell v. Bd. of Educ. of Okla. City Pub. Schls., Indep Dist. No. 89*,
   8 F.3d 1501 (10th Cir. 1993) ........................................................ 8

*Fiallo v. Bell*,
   430 U.S. 787 (1977) ............................................................. 2–3, 6

*Fong Yue Ting v. United States*,
   149 U.S. 698 (1893) ...................................................................... 3

*Hampton v. Mow Sun Wong*,
   426 U.S. 88 (1976) ........................................................................ 3

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ...................................................................... 3

*Heller v. Doe*,
   509 U.S. 312 (1993) ...................................................................... 7

*Hunter v. Underwood*,
   471 U.S. 222 (1985) ...................................................................... 5

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ...................................................................................... 1, 3, 6

*Lem Moon Sing v. United States*,
   158 U.S. 538 (1895) .............................................................................................. 3

*Matthews v. Diaz*,
   426 U.S. 67 (1976) ........................................................................................... 3, 5, 6

*McCleskey v. Kemp*,
   481 U.S. 279 (1987) ........................................................................................ 12–13

*McGowan v. Maryland*,
   366 U.S. 420 (1961) .............................................................................................. 7

*Oceanic Navigation Co. v. Stranahan*,
   214 U.S. 320 (1909) .......................................................................................... 2–3

*Ping v. United States*,
   130 U.S. 581 (1889) .............................................................................................. 3

*Shaughnessy v. Mezei*,
   345 U.S. 206 (1953) .............................................................................................. 3

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ................................................................................... 1, 5, 6

*United States v. Alamosa Cnty., Colo.*,
   306 F. Supp. 2d 1016 (D. Colo. 2004) ........................................................... 18

*United States v. Anton*,
   683 F.2d 1011 (7th Cir. 1982) ............................................................................ 3

*United States v. Carrillo-Lopez*,
   ___ F. Supp. 3d ___, 2021 WL 3667330 (D. Nev. Aug. 18, 2021) ................ 6

*United States v. Gutierrez-Barba*,
   No. CR-19-1224-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021) .............. 4, 7

*United States v. Gutierrez-Gonzalez*,
   184 F.3d 1160, 1165 (10th Cir. 1999) ............................................................... 3

*United States v. Henry*,
   111 F.3d 114 (11th Cir. 1997) ............................................................................ 4

*United States v. Hernandez-Guerrero*,
   147 F.3d 1075 (9th Cir. 1998) ...................................................................... 4, 7

*United States v. Machic-Xiap*,
   ___ F. Supp. 3d ___, 2021 WL 3362738 (D. Ore. Aug. 3, 2021) ............................ 6, 25

*United States v. Morales-Roblero*,
   No. 3:19-mj-24442-AHG, 2020 WL 5517594 (S.D. Cal. Sept. 14, 2020) .................. 11

*United States v. Novondo-Ceballos*,
   No. CR-21-383-RB, 2021 WL 3570229 (D.N.M. Aug. 12, 2021) ........................... 4, 7

*United States v. O'Brien*,
   391 U.S. 367 (1968) .................................................................................. 4–5, 6, 17

*United States v. Palacios-Arias*,
   No. 3:20-cr-62, Doc. 37 (E.D. Va. Oct. 13, 2020) ....................................... 4, 7

*United States v. Rios-Montano*,
   No. CR-19-2123-GPC, 2020 WL 7226441 (S.D. Cal. Dec. 8, 2020) ...................... 6

*United States v. Titley*,
   770 F.3d 1357, 1359 (10th Cir. 2014) .......................................................... 7

*United States v. Wence*,
   No. 3:20-cr-27, 2021 WL 2463567 (D.V.I. June 16, 2021) .......................... 6, 11, 24

*Vigil v. City of Las Cruces*,
   119 F.3d 871 (10th Cir. 1997) ..................................................................... 18

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................................... *passim*

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) .................................................................................. 6

## Statutes

8 U.S.C. § 1326 ....................................................................................... *passim*

Act of Mar. 4, 1929,
   70 Cong. Ch. 690, 45 Stat 1551 (1929) .......................................... 9, 13, 14–17

Act of March 20, 1952,
   82 Cong. Ch. 108, 66 Stat. 26 (1952) .............................................. 13, 17–21

Act of May 26, 1924,
68 Cong. Ch. 190, 43 Stat. 153 (1924)............................................................. 13–14

Anti-Drug Abuse Act of 1988,
Pub. L. 100-690, 102 Stat. 4181 (1988) ........................................................ 27

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA),
Pub. L. 104-132, 110 Stat. 1214 (1996) ........................................................ 27

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IRIRA),
Pub. L. 104-208, Div. C., 110 Stat. 3009 (1996) ......................................... 27

Immigration Act of 1990,
Pub. L. 101-649, 104 Stat. 4978 (1990) ........................................................ 27

Immigration and Nationality Act of 1952,
Pub. L. 82-414, 66 Stat. 163 (1952) ....................................................*passim*

Immigration and Nationality Act of 1965,
Pub. L. 89-236, 79 Stat. 911 (1965) .............................................................. 26

Immigration Reform and Control Act of 1986 (IRCA),
Pub. L. 99-603, 100 Stat. 3359 (1986) .................................................... 26–27

Violent Crime Control and Law Enforcement Act of 1994,
Pub. L. 103-322, 108 Stat. 1796 (1994) ........................................................ 27

### International Agreements

Agreement Between the United States of America and Mexico Respecting the
Temporary Migration of Mexican Agricultural Workers,
56 Stat. 1759, 1942 WL 35711 (Aug. 4, 1942) ............................................ 17

### Congressional Reports

H. Rep. No. 99-682, 1986 U.S.C.C.A.N. 5649 .................................................... 26

S. Rep. No. 81-1515, at 1 (1950)..........................................................22, 23, 24

### Other Authorities

President's Commission on Immigration and Naturalization,
Whom We Shall Welcome (1953) ................................................................. 21

**Introduction**

On October 1, 2021, Jose Amador-Bonilla filed a motion to dismiss the indictment, alleging that 8 U.S.C. § 1326 violates due process because it was enacted with a discriminatory purpose.  Doc. 15 ("Mtn. to Dism.").  This Court should deny the motion for several reasons.  First, § 1326 withstands rational basis scrutiny—which is the appropriate level of scrutiny for federal immigration legislation, *see Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *Kleindienst v. Mandel*, 408 U.S. 753 (1972)—because securing the border is a legitimate government purpose and imposing criminal penalties as a deterrent for those who repeatedly violate that law is rationally related to that purpose.  Second, even applying the framework of *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), Mr. Amador-Bonilla fails to show that racial discrimination against Latinos was the motivating purpose of § 1326.  To the contrary, while there were undoubtedly racists in Congress and others used racially insensitive language, the historical records shows that Mexicans and those from the countries of Central and South America were treated equally or more favorably than anyone else by Congress.  Because Mr. Amador-Bonilla cannot satisfy his burden of showing that racial discrimination was a motivating purpose of enacting § 1326, he is not entitled to relief under the *Arlington Heights* framework even if it applies.  Finally, even if the burden shifted to the government, Congressional action since the INA, the laws of most other countries, and opinion polls show that Congress would have enacted § 1326 without any alleged racially discriminatory purpose.

