IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. CR-21-187-C |
| JOSE LUIS AMADOR-BONILLA, | ) ) ) |
| Defendant. | ) |

**DEFENDANT JOSE LUIS AMADOR–BONILLA'S
REPLY TO GOVERNMENT'S RESPONSE TO HIS MOTION TO DISMISS**

**I.   The Court should assess Mr. Amador-Bonilla's Equal Protection challenge under the *Arlington Heights* framework and apply strict scrutiny.**

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Although the words "equal protection" do not appear in the Fifth Amendment's text, the Fifth Amendment's Due Process Clause includes an equal protection component and "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93 (1976). Laws that discriminate because of race should be subjected to strict scrutiny. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ("[R]acial classifications of any sort must be subjected to 'strict scrutiny.'") (quoting *Wygant v. Jackson Bd. of Educ*., 476 U.S. 267, 285 (1986) (O'Connor, J., concurring in part and concurring in judgment)); *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) ("A facially neutral law . . . warrants strict scrutiny only if it can be proved that the law was 'motivated by a racial purpose or object.'"). Our jurisprudence thus demonstrates

1

that when a facially neutral law is challenged as intentionally having a disparate impact on persons who have entered this country without permission from a specific place (here, Latin America) — and purposefully so, motivated by racial/ethnic animus (or, though not at issue here, religious animus), judicial review is heightened. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

Yet the government argues that because § 1326, though a criminal law, is an enforcement mechanism for *immigration* laws, the Court is limited to rational basis review. Essentially, the government is arguing that § 1326 should be reviewed as an immigration law and not as a criminal law. The government is mistaken.

It is important to note first and foremost that *all* persons present in the United States, including noncitizens, are entitled to the Fifth Amendment's protections. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (holding that noncitizens present in the United States are entitled to the protection of the Fifth Amendment); *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment . . . protects every one of these persons . . . ."). And when a foreign national "arrives in the United States and begins establishing ties to the country, the [Supreme] Court has recognized certain constitutional protections extend to those persons, even if their presence is 'unlawful, involuntary, or transitory,'" *California v. U.S. Department of Homeland Security*, 476 F.Supp.3d 994, 1018 (N.D. Cal. 2020) (quoting *Diaz*, 426 U.S. at 77). The government would have those protections diminished simply because this case targets a criminal law that is *related* to immigration.

But § 1326 is not an immigration law, it is a criminal law that exposes its targets to years, sometimes decades, of incarceration. That fact is paramount.

Indeed, every case cited by the government in support of its restrictive view that "rational basis" scrutiny is appropriate (*see* Gov. Response Brief at p. 6 (or Doc. 19 at 12)) involves the political branches' authority to *admit* or *exclude* foreign nationals. None involve an equal protection challenge to a criminal law or an equal protection challenge alleging racial animus. They are inapposite to the issues to be decided here.

In *Trump v. Hawaii*, cited by the government in support of its proposition, the State of Hawaii and several other states and groups challenged an executive order of the President of the United States that banned nationals from six predominantly Muslim countries from traveling to the United States, arguing the President did not have authority to do so under the Immigration and Nationality Act, and that the police violated the Establishment Clause of the First Amendment. *See Trump v. Hawaii*, 138 S.Ct. 2392, 2403 (2018). Equal Protection, therefore, was not at issue, much less whether or not *Arlington Heights* applied.

*Kleindienst v. Mandel*, also cited by the government, involved the denial of a visa to a Belgian journalist and "leftist" noncitizen professor invited to speak at various universities and forums in the United States. *See Kleindienst v. Mandel*, 408 U.S. 753, 757–59 (1972). The plaintiffs, the American universities and other citizens who had invited the professor to speak, alleged in part that sections of the Immigration and National Act of 1952 that prohibited visas to aliens who advocate communism denied them equal protection "by permitting entry of 'rightists' but not 'leftists.'" *Id*. at 760. The Supreme

Court did not engage in any discussion on the equal protection claim (or on its other First Amendment and due process claims) because the Attorney General's stated rationale for denial of a waiver was because Dr. Mandel abused a visa in the past, and therefore Dr. Mandel "validly exercised the plenary power that Congress delegated to the Executive" within the Immigration and Nationality Act to deny a waiver allowing admission. *Id*. at 769.  Thus, the case provides no insight into the correct level of scrutiny to be applied to an equal protection claim or any question to be decided in the instant case.