1

## Facts

Jose Luis Amador-Bonilla has been removed from the United States on four occasions—in 2006, 2007, 2015, and 2019.  Doc. 1 at 1.  He reentered the United States again without receiving the consent of the Attorney General or the Secretary of Homeland Security to apply for admission to the United States and was discovered on or about June 18, 2021, within the Western District of Oklahoma.  *Id.*  The grand jury returned an indictment charging Mr. Amador-Bonilla with unlawfully reentering the United States, in violation of 8 U.S.C. § 1326(a) on July 22, 2021.  Doc. 1.  On October 1, 2021, Mr. Amador-Bonilla filed a motion to dismiss, alleging that § 1326 violated the equal protection component of the Fifth Amendment's Due Process clause.  Doc. 15.

## Discussion

Mr. Amador-Bonilla's motion fails for two main reasons.  First, rational basis scrutiny, not the framework of *Arlington Heights*, applies to due process challenges to federal immigration laws.  Second, the *Arlington Heights* framework shows that Congress was not motivated by racial discrimination against Latinos when it enacted the INA and, even if it was, Congress would have enacted § 1326 without the effect of a racially discriminatory motivation.

**I.    Deferential, rational basis scrutiny is the appropriate level of scrutiny for due-process-based equal protection challenges to federal immigration laws.**

"At the outset, it is important to underscore the limited scope of judicial inquiry into immigration legislation."  *Fiallo v. Bell*, 430 U.S. 787, 792 (1977).  The Supreme Court "has repeatedly emphasized that 'over no conceivable subject is the legislative

2

power of Congress more complete than it is over' the admission of aliens." *Id.* (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)); *see also Mandel*, 408 U.S. at 766.  And "cases have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 792 (quoting *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953)); *see Harisiades v. Shaughnessy*, 342 U.S. 580 (1952); *Lem Moon Sing v. United States*, 158 U.S. 538 (1895); *Fong Yue Ting v. United States*, 149 U.S. 698 (1893); *Ping v. United States*, 130 U.S. 581 (1889).  The Court has "note[d] that 'the power over aliens is of a political character and therefore subject only to narrow judicial review.'" *Fiallo*, 430 U.S. at 792 (quoting *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976)); *see also Matthews v. Diaz*, 426 U.S. 67, 81–82 (1976); *Fong Yue Ting*, 149 U.S. at 713.  Finally, "in the exercise of its broad powers over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'" *Fiallo*, 430 U.S. at 792 (quoting *Diaz*, 426 U.S. at 80).

Despite carrying criminal penalties, § 1326 is entitled to this deferential treatment because it is an enforcement mechanism for aliens who repeatedly reenter the country in violation of the immigration laws. *Cf. United States v. Gutierrez-Gonzalez*, 184 F.3d 1160, 1165 (10th Cir. 1999) (explaining that Congress enacted § 1326 "in the hope of deterring illegal reentry" and because it had "been faced with the increasingly difficult task of stemming the flood of illegal immigration to this country" (citing *United States v. Anton*, 683 F.2d 1011, 1020 (7th Cir. 1982) (Posner, J., dissenting)).  Put differently,

"§ 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) (holding "§ 1326 is well within the ambit of Congress's sweeping power over immigration matters"); *United States v. Henry*, 111 F.3d 114 (11th Cir. 1997) (§ 1326 was "enacted to assist in the control of unlawful immigration by aliens"); *see also* Mtn. to Dism., Ex. 13 (explaining that § 1326's predecessor "would be of material aid in enforcing our immigration laws" because there was "no provision of law under which a penalty, other than repeated deportation, can be imposed" and "in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner"). Because § 1326 is a piece of federal immigration legislation, this court should apply a rational basis review. *See United States v. Novondo-Ceballos*, No. CR-21-383-RB, 2021 WL 3570229 (D.N.M. Aug. 12, 2021); *United States v. Gutierrez-Barba*, No. CR-19-1224-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021); *United States v. Palacios-Arias*, No. 3:20-cr-62, Doc. 37, at 3–4 & n.4 (E.D. Va. Oct. 13, 2020), *appeal pending*, No. 21-4020 (4th Cir.).

As a broader matter, it is questionable whether the *Arlington Heights* framework applies to legislation enacted by Congress. The entire basis of the *Arlington Heights* framework is an inquiry into the motive of the deciding official or officials. *See* 429 U.S. at 266. But where Congress is concerned, courts "will not strike down an otherwise

4

constitutional statute on the basis of an alleged illicit legislative motive." *United States v.*

*O'Brien*, 391 U.S. 367, 383 (1968).  As the Supreme Court explained:

> Inquiries into congressional motives or purposes are a hazardous matter.
> When the issue is simply the interpretation of legislation, the Court will look
> to statements by legislators for guidance as to the purpose of the legislature,
> because the benefit to sound decision-making in this circumstance is thought
> sufficient to risk the possibility of misreading Congress' purpose.  It is
> entirely a different matter when we are asked to void a statute that is, under
> well-established criteria, constitutional on its face, on the basis of what fewer
> than a handful of Congressmen said about it.  What motivates one legislator
> to make a speech about a statute is not necessarily what motivates scores of
> others to enact it, and the stakes are sufficiently high for us to eschew
> guesswork.  We decline to void essentially on the ground that it is unwise
> legislation which Congress had the undoubted power to enact and which
> could be reenacted in its exact form if the same or another legislator made a
> 'wiser' speech about it.