*Fiallo v. Bell*, also cited by the government in support of its proposition involved "three sets of unwed natural fathers and their illegitimate offspring sought, either as an alien father or an alien child, a special immigration preference by virtue of a relationship to a citizen or resident alien child or parent." *Fiallo v. Bell*, 430 U.S. 787, 790 (1977). One of many claims made was that the relevant INA statutory provisions denied the natural fathers and their illegitimate children equal protection by discriminating against them "on the basis of the father's marital status, the illegitimacy of the child and the sex of the parent without either compelling or rational justification." *Id*. at 791. The Supreme Court upheld those INA provisions as constitutional, noting that "'[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control.'" *Id*. at 796, quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 596–97 (1952). Again, this case

4

is far afield from the issues present in Mr. Amador-Bonilla's Equal Protection challenge to § 1326.

The government cites to *Mathews v. Diaz* as supporting its position, yet that case was about "whether Congress may condition an alien's eligibility for participation in a federal medical insurance program on continuous residence in the United States for a five-year period and admission for permanent residence." *Diaz*, 426 U.S. at 69. The Supreme Court held that statutory discrimination within classes of aliens, allowing benefits to some but not others, is permissible. *Id.* at 81–84. Racial animus was not an issue or allegation in the case; *Diaz* is irrelevant to the claim that rational basis is the correct level of scrutiny applicable to the case at hand.

Finally, the government inexplicably cites to *United States v. O'Brien*, 391 U.S. 367 (1968) as supportive of rational basis review. That case is the well-known landmark decision of the Supreme Court reviewed by all law students as a matter of course, holding that a criminal prohibition against burning a draft card did not violate the First Amendment's guarantee of free speech. The government's citation to *O'Brien* as supportive of the appropriate level of scrutiny to be applied to this case is curious. It provides a quote utilized by the government for other purposes (*see* Gov. Response Brief at p. 5 (or Doc. 19 at 11)), to be discussed later in this reply brief – but it certainly does not support rational basis review in this wholly different matter.

The government is simply mistaken in its contention that the cases it cites support the use of rational basis review in this matter. Of course, courts do owe exceptional deference to the political branches' exercise of their authority to admit or exclude foreign

5

nationals, as so doing is a "fundamental sovereign attribute exercised by the government's political departments." *Trump v. Hawaii*, 138 S.Ct. at 2418, quoting *Fiallo,* 430 U.S. at 792. But § 1326 is not such an exercise of authority whatsoever; it's an entirely different animal: a criminal statute that applies to people already present within this country.

Indeed, several district courts have applied *Arlington Heights* to race-based immigration challenges brought by individuals residing in the United States when reviewing equal protection challenges to § 1326. Such cases were cited by the District Court of Nevada in *United States v. Carrillo-Lopez* in its ruling for the defense that led to this like challenge by Mr. Amador-Bonilla: *La Clinica de la Raza v. Trump*, Case No. 19-cv-04980-PJH, ___F.Supp.3d___, 2020 WL 6940934 (N.D. Cal. 11/25/2020); *California v. U.S. Department of Homeland Security*, 476 F.Supp.3d 994 (N.D. Cal. 2020); *Cook County, Illinois v. Wolf*, 461 F.Supp.3d 779 (N.D. Ill. 2020); *CASA de Maryland, Inc. v. Trump*, 355 F.Supp.3d 307 (D. Md. 2018); *Centro Presente v. United States Department of Homeland Security*, 332 F.Supp.3d 393 (D. Mass. 2018).

Our Tenth Circuit would have applied a strict scrutiny standard of review to a defendant's allegation that the crack cocaine guideline disparately impacted black defendants, had that defendant also alleged a discriminatory purpose behind the guideline:

> For us to apply a strict scrutiny standard of review, Mr. Angulo–Lopez would have to allege more than a disproportionate impact, he must show a *discriminatory purpose. See United States v. Galloway,* 951 F.2d 64, 65 (5th Cir.1992). "'[E]ven if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.'" *United States v. Easter,* 981 F.2d 1549, 1559 (10th Cir. 1992) (quoting

6

> *Personnel Adm'r v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979)), *cert. denied,* ––– U.S. –––, 113 S.Ct. 2448, 124 L.Ed.2d 665 (1993).

*United States v. Angulo-Lopez*, 7 F.3d 1506, 1509 (10th Cir. 1993).

In sum, this Court should find that the government's allegation that the court is constrained to rational basis review to be without merit. The nature of Mr. Amador-Bonilla's Equal Protection claim requires application of the *Arlington Heights* standard to this challenge. *See, e.g., Department of Homeland Security v. Regents of the University of California*, 140 S.Ct. 1891 (2020) (applying *Arlington Heights* standard to Equal Protection challenge against an immigration policy—the Deferred Action for Childhood Arrivals program).