*O'Brien*, 391 U.S. at 383–84 (footnote omitted).  And the Supreme Court has recognized

the continuing validity of *O'Brien* after *Arlington Heights*, at least as far as Congress is

concerned.  *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985).  While *Hunter* applied

*Arlington Heights* to the actions of the Alabama Constitutional Convention of 1901, it did

so only after distinguishing *O'Brien*.  *Id.* at 228–29.  One of the ways it did so was by

relying on the Fourteenth Amendment.  And "the Fourteenth Amendment's limits on

state powers are substantially different from the constitutional provisions applicable to

the federal power over immigration and naturalization."  *Diaz*, 426 U.S. at 86–87.[1]

---

[1] Even when the Supreme Court has looked at federal immigration decisions by the
Executive—to whom *O'Brien* would not apply—and assumed that it could look behind
the decision, it still operated within the framework of rational basis review.  *See Trump*,
138 S. Ct. at 2420.

The courts that have rejected the use of rational basis review in equal protection challenges to § 1326 have largely relied on two reasons:  (1) the Supreme Court applied *Arlington Heights* in *Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915–16 (2020) (plurality opinion); and (2) the defendants are entitled to the protection of the Fifth Amendment because they are present in the country, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  *See United States v. Carrillo-Lopez*, ___ F. Supp. 3d ___, 2021 WL 3667330, at *1–3 (D. Nev. Aug. 18, 2021); *United States v. Machic-Xiap*, ___ F. Supp. 3d ___, 2021 WL 3362738, at *9–10 (D. Ore. Aug. 3, 2021); *United States v. Wence*, No. 3:20-cr-27, 2021 WL 2463567, at *2–4 (D.V.I. June 16, 2021); *United States v. Rios-Montano*, No. CR-19-2123-GPC, 2020 WL 7226441, at *1–2 (S.D. Cal. Dec. 8, 2020).  But those courts have read *Regents* and *Zadvydas* too broadly.

First, while the plurality in *Regents* used the *Arlington Heights* standard, it did not hold that standard applied, but merely assumed its application.  *See Regents*, 140 S. Ct. at 1915.  The parties disputed the proper framework, and the plurality declined to resolve the issue because the Respondents lost under the framework they proposed.  *Id.*

As to *Zadvydas*, the government does not dispute that the equal protection component of the Fifth Amendment's Due Process Clause applies.  If it were otherwise, then Mr. Amador-Bonilla's claim would simply be without a legal basis.  But *Zadvydas* does not answer the question of the appropriate level of scrutiny.  The Court's decisions in *Trump*, *Mandel*, *Fiallo*, *Diaz*, and *O'Brien*, answer that question—deferential, rational basis scrutiny applies to the enactment and enforcement of immigration laws.

6

"Under rational basis review, the law in question 'is accorded a strong presumption of validity.'" *United States v. Titley*, 770 F.3d 1357, 1359 (10th Cir. 2014) (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)).  A court "must deny the challenge 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (quoting *Heller*, 509 U.S. at 319).  "'The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective.'" *Id.* (quoting *McGowan v. Maryland*, 366 U.S. 420, 425 (1961)).  "'The burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it.'" *Id.* (quoting *Heller*, 509 U.S. at 320).  Mr. Amador-Bonilla has not even attempted to satisfy this burden, nor could he.

As discussed above, courts have already identified a rational basis for the enactment of § 1326.  As the Ninth Circuit put it, "without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Hernandez-Guerrero*, 147 F.3d at 1078; *see Gutierrez-Barba*, 2021 WL 2138801, at *5 (relying on *Hernandez-Guerrero*).  As the District of New Mexico found:  "The Government has an interest in ensuring compliance with deportation orders and promoting respect for the country's legal immigration process," and "it is axiomatic that § 1326 rationally relates to that interest by sanctioning those who disregard a previous deportation order." *Novondo-Ceballos*, 2021 WL 3570229, at *4; *see also Palacios-Arias*, Doc. 37, at 4 (reaching the same conclusion). And that was the stated basis for the predecessor of § 1326.  *See* Mtn. to Dism., Ex. 13.

7

Because § 1326 is rationally related to a legitimate government interest and Mr. Amador-Bonilla cannot show otherwise, this Court should deny his motion to dismiss.

## II.    Even applying *Arlington Heights*, the motion to dismiss should be denied.

Under *Arlington Heights*, courts "examine the impact of the official action, the historical background of the action, the sequence of events leading up to the challenged decision, any departures from the normal decisionmaking process, and any legislative or administrative history including contemporaneous statements by members of the decisionmaking body." *Dowell by Dowell v. Bd. of Educ. of Okla. City Pub. Schls., Indep. Dist. No. 89*, 8 F.3d 1501, 1518 (10th Cir. 1993) (citing *Arlington Heights*, 429 U.S. 266–68). Even if Mr. Amador-Bonilla could show Congress "was motivated in part by a racially discriminatory purpose," it does not necessarily require invalidation of § 1326. *Arlington Heights*, 429 U.S. at 270 n.21. Instead, the burden would shift to the government to "establish[] that the same decision would have resulted even had the impermissible purpose not been considered." *Id.* Mr. Amador-Bonilla fails to satisfy his burden of showing a discriminatory motivation, but even if he had been successful, evidence shows Congress would have enacted § 1326 without such a discriminatory motivation.

### A.    The action being reviewed is the 82nd Congress' enactment of the Immigration and Nationality Act of 1952.

Before addressing the *Arlington Heights* factors, it is necessary to determine the decisionmaker and decision being reviewed. While this might be easy in many cases— for example, the government action being reviewed in *Arlington Heights* was the Village

8

Council's decision to deny a request to rezone a particular tract of land, *see* 429 U.S. at

258–59—the inquiry becomes far murkier when dealing with legislation enacted by one

Congress, reenacted by a different Congress, and subsequently amended by several other

Congresses.  Because Mr. Amador-Bonilla was charged under the Immigration and

Nationality Act of 1952, Pub. L. 82-414, § 276, 66 Stat. 163, 229 (1952) (INA), it is the

appropriate decision to be reviewed if this Court applies *Arlington Heights*.

Mr. Amador-Bonilla asserts that the appropriate decision was the enactment of the

Act of Mar. 4, 1929, 70 Cong. Ch. 690, 45 Stat. 1551 (1929) ("1929 Act"),[2] because

"Section 1326 was created from the passage" of the 1929 Act.  Mtn. to Dism. at 2–4.  As

a factual matter, Mr. Amador-Bonilla assertion is incorrect.  The INA expressly repealed

the 1929 Act.  *See* INA, § 403(a)(30), 66 Stat. at 279 ("The following Acts and all

amendments thereto and part of Acts and all amendments thereto are repealed: . . . Act of

March 4, 1929 (45 Stat. 1551; 8 U.S.C. 180–180d).").  Thus, while the 1929 Act may

have some relevance on the "historical background" factor of the *Arlington Heights*

framework, it should not frame this Court's decision if *Arlington Heights* applies.