## II.     Section 1326 has a disparate impact on Latinx individuals.

The government takes issue with the fact that little of Mr. Amador-Bonilla's motion was devoted to demonstrating the disparate impact that § 1326 has on Latinx individuals purposes (*see* Gov. Response Brief at p. 10 (or Doc. 19 at 16)), but then goes on to admit that it likely does indeed have a disparate impact on Latinx individuals purposes (*see* Gov. Response Brief at p. 11 (or Doc. 19 at 17)), so the Court should deem the issue of "disparate impact" as conceded. It is true that such disparate impact standing alone is not enough to win the day, and the contrary has not been urged by Mr. Amador-Bonilla. That is only a prong of the analysis: racial discriminatory *intent* is discussed further in Part III.

Despite the government's concession, Mr. Amador-Bonilla will nevertheless provide further evidence of disparate impact than it has already done. As noted by the *Carillo-Lopez* court:

> While no publicly available data exists as to the national origin of those prosecuted under Section 1326, over 97% of person apprehended at the border in 2000 were of Mexican decent, 86% in 2005, and 87% in 2010.

*United States v. Carrillo-Lopez*, ___F.Supp.3d___, 2021 WL 3667330 at *5 (D. Nev. 8/18/2021), citing Carillo-Lopez's brief which cited *U.S. Border Patrol Nationwide Apprehensions by Citenship and Section*, 2007-2019, available at https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY2007%20-%20FY%202019%29_1.pdf (last accessed Nov. 9, 2021). The latest Federal Sentencing Statistics Sourcebook shows that in Fiscal Year 2020, "immigration" crimes were the most prosecuted cases, and that of the 26,230 "immigration" crimes prosecuted, 1.9% were White (498), 0.8% were Black (220), 0.5% were "Other" (144), and **96.7%** (25,368) were Hispanic. U.S. Sentencing Commission, FY 2020 Sourcebook of Federal Sentencing Statistics, Table 5.

As argued in *Carillo-Lopez*, these disparities are comparable to disparities that have supported other successful *Arlington Heights* challenges. *See, e.g., Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 497 (9th Cir. 2016) (concentrating most low-income housing in neighborhoods that are 75% Hispanic); *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015) (targeting a program, 90% of whose enrollees were of Mexican or other

Hispanic origin); *The Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 704 (9th Cir. 2009) (excluding 71% Latino areas from benefits, while extending those benefits to other areas that were only 48% Latino); *see also Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979) (applying *Arlington Heights* and finding a states' hiring preference in favor of veterans to have a disparate impact on women because 98% of veterans in the state were male).

The test for disparate impact only requires evidence that § 1326 "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266. This standard has been easily met.

The focus then turns to discriminatory intent behind § 1326.

### III. The government's defense of the term wetback should not be given credence and does not demonstrate that invidious discrimination was not a motivating factor behind the passage of the law.

The government devotes over three pages of its response brief to defending use of the term "wetback" as not being a racial slur, basically because the term was widely used. It claims there is no racial animus behind the term because it is just a term only for illegal immigrants, and because it was an accurate description of those who crossed the Rio Grande River. There is much wrong (and, frankly, gross) with this position. As Judge Simon of the District Court of Oregon stated when presented with this ill-considered argument, "[R]educing an entire population to a fleeting condition of a subset of that population is precisely what makes the term a slur." *United States v. Machic-Xiap*, ___ F.Supp. 3d ___, 2021 WL 3362738 at *12 (D. Or. 08/03/2021).

> IV. **The evidence presented demonstrates that Congress passed the illegal reentry law with invidious intent.**

The Supreme Court has acknowledged the difficulties in proving the motivation of Congress to pass a statute based on "what fewer than a handful of Congressmen said about it." *Hunter v. Underwood*, 471 U.S. 222, 228 (1995), quoting *O'Brien*, 391 U.S. at 383-84. But, just as in *Hunter*, "the sort of difficulties of which the Court spoke in *O'Brien* do not obtain in this case." *Hunter*, 471 U.S. at 228.