### B.    Mr. Amador-Bonilla has failed to show that racial discrimination against Latinos was a motivating purpose for enacting § 1326.

#### 1.    The INA's Impact

"The impact of the official action[,] whether it bears more heavily on one race

than another, may provide an important starting point."  *Arlington Heights*, 429 U.S. at

---

[2] Unless Congress named a particular act, this response refers to the various acts of
Congress by either year or date.

266 (internal quotation marks omitted). But "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Id.* at 264–65. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Id.* (internal quotation marks omitted). Mr. Amador-Bonilla does little to carry his burden on this factor.

In his motion, Mr. Amador-Bonilla devotes one sentence that could plausibly be read to address the "impact" factor. Specifically, he alleges: "The 1952 Congress had full knowledge of the unlawful reentry statute's disparate impact, as Mexicans comprised up to 99% of the tens of thousands of individuals prosecuted and convicted in the years following the law's passage." Mtn. to Dism. at 26. To support this assertion, Mr. Amador-Bonilla relies on the declaration of Professor Kelly Lytle Hernandez. *Id.* at 26 n.57 (citing *id.*, Ex. 5 at 8). Professor Hernandez in turn recounts statistics from the 1930s. *Id.*, Ex. 5 at 8.

Mr. Amador-Bonilla also relies on a 1950 Senate Report. *Id.* at 26 n. 57 (citing *id.*, Ex. 18). But the Senate Reports hurts Mr. Amador-Bonilla, rather than helping him. Unlike Professor Hernandez's declaration and the resulting assertion in the motion, the 1950 Senate Report suggests that there were "difficulties encountered in getting prosecutions and convictions, especially in the Mexican border area." *Id.*, Ex. 18, at 1. It points out that along the Mexican border, "many flagrant violators of the immigration laws are not prosecuted or, if prosecuted, get off with suspended sentences or probation." *Id.* It attributes this to "the fact that the aliens in most cases will be deported regardless

10

of conviction and sentence and the crowded conditions prevalent in most prisons and penitentiaries." *Id.* The 1950 Senate Report contrasted this with the more successful enforcement efforts "in other sections of the country, particularly on the east coast." *Id.* Thus, to the extent that pre-1952 evidence is relevant to show the impact of the INA, the 1950 Senate Report is more informative than the less contemporaneous figures offered by Mr. Amador-Bonilla (covering 1929-1939).

Nevertheless, because Latinos are likely impacted by § 1326 than any other group and, thus, there is likely a disparate impact. *See Arlington Heights*, 429 U.S. at 266. But a disparate impact is unsurprising "because Latinos make up a large share of the unauthorized alien population"; thus, "one would expect them to make up an outsized share of" persons reentering the country after removal. *Regents*, 140 S. Ct. at 1915 (plurality opinion). This is especially true given the fact that the United States shares an extremely long land border with Mexico and, through Mexico, land access to Central and South American countries. "Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.* Because oversized impact of § 1326 on Latinos "is more readily explained by the geographic proximity of the border to Mexico and Latin America than by racial animus," *United States v. Morales-Roblero*, 3:19-mj-24442-AHG, 2020 WL 5517594, at *10 (S.D. Cal. Sept. 14, 2020), the disparate impact factor should have little weight in any *Arlington Heights* analysis in this case. *Wence*, 2021 WL 2463567, at *10.

11

### 2.     The INA's Historical Background

"The 'historical background' of a legislative enactment is 'one evidentiary source' relevant to the question of intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) (quoting *Arlington Heights*, 429 U.S. at 267). "But [the Supreme Court has] never suggested that past discrimination flips the evidentiary burden on its head." *Id.* "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* at 2324 (quoting *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion)). "[U]nless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987).

In discussing the historical background of § 1326, Mr. Amador-Bonilla starts in the 1920s with actors other than Congress. *See* Mtn. to Dism. at 6–8. But *Arlington Heights* looks at whether the historical background "reveals a series of *official* actions taken for invidious purposes." 429 U.S. at 267 (emphasis added). Thus, the "historical background" factor is not an invitation to air out all the racist sentiments from every corner of the country decades before the relevant decision.[3] Given courts cannot accept *official* action from long ago as probative of the intent of a statute, *McClesky*, 481 U.S. at

---

[3] The cases cited by Mr. Amador-Bonilla do not suggest otherwise. For example, he points to *Hunter*, Mtn. to Dism. at 21, where the Supreme Court noted that the 1901 Alabama Constitutional Convention "was part of a movement that swept the post-Reconstruction South to disenfranchise blacks," *Hunter*, 471 U.S. at 229. But in *Hunter*, it was not "seriously disputed . . . that the zeal for white supremacy ran rampant at the convention," and the Court looked at evidence from the convention. *Id.*

298 n.20, actions by those outside Congress decades before 1952 surely cannot speak to the intent of the 1952 Congress when it enacted the INA.

Looking at the action Congress took, Mr. Amador-Bonilla points to several pieces of legislation Congress enacted starting in 1924—including the Act of May 26, 1924, 68 Cong. Ch. 190, 43 Stat. 153; the Act of March 4, 1929, 70 Cong. Ch. 690, 45 Stat. 1551; and the Act of March 20, 1952, 82 Cong. Ch. 108, 66 Stat. 26.  Mtn. to Dism. at 2–3, 10–14.  While the history behind these acts was not totally free from racism, they do not show that discrimination against Latinos was a motivating purpose of Congress when it enacted the INA.

Beginning with the 1924 and 1929 Acts, Mr. Amador-Bonilla points to these acts as establishing quotas and enforcing the immigrations laws through criminal penalties as showing racism against Latinos.  Mtn. to Dism. at 8–10.  As an initial matter, it must be understood that Congress repealed both the 1924 Act and the 1929 Act with the INA. *See* INA, § 403(a)(23), (30), 66 Stat. at 279.  This repeal show that the 1952 Congress fully reconsidered what is now § 1326, independent of the history surrounding the enactments in 1924 and 1929.

The 1924 Act does not suggest that Congress acted with a discriminatory purpose towards Latinos.  To the contrary, the 1924 Act treated immigrants from Mexico and independent countries in Central and South America more favorably than those coming from most other countries by not limiting how many persons from Mexico, Central America, or South America could enter the United States.  *See* 1924 Act, § 4(c), 43 Stat.