In *Hunter*, the United States Supreme Court invalidated, as a violation of the Equal Protection Clause, section 182 of the Alabama Constitution which prevented any person convicted of "any crime . . . involving moral turpitude." While § 182 was a facially neutral law, it had racially disproportionate effects, thus, like here, requiring the court to discover if the law was passed with a discriminatory purpose. The court looked to the 1901 convention when it was initially passed, which evidenced that the committee that passed the law selected not only crimes of moral turpitude but other crimes such as vagrancy, living in adultery, and wife beating that were thought to be crimes more often committed by blacks. *Id*. at 232. The Supreme Court found that expert testimony showed the rampant zeal for white supremacy at the convention and that the convention was part of a movement in the post-Reconstruction South to purposefully disenfranchise blacks. *Id*. at 229. The Supreme Court rejected the State's claim that § 182 should be sustained because there was a legitimate interest in denying the vote to those convicted of crimes of moral turpitude—such a claim could not overcome evidence that that was not the racial animus motivating the law. *See id*. at 232. Similar to arguments made in the instant case, the State has urged

that whatever the purpose behind the original passage of the law, "events occurring in the succeeding 80 years had legitimated the provision." The Supreme Court found it irrelevant whether a similar law, passed today without any impermissible motivation, would pass muster—the fact was "that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continued to this day to have that effect. As such, it violates equal protection under *Arlington Heights*." *Id*. at 233.

Mr. Amador-Bonilla has provided voluminous documentary evidence and transcripts of expert testimony demonstrating that Congress passed the illegal reentry law with invidious intent. It is drafters of the legislation and the heads of the immigration committee who made the statements clearly evidencing strong racial animus motivated passage of this law. It was a time of eugenical and nativist enthusiasm, and, as demonstrated in the opening motion, key legislators and government actors unabashedly avowed keeping the "rat men" out of the gene pool, protecting the "American racial stock from . . . mongrelization," and keeping out "the scoff and scum, the mongrel . . . from Mexico." While it may be true that various legislators also had economic concerns, those concerns do not eviscerate the fact that racism was a "motivating factor," which is all the law requires. *Hunter*, 471 U.S. at 232.

### V. Subsequent legislation, other countries' illegal reentry laws, and public polling, has not cleansed § 1326 of its racial origins.

"Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate

that the law would have been enacted without this factor." *Hunter,* 471 U.S. at 228. The government has not so demonstrated.

The government points to refinements to the nation's immigration policy since the enactment of the INA, pointing to additional enforcement statutes criminalizing businesses that hire illegal aliens, those who transport illegal aliens across the border, and Congress's expressed desire to enforce its immigration laws "vigorously and uniformly." None of these erase § 1326's racial origins. None of these show that § 1326 would have been enacted absent racial animus.

The government points to the fact that other countries also have illegal reentry laws. No other country punishes illegal entry to the extent of the United States, and no other country exposes violators to as many potential years in prison as does the United States. *See* Ex. 1, The Law Library of Congress, Criminalization of Reentry Around the World. Nor does the fact of such laws mean that ours is not racially motivated.

In *Espinoza v. Montana Dep't of Revenue*, the Supreme Court relied on a law's "checkered tradition" of underlying religious discrimination to overturn it, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." *Espinoza v. Montana Department of Revenue*, 140 S.Ct. 2246, 2259 (2020). Justice Alito noted in a concurring opinion that the Court could examine the law's underlying motives even where legislators had "readopted their rules under different circumstances in later years." *Id.* at 2268. Thus, even later reenactments of a law do not necessarily cleanse a law of its invidious origins such that it is constitutional. *See, e.g., Ramos v. Louisiana*, 140 S.Ct.

1390, 1401 & n.44 (2020) (rejecting Justice Alito's dissent arguing that recodification of a jury non-unanimity rule cleansed it of its racial intent).

Ultimately, the government has offered nothing to evidence that Congress would have enacted § 1326 without any discriminatory motivation. The passage of time has not cleansed this law of its invidious origins. Had they not been present, the law very well could have taken a different form. But section 1326 has never been so much as reexamined by Congress; it has never reckoned with the racism inherent in its passage. Changes to the INA merely send more and more Latinos to federal prison for longer sentences and do nothing to undermine § 1326's original invidious foundation.

## CONCLUSION

For the reasons stated above and in Mr. Amador-Bonilla's motion and all exhibits thereto, the Court should dismiss the indictment because §1326 is unconstitutional.

Respectfully submitted,

/s/ *Laura K. Deskin*
Laura K. Deskin
Research and Writing Specialist

/s/ *Julia C. Summers*
Julia C. Summers
Assistant Federal Public Defender
Office of the Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
Phone: (405) 609-5930
Fax: (405) 609-5932
Laura_Deskin@fd.org
Julia_Summers@fd.org
Counsel for Defendant

## CERTIFICATE OF SERVICE

    I hereby certify that on November 9, 2021, I electronically transmitted the attached document to the Clerk of Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the ECF Registrants who have entered an appearance in this case.

                  /s/ *Laura K. Deskin*
                  LAURA K. DESKIN