13

at 155.  Mr. Amador-Bonilla recognizes this fact, explaining that Congress did so "due to the influence of large agricultural businesses that relied heavily on labor from just over the border."  Mtn. to Dism. at 9.  He then contends that some members of Congress were not happy with this arrangement, *id.* at 9–10, stating that "[l]egislators 'proposed bill after bill' restricting Mexican immigration but none could survive opposition from southwestern growers."  *Id.* at 10 (citing Mtn. to Dism., Ex. 5 at 5).  But the 1924 Act and the subsequent failed bills show the opposite of what Mr. Amador-Bonilla suggests, they show that the 1924 Congress was motivated by economics, not racial discrimination.[4]

Based on the contemporaneous historical evidence submitted by Mr. Amador-Bonilla, the 1929 Act has a mixed history.  The Senate Report, which accompanied the bill that eventually became the 1929 Act, incorporated a memorandum from the Labor Department and a letter from the Secretary of Labor.  Mtn. to Dism., Ex. 13.  It explained that prior to the 1929 Act, "there [was] no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully."  *Id.* at 1.  The result was some "aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner."  *Id.*  It was "believed that such a statute would be

---

[4] It appears that Mr. Amador-Bonilla would read racism into any action that Congress took regarding immigration.  As noted in the body, the 1924 Act treated Latinos better than almost any other group by exempting Latin American countries from quotas.  But if Congress had imposed quotas on Latin American countries—thus, restricting the number of people from Latin American countries who could legally enter the United States—Mr. Amador-Bonilla would likely say that showed how racist Congress was as well.  *See* Mtn. to Dism., Ex. 17, at 4–5 (suggesting that the national origin quota system was racist).

14

of material aid in enforcing our immigration laws." *Id.*  It also adopted the Secretary of Labor explanation that the 1929 Act "would be of material assistance in the administration of existing immigration laws."  *Id.* at 2.  It further explained that "[m]any of the aliens who are required to be deported enter as seamen," suggesting they do not enter through Mexico or Canada, and, thus, may not even have been Latinos.  *Id.*

In discussing the 1929 Act, Mr. Amador-Bonilla also points to a House Report that accompanied a more extensive immigration bill than what became the 1929 Act. Mtn. to Dism. at 20; *id.*, Ex. 15.  The House Report devotes one paragraph to the criminalization of unlawful reentry after deportation.  *Id.*, Ex. 15 at 7–8.  It explains, much like the Senate Report accompanying what became the 1929 Act, that "if the class of aliens who are endeavoring to enter the United States surreptitiously become aware that when detected they will be fined and imprisoned, as well as deported, the number who attempt to smuggle themselves or have themselves smuggled into the United States will be materially lessened."  *Id.* at 8.  Simply put, the House Report recommended enactment of criminal penalties for unlawful reentry as a deterrent for violation of the immigration law.

The floor debate in the House of Representative over the 1929 Act is more troubling.  About halfway through the debate, six or seven representatives took to the floor and lamented immigration from Mexico and, to a lesser extent, countries in Latin America.  Mtn. to Dism., Ex. 6 at 6–9.  Representative Sabath explained why their concerns were largely not germane to what became the 1929 Act, saying:  "Mexicans can

15

come over here by the thousands—they do not come illegally, they come because there is no quota against them." *Id.* at 6. He also explained the reality, Congress was not motivated to restrict immigration from Mexico and other Latin American countries. *Id.* at 8 ("I introduced, three times, and advocated *unsuccessfully*, a bill placing Mexico, South and Central America, Canada, Cuba, and the West Indies under quota as it is applicable to European immigration." (emphasis added)).

Ultimately, Mr. Amador-Bonilla asks this Court to take statements by a handful of Representatives and impute their views, which were represented by legislation Congress repeatedly rejected, on Congress as a reason for enacting the 1929 Act. Mtn. to Dism. at 20–22. In doing so, he relies on a "cat's paw" theory. *Id.* at 22 (citing *Democratic Nat'l. Comm. v. Hobbs*, 948 F.3d 989, 1041 (9th Cir. 2020) (en banc), rev'd, *Brnovich v. Democratic Nat'l. Comm.*, 141 S. Ct. 2321 (2021)). But the Supreme Court reversed *Hobbs* and rejected the application of the "cat's paw" theory to legislative bodies like Congress, saying:

> The "cat's paw" theory has no application to legislative bodies. The theory rests on the agency relationship that exists between an employer and a supervisor, but the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents. Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools.

*Brnovich*, 141 S. Ct. at 2350. Thus, Mr. Amador-Bonilla's "cat's paw" argument is unsound. Given the reports recommending passage show the 1929 Act was motivated by a legitimate interest in enforcing then-existing immigration laws, the floor statements of a

few representatives who could not get racially motivated legislation passed through Congress should not infect the 1929 Act. *See O'Brien*, 391 U.S. at 383–84.

The Act of March 20, 1952, has its own history, which starts with the Agreement Between the United States of America and Mexico Respecting the Temporary Migration of Mexican Agricultural Workers, 56 Stat. 1759, 1942 WL 35711 (Aug. 4, 1942). Mr. Amador-Bonilla acknowledges, the agreement was designed to "ensur[e] decent wages and humane treatment for the laborers." Mtn. to Dism. at 11. In fact, the agreement provided protections and guarantees to persons who entered pursuant to that agreement. 1942 WL 35711 at *2. The importance of the March 20, 1952 Act was explained by the Mexican Minister of Foreign Affairs: authorization of the Mexican government was necessary for the "departure of Mexican workers for the United States" and Mexico was concerned that Mexican immigration to the United States would deprive Mexico of the people needed for Mexico to build its economy. *Id.* at *1. Based on the floor debate in the Senate, it appears the Mexican government was prepared to withhold its consent to lawful Mexican immigration to the United States unless there was progress on what became the Act of March 29, 1952, to extend the 1942 agreement. *See* 98 Cong. Rec. 791 (Exhibit 1 at 8) ("The contract for Mexican labor expires on February 11 . . . . We are told that if the Senate passes the bill and sends it to the House of Representatives, it will be possible to obtain an extension of the expiration date.").[5]

---

[5] Mr. Amador-Bonilla appears to overlook the agreement and, instead, focus on how it was carried out. Mtn. to Dism. at 11–12. But neither the 1942 Congress nor the 1952

Turning to the floor debate, Mr. Amador-Bonilla is correct that the Senators frequently used the term "wetback" on numerous occasions when discussing Senate Bill 1851.  Mtn. to Dism. at 13–14; *see* 98 Cong. Rec. 791–813 (Exhibit 1 at 8–30).  And while "[t]he term 'wetback' is severely degrading," *Vigil v. City of Las Cruces*, 119 F.3d 871, 874 (10th Cir. 1997) (Lucero, J., dissenting from the denial of rehearing en banc), the context of the floor debate shows that the term was used as shorthand for illegal aliens, not as a racial slur against Latinos, *cf. Amaya v. United States*, 247 F.2d 947, 947 (9th Cir. 1957) (defining "wetbacks [as] illegal immigrants from Mexico"); *United States v. Alamosa Cnty., Colo.*, 306 F. Supp. 2d 1016, 1020 n11 (D. Colo. 2004) ("According to Lewis Entz, in the San Luis Valley the term 'wetback' refers to illegal Mexican immigrants rather than to local Hispanic residents.").  Senator Kilgore, who participated substantially in the floor debate, provided context for the use of the term "wetback" in the context of the debate:

> Not only is it true of the border States, but also of my own State of West Virginia, where great numbers of legally entered people of Spanish or Mexican ancestry work in the mines and factories.  If someone drifts in, speaking the same language and associating with them, it is very difficult for an employer to know which ones are in the country illegally.
>
> A mine operator, for instance, who may have a hundred Spanish-speaking employees working in his mine, may suddenly learn that there is one wetback among them, but he has not induced that wetback to come there. Unless there is in this bill a clause defining harboring, in accordance with the

---

Congress was responsible for how the agreement was executed, and it is ultimately the motivation of the 1952 Congress that this Court is attempting to ascertain under *Arlington Heights*.  Put differently, while Congress' goal to treat Mexican immigrants well may not have become reality, but the failure of another party to carry out Congress' goals does not speak to Congress' intent in enacting beneficial legislation.

18

definition as given by the Supreme Court, such an employer could be held guilty of a felony by reason of the fact that he harbored a wetback.

Incidentally, that could operate also against a Spanish-speaking person, or a person of Spanish, Italian, or other foreign ancestry, who has come into this country, who is a bona fide citizen, and who tries to find work, because employers would be reluctant to hire a person who soke a foreign language.

98 Cong. Rec. 794–95 (Exhibit 1 at 11–12).  Immediately thereafter, Senator Lehman

explained that the bill criminalized "willfully or knowingly encourage[ing] the admission

or entry of a wetback into this country" and then in the very next sentence says it

criminalizes "induc[ing] illegal entry willfully or knowingly" in the very next sentence."

98 Cong. Rec. 795 (Exhibit 1 at 12).

Another speaker in the floor debate was Senator Chavez of New Mexico, who

used the term "wetback" four times.  *Id.*[6]  Senator Chaves was the first Hispanic elected

to the United States Senate for a full term.  Exhibit 2 at 1 (Senator Chavez's House of

Representatives' Biography).  He was also "a strong defender of civil rights" and

introduced legislation "to prohibit discrimination in employment because of race, creed,

national origin, or ancestry."  Exhibit 3 at 2 (Senator Chavez's Library of Congress

Biography).  And "[w]hile others avoided the subject or denied the existence of

---

[6] First, Senator Chavez said:  "All of us, of course, wish to have some provision adopted affecting the wetback or any other immigrant who is here illegally . . . ."  98 Cong. Rec. at 795 (Exhibit 1 at 12).  Second, he said:  "I am just as sincere as is any other Senator in trying to solve the wetback problem, because it affects my State."  *Id.*  Third, he said:  "Our citizens, brothers of the boys who are dying in Korea, boys from Texas, New Mexico, and Arizona, are in many instances unable to obtain work because of the wetback problem."  *Id.*  Finally, Senator Chavez said:  "I believe that so far as the wetback problem is concerned this bill represents progress."  *Id.*

19

discrimination against Hispanics, Senator Chavez was not afraid to bring the 'race' issue into elections and politics." *Id.* Based on his history, if other senators were using the term "wetback" as an indication of discriminatory intent against Latinos, then one would expect Senator Chavez—a Latino and a champion of civil rights—to have condemned them for doing so and not to have used the term himself.

Another person to use the term "wetback" outside of the floor debate on the Act of March 20, 1952—but in a related context—was President Truman. Mr. Amador-Bonilla cites statements President Truman favorably because he "explicitly called out the racism of the [INA]." Mtn. to Dism. at 22. While President Truman's veto of the INA will be addressed below, this Court should consider President Truman's "Special Message to the Congress on the Employment of Agricultural Workers from Mexico," delivered on July 13, 1951, when considering the history leading up to the Act of March 20, 1952, as well as the INA. *See* Exhibit 4 (Special Message from President Truman to Congress dated July 13, 1951). President Truman issued that Special Message when he signed S. 984, which was enacted with an eye towards "improv[ing] the situation of Mexican workers brought into this country for contract work" through the "guarantee[ing] of wages and work standards for these workers." *Id.* at 2. But President Truman also noted that S. 984 was "very limited progress, which hardly touches our basic farm labor problems." *Id.* The chief problem identified by President Truman was "the steady stream of illegal immigrants from Mexico, the so-called 'wetbacks', who cross the Rio Grande or the western stretches of our long border, in search of employment." *Id.* Again, as Mr.

20

Amador-Rios points out, President Truman was not afraid of calling out racism, but even he used the term "wetback" in 1951 to refer to *illegal* immigrants, not as a racial slur against Latinos.[7]

　　　Ultimately, were there racists in Congress in the years leading up to the enactment of the INA?  At certain times, definitely; at other times, probably.  But does the historical record suggest that Congress was motivated by a racially discriminatory purpose when it enacted various pieces of immigration legislation?  No.  Contrary to Mr. Amador-Bonilla's position, the "historical background" factor should not be a license to find the worst third party or even the worst legislator and impute their motivation on Congress as a whole.  Instead, this Court should conduct an independent review of primary sources in

---

[7] President Truman's Commission on Immigration and Naturalization also used the term "wetback" in two places in its final report.  *See* President's Commission on Immigration and Naturalization, Whom We Shall Welcome at 31, 257 (1953), available at: https://ia800204.us.archive.org/31/items/whomweshallwelco00unit/whomweshallwelco00unit.pdf (last accessed Oct. 20, 2021) (Exhibit 5 at 2, 4).  First, when it noted "191,000 Mexican nationals [who] were admitted temporarily for agricultural work . . . authorized by Congress, is overshadowed by the illegal entry each year of over half million Mexican 'wetbacks.'"  *Id.* at 31 (Exhibit 5 at 2).  Second, when it found "[o]ne of the most troublesome problems arising out of the administration of the immigration laws concerns the hundreds of thousands of 'wetbacks' who illegally cross the border from Mexico each year."  *Id.* at 257 (Exhibit 5 at 4).  It did not blame Congress for the limitation on lawfully admitted Mexican agricultural workers, noting instead that "[m]ore might have been used, but the Mexican government imposed a maximum ceiling of 75,000 who could be permitted in this country at any particular time."  *Id.* at 32 (Exhibit 5 at 3).  Nor did the Commission use the term "wetback" to signal discrimination against Latinos; rather, the first foundation truth that the Commission believed should be incorporated by our immigration laws is that "America was founded upon the principle that all men are created equal, that differences of race, color, religion, or national origin should not be used to deny equal treatment or equal opportunity."  *Id.* at xii (Exhibit 5 at 1).

the historical record and, in this case, find that the historical record counsels against a finding that discriminating against Latinos was a motivating purpose of the INA.

**3.    The Events Leading to the INA's Enactment and Its Legislative History**

"On July 26, 1947, the Senate passed Senate Resolution 137 which directed 'the Senate Committee on the Judiciary, or any duly authorized subcommittee thereof' to make a full and complete investigation of our entire immigration system."  S. Rep. No. 81-1515, at 1 (1950), available at https://www.ilw.com/immigrationdaily/news/ 2008,0701-senatereport81-1515.shtm (last accessed Oct. 20, 2021); *see* Exhibit 6 at 1 (excerpts of the S. Rep. No. 81-1515).  After nearly three years, the Senate Judiciary Committee reported that the United States' immigration laws needed to be consolidated and replaced with a single omnibus bill.  Exhibit 6 at 2.

In the introduction of the report, the Senate Judiciary Committee explained that the discussion of race, rather than national origin, when discussing immigration "is handicapped by four points of obscurity":  (1) "there exists no very clear idea in the minds of many as to what constitutes race"; (2) "the marks of differentiation which serve to set one race off from another are often vaguely presented"; (3) "there seems to be little, if any, reliable knowledge concerning the number and origin of races"; and (4) geographical locations of races is not always clearly defined.  *Id.* at 3.  It noted that grouping was often done by skin color, which was based on "the effects of environment, either to sunlight or to humidity, or to a combination of the two."  *Id.*  Nevertheless, when discussing race, it relied upon a fivefold classification adopted in 1775.  *Id.*  Relevant to

22

the present motion, the 1950 Senate Report grouped those from "Mexico, Central America, and South American" as part of the Latin group of the white race.  *Id.* at 4.  The report explained that "little distinction has been made between Latin Americans and Spaniards who came to this country, inasmuch as both spoke Spanish."  *Id.* at 6.  Thus, while the report began by laying out its understanding of race in terms of demographics, nothing in that discussion suggested racial animus towards Latinos.

Regarding illegal entry and illegal reentry, the report noted that the success of the then-existing laws criminalizing illegal entry and illegal reentry varied based on the part of the country.  *Id.* at 10.  As to "the Mexican border area[,] [i]t was stated that many flagrant violators of the immigration laws are not prosecuted or, if prosecuted, get off with suspended sentences or probation" because of "the fact that the aliens in most cases will be deported regardless of conviction and sentence, and the crowded conditions prevalent in most prisons and penitentiaries."  *Id.*  But "in other sections of the country, particularly on the east coast, a number of alien smugglers were successfully prosecuted during 1949 and received appropriate sentences."  *Id.*  The report explained that many people suggested that new legislation "provid[e] for a more severe penalty for illegal entry and smuggling," but the committee believed that doing so "would not solve the problem" because, "[i]f prosecutions and convictions are difficult to obtain under the present statutes, to increase the penalties thereunder would make them even more difficult to obtain."  *Id.*  Ultimately, the report recommended that legislation focus on "laws which apply equally to all sections of the country."  *Id.*  Put simply, the report

recognized that enforcement of the criminal immigration statutes was less effective along the Mexican border but decided not to make it any more effective.

While not involving Latinos, the report also addressed potential racial discrimination baked into the pre-INA immigration laws—specifically, the inability of certain Asians to immigrate to or become naturalized citizens of the United States. *Id.* at 7–9 (immigration), 11–12 (naturalization). The report recommended removing the barriers to the immigration and naturalization, concluding that "exclusion on the basis of race is no longer necessary." *Id.* at 9. It further explained that removal of racial discrimination in our immigration laws would "improve[] international relations and prestige" and "greatly strengthen international good will by demonstrating that we practice what we preach in the matter of equality of individuals and races." *Id.* at 12. As a result, the INA explicitly provided, "The right of a person to become a naturalized citizen of the United States shall not be denied or abridged because of race[.]" INA, § 311, 66 Stat. at 239. It also removed the total bar on immigration from Asian countries; although, it only set a quota of 100 people per year per Asian country. INA, § 201(a), 66 Stat. at 175.[8] These changes show that Congress was motivated in the INA by taking

---

[8] President Truman vetoed the INA because it kept the national origin quota system, from which persons from Latin American countries were exempted, Mtn. to Dism., Ex. 17 at 2–5, and specifically due to perceived racism against Asians, *id.* at 10. But proponents of the INA who encouraged their colleagues in Congress to override President Truman's veto were driven by the fact that it "remov[ed] racial barriers to immigration and naturalization" and that Congress, in enacting the INA over President Truman's veto, was "trying to correct things that are inequitable." *Wence*, 2021 WL 2463567, at *7 (quoting 82 Cong. Rec. 8215, 8218).

steps to end the racial discrimination that had been present in the then-existing immigration laws and not to prop it up.

### 4.  Departures From the Normal Decision-Making Process

There were no departures from the normal decision-making process with the enactment of the INA generally or § 1326 particularly.  When discussing this factor, Mr. Amador-Bonilla reiterates his view of the historical background, Mtn. to Dism. at 23–27. Because enactment of INA followed the normal legislative course, this factor weighs against finding a racially discriminatory purpose.  *See Machic-Xiap*, 2021 WL 3362738, at *14 ("Procedurally, the INA followed a comprehensive review of the entire panoply of the nation's immigration laws.  Congress passed the INA after study by committee and significant debate.").

While there were undoubtedly bad actors in Congress in the early 20th century, an unbiased review of the contemporaneous historical record shows that discrimination against Latinos was not a motivating purpose in Congress' decision to enact and retain criminal penalties for unlawful reentry after removal.  Instead, the motivation for § 1326 was the need to enforce the immigration laws against those who were undeterred by the possibility of removal or repeated removals.

**C.  Even if the 1952 Congress was motivated by discrimination against Latinos when it enacted § 1326, Mr. Amador-Bonilla is not entitled to relief because subsequent legislation shows that Congress would have enacted § 1326 without any discriminatory motivation.**

Proof that an official action "was motivated in part by a racially discriminatory purpose [does] not necessarily . . . require[] invalidation of the challenged decision."

25

*Arlington Heights*, 429 U.S. at 270 n.21.  Instead, it shifts the burden to the government to "establish[] that the same decision would have resulted even had the impermissible purpose not been considered."  *Id.*  If this is established, "the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose."  *Id.*

Since it enacted the INA, Congress has not stopped refining the immigration policy of the United States.  For example, in response to the Commission established by President Truman after the enactment of the INA, Congress enacted the Immigration and Nationality Act of 1965, Pub. L. 89-236, 79 Stat. 911.  One of the biggest changes that the 1965 Act brought was the abolition of the national origin quota system.  *See id.* § 1, 79 Stat at 911.  The 1965 Act also explicitly precluded discrimination based on race in the issuance of immigrant visas.  *Id.* § 2, 79 Stat. at 911.  Congress, while shedding what President Truman identified as the lingering racism in the INA, did not think that repeal of § 1326 was also necessary; this suggests that the 1965 Congress believed that § 1326 was appropriate despite any possibility that racial discrimination was a motivating factor.

Similarly, Congress enacted the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. 99-603, 100 Stat. 3359, "to close the back door on illegal immigration so that the front door on legal immigration may remain open."  H. Rep. No. 99-682, 1986 U.S.C.C.A.N. 5649, 5650.  The bill did so by adding criminal penalties for businesses that made a pattern or practice of hiring illegal aliens, *see* IRCA, § 101(f), 100 Stat at 3367–68, as well as those who transport aliens across the border illegally, *see id.*

26

§ 112(a), 100 Stat. at 3382.  Congress did this as a supplement to the laws already in existence—including § 1326—and expressed its desire that "the immigration laws of the United States should be enforced vigorously and uniformly." *Id.* § 115, 100 Stat at 3384. Thus, the 1986 Congress affirmatively expressed its acceptance of § 1326 and other previously enacted enforcement statutes.

In enacting IRCA, Congress can hardly be said to have been acting with discrimination towards Latinos as a motivating purpose.  IRCA expressly precluded discrimination based on race.  *Id.* §§ 121(b)(6), 204(h), 100 Stat. at 3391, 3409–10.  It also provided a pathway for illegal aliens to legalize their status.  *Id.* § 201, 100 Stat. 3394–3404.  "An estimated 3 million individuals—mostly of Hispanic descent—gained legal status through IRCA, securing economic and social opportunities as legal residence of the United States and gaining protection from deportation."  Exhibit 7 at 2.

Ultimately, Congress has considered and modified § 1326 on five occasions.  *See* Anti-Drug Abuse Act of 1988, Pub. L. 100-690, § 7345, 102 Stat. 4181 (1988); Immigration Act of 1990, Pub. L. 101-649, § 543(b)(3), 104 Stat. 4978 (1990); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 130001(b), 108 Stat. 1796 (1994); Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, §§ 401(c), 438(b), 441(a), 110 Stat. 1214 (1996); Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IRIRA), Pub. L. 104-208, Div. C., §§ 305(b), 308(d)(4)(J), 308(e)(1)(K), 308(e)(14), 324(a), 110 Stat. 3009 (1996).  In doing so, Congress determined that § 1326 needed enhancement not repeal.

Additionally, criminalization of unlawful entry or reentry is standard practice for most countries.  As of August 2019, at least 124 countries treated illegal entry as a crime.  *See* Exhibit 8 at 3.  This includes France, Germany, Italy, Japan, the United Kingdom, Canada, Russia, China, India, Honduras, Chile, and Haiti.  *Id.* at 4–32.  Given that a large majority of countries have concluded it is prudent to criminalize unauthorized entry and/or reentry as part of their immigration policy without any indication that racial discrimination against Latinos played any factor in their decision, it likely the United States would have adopted § 1326 without any free of any alleged racial motivation.

Finally, public polling suggests that Congress would still enact § 1326 today, free of any motivation by a desire for racial discrimination.  In a poll conducted by Marist College and commissioned by National Public Radio and PBS NewsHour, 66% of adults believed that it would be a bad idea to decriminalize illegal border crossings and only 27% thought decriminalizing illegal border crossings would be a good idea.  Exhibit 9.

Given that Congress has enacted several laws affecting both the INA generally and § 1326 specifically and failed to repeal § 1326, that a large majority of countries around the world criminalize unlawful entry and reentry, and that the public opposes decriminalizing illegal border crossings, there is substantial evidence that Congress would have enacted § 1326 even without a discriminatory purpose.  As a result, even if this Court finds that the *Arlington Heights* framework applies and that Mr. Amador-Bonilla has shown that racial discrimination was a motivating purpose of enacting § 1326, this Court should still deny Mr. Amador-Bonilla's motion.

## **Conclusion**

Section 1326 is rationally related to the government's legitimate interest in securing our country's borders by restricting entrance to officially designated points. That alone is sufficient to deny Mr. Amador-Bonilla's motion.  But even if *Arlington Heights* applies, Mr. Amador-Bonilla has failed to show that racial discrimination against Latinos was a motivating purpose of Congress in enacting the INA.  And, finally, the government has shown that Congress would have enacted § 1326 even if it had been motivated by racial animus against Latinos.

<div style="margin-left:40%">

Respectfully submitted,

ROBERT J. TROESTER
Acting United States Attorney


s/ Steven W. Creager
STEVEN W. CREAGER
Bar Number:  30052 (OK)
BRANDON T. HALE
Assistant U.S. Attorneys
210 W. Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (office)
(405) 553-8888 (fax)
steven.w.creager@usdoj.gov

</div>

## **Certificate of Service**

This is to certify that on October 25, 2021, I electronically transmitted the attached document to the Clerk of Court using the NextGen PACER System for filing and transmittal of a Notice of Electronic Filing to the following PACER registrant:  Julia Summers, counsel for Jose Luis Amador-Bonilla

<u>s/ Steven W. Creager</u>
Assistant U.S. Attorney

30